IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF ARKANSAS

WESTERN DIVISION 4

JAMES ANDREW TANNER                                                                  PLAINTIFF

vs.                                          No. 4:17CV-780 SWW

KURT ZIEGENHORN IN HIS INDIVIDUAL CAPACITY,

COLONEL BILL BRYANT IN HIS OFFICIAL                                      DEFENDANTS

CAPACITY AS HEAD OF THE ARKANSAS

STATE POLICE, AN AGENCY OF THE

STATE OF ARKANSAS; WILLIAM "BILL"

SADLER IN HIS INDIVIDUAL AND OFFICIAL CAPACITY;

JOHN AND JANE DOE 1-5, INDIVIDUALLY

AND IN THEIR OFFICIAL CAPACITY.

## BRIEF STATEMENT OF FACTS

COMES NOW the Plaintiff, JAMES ANDREW "DREW" TANNER, by and through his attorney of record, William Whitfield Hyman of King Law Group, PLLC, and for his Complaint against Colonel Bill Bryant in his Official Capacity as head of the Arkansas State Police, Kurt Ziegenhorn in his individual capacity, William "Bill" Sadler in his individual and official capacity, and John and Jane Doe 1-5 in their official and individual capacity, would state and allege the following:

On November 29th, 2014, Drew Tanner, while shopping at Wal-Mart in Searcy, Arkansas, was openly carrying a loaded pistol when a man clad in only a gray t-shirt and blue jeans began stalking toward him. That man approached Drew and inquired as to which law enforcement agency he was with. Drew responded that he was not with a law enforcement agency, then that man forcefully grabbed Drew by the arm said "State Police. Identify yourself." Drew would later learn

that man was none other than defendant Kurt Ziegenhorn, an off duty trooper based out of a different Troop than the one that is responsible for Searcy. Drew was alarmed at Ziegenhorn's unprovoked hostility did not see anything identifying Ziegenhorn as a Trooper. Drew wriggled from Ziegenhorn's repressive grasp and made a panicked call to 911. In his 911 call, Drew identified himself while retreating to safety toward the exit. The 911 dispatcher told Drew to stay in the building and wait for Searcy Police Department officers to arrive. During this time, Ziegenhorn eventually produced a badge to the employees and the manager of the Wal-Mart then informed Drew, in contradiction to Wal-Mart's official policy, that Wal-Mart did not allow open carry of firearms in the store. Drew complied but Ziegenhorn insisted on escorting Drew outside of the Wal-Mart where he proceeded to further detain Drew, as well as yell and hurl profanities and placing his finger within inches of Drew's face. During this time, Defendant Ziegenhorn asserted, "I don't care who the fuck you think you are, when a fucking Trooper asks you to identify yourself, you fucking do it, is that clear?" (paraphrased). Once the Searcy police officers arrived, Mr. Tanner identified himself to them and answered their questions.

Due to Ziegenhorn's outrageous behavior during the November 29th, 2014, encounter, Drew lodged an official complaint against Ziegenhorn with the Arkansas State Police in the following days. Drew also emailed Wal-Mart corporate, and was able to get confirmation and clarification that they did in fact allow open carry in their stores. On December 3rd, 2014, with this email in hand, Drew returned to the Searcy Wal-Mart (unarmed this time) to speak with the manager and inform him of Wal-Mart's official policy. Ziegenhorn, cloaked in the authority of the Arkansas State Police, arrived within 30 seconds. What Ziegenhorn was doing there is still unclear, as he is assigned to Forrest City, nearly an hour and a half from Searcy. What we do know is that Ziegenhorn applied for an arrest warrant for Drew that same day. The only logical conclusion is that Ziegenhorn was stalking Drew. While Drew was waiting to converse with the manager, Ziegenhorn marched up to

him and in a typical 1940s fashion demanded, "Mr. Tanner, are you carrying a weapon today?" Drew politely responded that he did not have to answer that question. Ziegenhorn relentlessly repeated his question and Drew eventually capitulated and admitted that he was not armed. Then Ziegenhorn demanded Drew produce his identification, despite already addressed Drew by name. Drew responded that he did not have to produce his identification because the Ziegenhorn knew who he was. Ziegenhorn then handcuffed Drew, searched his person, confirmed he was not armed, and escorted him outside to a patrol car. Defendant Ziegenhorn then detained Mr. Tanner for approximately 30 minutes and confiscated his Concealed Handgun License before releasing Mr. Tanner without any charges. That same day, Defendant Ziegenhorn filed a request for an arrest warrant for Drew for the charge of Obstructing Governmental Operations and Carrying a Weapon. As a result of the December 3rd, 2014, incident, Drew lodged another official complaint against Defendant Ziegenhorn. The warrant was signed by a judge on January 16, 2015 and executed by the Searcy Police on January 17, 2015. After being forced through months of proceedings, bearing the cost of an attorney to represent him, Drew was eventually found not guilty of all charges in White County Circuit Court.

The Arkansas State Police "ASP" operates an official social media page at the website *https://www.facebook.com/ARStatePolice/* . This page clearly purports to be "the official Facebook page of the Arkansas State Police" and, while claiming not to be a "public forum," still invites comments from the general public. Therefore, it is at least a limited public forum. In February, 2016, the Arkansas State Police decided to recognize the excellence of one of their officers. Drew, a follower of the page, recognized the name as one of the men who had conducted the internal investigation and found that Ziegenhorn had done nothing wrong. Drew decided to take to social media in order to inform the public of the corruption in the ASP.. Drew stated "I have this guy's autograph...this guy sucks" and attached a picture of the notice to the comment. Despite

affirmatively opening this page for discourse and commentary, The Arkansas State Police deleted Drew's comments from this government-run Facebook page. On September 14th, 2016 two identical comments were deleted by the Arkansas State Police: "Just don't be like that douche, Trooper Ziegenhorn." When Drew realized his comments had been deleted, he sent the Facebook page several links to successful lawsuits against government agencies for deleting Facebook comments. The administrator responded and said that they had deleted the messages due to the profanity. Then Drew posted ""Just don't be like that fascist pig, Trooper Ziegenhorn." Moreover, in these specific instances, because Mr. Tanner criticized the ASP in his comments and did not express a viewpoint aligned with the department, the ASP has banned and "blocked" Drew from participating in the forum. These comments were related to Drew's mistreatment by Ziegenhorn and the inaction of the Arkansas State Police to punish their trooper's poor conduct. No notice or opportunity to be heard or appeal these decisions were ever provided to Drew.

In an attempt to investigate all of these civil rights violations, Drew has sent seven Arkansas Freedom of Information Act Requests to the Arkansas State Police's Custodian of Records, Bill Sadler. all of those requests have been denied except one, in which Defendant Bill Sadler claimed to want to charge Mr. Tanner thousands of dollars in order to respond to the request. On December 7th, 2016 Mr. Tanner sent a Freedom of Information Act request to Bill Sadler asking for any records of the policies, procedures, and administrators for the ASP Facebook page during the week of September 11-17, 2016. Defendant Sadler responded that no such records existed.

Social media, in our current age, is a very common activity that the people engage in to communicate with others, share ideas, protest, lobby, and generally express their views on topics to

others. In fact, over 2 billion people actively used Facebook for purposes such as these per month in 2017. See: https://techcrunch.com/2017/06/27/facebook-2-billion-users/

In some instances, government entities may determine the type of forum they want to create. Here the ASP, using the social media site Facebook.com, initially created a forum open to the public. As of October 9th, 2017, the ASP has created a policy that attempted to turn the page into a limited public forum by stating: "Please note that this is a purposefully controlled online site established for this limited purpose, NOT A PUBLIC FORUM. All postings/comments are, in addition to being governed by the terms and conditions established by Facebook, subject to the following terms and conditions established by the Arkansas State Police…Comments not topically related to a particular posting authorized by the Arkansas State Police...Comments that include or constitute abusive, profane, threatening, insulting, false, defamatory, slanderous, libelous, hateful, harassing or stalking...vulgar, obscene, violent...inappropriate or offensive, and/or criminal or unlawful language or content... " The new ASP rules governing the Facebook posts are attached as Plaintiff's Exhibit B and is incorporated as if restated verbatim herein.

Like it or not, the ASP facebook page is an open forum. In an open public forum, restrictions that apply to certain viewpoints but not others face the highest level of scrutiny. *Legal Services Corp. v. Velazquez,* 531 U.S. 535 (2001). Alternatively, even if ASP did not intend to create a traditional public forum, their policies and procedures would still fail under the rules and tests promulgated for non-traditional public forums; the ASP allows some comments, but not others, even when they are within the scope of the initial topic presented by the agency themselves. Although the internet is not a park in the physical sense, the First Amendment has been designed to

protect more than just newspapers and magazines. Moreover, a forum *need not* be a physical place. *Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819 (1995).

During testimony regarding the denial of a Freedom of Information Act request in a different Arkansas Freedom of Information Act case earlier this year on March 3rd, Bill Sadler admitted that there was no investigation into the factual basis for FOIA denials. Mr. Sadler testified that he did not even know whether or not the criminal cases that were the subject of the FOIA were part of an undisclosed or open investigation and was even unsure of many of the charges. He specifically replied that "I am not privy to those investigations or those questions."

        Respectfully submitted,

        James Andrew Tanner *Plaintiff*

        By:___/s/Whitfield Hyman/s/

        William Whitfield Hyman, ARKBAR2013237

        King Law Group, PLLC

        300 N. Sixth Street

        Fort Smith Arkansas, 72901

        P: (479) 782-1125 F: (479) 316-2252

        *Attorney for Plaintiff*