1   IN THE UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF ARKANSAS

3   WESTERN DIVISION

4

5

6   JAMES ANDREW TANNER            )  Case
                                   )  No.4:17-CV-780-DPM
7               Plaintiff,         )
    vs.                            )
8   KURT ZIEGENHORN, ET AL         )
                defendants.        )
9

10

11                  * * * * *

12                  DEPOSITION OF

13                  **KURT ZIEGENHORN**

14                  OCTOBER 9, 2018

15                  * * * * *

16

17

18

19

20

21

22  CYNTHIA'S COURT REPORTING
    P.O. Box 180487
23  Fort Smith, AR 72918-0487
    (479)651-7529
24
    REPORTED BY:  Cynthia Minks Myers, CCR NO. 581
25

**A P P E A R A N C E S**

William Whitfield HYMAN
Attorney at Law
300 N 6th St.
FORT SMITH, AR 72901

William C. Bird, III
Reid P. Adkins
Assistant Attorney General
323 Center Street, Suite 200
Little Rock, AR  72201

**S-T-I-P-U-L-A-T-I-O-N-S**

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of Kurt Ziegenhorn, may be taken on the 9th day October 2018, by Cynthia Minks Myers, Certified Court Reporter, within and for the State of Arkansas, taken by Agreement.

It is further stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition will be taken pursuant to the Rules of the District Court for the State of Arkansas.

* * * * *

1                        I N D E X

2     WITNESS                              EXAMINATION
      **KURT ZIEGENHORN**
3        By Mr. Hyman                            5

4

      CERTIFICATE OF REPORTER                   116
5

6

7

8                    E X H I B I T S

9     DEPOSITION EXHIBIT                    PAGE NO.
      Exhibit No.1                             48
10    Exhibit No.2                             57
      Exhibit No.3                             76
11    Exhibit No.4                             81
      Exhibit No.5                             88
12    Exhibit No.6                            104
      Exhibit No.7                            109
13    Exhibit No.8                            113

14

15

16

17

18

19

20

21

22

23

24

25

**KURT ZIEGENHORN,**

having been first duly sworn appeared as a witness

And testified as follows:

**EXAMINATION**

BY MR. HYMAN:

    Q.  Would you please state your name.

    A.  Kurt Ziegenhorn.

    Q.  What city do you live in?

    A.  I live in McCrory.

    Q.  Is that where you lived in 2014?

    A.  Yes.

    Q.  And November 29, 2014?

    A.  Yes.

    Q.  Is that only resident city?  Do you have

another house somewhere else?

    A.  No.

    Q.  Okay.  And what was your job on

November 29th, 2014?

    A.  I worked for Arkansas State Police.

    Q.  Okay.  What did you do for them?

    A.  I'm a trooper with the highway patrol.

    Q.  Okay.  And what troop were you with?

    A.  Troop D.

    Q.  Does troop D typically cover Searcy,

```
 1   Arkansas?
 2       A.   Troop D typically covers Searcy.  That's the
 3   troop that we -- our general run.
 4       Q.   Okay.
 5       A.   It's -- I misunderstood the question.
 6       Q.   Okay.
 7       A.   Searcy is not in troop D.
 8       Q.   Okay.  That's the answer to the question?
 9   Okay.  So but you live in McCrory.  McCrory is pretty
10   close to Searcy; right?
11       A.   Yes.
12       Q.   How far is that?
13       A.   It's approximately 33 miles.
14       Q.   Okay.  Do you have any hobbies out there?  Do
15   you go hunting?  Do you go fishing?
16       A.   In?
17       Q.   In McCrory.
18       A.   In McCrory, yes.  I didn't know whether you
19   were referring to Searcy or not.
20       Q.   Okay.  Do you go hunting or fishing nears
21   Searcy?
22       A.   I go to Pangburn.
23       Q.   Now, you have a bunch of children that go to
24   the school in McCrory I'm sure?
25       A.   Yes.
```

1     Q.   Okay.   And now one of your children wears

2     glasses?

3     A.   Yes.

4     Q.   Correct?   And he broke some glasses and you

5     you had to fix them at one point; right?

6     A.   Yes.

7     Q.   Okay.   Could you tell me a little bit about

8     that?

9     A.   Exactly what --

10     Q.   Okay.   So --

11     A.   -- are you asking?

12     Q.   In November or December of 2014 did you have

13     a child that broke a pair of glasses?

14     A.   Yes.

15     Q.   Okay.   How did they break the glasses?

16     A.   4-year-old brother.   9-year old just playing.

17     I don't know exactly how they broke but they broke.

18     Q.   Okay.   And what did they look like after they

19     were broken?   What state were they in?

20     A.   I'm not for certain but I'm pretty sure it

21     was the arm.   They were the flexible, where you could

22     bend.   My wife and I discussed it was more than

23     likely arm.   But, that's been three and a half years

24     ago.

25     Q.   Okay.   The arm being the part that connects

1    the main frame back over ear?

2        A.   Yes.

3        Q.   Okay.   That had become detached?

4        A.   That's -- I'm not for certain if it's that or

5    the lens.  Somewhere -- the lens holders.  But, they

6    were unusable.

7        Q.   Okay.  So, have you ever had a citizen

8    complaint against you?

9        A.   Yes.

10       Q.   Okay.  How many have you had do you think?

11       A.   Are you talking about formal complaints?

12       Q.   Yes, formal complaints.

13       A.   One other that I know of.  That gentleman

14   filed two, I believe.

15       Q.   Okay.  Could you tell me the process about

16   that generally, that you know about, when somebody

17   files a complaint?

18       A.   They usually contact a supervisor.  The

19   supervisor either, if it's a simple complaint or

20   something they handled, you know, they don't

21   encourage them.  You know, do you feel it's necessary

22   to file a formal complaint, fill out ASP50.  This

23   goes through them.  They don't contact us at any

24   point during this time.  That complaint, if it is,

25   they file ASP50 which is a formal complaint.  They

send it to Little Rock.  Little Rock reviews the

complaint and they'll start an investigation.  Then,

we are supposed to receive an official notification

from Little Rock via letter that an official

complaint has been filed against us.  After that

point in time, then we may be brought in for an

interview on this complaint.

Q.  Okay.  Now on the complaints against you,

were you ever brought in for an interview?

A.  Yes.

Q.  Okay.  For all of complaints that have been

brought against you or just one or?

A.  Both of them.  I believe that's -- to the

best of my knowledge, that's general protocol of OPS.

Q.  Okay.  If somebody files a complaint against

you there's going to be an interview basically?

A.  Sir?

Q.  If somebody files a complaint against you

there's going to be an interview; right?

A.  Yes.

Q.  Okay.  So about this other complaint with the

-- with the Reverend Broadbent, right?

A.  Yes.

Q.  What was the basis of that complaint?

A.  The basis of the complaint was he didn't like

me.  It pertains to a church that my parents were at
and my father happened to be a trustee.  The church
was closed and shut down and locked.  The trustees, I
was present when the trustees actually boarded and
bolted the church.  On an evening on my way to work,
at the time my car -- I worked in a different county,
Monroe County.  I would take my personal car down to
where my car was parked.  I happened to come by that
church and noticed a stool outside of the window.  I
said that is unusual.  I went down to investigate it,
found a window had been taken out of the church
building.  And I then called -- I can't remember who
I called at the time.  I did notify my headquarters
to get county deputy out.  And, Mr. Broadbent come
around the corner and I Mirandized him.  He admitted
that he was trying to gain access to the church.  He
admitted that he broke in through another window at
another time.  I took him into custody at the time
until the county arrived.

Q.   Okay.  And that was the basis of his first
complaint; right?

A.   First complaint.

Q.   And then he made another complaint?

A.   He made another complaint.

Q.   What was that about?

A. He felt that, I guess, I was following him.
It's just unfortunate our paths crossed. It was a
weekday morning. I went down to my mother's house.
I come up -- which is south of this church. I come
up a U.S. highway traveling north, past the church.
I noticed that there was activity there. Now,
granted, this had been approximately a year that the
church had been closed and that church was trying to
evict him out of the church parsonage. He would not
leave. He filed a suit on that, that's on civil -- I
mean on circuit court documents at Cross County. I
came by there I -- I called somebody. I pulled into
a gas station that's on a corner because I was going
to see, was he moving out, final moving out? Because
it had been a year or two years since they had closed
the church and they were still trying to get rid of
him, get him out.

So, I pulled off in the gas station and I'm
parked on 64 which runs east and west, 49 intersects
it and runs north-south. I was off the gas station,
just west of there. He proceed to pull in behind me.
He pulled into the gas station and pulled directly
behind me. This gentleman does not like my parents.
He knows who I am. I pulled out. I got to go to
Winn, Arkansas that day, which is in another county.

I was going over to the prosecutor's office regarding
a fatal accident.  I had to take the case file to
him.  That was my whole entire process to go that
way.  I pulled out.  He pulled in directly behind me
out on the highway.  I said -- you know, the trouble
I've had, my parents have had, and threats he's made
against my parents and everything, I said I'm not
going to let him follow me.  I pulled to the side.
Let him go past, I went to Winn.  He just happened to
be in front of me.  He pulled off in Winn.  I kept
going and went to the prosecutor's office.  No
contact made.

    Q.  Okay.  So Reverend Broadbent said you
followed him?

    A.  I'm not sure if you could call him reverend.

    Q.  He calls himself reverend; right?

    A.  I understand that.  If you will look at the
circuit court docket you will find, for a matter of
record, that he posted his degree through paper mill,
mail order.  He should not have even been a pastor in
Southern Baptist Convention because he was divorced.
He had done this in Casa Grande, Arizona, where he
tried to take possession of a church parsonage.  All
this is matter of record with the circuit court where
he is -- all of this came to light and in order to

get rid of him, the trustees wound up closing the
church.

    Q.  Right.

    A.  Because he had run basically everyone off.

    Q.  Okay.  But he claims that you followed him
for about ten miles, right, if you --

    A.  Well, from Fair Oaks to Winn.

    Q.  From Fair Oaks to Winn.

    A.  That's where I was going.

    Q.  Okay.  But that's what he claimed, right,
regardless of --

    A.  Well, he was in front of me.  I wasn't
particularly following him.  I would rather me be
behind him than him behind me.

    Q.  Right.  Okay.

    A.  He was a convicted felony and served time in
the prison in Florida.

    Q.  So, now do you remember an incident with Mr.
Tanner, from November 29th, 2014?

    A.  I do.

    Q.  Okay.  What do you recall about that incident
in a Wal-Mart?

    A.  Most everything is stated in the memo I've
written, an OPS file.  I don't have those in front of
me.  I will try to be as close to it, because that's

exactly how it was.

On the 29th I had it happened to be in Wal-Mart. We was shopping at the time towards the back of the store, my wife and two kids. I see a gentleman coming down the -- down the aisle. He was wearing what we consider a tactical-type holster, the one that is slung from the knee to the thigh with a strap around it. My immediate thought was, okay. Here's a local police officer from the local -- I figured Judsonia, or Bradford, or some local area. The kids were in the toy aisle at the time and I said, well, I'll talk to him. So, I walked to the center aisle where we met and he was coming my direction. I asked him -- I don't remember exact words but, how are you doing or whatever it may have been. I asked him what department he was with. Mr. Tanner replied that he was not with anyone at the time, with anyone as far as being a law enforcement. And it was kind of a surprise. It was normal reaction to him saying I'm not with anybody. It was not that tone. It was more of a head back, I'm not with anybody.

Q. Okay.

A. And at that time, I identified myself, as being with the Arkansas State Police. Name and had

1   been a trooper.  As I approached him, from my vantage

2   point, his arm seemed to reach -- his right arm

3   seemed to fall down towards his weapon.  And trained,

4   it's a tactical advantage I then gained control of

5   the arm temporarily to -- which would be the arm and

6   the elbow, because I was on his right side, so that

7   he didn't have access to a weapon.  And then after

8   that brief encounter, talking with him, he -- he was

9   not your normal -- oh, how would I describe it.  When

10  I asked him to identify himself, he tells me I don't

11  have to tell you nothing.  I don't have to give you

12  anything, more or less.  He was noncompliant.

13      Q.  Would you want to restate your last -- you

14  said he was at that point noncompliant or?

15      A.  At that point he appeared to be noncompliant.

16      Q.  Okay.

17      A.  Just there in a brief part, he calmed down.

18  He said he was going to call 911.  I said go ahead.

19  I said I was -- he started moving toward the front

20  door.  He was on the phone.  He had his right hand on

21  his phone.  I didn't allow him access to the weapon

22  so he walked in front of me as I followed him to the

23  front door.

24      Q.  So he had his right-hand on the phone?

25      A.  On the phone.

Q.   Okay.  So if he would have had his left hand
on the phone, that would have been -- that would
giving him access to the weapon?

A.   It would have.

Q.   Okay.  And that would have been -- why would
that be important to you?

A.   To me, it's a tactical advantage.  If most of
the times, if I'm on phone, I'm on the left.  I mean,
because you don't want anybody to reach and grab
because if he has to go through an extra move, the
person would have to go through an extra motion if
they were to reach for their weapon.  If they have a
phone in their hand, they have to first lose the
phone and then reach for the weapon.

Q.   Okay.

A.   So if that hand is tied up, it gives -- same
way we are trained to approach a vehicle.  Do
everything with your left hand to keep this hand
free.  And, you don't want to ever tie this hand up.
Field sobriety, left hand.  That way you got your
weapon here, protect your weapon.  If you need -- if
it happens, you use it.

Q.   Okay.  So if he would have been on the phone
with his left hand you wouldn't of allowed him to
make the phone call or how would that have played

1  out?

2    A.  That type of tactical situation, you try to

3  the take control of the situation and put yourself in

4  a tactical advantage.  What I would have done at the

5  time, I couldn't tell you.

6    Q.  Okay.  So generally you wouldn't want him to

7  be using his left hand on the phone because if he's

8  armed and the scenario you've described?

9    A.  Right.  If a person is right-handed and their

10  left hand is up and their right hand's free, they can

11  make for a bad situation.

12    Q.  Okay.  So when you when you initially got

13  ahold of him, how did you -- how did you do that?

14  Did you grab him by the wrist and elbow?

15    A.  Wrist, elbow.

16    Q.  Okay.

17    A.  Keep the hand from going to the weapon.

18    Q.  Okay.  And you would you describe that as had

19  a pretty good hold on him?

20    A.  No.  I mean it wasn't that hard.  It was just

21  a control.  I mean it wasn't a twist or anything like

22  that.  It was just a control to control the arm.

23    Q.  Okay.  But it was enough to stop him from

24  reaching for the weapon?

25    A.  If he would have tried to reach, my grasp

1    would have got harder.

2        Q.  Okay.

3        A.  But he didn't really try to fight.  I mean he

4    didn't try to fight it, so I didn't use any more

5    force.  There -- I didn't use force.

6        Q.  Okay.

7        A.  I mean I just had an arm control.  It was not

8    grab and hold and reaching in real hard.  Had the

9    person resisted, yes it would have went further.

10       Q.  Okay.  So looking back on it, since you let

11   him go and then he made that phone call, would you

12   still consider what Drew did a reach for the gun or?

13       A.  Sir?

14       Q.  Would you consider what Drew did initially is

15   reach for the gun or -- or what would you call it?

16   What prompted you to grab ahold of him?

17       A.  It was his mannerisms and demeanor from the

18   point of when I asked him who he was and how he

19   reacted.  It was not what I'm used to being normal.

20   It kind of set off when I asked him who he was with.

21   It was kind of I'm not with anybody.  Or it's the

22   tone, the demeanor, that was displayed that brought

23   it to that situation.  I felt that he probably could

24   reach down for his weapon.  That's the reason I

25   reached for control.

1     Q.  That he possibly could reach down for his

2  weapon?  So, what exactly did he do with his hand?

3     A.  It had dropped from here to here.

4     Q.  Right.  Could you verbalize that so we --

5  this is going to be in writing.

6     A.  His hand dropped from his, what would I say,

7  from the chest area to the waste area and with the

8  weapon being down to the right side.

9     Q.  Okay.  So, he didn't reach for his gun he

10  just dropped his hand down to his waste?

11     A.  I didn't know whether he was dropping or

12  reaching.  It was in the general area of the weapon.

13     Q.  Okay.  But his gun was on his thigh right?

14     A.  Yes.

15     Q.  Not his waste?

16     A.  It still going down.

17     Q.  Right.  Right.

18     A.  I stopped it before it went any further.

19     Q.  Okay.

20     A.  That was at what point?

21     Q.  I'm sorry, what was that?

22     A.  I mean do you, from my standpoint, do you let

23  a person actually grab hold of a weapon and pull it

24  out and say do it or -- or -- it is a precaution, I

25  mean, on our part.

1    Q.   Okay.  So at this point it was -- he reached

2    down or he let his hand drop towards his gun because

3    of his -- and then you grabbed hold of his arm

4    because of his demeanor and the way his tone when he

5    said he wasn't with anybody; right?

6    A.   Yeah.

7    Q.   Those three reasons?

8    A.   His tone and demeanor was not normal.  And

9    when he reached down, or dropped his hand down to

10   that area, it -- I didn't want things to go south.

11   Q.   What --

12   A.   I didn't.

13   Q.   What do you mean by demeanor?

14   A.   General mannerisms.

15   Q.   Such as?

16   A.   A person's walk, their gait.  How they

17   respond to questions, what I ask, instead of being a

18   normal tone of voice as we're talking now or trying

19   to converse the situation.  I mean, I asked for his

20   -- once I identified myself and the person just says

21   I ain't got to show you nothing.  You know, a person

22   carrying a deadly weapon, you if -- if they are law

23   enforcement, sure, just a second, sir.  It was not

24   like that.

25   Q.   Okay.  So was there something about Drew's

1  walk or gait that --

2     A.  It was just out of the ordinary.  I mean

3  walking down, you know, most people who carry, carry

4  side holsters, they don't carry tactical type

5  holsters around.  Most law enforcement are dressed,

6  you know, in kind of like, you know, a collar shirt

7  or pants and stuff like that if they're -- if they

8  are out, open.  If the weapon is out, open.

9     Q.  Okay.  So it was his demeanor and his tone of

10  voice when he answered your question, the fact that

11  he told you he didn't have to tell you anything, and

12  the fact that he had a firearm, and that his hand

13  dropped from his chest to his -- or was dropping from

14  his chest or waste area, those are all of the

15  reasons?

16     A.  From his chest down to the handgun area, yes.

17     Q.  Okay.

18     A.  I believe that's everything.

19     Q.  Okay.  And by demeanor, you've, for this

20  particular case, you've said there was something

21  about his walk and gait and tone of voice.  What was

22  unusual about his walk and gait?

23     A.  I'd describe it as unusual, not as normal.  I

24  mean he come down through the aisle.  He had maybe

25  one or two items in his hand, one item in his hand or

something like that.  And it just kind of stuck out

another -- another officer had actually seen him in

there and noticed it was unusual of him, that stuck

out.

    Q.  Okay.  What was the name of the other

officer?

    A.  Thomas Nevels, who is, I guess, a PD officer.

    Q.  Okay.  How do you feel about open carry by

people who are not police officers?  Do you think

that should be the law?

    A.  You're asking my opinion?

    Q.  Yes, sir.

    A.  If you ask my opinion I -- I'm here to state

fact.  But open carry, it is dangerous, especially in

the today's world.  You don't know whose bad.  People

carrying around, it's a -- for example the holster

that Mr. Tanner was carrying, I could strip the

weapon out of the type of holster he was carrying

just by pulling it out, snap button.  There's no

responsibility in the open carry.  A person will have

a $400 gun with a $2 holster that can be ripped out.

It's a lot of responsibility.  It also gives away

tactical advantage.

    Q.  Okay.  So do you think it should be the law

or no?

A.  Me personally, as far as open carry, I don't
see a need in it.

Q.  Okay.  Now why didn't you take Mr. Tanner's
concealed handgun license during this November 29th
interaction?

A.  Sir?

Q.  Why didn't you take Mr. Tanner's concealed
handgun license during this November 29th
interaction?

A.  He didn't produce it.  I didn't know that he
had one at the time.

Q.  Even after the Searcy PD showed up you didn't
know whether or not he had a concealed handgun
license?

A.  I don't recall whether he had it -- whether I
found out that night or next day, whether he had one.

Q.  Okay.  Now, I believe you attached a report
from the Searcy PD to your affidavit for a warrant
for Mr. Tanner in the district court.  And I believe
that report, in it, states that Mr. Tanner presented
his concealed handgun license to them.  Would that
be --

A.  That he presented to them?

Q.  Right.  Do you recall anything like that in
the report to your affidavit?

1    A.  I don't recall.  He had conversed separately

2    with them outside.

3    Q.  Okay.  You were there during that

4    intersection with the Searcy PD?

5    A.  I was outside.  I don't remember that

6    specific detail.

7    Q.  Okay.  So it's possible that he did show it

8    that night and you just don't recall?

9    A.  I don't recall.

10   Q.  Okay.  So why wouldn't you have taken it that

11   night?  Did you just turn it over to the Searcy PD to

12   handled it from there or?

13   A.  That's what I assumed was going to happen.

14   Q.  Okay.

15   A.  Searcy PD would take care of that.

16   Q.  Okay.  So when did you find out that he did

17   have a concealed handgun license if you didn't find

18   out that night?

19   A.  It would be when I -- at some point I figured

20   out whether, when I got ready to do the affidavit,

21   and done the ACIC check it would of showed the

22   concealed carry.  So, it was either -- I learned it

23   from -- that night or when I started the affidavit

24   process when I ran.

25   Q.  Okay.  What is the procedure for you normally

to take someone's concealed handgun license when you
think there are in the violation of concealed handgun
laws and rules?

    A.   The procedure?

    Q.   Yes, sir.

    A.   It depends on the situation, whether I make
contact with the lieutenant Cora Gentry, I believe
the following Monday or Tuesday.  At the time, made
her aware of the situation.  There should be a memo
attached to where I sent to her --

    Q.   Yes, sir.  I'm talking about generally when
someone -- do you take it during the interaction or
do you always follow-up later?

    A.   Sometimes.  It depends.  I mean it's -- some
things are straightforward as far as if you are
drinking and driving alcohol-related offense, it
would be taken right then.

    Q.   Okay.  Have you ever gone back and taken
somebody else's concealed handgun license after an
incident other than Mr. Tanner's?

    A.   I've sent the information -- I believe I sent
on one occasion I sent the information to Little Rock
because I found out that they had a concealed after
the fact.  Involving a -- it was an alcohol-related
DWI.

1    Q.  Okay.  But you never went and physically got

2  that persons license, or did you?

3    A.  No, I didn't.

4    Q.  Okay.  So there's never been any other

5  instance where you have gone back and got somebody

6  else's concealed handgun license after they've done

7  something you think is in violation of the --

8    A.  I think I've only done three in nine years.

9    Q.  Okay.  So pretty rare to do this in general?

10    A.  Yes.

11    Q.  Okay.  So did anyone tell you to get Mr.

12  Tanner's concealed handgun license?

13    A.  We talked, I reviewed that.  I talked to them

14  -- lieutenant Cora Gentry or Greg Downs, one of the

15  two during that timeframe, and they said start

16  process for revocation.  They said they would like to

17  if they could have that license, if you happen to

18  come -- you know, come across it and get it.

19    Q.  Did you talk to them on the phone exclusively

20  or did you have e-mail conversations only?

21    A.  It would have been on the phone.

22    Q.  Okay.  So what did you think they meant by,

23  you know, if you can get it we would like to have it?

24    A.  If I happen to come across it, which I, you

25  know, don't think I ever come across it, whether it

be jail or somewhere else, I would tell him about it,
that it's being revoked and returned to Little Rock.
It was my understanding that much like driver's
license is privilege in department finance, the
concealed handgun license is property of the
department which is issued.

Q.   Okay.  So when you took it from Drew on
December 3rd, it had actually been revoked at that
time?

A.   That, I didn't know.

Q.   Okay.  So who decides to initially suspend or
revoke a concealed handgun license?

A.   Who?

Q.   Who decides to initially suspend or revoke a
concealed handgun license?

A.   The memo was sent down.  They go over the
facts.  I don't know where it starts from there.  It
was sent to the concealed carrier section.  And, how
it goes from there, I -- I'm not sure who the final
word say on that.

Q.   Okay.  So, earlier we were talking and you
said you liked to hunt.  Do you know generally what
the hunting seasons are during -- let's narrow it
down, for November 29th, 2014, I mean would you
generally know what the hunting season would be in

1  November?

2      A.  Usually deer season, maybe at the time,

3  because they usually have split seasons.  That would

4  have been after Thanksgiving.  I know there's

5  Thanksgiving hunts.  I'm not sure what the dates were

6  that year.

7      Q.  Okay.  But like, for example, would you know

8  this year what the hunting season would be for

9  October?

10     A.  I haven't looked.  I know bow season is now.

11     Q.  Okay.  Are there any places to hunt near the

12  Searcy Wal-Mart?  Isn't there like some kind of state

13  park not too far from there?

14     A.  I'm not familiar with.  I don't know if

15  there's anyplace to hunt right there at Wal-Mart.

16     Q.  Right, not at Wal-Mart but within a couple of

17  miles of Wal-Mart?

18     A.  I don't know.

19     Q.  You don't know.  Okay.  Do you know any of

20  the asset protection employees at Searcy Wal-Mart?

21     A.  No, I do not.

22     Q.  Okay.  Did you know any on November 29th,

23  2014?

24     A.  No.

25     Q.  Okay.  Now did you know if Drew drove or

1    walked to Wal-Mart on November 29th, 2014?

2        A.  I do not.

3        Q.  Do you know where he was headed after he left

4    Wal-Mart?

5        A.  No, I do not.

6        Q.  Okay.  Did you know where he was coming from?

7        A.  No, I do not.

8        Q.  Before he got to the Wal-Mart?

9        A.  No, I do not.

10       Q.  Do you know if Drew owns any shares in

11   Wal-Mart on November 29th, 2014?

12       A.  No, I do not.

13       Q.  Did you know if Drew had any sort of

14   proprietary interest in Wal-Mart on that day?

15       A.  No, I do not.

16       Q.  Okay.  Did you know if that particular

17   Wal-Mart location rents that facility from somebody

18   else or if they out right own it?

19       A.  I don't know.

20       Q.  Okay.  And you didn't know that on that date

21   on November 29th either; right?

22       A.  No.

23       Q.  Did you know where Drew worked before you

24   approached him on November 29th?

25       A.  No, sir.

1    Q.   Okay.  So do you know if Drew was employed as

2    a security guard on November 29th, 2014?

3    A.   No, I do not.

4    Q.   So do you know if he worked for Wal-Mart on

5    November 29th, 2014?

6    A.   No, I do not.

7    Q.   Okay.  So are there any special rules

8    regarding where a security guard can carrier a weapon

9    and how they can carry it?

10    A.   It would depend on what security company, I

11    guess.

12    Q.   Well for the -- isn't there a security guard

13    licensing scheme?

14    A.   Some security guard companies issue -- they

15    get the weapon when they get there, they can't carry

16    their own.

17    Q.   Okay.

18    A.   I mean it just depends.

19    Q.   But it would be legal for a security guard to

20    open carry a firearm at the place where he was

21    employed?

22    A.   For him to the carry a weapon where he's

23    employed, I'm sure it is.

24    Q.   Okay.  Now are security guards allowed to

25    travel away from a physical location where they're

 1    employed while they're armed; or, do you know?

 2        A.   I'm not sure.

 3        Q.   Okay.  And correction offices are obviously

 4    allowed to carrier firearms, right, but Drew said he

 5    wasn't with anybody and you took that to mean?

 6        A.   That he was not to with any affiliated

 7    department of the corrections or for that region.

 8        Q.   So by Drew's response you took that to mean

 9    he was not with anybody who was with law enforcement?

10        A.   With any law enforcement or even security

11    guard would have been forthcoming and said I'm with

12    such and such security.

13        Q.   Okay.  So you took Drew's response to mean

14    that he was not with any security guard company or

15    any type of law enforcement?

16        A.   Yeah.

17        Q.   Okay.

18        A.   Yes.

19        Q.   And that would be the extent of what you

20    believed his statement to mean?

21        A.   Yes.

22        Q.   Okay.  Now was Drew's firearm loaded that

23    night?

24        A.   That, I don't know.

25        Q.   Okay.  So you -- you don't know that now and

1    you've never known whether or not it was loaded?

2       A.   I do not.

3       Q.   Okay.  Now, did you know if Drew was a

4    retired law enforcement officer?

5       A.   No.

6       Q.   Okay.  Did you know if Drew was a prosecuting

7    or department prosecuting attorney?

8       A.   No.

9       Q.   Okay.  Do you know how many inches long the

10   barrel of Drew's firearm was?

11      A.   It appeared to be -- appeared to be a

12   45-caliber, just by recollection.  Typical -- there

13   are about -- they are approximately five inches.  It

14   wasn't like a revolver where they have snub nose, two

15   inch, four inch or six inch.

16      Q.   Okay.  So at the time you would have

17   estimated the length of the barrel to be about five

18   inches?

19      A.   Five inches, but I couldn't be for sure

20   because it was in the holster.

21      Q.   Okay.  Do you have like a range of what it

22   could be in your head?  Anywhere from five to

23   whatever or less than five?

24      A.   It appeared to it be a semiautomatic weapon.

25   And most -- and you've got me guessing.  I'm not for

1    certain but most of them are four and a half, five

2    and a half inches.

3        Q.  Okay.

4        A.  In that range.

5        Q.  Is that estimate based on your general

6    knowledge about semi automatic 45-caliber pistols or

7    is that estimation based upon your memory of Drew's

8    specific firearm barrel length that night?

9        A.  I didn't see the barrel length.  It was in

10   the holster.  That's on my general knowledge of --

11       Q.  Oh, okay.

12       A.  -- that type of weapon.

13       Q.  Okay.  So you could not -- so from what you

14   could tell, you weren't sure how many inches long the

15   barrel was?

16       A.  No, I do not.

17       Q.  Is there a maximum length you could put to it

18   or a minimum length you could put to it based on what

19   you could see that was not covered up by the barrel

20   -- or what could possibly not be covered up by the

21   holster?

22       A.  It was -- I couldn't tell.

23       Q.  Okay.  So you would have no estimation as to

24   the barrel length because it was in a holster;

25   correct?

1    A.   That's correct.

2    Q.   Okay.  Did you know it was at the -- maybe I

3 can try to refresh your memory.  On December 29th,

4 2014, did you know it was modern gun dear season?

5    A.   If that's when the regulations of it.

6    Q.   Okay.

7    A.   I know I went hunting on December 1st so I

8 know it was in at that time.

9    Q.   Okay.  What are bear season on November 29th,

10 2014?

11    A.   I don't hunt any bear so I don't -- we don't

12 have any in my area.

13    Q.   Okay.  What about rabbit and squirrel season?

14    A.   Specific dates, I didn't follow.  I don't

15 rabbit hunt.  But, most of the time they run,

16 generally run, October 1st to February 28th.

17    Q.   Okay.

18    A.   Is the way they used to.

19    Q.   Right.  So could you tell if Drew's firearm

20 was 45-caliber at the time?  Like you looked at it

21 you're like looks like the 45-caliber?

22    A.   It was by appearance.  It appeared by it's

23 size to be a 45.

24    Q.   Okay.

25    A.   But it could -- like I said before, it

1    appeared that way.  It could have been a 22.

2        Q.  Could have been a 22.  Could it have been a

3    BB gun or an air soft gun or would it have been too

4    realistic for that?

5        A.  The air soft -- I've seen BB guns more

6    realistic than a real gun.  I mean they literally

7    look the same.

8        Q.  Yeah.  I think that happens a lot in west

9    Memphis.  Kids think it's cute to their point BB guns

10   at different people and then it doesn't end well for

11   them.

12       A.  Air soft, they use real ones over there.

13       Q.  Or they later claim that it was an air soft

14   gun; right?

15       A.  (Nodding head.)

16       Q.  So, what about -- was it quail season on

17   November 29th, 2014?  Have you ever hunted quail?

18       A.  We don't have a lot of quail.  I've hunted --

19   they -- it's one of those types of bird if you are

20   out rabbit hunting or squirrel hunting and you come

21   across them, it's in the season to shoot.  But, we

22   don't have at lot.

23       Q.  Okay.  And bobcat season on November 29th,

24   2014?  Do you recall if it was bobcat season?

25       A.  It falls in the fall bear season it would be.

1    Q.  You generally know it was a certain type of

2  season it would also be the other type of animal

3  season, right, because they kind of group together?

4    A.  I don't specifically hunt bobcat so I

5  wouldn't have looked that up.

6    Q.  Right.  And then coyotes, coyote season?  Is

7  it ever not coyote season?  I don't know how that

8  works.

9    A.  I think it has to fall into a general hunting

10  season.

11    Q.  Okay.  And then was -- it was fox season on

12  the November 29th, 2014?  Do you recall if it was fox

13  season?

14    A.  No, I don't.

15    Q.  Or opossum?

16    A.  No, I don't.

17    Q.  Or river otter?

18    A.  No.

19    Q.  Raccoon?

20    A.  No.

21    Q.  Beaver?

22    A.  No.

23    Q.  Muskrat?

24    A.  I have no recollection of what the seasons

25  were in 2014.

1    Q.   Have you ever hunted ferial hogs?

2    A.   Yes.

3    Q.   Okay.  And what are the regulations on

4    hunting ferial hogs?

5    A.   They've changed.  You can hunt -- I'm unsure

6    of regulations as they appear now.  I've only hunted

7    them during an open season.

8    Q.   But it used to be where you can hunt them at

9    any time; right?

10   A.   I've heard that.

11   Q.   Okay.

12   A.   That's on the private land.  The places we

13   hunt butted up against a refuge and actually hunted a

14   hog on a refuge and then for that reason it had to be

15   during am open season.

16   Q.   Okay?

17   A.   On the refuge.

18   Q.   Okay.  Do you know if it's legal to hunt any

19   of those animals with a pistol?

20   A.   It is.

21   Q.   Okay.  So you want to go through the list

22   again or can you just name off the top your head

23   which animals you think is it the legal to hunt with

24   a pistol?

25   A.   Well your larger ones, you carry a pistol

1    when they're fur bearing.  I think most of -- I don't

2    believe there's a caliber restriction but you would,

3    if you are hunting for fur, you don't want to use a

4    large caliber.  You want to use another small caliber

5    not at large caliber to keep from damaging the fur.

6    Squirrel, I believe is nothing larger than only rim

7    fire.  Which would be.

8    Q.  22?

9    A.  22 or 17 now.

10    Q.  Uh-huh.

11    A.  17-caliber.  For deer and large animals, I

12    get -- may get this confused with Colorado because

13    I've been out there.  I believe Arkansas has to be a

14    .22-caliber or above on a center fire.

15    Q.  Okay.

16    A.  But as far as pistol recommendation, I don't

17    believe that that game in Arkansas Game and Fish have

18    restrictions on caliber size for specific animals.  I

19    know that Colorado did even for handguns.

20    Q.  Okay.  So before you took control of Drew's

21    wrist and elbow did you know which county Drew was a

22    resident of?

23    A.  No, I did not.

24    Q.  Okay.  What made you think -- or did you

25    think Drew was going to use that weapon unlawfully

1  against another person?

2      A.  I don't know.

3      Q.  So what made you think that he might use it

4  unlawfully against another person; or, did you think

5  that?

6      A.  That's the reason I intervened.  I asked, you

7  know, maybe somebody else didn't know, find out for

8  what reason he's there.

9      Q.  Okay.  So before you grabbed hold of his

10 wrist and elbow, you had no reason to believe that he

11 was going to use the firearm unlawfully against

12 another person?

13     A.  As he was walking down aisle or something?

14     Q.  Right.

15     A.  Coming towards me?

16     Q.  Right.

17     A.  Assumed he was law enforcement at that time.

18 No, I did not.

19     Q.  So once you found out he wasn't law

20 enforcement, and that's when you thought he might be

21 using the firearm unlawfully against another person

22 or did you --

23     A.  Well, his demeanor changed.

24     Q.  Okay.  When his demeanor changed that's when

25 you thought he might use the firearm unlawfully

1  against another person; right?

2      A.  Yes.

3      Q.  Okay.  So what about his demeanor made you

4  think he was going to possibly use the firearm

5  unlawfully against another person?

6      A.  Because the resistance, his demeanor and how

7  he come by asking questions that I've run across

8  others, other people, if they have a firearm are

9  happy to, yes, I am, talk to you.  Mr. Tanner proceed

10 that he did not want to converse at that point.  He

11 didn't want to have to show me anything or talk with

12 me.

13     Q.  Okay.  So at which point did you grab on to

14 him?  You grabbed on to him and that as you were

15 identifying yourself as a trooper?

16     A.  I'm not sure of exact instance circumstance,

17 but I grabbed on when the hand fell down from the

18 waste to the -- from the midsection towards the waste

19 area, towards the gun area.  I don't know if it was

20 directly before but it was definitely during and

21 after.

22     Q.  Now at that point, Drew gets on his phone and

23 starts calling 911 and then you approach some of the

24 Wal-Mart staff.  What did you talk to the Wal-Mart

25 staff about?

1    A.  The Wal-Mart staff, I was moving toward the
2    front.  Not only did I have my badge and my gun, for
3    them I pulled out my department issue -- we call them
4    blue ID -- also.  That's specific to the state police
5    certification.  I was still trying to get him to
6    identify himself.  I did get a name date of birth out
7    of him.
8    Q.  Okay.  So why did you make your gun visible
9    to the Wal-Mart staff?
10   A.  After the interaction, my badge hung below my
11   shirt and after the interaction, I moved my shirt
12   above my weapon up on the inside so it is now
13   visible.
14   Q.  Okay.  Why did you do that?
15   A.  Because now it's possible a threat situation,
16   to make an easy assessment.
17   Q.  Okay.  So did you -- what did you talk to the
18   Wal-Mart staff about once you showed them your ID?
19   A.  I don't recall.  I think we moved almost
20   directly outside.
21   Q.  So you do recall speaking with a couple of
22   the staff members and then going outside or you
23   don't?
24   A.  I don't remember the course of the
25   conversation that took place.

1     Q.  Okay.  So you don't remember telling anybody

2  at Wal-Mart anything about Drew's handgun or that it

3  was illegal to open carry a firearm or anything like

4  that?

5     A.  I don't recall.

6     Q.  Okay.  And then after you spoke to the

7  Wal-Mart staff members, one of them asked Drew to

8  leave the store; did they not?

9     A.  Asked?

10     Q.  Asked Drew to leave the store?

11     A.  I believe so.

12     Q.  Okay.  And you escorted Drew outside; right?

13     A.  Searcy PD was outside and I -- I followed out

14  to the door, yes.

15     Q.  So Searcy PD was already outside by the time

16  -- because that's a pretty quick response time.

17     A.  Well, they are right there.

18     Q.  But now did you -- you went with Drew outside

19  when he was asked to leave; correct?

20     A.  Yes, I believe so.

21     Q.  Okay.  And how long did you guys wait outside

22  of the Wal-Mart before Searcy PD pulled up?

23     A.  If I'm not mistaken they were there.  If it

24  wasn't there, it -- they were there immediately.

25     Q.  So you don't remember having a short

conversation with Drew while they waited?

A.   Talking about before they got there?

Q.   Right.  Outside, before Searcy PD walk up.

A.   No.

Q.   Okay.  Now was Drew free to leave at that point when you -- when you were outside and Searcy PD was there?

A.   It was turned over to the Searcy PD.  I figured Searcy PD would hand that portion of it.

Q.   Okay.  But it was your understanding that Searcy PD was doing what at that time?

A.   It was my understanding is that Searcy PD was going to do charges.

Q.   Okay.  And they did not eventually end up pursuing charges against Mr. Tanner?

A.   No.

Q.   Did you ever talk with them about that or?

A.   I can't -- I don't recall.

Q.   Okay.  So was Drew a threat at any point from when he was walking away from you up until the Searcy police arrived?

A.   He had calmed down.  I didn't see any need for me to take any offensive action.  So there was -- he didn't seem as to be a threat as when he walked out.

1     Q.  Okay.  So and based on that incident, Drew

2   eventually filed a complaint against you; correct?

3     A.  To my knowledge, yes.

4     Q.  Okay.  And did you ever get a copy of his

5   complaint about what he said that happened?

6     A.  Yes.

7     Q.  Okay.  So you read it, and what did you think

8   about it?

9     A.  Just a complaint.

10    Q.  Okay.

11    A.  Some people just don't like the way things

12  are done.

13    Q.  Okay.  Drew said you cussed him out in that

14  complaint, didn't he, outside of the Wal-Mart?

15    A.  Cussed him out?  I may have said some words,

16  a couple words, as he was leaving.

17    Q.  Okay.

18    A.  But nothing directly before that time.

19    Q.  Okay.  So here's a copy of one of them, one

20  of the complaints here.  Drew says on two different

21  occasions, Officer Ziegenhorn has questioned me,

22  grabbed me without cause, yelled and cursed at me

23  while pointing his finger inches from my face,

24  searched my person without cause, illegally detained

25  me in handcuffs without cause and confiscated my

concealed handgun license without cause.  This

officer reflects a poor quality and low standard upon

Arkansas State Police and has a complete disregard

for the law he has sworn to enforce.

Is that your memory of one of his complaints

against you?

A.  Yeah, this is the ASP50.  Yes, it is.

Q.  Is that the complaint that they gave to you

at one point?

A.  It's given a control number and signed by

sergeant Paulette Ward.  I'm assuming this is the

exact same one that was given to me.

Q.  Okay.  Now, Drew claims that you cursed at

him and you said you had some words with him.  And,

you and I are both from east Arkansas.  I think when

you have words with somebody that means maybe you did

say a cuss word or two; is that accurate?

A.  Sir?

Q.  Is that turn of phrase, had some words with

him before he left, that does mean you might have

cursed with him; right?

A.  I might have said some words, and some being

inappropriate, as he was leaving.

Q.  Okay.  Do you recall what those words were?

A.  No, I do not.

Q.   Okay.  But generally, by inappropriate, you
mean what some people would consider cuss words?

A.   Some people may consider them curse words.

Q.   Okay.  Would you consider them cuss words?

A.   I believe in the original complaint, or one
of the complaints or memos, I think he stated I used
the word, you know, Fing three separate -- on three
separate times.  That's if I use it, I might have
used it once.  Continually, over and over, is not
generally my deal.  But, I probably said that.  Was I
close to him?  I had my finger up there?  Yes.  I did
lay hands on him?  No.

Q.   And that was outside?

A.   That was outside.

Q.   Okay.  Now you write a lot of traffic
tickets, right, and they taught you a lot about
traffic law when you were in the academy I'm sure?

A.   Yes.

Q.   Okay.  I think for November you had something
like 29 speeding tickets and you were the best
officer for writing speeding tickets in November of
2014.  I came across an e-mail like that.  Does that
sound accurate to you?

A.   If that's what you received then --

Q.   Okay.

1    A.   -- that may be accurate.

2    Q.   Okay.  So it's fair to say that you know lot

3    about traffic law, right, because you enforce traffic

4    laws?

5    A.   Yes.

6    Q.   Okay.  I've got here the center turn lane

7    statute from 2017 so it's the current one.  Would you

8    look at that and tell me what you think this statute

9    means you can do in a center turn lane?  Specifically

10   subsection C there.  It's permissible for a vehicle

11   making a left-hand turn from an intersecting street

12   or driveway to utilize a center turn lane as part of

13   a maneuver to gain access to or to merge into the

14   traffic lanes.  Except that is it a not permissible

15   to use the center turn lane as acceleration lane.

16   A.   Okay.

17   Q.   What does that mean to you?

18   A.   That would be pulling into the center turn

19   lane and accelerating out up to speed and using as

20   traffic lane and getting over.

21   Q.   To merge with traffic?

22   A.   To merge with traffic.

23   Q.   That would not be allowed in subsection C

24   right, or that would be?

25   A.   That according to C.

1     Q.   It would or would not be allowed?

2     A.   Oh, it's not permissible to use the center

3   turn left lane as an acceleration lane.

4     Q.   Right.  But it would be permissible to get in

5   that lane and turn onto another street or into a

6   driveway?

7     A.   For a left turn, yes.

8     Q.   Or to pull into it, stop, and then merge into

9   it from a driveway; right?

10    A.   Pull into it, stop, and turn.  Yes.

11    Q.   Okay.  That's pretty clear; right?  You can

12   understand that statute and it makes sense?

13    A.   Yes.

14    Q.   Okay.  This is labeled as 27-51-309 Center

15   Turn Lane statute; right?

16    A.   Is this out of the current book?

17    Q.   Yes, but I believe the statute's gone

18   generally unchanged for a few years.

19    A.   Okay.

20          MR. HYMAN:  This is the going to be labeled

21   as Plaintiff's Exhibit 1.

22          (Exhibit No. 1 marked for identification.)

23          MR. BIRD:  No objection.

24          MR. HYMAN:  Just so you guys can look back

25   later and make sure it's what we talked about.

1    Q.  Okay.  So, that's pretty clear what you can

2  and can't do in the center turn lane; right?

3    A.  Yes.

4    Q.  Okay.  And because it uses the word

5  permissible to tell you what you can and can't do in

6  that center turn lane; is that right?

7    A.  It tells you what you can do from the lane

8  and tells you what you can't from the lane.

9    Q.  Okay.  So and the carrying the weapon statute

10  doesn't have a list of things that are permissible

11  and impermissible to do while carrying a weapon or to

12  make you not guilty while your carrying a weapon; or,

13  do you recall?

14    A.  I don't know the statute by heart.

15    Q.  Okay.

16    A.  I mean I would have to look at the statute.

17    Q.  On July 12th, 2013, there's an e-mail from a

18  Stan Witt that was sent to ASP all.  I've got a copy

19  of it.  It goes into basically what the carrying a

20  weapon statute means.  Is that -- or at least maybe

21  what the changes were.  Do you recall an e-mail like

22  that?

23    A.  Yes.

24    Q.  Okay.  Did you read that e-mail?

25    A.  I read the e-mail, yes.

1    Q.  Okay.  What was your understanding of that

2    e-mail?

3    A.  My understanding of the e-mail was falling in

4    lines with Dustin McDaniel's opinion at the time and

5    open carry was not legal.

6    Q.  Okay.  So that e-mail to you, you thought it

7    meant that open carry was not legal or would not be?

8    Why did you think that based on the e-mail?

9    A.  Because on the e-mail, it was general from

10   the -- the attorney again who's top law enforcement

11   over at the State.  It comes from -- it comes from

12   our coronal, the head of state police, from the

13   supervisor.

14   Q.  So attached to that e-mail or a link for that

15   e-mail potentially was -- was something -- was the

16   attorney general's opinion from Dustin McDaniel,

17   right, in 2013 regarding the journey clause?

18   A.  I would have to -- I would have to see that.

19   Q.  Okay.  Well, here, why don't you take a

20   second to familiarize yourself with it.

21        MR. HYMAN:  I'm trying to get you guys a

22   copy to.

23   BY MR. HYMAN:

24   Q.  Okay.  So, that e-mail says attached you will

25   find brief summary of changes made in the 2013

legislative session.  Please review these law changes

and direct any questions to your chain of command.

That's from coronal Stan Witt, right?  He was then

the guy that runs the -- or that directed Arkansas

State Police; right?

A.  Yes.

Q.  Okay.  And so then in an attachment to that

e-mail there is a little blurb about Act 746 on -- at

the bottom it will say PLF sum J0352, that might help

you find it.

MR. BIRD:  What number?

MR. HYMAN:  PLF sum J0352.

MR. BIRD:  Okay.

BY MR. HYMAN:

Q.  Just let me know when you are tracking.

A.  Okay.

Q.  Okay.  So about midway down it says firearms

Act 746 defines a journey as travel beyond the county

in which a person lives for the purpose of possessing

a handgun.  The act also amends the mental state to

require that a person have the purpose to attempt to

unlawfully employ the weapon as a weapon against a

person; right?  Is that is that a part of the e-mail

that you received?

A.  That's part of this document, yes.

1    Q.   Okay.   And to your knowledge this is an

2    attachment to that e-mail from Stan Witt?

3    A.   To my knowledge, it is.

4    Q.   Okay.   Now what does that blurb mean to you

5    when it comes to the act also amends the mental state

6    to require that a person have the purpose to attempt

7    to unlawfully employ the weapon as a weapon against a

8    person?

9    A.   Before, there was not a mental state before.

10   Q.   Okay.   So what does that mean?

11   A.   It means you have to, according to this, you

12   have to determine a mental state of someone which you

13   can't physically see to figure out whether someone's

14   going to employ a weapon.

15   Q.   Going to unlawfully employ a weapon against

16   person; right?

17   A.   Yeah, that's what it says.

18   Q.   Okay.   And then it gives at link to the

19   attorney general opinion as well?

20   A.   Yes.

21   Q.   Dustin McDaniel's opinion at the time?

22   A.   Yes.

23   Q.   You read that e-mail when it came out because

24   it has all of the legislative updates about the

25   changes in the law?

1    A.   It was went over it.

2    Q.   Okay.

3    A.   I actually --

4    Q.   And you received it because everybody gets

5    the legislative update from the director?

6    A.   If it's ASP all, it would come to my

7    computer.

8    Q.   Okay.  And then there's an opinion from the

9    attorney general, which I believe you stated that you

10   read and relied upon; correct?  And that's starts on

11   -- the bottom right PLF sum J360.

12   A.   Sir?

13   Q.   Is that correct, do you have that with you?

14   A.   That's what I'm reading.

15   Q.   Okay.  So this is the opinion that we've all

16   heard about from Dustin McDaniel that you that you

17   rely on; right?

18   A.   Yes.

19   Q.   Okay.  So if you would, on the second page of

20   that, it says -- there's the second paragraph here,

21   it says, "But before addressing to the extent to

22   which Act 746 may extend gun carrying rights under

23   the current law, I will mention two provisions of the

24   act while possibly significant in themselves should

25   be identified as not germane to your question."

1        Now what does that mean, not germane?  It

2   means like not -- it doesn't apply?  It is not --

3   it's not about your question?  You know, this is

4   something separate?

5       A.  Definition?

6       Q.  Well not just -- in your mind, when you read

7   that, it's like okay this isn't about the question,

8   right, is this something else in the statute that's

9   not related to your question; right?

10       And is it a kind of helpful, at the bottom of

11   the that paragraph, it says, "neither of these

12   amendments, however, bears on the operative inquiry

13   here.  Mainly what constitutes a journey for purposes

14   of applying the journey."  That kind of helps us out

15   with the context.  So, he's saying these two things

16   are unrelated to your question, right, in this

17   attorney general opinion?

18       A.  The attorney general's position?

19       Q.  Yes, sir.  He's saying that before I address

20   your question about --

21       A.  That's in the discussion part.

22       Q.  Okay.

23       A.  Where he discusses the opinion with his

24   general opinion states.  The answer to your question

25   is no.

1    Q.  Well this is all part of his opinion.

2    A.  I understand.

3    Q.  Okay.  So he says, "First, the act redefines

4    and in doing so arguably changes the mental state

5    required to support a conviction."  And then there's

6    thing to footnote seven.  Footnote seven says,

7    The act defines as one element of a possession

8    offense under subsection 573-120, is having a purpose

9    to attempt to unlawfully employ the handgun, knife,

10   or club as weapon against a person.  Although, one

11   might debate the significance of any if any of this

12   change in terminology, it's clearly immaterial to

13   your question."  Okay.  And then it says, another

14   part, "Secondly, the act arguably shifts to the state

15   the burden of proving that a defendant was not

16   permissibly carrying a weapon upon a journey.

17   Neither of these amendments however bears on the

18   operative inquiry here, namely what constitutes a

19   journey for the purposes after of applying the

20   journey exception."  Right?  And that was all part of

21   his opinion?

22   A.  If it was the complete opinion, yes it would

23   be.

24   Q.  And then we look at footnote eight and it

25   says, "If the act amends subsection 573-120 C to

provide the carrying of a weapon will be permissible

under certain recited circumstance.  By contrast, of

subsection 573-120 C currently recites the

circumstance as providing a defense to a prosecution

for carrying a weapon.  Arguably, this amendment

shifts to the state.  The burden of establishing that

a defendant was not on a journey rather than

burdening the defendant with going forward with

evidence that he was as with the mens rea amendment

however this possible shift is unrelated to the

meaning of the term journey as used in defining an

exonerating circumstance in subsection 573-120 C."

        So he, as part of the defendant opinion, he's

pretty narrow as to what exactly he's giving an

opinion on; right?

        A.   Lawyers wrote it.

        Q.   Yeah.

        A.   They wrote the law.

        Q.   Right.

        A.   All I can say is through the whole act, if

things were made clearer, we would never have this

problem.

        Q.   Okay.  So the attorney general, in his

opinion, stated, that you said you read in your

interrogatories, that the burden of proof is arguably

1    on the state?

2        A.  It's on the state.

3        Q.  Yeah.  And that the mens rea has changed,

4    right, and mens rea is mental state?

5        A.  Sir?

6        Q.  And the attorney general also said the mens

7    rea or mental state has changed.

8        A.  He said the mental state had changed.

9        Q.  Okay.  So now we can move onto the second

10   encounter.

11               MR. BIRD:  Can we make that an exhibit --

12               MR. HYMAN:  Yeah.

13               MR. BIRD:  -- since you read from it?

14               MR. HYMAN:  Sure.  I'm sorry.  I was

15   actually going to do that.  Thank you.  You are

16   looking out for me.

17               I'm going to mark this as Plaintiff's

18   Exhibit 2, which is going to be an e-mail from Stan

19   Witt to ASP all, which includes an attachment and a

20   link.

21               (Exhibit No. 2 marked for identification.)

22               (A short break was taken.)

23   BY MR. HYMAN:

24       Q.  So, why don't you tell me about the second

25   incident with Mr. Tanner on December 3rd, 2014, I

1    believe.

2        A.  December 3rd, 2014.  How far would you want

3    to go back or just where -- what do you want me to

4    start on?

5        Q.  Let's talk about why you were in -- what you

6    were doing in Searcy that day?

7        A.  I was in Searcy that day.  I had brought over

8    the affidavit that I had filled out.  I went to the

9    prosecutor's office, Buck Gibson, we reviewed the

10   affidavit.  Approved and notarized by -- down at the

11   bottom, took the affidavit over to the -- what do

12   they call that the place -- center where the district

13   courts office is.  I took it over there to have a

14   warrant signed.  I get over there, ask the lady and

15   she said, "No, we do our own warrants."  So, it was

16   submitted through the district court because the

17   judge likes to look over them and take care of that,

18   is what I was told.  And they -- and they do the

19   whole warrant.

20       Q.  Okay.  So tell me about -- have you talked to

21   the -- you went to the prosecutor's office?

22       A.  Yeah, city prosecutor.

23       Q.  City prosecutor.  To talk to them about this

24   case or try to get a warrant or what?

25       A.  I always -- on the affidavit, I called him

1  beforehand and made arrangements to meet him at his

2  office.  And whenever I do an affidavit, I just don't

3  take it to the judge and say here's my affidavit, and

4  the warrant, is signed.  It's always reviewed by the

5  prosecutor, wherever I take an affidavit to, and they

6  have to say, yes, we'll continue with it on.  So,

7  prosecutor Buck Gibson.  You take the affidavits to

8  the prosecutors, you know they approve it, go over

9  it, look for any mistakes or errors, tell us if

10  there's anything that needs to be changed on it,

11  whether it be wording, commas, spelling or anything,

12  before it's submitted to the court.  Mr. Gibson

13  approved the affidavit for arrest.  It was taken then

14  over to the courthouse or the district court office.

15    Q.  Okay.  So when you were talking to Buck

16  Gibson about that, other than your affidavit and the

17  references to the two statutes that you were claiming

18  he violated, and the reports from the Searcy PD about

19  the incident, did you discuss anything else with

20  Mr. Gibson?  Like any more detail that is not listed

21  in the actual warrant?

22    A.  It was particularly involved in that case and

23  the incident and what was in the affidavit and how we

24  come about it.  The actual interaction, I can't

25  recall if there was other conversations we might have

1    had that day.

2        Q.  Okay.  But you did talk to him about Drew's

3    --  the incident with Mr. Tanner generally?

4        A.  Sir?

5        Q.  You did talk to him about the incident with

6    Mr. Tanner generally, the November --

7        A.  Yes.

8        Q.  -- 29th --

9        A.  29th.  That was what the affidavit -- that's

10   what I was there for.

11       Q.  Did you tell him anything about the

12   November 29th, 2014, incident that is not written

13   down in affidavit form?

14       A.  I think I explained the whole thing to him.

15   And looking back at the affidavit, I'm sure that

16   there was some details that was left out.

17       Q.  Okay.

18       A.  It may have been -- went further with him.

19       Q.  Okay.  So you had written that day, a memo

20   about the incident?

21       A.  Yes.

22       Q.  About the first incident; correct?

23       A.  I believe so, yes.

24       Q.  Okay.  Did you mention that memo to Buck

25   Gibson or did you read it to him or?

1    A.  I don't recall.

2    Q.  Okay.  But if you would have relayed

3 information to Buck Gibson, it would have been

4 basically what you wrote down in your memo about the

5 incident?

6    A.  Yes, I mean it's -- talk about stuff that may

7 have been -- would have been in the memo.

8    Q.  Okay.  And so then what where did you go from

9 there?

10   A.  Then, after I left there, I went out to the

11 district court office.  Things are happened a little

12 different in White County than over in our

13 jurisdiction.  Our jurisdiction, a warrant for arrest

14 once it has been reviewed, the judge will look at it

15 that day and issue a signed warrant.  It kind of

16 surprised me in White County, a warrant signed, they

17 told me we do our own warrant for arrest.  Judge

18 reviews them.  So, I just dropped off my affidavit,

19 there for the court.

20   Q.  Okay.  And did you ever follow-up with any of

21 the Searcy PD officers, if they were going to pursue

22 charges for the incident or anything like that?

23   A.  I talked to one of them.  I can't remember

24 which one.  I think they didn't file any charges.

25   Q.  Okay.  And so when you dropped off the

1  warrant at the district court did you speak with

2  anyone there other than the clerk?

3      A.   Not that I recall.

4      Q.   Okay.  So do you speak with the clerk at all

5  about the warrant and get the process from her?

6      A.   Well, that's what I asking.  Like when will

7  it be well, I asked how long will it be.  She said

8  the judge has to review and they issue the warrant.

9      Q.   Okay.

10     A.   They didn't give me a definite timeframe.

11     Q.   Okay.  Where did you go from there?

12     A.   From that point, from out there at the

13  district courts office, I proceeded to go to

14  Wal-Mart.  I had to -- I had a pair of glasses that

15  was there for warranty work and I had to go to the

16  vision care center.

17     Q.   So the glasses were already there?

18     A.   Well, I think I may have been dropping them

19  off, that's my original statement that I made in my

20  OPS, because that was immediately following.  My wife

21  kind of reminded me.  Kind of looked back and it was

22  dropped them off or picking them up but, we believe,

23  you know, for certain that -- almost certain, almost,

24  that I was dropping them off.  Because we, you know,

25  we couldn't find any receipts because it was warranty

work, just drop off and go forward.  My wife said

looked at a picture that she had where he was wearing

his back up glasses on the 6th.  They are a lot of

different than his -- they were different than his

normal glasses.  They weren't -- there were flex

type.  And, he was wearing those, that I know, in a

picture December 1st.  So, they would have been --

become broken on or after December 1st and taken

over.  And, she believed that she picked those up on

the December 6th because she headed over to Judsonia

that date for a pageant.

Q.  Okay.  So --

A.  Picked them up thereafter.

Q.  Okay.  So about what time did you arrive at

the Wal-Mart; do you recall?

A.  I believe -- what did I write down, 1:50

somewhere around close to 2 o'clock.

Q.  Okay.

A.  It was around 2 o'clock.

Q.  Okay.  And now do you normally go to Searcy

for all your eye care needs or do you ever go to Winn

or Jonesboro?

A.  We go to Searcy.

Q.  Okay.

A.  My wife works the area, worked at that time

with her job she had worked White County area. She

had worked at White County Hospital. She knew the

doctor knew people over there and our insurance,

Wal-Mart Vision Center is one of the insurance

carries place we -- what we used.

Q.  Okay.

A.  So that was the closest one. Some places we

generally go to visit we had go to the Lowe's, we're

over there quite a bit.

Q.  Okay. Did you ever think about going to

Marion, Arkansas, or West Memphis, Arkansas, to go

visit Dr. Hyman? He's optometrist over there.

A.  No.

Q.  I hear he's pretty good. I'm not sure. So

at the Wal-Mart you walk in. What happens next?

A.  I park on the -- the front door faces the

north.

Q.  Okay.

A.  I parked on west side by the garden center.

I got out of the car. I went in. I walked past

customer service along the front. I happened to

notice Mr. Tanner there. I went on past because I

had -- I'm going to take care of business. I went

down to the vision care center, I took care of what I

needed to there. As I was coming out, he was still

standing there. And recollection to the conversation
I had had with the concealed carry division, about
obtaining a permit because it was under revocation, I
will talk to him. Maybe he's in a little calmer, a
little something at this time. So, I approach him.
I refer to him by name and asked him if he was
carrying. Mr. Tanner at this point, he turns around
-- you know, I don't remember the exact -- any of the
exact words he said but he became loud. And, this is
in a store with a lot of people. His voice was
elevated. Speaking with some Searcy officer in a
prior complaint that I had seen, that he had a knack
for, around Searcy, he would carry weapon around
Searcy he would have somebody else film it and
someone else waiting to the side.

      So, I approached Mr. Tanner I knew it was
like okay. Is there anyone else here with him behind
me? My back is to a lot of people. It was at the
point that I felt that the conversation at the point
it was becoming disorder. It was disorderly and the
in a public place. Because I did not have any backup
or no one watching my back, didn't know if he had
someone with him, it was safe -- I figured it was
safer to go ahead and place him in custody.

    Q. Let's go back. You asked him if he was

1   carrying.  He answered you; didn't he?

2       A.  Yes.

3       Q.  What was his answer?

4       A.  He said no.

5       Q.  Okay.

6       A.  Then we proceeded outside.  I tried to talk

7   to him calmly.  Mr. Tanner just would not be in a

8   calm state, a normal conversation as you and I have

9   right now.  So, I went through the proper steps to

10  properly identify him because I'd never seen, you

11  know, actually looked at his driver's license.

12  Properly ID him, which I know I do.  In a case when,

13  because he was cuffed at the time, I removed his

14  wallet from his back pocket.  When I flip it over,

15  you can see his driver's license and there in plain

16  view, upon his driver's license I can also see that

17  his concealed carrier permit is there with him.  I

18  believe that I told Mr. Tanner that his concealed

19  carrier was under revocation consideration and that

20  the Little Rock wanted those back.  That is -- and it

21  was -- the concealed carry permit was property of the

22  state police.  I then took that and gave it back to

23  him or gave his -- put his wallet back after properly

24  identifying his -- who he was, visually.  I tried to

25  talk to him.  He would not talk.  Just kept on and

1  on, he -- he just rattled on.  It's almost like a

2  sovereign citizen that I dealt with.  They don't want

3  to listen.  They don't want to be cordial.  It -- he

4  just wanted to fight.  You know, argue.  And we dealt

5  with that over in our troop.  We've had that in our

6  troop.  Which resulted in two deaths of officers.

7  Officer -- the death of two officers.  Officers.  So,

8  I was cautious because of that.  I knew he had always

9  had somebody recording or somebody recorded his

10  action.

11      Q.  Who told you that somebody had recorded his

12  actions?

13      A.  I think one of the Searcy officers may have.

14      Q.  Okay.  Which one would you -- one of the ones

15  from that incident from the first one or?

16      A.  I don't recall.

17      Q.  So just a general Searcy officer might have

18  told you that somebody -- Drew had somebody recording

19  him?

20      A.  Yes, and there was -- I later found there

21  was, on Facebook, where he had been interaction with

22  Searcy PD officers with someone filming him and them

23  interacting.

24      Q.  Okay.  So who had, to the best of your

25  knowledge, somebody from Searcy told you that

somebody follows Drew and films him?

A.   That the portion of the video I saw is Mr. Tanner had someone he knew filming his interaction with Searcy PD not Searcy PD filming him.

Q.   Okay.  And you saw this video before or after this interaction?

A.   I don't recall.

Q.   Okay.

A.   I knew about -- as far as seeing the video, I knew it had happened.  But actually seeing the video, I can't remember the exact time.

Q.   Okay.  And you've read some reports about Mr. Tanner carrying a firearm?

A.   Yes.

Q.   Okay.  And tell me about those reports.  Did those ever talk about Mr. Tanner having a negative attitude?

A.   With the Searcy PD, the portion that I read, you know, is they would get a call, a gentleman walking down one of the main streets, carrying a weapon.  And that was the initiation of the call and they did a report.

Q.   You don't recall anything negative about the fact that he was carrying a weapon?

A.   Sir?

1    Q.   You don't recall anything --

2    A.   That he was carrying a weapon was the reason

3    for the call.

4    Q.   Okay.  But there was -- did you recall

5    anything where he had a negative interaction with law

6    enforcement?

7    A.   I don't recall the interaction unless I

8    looked at the report.

9    Q.   Okay.

10   A.   Do you have it?

11   Q.   I believe I have one of them that you sent in

12   an e-mail to somebody potentially.  Let's see.

13        Let's go back to when you first came up to

14   the him at the Wal-Mart.  You were talking to him.

15   From what you remember, the first thing you said to

16   him is, "Mr. Tanner, are you carrying a weapon?"  Or

17   are you carrying something -

18   A.   Something of that nature.

19   Q.   Okay.  So then his response is no.  And then,

20   what are you talking to him about after that

21   generally?

22   A.   I would have to see my statement because I

23   remember it better back then than I do now.

24   Q.   Your OPS report statement or which statement?

25   A.   The OPS statement would have it in it.

1      Q.   Okay.  Let me see if we got it.  Is this your

2   OPS report?

3      A.   Yes.

4      Q.   Okay.  Do you want to refresh your memory

5   with your second incident with him?

6      A.   It's been a long morning.

7      Q.   Yeah.

8      A.   Okay.

9      Q.   Okay.  So, do you remember what you talked to

10  him about?  What you said to him after he responded,

11  no, he was not carrying?

12     A.   It was pertaining to his concealed carry

13  license, I believe, is what I stated here.

14     Q.   Let me see if I can -- I think you might have

15  my copy.  May I have it?

16          So according to original OPS report, "Mr.

17  Tanner how are you doing today?  Are you carrying a

18  weapon today?"  And he says, "No, I'm not carrying."

19     A.   What page is that?

20     Q.   Four.

21     A.   Oh, I'm on seven.

22     Q.   So then you say, "So, I would like to see

23  your concealed carry permit."  I wanted to look at

24  it, you know, get it, retrieve it for Arkansas carry

25  division but he at that point just stiffens up.  Kind

1  of bows up and it's like I tell myself I can't have

2  this in the service center in front of Wal-Mart.  50

3  people up there.  For my safety and everybody else's

4  safety around, I said I got to move it outside.  With

5  the way his actions, were I knew if I just tried to

6  politely say let's go, it's not going to happen;

7  right?

8      A.  That's correct.

9      Q.  Okay.  So but you -- so, so far, there's just

10  two questions here; right?  Or three questions.  How

11  are you doing today?  Are you carrying?  And then I

12  would like to see your concealed handgun license.

13  And you can see him stiffen up and you arrest him.

14      A.  Stiffen up and start becoming loud and become

15  a distraction in front of the --

16      Q.  How was he becoming loud?

17      A.  Elevated voice.  I said in the back of my --

18  does he have anybody with him?

19      Q.  Right.  Did you mention that you thought he

20  might have somebody with him in your OPS report?

21      A.  I don't know if it was in the OPS report.  I

22  know did in the -- either the memo or an OPS report,

23  one or the two.

24      Q.  Okay.  Well, will you look through the OPS

25  `report and show me where you thought he might have

1    somebody with him?

2       A.  Sir?

3       Q.  Will you look through interview in the OPS

4    report and tell me where you said he might have

5    somebody with him?

6       A.  Page eight.

7       Q.  So, you say I know Searcy PD in the past with

8    someone at the side, is that where you referencing

9    or?

10      A.  That he has always had someone to the side of

11   Mr. Tanner.  I've read this OPS deal and he's taken

12   it off of the recording I know there are some

13   spellings and some things that didn't go correct.

14      Q.  Okay.  So you know that he's taken it off or

15   -- there's a recording and then someone's transcribed

16   this later?

17      A.  Yes.

18      Q.  Okay.

19      A.  I think it actually says that on the front,

20   the day it was transcribed.

21      Q.  Right, right.  And so and in this part, the

22   part that says, "I know Searcy PD in the past, with

23   someone at the side."  That's the part that you are

24   referencing when he might have somebody around.

25   Okay.

1          So, back to your questions to him.  You told

2     him you would like to see his concealed handgun

3     permit?

4          A.  Yes.  The goal was to approach and see, get

5     him to surrender it.

6          Q.  Okay.

7          A.  Upon approaching him.

8          Q.  Okay.

9          A.  And the approach to see if he'd surrender, he

10    become combative and loud and started causing a

11    scene.

12         Q.  What was he saying?

13         A.  It was like -- I put it in here because it's

14    been a long time ago.

15         Q.  You said he was starting to create a scene.

16    The tone of his voice became -- started to become

17    loud; right?

18         A.  Yes, sir.  In observation of safety and the

19    people around a public place, it was safe to move the

20    possibility of an altercation outside.

21         Q.  I don't see in here where you say any of the

22    specific answers to any of your questions.  Where in

23    this OPS do you say Mr. Tanner's answer or didn't

24    answer your question before -- while he was becoming

25    disorderly?

A. What was your question again?

Q. Okay. So, you say he was being disorderly after you asked him if he was carrying and if you could see his concealed handgun license. How did you ask that question? Let's start there. To the best of your knowledge how did you ask that question?

A. The best of my knowledge on how the question was asked? I can't recall.

Q. Okay. Lets talk about his answer. To the best of your knowledge how was he answering your questions?

A. He was answering back. He didn't have to talk. He started rattling off about Act 746, legal right to carry anywhere.

Q. Isn't that after you arrested him? After you put him in cuffs according to the -- according to the OPS report?

A. Some of that was inside too.

Q. Right. But he was in cuffs once he was inside, right? You put him in cuffs inside the Wal-Mart?

A. Inside and we walked to the front.

Q. Right.

A. Walked to the front, outside by my car.

Q. Okay. So I'm just worried about what exactly

was said before you started to restrain him and put
cuffs on him.

     A.   I believe it was -- I asked him if he was
carrying and he said, "No, I'm not."

     Q.   Didn't you ask for his identification because
you hadn't had his identification yet?

     A.   I may have.

     Q.   Okay.

     A.   Because I never actually seen -- laid eyes on
his identification.

     Q.   Okay.  And then once you asked for his
identification, that's when he said I don't have to
the provide that to you or something along those
lines?

     A.   I don't know all of the timeframe of the many
things that was said.  What was coming there was
getting louder.  And with people around --

     Q.   How loud?  Was he yelling at you?

     A.   It attracted the notice of people around.

     Q.   Okay.

     A.   I had people standing at arms length of me.
There was people in the service center.  There was
people behind me.  I don't know how close they were
behind me.

     Q.   Okay.  So where were you parked when you

1    pulled up to the Wal-Mart?

2        A.  I was parked on the west side.

3        Q.  Were you parked in the fire lane?

4        A.  Either up inside the fire lane, up in the

5    area of past the street right there, by the guard

6    center.

7        Q.  Okay.

8        A.  An area there.

9        Q.  Was that in the fire lane or was it not?

10       A.  I'm not sure exactly where it's located.  I

11   think all of that is considered a fire lane.

12       Q.  Okay.  So you parked in the fire lane and

13   then went to go pick up or drop off a pair of

14   glasses?

15       A.  Yes.

16       Q.  Okay.  And then coordinating to your

17   timesheet at that time were not officially on duty

18   yet at that point; right?

19       A.  I had checked in.

20       Q.  You had checked in?

21       A.  Yeah.

22       Q.  Okay.

23           MR. HYMAN:  At this point I'm going to the

24   admit your OPS interview as Plaintiff's Exhibit 3.

25           (Exhibit No. 3 marked for identification.)

BY MR. HYMAN:

Q.  So at the time, 2014, do you remember what your radio car number was?  Was it D36?

A.  It may have been D34 or D36.  Any time a car leaves a troop you have to notify dispatch.  Someone has to know about it.  So, I know it was checked in.

Q.  Okay.  So how does that process work?  Do you ever -- do you take that vehicle home or do you check it back at the troop and then drive your own personal vehicle home?  How does that work?

A.  It stays at the house, at my home.

Q.  So by take out, you mean whenever you leave your house with the vehicle you check in or?

A.  You check out on the radio.

Q.  So when you leave your house in your vehicle, you call in on the radio or check in on the radio; right?

A.  That the two ways it's usually done.

Q.  Okay.

A.  A person checks immediately 10-8 in for service.  A practice done at the time, it's kind of been discouraged, a person will check 10-6 in their unit.  And say they came in early at 1:30 and checked in at 2.  I will be 10-6 on my unit.  10-8 at 2. That may be done for certain reasons.  To go get gas,

1  go get the car washed before they actually begin

2  their duty.

3      Q.  Okay.  Now, I have here something called

4  affidavit of arrest for the following person and a

5  report from Searcy PD.  Will you look at this and see

6  if you recognize that?  It has two pages to it I

7  think.

8      A.  Which one of these were you referring to

9  earlier?

10      Q.  Well depending -- I think I might have

11  referred to all three of those things at one point.

12  But one of those is an affidavit that you submitted

13  to the court; correct?

14      A.  Yes, sir, I see that.

15      Q.  In order to get a warrant?

16      A.  Yes, sir.

17      Q.  Another one of those is a report from Searcy

18  PD.  Someone called in and said Drew is walking down

19  the street with a firearm; right?  And another one of

20  those is a report from Searcy PD about the

21  November 29th, 2014, incident; correct?

22      A.  This one here I'm looking at is from 10/7.

23  It's a warrant entry form.  That goes with this one.

24  One for October 7th, 2014 at 5:00:51.

25      Q.  Right.  Could you look at the top left of

1  that and tell me when that was printed, that

2  particular document?

3      A.  It was printed 12/3 of '14.

4      Q.  Okay.  So was that a document that you picked

5  up from Searcy PD or somewhere regarding Mr. Tanner's

6  previous carrying of a firearm?

7      A.  Yes.  And I recall and see this, that it was

8  picked up in route to Mr. Gibson's office.

9      Q.  Okay.

10     A.  It was added to it, I believe.

11     Q.  Okay.  So was that a part of your request for

12  warrant for Mr. Tanner?

13     A.  I had already had the affidavit on that.

14     Q.  Okay.  Did you submit that with your

15  affidavit or is that something that you had

16  separately?

17     A.  I don't believe I submitted this with the

18  affidavit.  I don't believe so.

19     Q.  You didn't submit that with the -- you didn't

20  submit the October 7th report with the affidavit but

21  didn't you submit the December -- or the -- I'm sorry

22  the November 29th report from the Searcy PD with the

23  affidavit?

24     A.  Is that this one?

25     Q.  Yes, I believe so.

1      A.   Okay.  This was submitted with the affidavit?

2      Q.   I'm asking you, did you submit that with your

3    affidavit?

4      A.   For?

5      Q.   I thought you had both of those together.

6      A.   Now, they were all sent to -- all of this

7    information was sent down to the lieutenant Cora

8    Gentry at one time.  So, they may have been bundled

9    together as part of a memo.  I don't believe it was

10   put in with the affidavit.  The affidavit should have

11   been by itself.

12     Q.   Okay.

13     A.   I do remember sending these documents down to

14   Cora Gentry.  I think it went in an e-mail that was

15   sent.  They were attachments that these were in, that

16   I believe were in together.

17     Q.   Okay.  But it would be fair to say that the

18   report from Mr. Tanner carrying on the October 7th of

19   that year, was one of the -- was the report that you

20   relied on that he had a history with Searcy PD?

21     A.   Other than that and one of the officers out

22   that night said they had had issues with him.  One of

23   the officers that night had said that.

24     Q.   From the 29th?

25     A.   From the 29th.

1     Q.  One of the two officers that came out?

2     A.  Yes, sir.

3     Q.  Were there two officers that came out or were

4 there more or less?

5     A.  I know there was two.  This list there was

6 three.

7     Q.  Okay.  So one of the three.

8     A.  This one may just be the supervisor.  It

9 lists three people on here as officers involved.

10    Q.  Okay.  Do you think any of those three are

11 the ones that told you they had previous issues with

12 him, with Mr. Tanner?

13    A.  One of those.

14    Q.  Okay.  That was one of the officers that you

15 relied on for something with filming -- with Mr.

16 Tanner and filming or is that another conversation

17 you had?

18    A.  I believe it was a different conversation.

19 It wasn't that night.

20    Q.  Okay.

21        MR. HYMAN:  I'm going to admit the request

22 for the affidavit for warrant as Defendant's

23 Exhibit 4.

24        (Exhibit No. 4 marked for identification.)

25 BY MR. HYMAN:

1     Q.  As far as the other report from Searcy PD,

2  does that other report mention that Mr. Tanner showed

3  his concealed handgun license?

4     A.  On 10/7?

5     Q.  No.  The one from November 29th, 2014.

6     A.  It doesn't say anything about concealed carry

7  on here.

8     Q.  Okay.  So you testified about this incident a

9  few times, right, or at least in Drew's concealed

10  handgun license revocation hearing and in your OPS

11  interview.  Was that sworn testimony or was -- what

12  was -- how was that testimony taken?

13     A.  The OPS interview?

14     Q.  Sure.  Was that sworn testimony or was that

15  just you talking?

16     A.  Did we swore on that?  I don't exactly

17  remember.

18     Q.  Okay.

19     A.  It's -- anything -- I answered truthfully.

20  Everything must be answered truthfully.

21     Q.  So in your mind everything there was as if

22  you were sworn in your mind?

23     A.  That interview there, I did not testify on

24  revocation hearing, did not.  Only other time I

25  testified --

     Q.  You didn't testify at Drew's revocation
hearing?

     A.  No.  They didn't need me.

     Q.  There was an administrative hearing, was
there not?

     A.  Was that in --

     Q.  A proceeding with Greg Downs and Mary
McLaurin?

     A.  I'd not talked with Mary Clair.  Probably
before it but not on --

     Q.  Not on the day of?

          I have here a record that starts off "Before
the Department of the Arkansas State Police in matter
of James A. Tanner," there is a bunch of names of
people who were there.

     A.  Yeah, I have not seen this.

     Q.  So do you recognize that now?  Just let me
know if it rings a bell that you testified at a
hearing or not.

          It starts off, "Be it remembered that on the
12th of May 2015, at 10:00 p.m. -- that's probably a
mistake, it's probably 10:00 a.m. -- but is that --
do you recall being at this the event?

     A.  At ASP headquarters, I believe.

     Q.  Were you physically there or did you call in?

1     A.  I was down there that day.  I remember being

2  in Mary McLaurin's office.

3     Q.  Do you remember giving testimony that day

4  about this incident on November 29th of 2014?

5     A.  I'm trying to remember which room we were in.

6         MR. BIRD:  General question.  Do you

7  remember being there.

8     A.  I remember being there.  I think it was right

9  before the district court also at the same time, the

10  testimony.

11     Q.  Okay.  So you remember giving testimony on

12  May 12th, 2015, in this matter about November 29th,

13  2014?

14     A.  Yes.

15     Q.  Okay.  So was your testimony at this hearing

16  essentially the same testimony you gave at the

17  district court hearing or is it different?

18     A.  I didn't look over it.  This pertained to the

19  conceal carry.

20     Q.  Okay.

21     A.  And it was all mainly that he was open

22  carrying with a concealed carry permit.

23     Q.  Okay.  So would your actual testimony -- was

24  it was it truthful and accurate?

25     A.  This is the first time I think I've reviewed

1   this document.

2       Q.  Okay.

3       A.  I would like time to look over it.

4       Q.  Okay.  That's fine.

5       A.  Before I answer any more questions on it.

6       Q.  Okay.

7       A.  Because I if -- we can take a break or

8   something, that'd be fine.  Give me a chance to look

9   over it.

10      Q.  Yeah, that's fine by me if you would like.

11      A.  You going to ask some more questions over

12  this document?

13      Q.  Just that it was generally the truth that you

14  testified to at the time and if it there were any

15  differences between this testimony and the testimony

16  at the district court.

17      A.  I can't answer that unless I've fully read

18  over it.

19      Q.  Okay.  If you want to read over it, that is a

20  fine.

21      A.  Okay.  I can't answer without fully reviewing

22  that.

23      Q.  Okay.  You want to take a break to read it?

24      A.  I will have to go to the restroom also.

25      Q.  Great timing.  Okay.

1                    (A short break was taken.)

2    BY MR. HYMAN:

3        Q.  You have gotten at chance to read over that

4    testimony?

5        A.  Yes.

6        Q.  Do you recall giving testimony that day on

7    May 20th, 2015?

8        A.  I do.

9        Q.  Okay.  And now that you've read over it, is

10   that a true and accurate depiction of what you

11   thought you said that day or there any differences?

12       A.  That's the testimony I give that day.  That's

13   what I believe to be true and correct at that time

14   when I give the testimony.

15       Q.  Okay.  But you don't think there's anything

16   wrong with that record?  It looks like the words you

17   spoke?

18       A.  They transcribed what happened.

19       Q.  Okay.  What I'm getting at is that looks like

20   what you said that day?  There's nothing wrong with

21   that document?

22       A.  No.

23       Q.  Okay.  So os there any difference that you

24   can recall between the testimony in that record and

25   the testimony that you gave in the district court in

1  Drew's criminal case?

2      A.  The district court case would have been, of

3  course, it was -- I answered questions offered up by

4  the district attorney.  The court attorney, I

5  answered the questions he asked.  Different than

6  these.  Some yes.  You know, a lot of questions were

7  not being worded the same as the prosecutor asked in

8  district court.  Some may have been, correct.  So, it

9  would not have been exact.  It would have been the

10 questions that the prosecutor asked me.

11     Q.  Right.  Right.  But if you -- generally

12 that's a same story that you gave in district court

13 as in the concealed license hearing; right?

14     A.  Yes, it would have followed that.

15     Q.  It would have followed that.  You can't

16 specifically remember anything different that you

17 might have said extra in the district court than in

18 this document?

19     A.  There would have been additions to this

20 because this pertained to the open carry.

21     Q.  Right.

22     A.  That it was open carrying.  And it was the

23 main there -- between this and what was in the OPS

24 file, those together, would have been what I

25 testified to in district court.

1      Q.  Okay.

2           MR. HYMAN:  Can I admit as State's

3      Exhibit 5.

4           (Exhibit No. 5 marked for identification.)

5           MR. BIRD:  Do you have a complete copy of

6      it, of the entire transcript?

7           MR. HYMAN:  I do, probably.  That is just

8      Ziegenhorn's testimony though.  I think we -- because

9      he leaves.

10          MR. BIRD:  Okay.

11          MR. HYMAN:  Do you want to circle back

12     around to it.  It's like 90 pages and this is the

13     only --

14          MR. BIRD:  Okay.

15          MR. HYMAN:  -- relevant portion.

16          MR. BIRD:  The only thing I would want to

17     make sure of, because I haven't looked at this

18     before, is if he was ever recalled or anything like

19     that.

20          MR. HYMAN:  He never recalled.  He leaves

21     the building.

22          MR. BIRD:  I mean obviously you have right

23     to admit this to the deposition.  I don't have a

24     problem with it.  But just note for the record this

25     is an incomplete copy of the transcript.

1          MR. HYMAN:  Okay.

2          MR. BIRD:  And we have not sent you any

3   written discovery requests but we will make a request

4   for the complete copy of that.

5          MR. HYMAN:  Yeah.  I think you guys have

6   it.

7          MR. BIRD:  We have it, yeah, we do.

8          MR. HYMAN:  It's available on line.

9   BY MR. HYMAN:

10      Q.  So would you say that you consistently told

11  the same story over and over and that this was

12  truthful with no embellishments?

13      A.  It's the same story.  As it goes on, I get

14  older and I forget.

15      Q.  So you were at the Wal-Mart and you were

16  off-duty on November 29th, 2014; right?

17      A.  That is correct.

18      Q.  Okay.  So I actually have the video here of

19  that interaction and I was going to ask you some

20  questions about it.  Now as part of your many of your

21  memos and testimony, you consistently say that Drew

22  was carrying in his -- or calling -- had the phone in

23  his right hand; right?

24      A.  That's the best of my knowledge, yes.

25      Q.  Okay.  So here's a video.  I'm going to come

1    over there.  Now, do you recognize this screen shot?

2        A.  Yes.

3        Q.  So do you recognize -- this is clip two that

4    you are looking at; right?  And on this do you see

5    this person right here?

6        A.  Yeah.

7        Q.  Do you recognize that person?

8        A.  I do.

9        Q.  Who is that?

10        A.  I mean, I assume it's Mr. Tanner.

11        Q.  Okay.  And do you see he had his hand up to

12    his ear in that video?

13        A.  Yeah.

14        Q.  Okay.  And which hand did he appear to be

15    using?

16        A.  At that time, the left hand.

17        Q.  Okay.  And who's this person following right

18    after him?

19        A.  That would be myself.

20        Q.  Okay.

21        A.  Where is this in the store?

22        Q.  This looks -- this is labeled as clip one.

23        A.  I meant the clip we just looked at.

24        Q.  Oh, the clip two was labeled --

25        A.  Where is that located?  Is that in front of

1    the store?

2        Q.  No.  I believe this is -- this is kind of

3    where you guys are.

4        A.  Food section, is that correct?  Is that the

5    food section?

6            MR. BIRD:  He can't answer your question.

7    BY MR. HYMAN:

8        Q.  It's just clip two is all I can really say

9    and that this is an image from it.

10       A.  Okay.

11       Q.  I have never been to that Wal-Mart though.

12           Sorry, this Wal-Mart system is little slow.

13   It doesn't like it when you click back and forth.

14           So, do you recognize this on clip one, this

15   still image?

16       A.  Yes.

17       Q.  Okay.  What am I looking at here?

18       A.  Wal-Mart.

19       Q.  Wal-Mart.  And so here's bikes on the

20   right-hand side?

21       A.  Bikes.

22       Q.  Okay.  Over the here the on left-hand side,

23   what's going on over here?

24       A.  Books, magazines.

25       Q.  Okay.

1     A.   Power department.

2     Q.   Okay.  So here, do you recognize the person

3   on the right-hand side of the screen?

4     A.   Yeah.

5     Q.   And this part of the video is labeled

6   10:51:30 p.m.; correct?

7     A.   Yes, that's what it is labeled.

8     Q.   Okay.  And this person on the right-hand

9   side, that's you right?

10     A.   That is correct.

11     Q.   Okay.  Have you seen this video before?

12     A.   No.

13     Q.   Okay.  So can you describe to me what's going

14   on right now?  You can see you walking up to Mr.

15   Tanner.  Who are you speaking with in this?  Who had

16   this cart?  Do you recognize that person?

17     A.   That might have been my wife.

18     Q.   Okay.  So this was -- this video just

19   depicted you interacting with Mr. Tanner?

20     A.   Are you still in the slow motion or what are

21   we doing?

22     Q.   I think this is regular play time but it just

23   -- it's the way this thing is kind of -- with any

24   surveillance footage, you get every other frame.

25   Okay.  So let's go back there.  Can you -- can you

1    stop this footage and show me the time when you first
2    see Mr. Tanner?
3        A.  I would have to watch the whole thing.
4        Q.  Okay.
5        A.  I mean just -- back up.  It's backing up.
6    That person with the buggie appears to be my wife.
7    At some point, directly after this, is when I walked
8    to this area.
9        Q.  And at some point directly after what time
10   stamp?
11       A.  Well, sometime -- 10:51 from what you've
12   shown me.  He was down this aisle.  Should have been
13   -- should have been down this aisle, if this was
14   toward the front of the store, coming down this aisle
15   and I just stepped over and observed.
16       Q.  So can you tell me the minute and second mark
17   when Mr. Tanner starts approaching where you are?
18       A.  We was coming in the general area right
19   there.  You have to back up in the same area.  So,
20   you would have to back up.
21       Q.  Okay.  So starting from here, can you see in
22   this video when Mr. Tanner approaches you?
23       A.  He's approaching my position.  I mean --
24       Q.  At what time?
25       A.  I mean, it's at what 10:51.

1    Q.  10:51:30?

2    A.  Or before.  Because I could see down the

3  aisle when I come across.  I'm over here because my

4  children should have been over in this area somewhere

5  in the store.

6    Q.  This area being past the bicycles to the

7  right?

8    A.  Over near the toy area.

9    Q.  Okay.  Can you freeze frame the video when

10 you think the first time you say something to Mr.

11 Tanner is?

12   A.  From about right now.

13   Q.  Okay.

14   A.  Or somewhere.

15   Q.  Further back or?

16   A.  I mean right in there.

17   Q.  Okay.  Have you said anything yet do you

18 think?

19   A.  Do I think?  I don't see an interaction or

20 reaction from him so I'm assuming not.

21   Q.  You haven't said anything to him as of

22 10:52:28 seconds?

23   A.  No, it doesn't appear.  I mean I'm -- he just

24 looked up.  And it's possible I said something at

25 that time frame.

1    Q.   10:52 and 30 seconds?

2    A.   Or 31 or 29 or 30.

3    Q.   Okay.

4    A.   Because it's initially when you say something

5    to somebody there are -- they look up or look at you.

6    Q.   Okay.

7    A.   But I'm only guessing because there's not

8    audio.

9    Q.   So at what point do you grab ahold of him?

10   A.   Right there.

11   Q.   At 10:52 and 35 seconds?

12   A.   I believe that's it.

13   Q.   Okay.  Have you grabbed ahold of him at --

14   let's see?

15   A.   Well, I mean I can't see from that video

16   whether I have ahold of him yet or not.

17   Q.   Okay.  And can you tell in this video if Mr.

18   Tanner ever takes his hands and moves them down?

19   A.   I can't see from that vantage point.

20   Q.   Okay.  And at any point in this video, have

21   you been able to see your badge from this clip one?

22   A.   I wasn't paying attention to the badge.

23   Q.   Okay.  Okay.  So, just tell me when you think

24   you can see your badge.

25            MR. HYMAN:  For the record we're playing

1    the video from the beginning of clip one.

2         A.   I thought I saw a glimpse of it.  There's a

3    bright spot.  I'm not sure if that was it or a glare.

4    Because it's going to be right there, that glare.

5         Q.   At --

6         A.   Off of it.

7         Q.   -- 10:51:50.  You think you can see it there?

8         A.   Because I know what where it's at and where

9    I'm looking.  It appears to be a glare, it maybe

10   possible, off of it right there.

11        Q.   Okay.

12        A.   It's hard from that angle.

13        Q.   Is it on your right-hand side at this point?

14        A.   It's on my right-hand side.

15        Q.   Okay.  Tell me to stop it again if you ever

16   get another glare from it as we continue to play it;

17   okay?

18        A.   The video is too far away.

19        Q.   Okay.  So, did you see anything in the clip

20   one where Drew reached down for his phone and you can

21   tell what hand he had his phone in, according to clip

22   one?

23        A.   Clip one?  Which one's clip one again?

24        Q.   The one we just watched.

25        A.   The one we just watched?

 1      Q.   Uh-huh.

 2      A.   On his phone you said?

 3      Q.   Yeah.  Were you able to see which hand he

 4  grabbed his phone with?

 5      A.   No, I didn't.

 6      Q.   Okay.

 7      A.   I can't tell.

 8      Q.   You can't tell from the angle in the clip one

 9  but on clip two --

10      A.   I believe that's at the front of the store.

11      Q.   I believe it's filming from the front of

12  store inward.  Mr. Tanner, in clip two, appears to be

13  on his phone with his left hand; correct?

14      A.   Clip two?

15      Q.   In clip two.  Correct?

16      A.   Is that -- is that clip two?

17      Q.   Yeah, this was clip two.

18      A.   Okay.  Yes, in clip two it appears to be in

19  his left hand.

20      Q.   This is clip three.  Can you tell which hand

21  he has it in there?

22      A.   Appears to be in his left hand.

23      Q.   Okay.  And clip four, can you tell?

24      A.   That's -- it appeared that he was walking

25  towards the exit there.

1    Q.  So, this was clip five.  Can you tell if this

2    is Mr. Tanner here?

3        A.  Yes.

4        Q.  Okay.  And is he on his phone with right or

5    left hand?

6        A.  His left.

7        Q.  Okay.  But if you recall in your reports, one

8    of the reasons why you said you felt like he was no

9    longer a threat is because his phone was in his right

10   hand and unable to grab his firearm without an extra

11   action; correct?

12       A.  That's correct.  It's in my report that way.

13       Q.  Right.  And that was in your testimony

14   earlier today; correct?

15       A.  I believe so.

16       Q.  Okay.  So do you ever see Mr. Tanner with his

17   hand -- with his right hand on his phone in clip five

18   here?

19       A.  No, I don't.

20       Q.  Okay.  Clip six, still in his left hand?

21       A.  Yes.

22       Q.  Okay.  This is clip seven.  Where is this in

23   clip seven?  Is this in front of Wal-Mart at one of

24   the entrances?

25       A.  I don't know.  It's at Wal-Mart.

1    Q.   Is this you and Drew at 10:59:05 roughly?

2    A.   Yes.

3    Q.   Okay.  So you're talking to him and are the

4    Searcy police around at this point?

5    A.   I can't see them.

6    Q.   Okay.  And your gun is exposed at this point?

7    Was, during clip seven, was your firearm exposed at

8    that point?

9    A.   I was looking at the clip.  Yes, it was.

10   Q.   Okay.  So at a different angle here in clip

11   eight, what does it appear to be to you?

12   A.   That's the Searcy PD.

13   Q.   And they pull up at 10:59:24 and they get out

14   of the car 10:59:26; right?

15   A.   It's what that says.

16   Q.   Okay.  10:59:24, right, get out of his car.

17   So in clip seven -- clip seven it starts at 10:58:08

18   roughly, right, and then you and Drew make an

19   appearance at 10:58 -- you and Drew make an

20   appearance at 10:59:06; right?

21   A.   Yes.

22   Q.   Okay.  So the police show up roughly

23   20 seconds later after you are out in front of the

24   Wal-Mart?

25   A.   Yes, when they parked their -- parked there.

1      Q.  So the Searcy PD doesn't show up for another

2   20 seconds; right?

3      A.  20 seconds.

4      Q.  That's what I'm asking.  If it's 10:59:06 or

5   10:59:05 --

6      A.  Are you talking about the time we reached the

7   door from the time they parked?

8      Q.  Yes.

9      A.  Is 20 seconds, is that what you are saying?

10     Q.  Yes.  That's my question.  Did it appear to

11  be 20 seconds?

12     A.  10:59:06 reaching the door; right.

13     Q.  Right.  And then clip eight we can see that

14  the Searcy police don't pull up until 10:59:22 until

15  they park and they're not out of the vehicle until

16  10:59:26 and blue lights aren't on; right?

17     A.  Are not.

18     Q.  Are not.  Okay.  So you are with Drew for

19  about 20 seconds in front of Wal-Mart before the

20  police show up; right?

21     A.  Yes.

22     Q.  Okay.  So was Drew free to leave at that

23  point from you if he had just kept on walking got in

24  the car go home?

25     A.  I was detaining him for local PD to show up

1    to take over.

2        Q.   Okay.

3        A.   They were in route.

4        Q.   Okay.  Now, do you rememberer what time you

5    pulled up to the Wal-Mart on December 3rd?

6        A.   Exact time, I do not.

7        Q.   Okay.  I think this is the video that has the

8    exact time in clip 12.  Does that show you here

9    parking at about 1:36?

10       A.   1:36.

11       Q.   And you're out of your vehicle.  Are you out

12   of your vehicle, see yourself exit the vehicle?  You

13   exit your vehicle at 1:36:40; right?  Did you exit

14   the vehicle about 1:36:40?

15       A.   Yeah.

16       Q.   Okay.  All right.  I think that's all I've

17   got from there.

18            MR. HYMAN:  I will admit that copy in a

19   second.

20   BY HYMAN:

21       Q.   I have here a copy of the statute for

22   carrying a weapon as it was in 2014.  You said, I

23   believe you read of changes in that statute and you

24   read that statute?

25            MR. HYMAN::  I think this might be it

1    already in front of him.

2              MR. BIRD:  The statute?

3              MR. HYMAN:  Yes, the statute for carrying a

4    weapon.

5              MR. BIRD:  Yeah.

6    BY MR. HYMAN:

7        Q.  Okay.  So in this statute there's a section

8    here that says is it permissible -- let's see, okay.

9    So in subsection C here, it says it's permissible to

10   carry a handgun under this section if at the time of

11   the act of carrying a weapon -- and it lists a bunch

12   of different things; right?

13       A.  Yes.

14       Q.  Okay.  And you're generally familiar with

15   those, right, because you read this statute?

16       A.  Yes, correct.

17       Q.  Okay.  So earlier we spoke about the word

18   permissible in a different statute.  So, it's

19   permissible to carry -- be similar to permissible to

20   other the statute about the center turn lane; right?

21       A.  Sir?

22       Q.  So permissible to carry would be similar in

23   that other statute that we read earlier about the

24   permissible use in the center turn lane; right?

25       A.  Correct.

1     Q.  Okay.  So these are listed exemptions that a

2 person can carry a weapon as long as they are doing

3 one of these things listed below; right?

4     A.  Yes.

5     Q.  Would that include open carry?

6     A.  Sir?

7     Q.  Would that include open carry under this

8 statute?

9     A.  That would be correct.

10     Q.  Okay.  So someone could open carry, for

11 example, if they are in their own dwelling or place

12 of business; right?

13     A.  Correct.

14     Q.  And if a person's a law enforcement officer,

15 or a member of the armed forces acting in the scope

16 of his or her official duties, a person's assisting

17 law enforcement officer and then a bunch of stuff.

18 Then there's the journey exception, right?  And then

19 there's the security guard section.  And then there's

20 the person that's hunting game with the handgun that

21 maybe hunted with a handgun under rules and

22 regulations of the Arkansas State Game and Fish

23 Commission or is on route to or from a hunting area

24 for the purpose of hunting game with a handgun.

25        So that's -- that's one of the instances that

1    it would be permissible to open carry; right?

2        A.   Correct.

3        Q.   So and you'd read the statute before your

4    interaction with Mr. Tanner?

5        A.   I have been -- been over it.

6        Q.   Okay.  And there's also, you know, you could

7    be a prosecutor or deputy prosecuting attorney, or

8    that you could be retired law enforcement, or some

9    other -- other exemptions; right?  So, how did you

10   know that Drew was not any of these things when you

11   detained him?

12       A.   Initially, I did not.

13       Q.   Okay.  When this statute says it is

14   permissible doesn't that mean, you know, the person

15   can do it, if -- if it's one of these things and so

16   therefore the burden is on the trooper to think

17   otherwise?

18       A.   You would have to determine that those aren't

19   the facts of the case.

20       Q.   Okay.

21            MR. HYMAN:  I would like to admit this as

22   Plaintiff's Exhibit 6.

23            (Exhibit No. 6 marked for identification.)

24   BY MR. HYMAN:

25       Q.   So before interacting with Drew on

1    December 30th did you specifically lift up your shirt

2    so your badge would become more visible before

3    walking over to him or anything like that?

4        A.  You said December 3rd?

5        Q.  I'm sorry.  On November 29th.

6        A.  November 29th, I do not remember initially

7    doing it.  Because -- again, because I thought he may

8    have been law enforcement.

9        Q.  So why did you go and apply for a warrant for

10   Mr. Tanner for his action on November 29th?

11       A.  For actions on November 29th I applied for a

12   warrant for his fairly to identify himself to a law

13   enforcement officer.

14       Q.  Okay.  But didn't you in your application

15   also list carrying a weapon?

16       A.  I did.

17       Q.  And then the judge struck through that;

18   right --

19       A.  Yes.

20       Q.  -- when he actually issued the warrant?

21       A.  Yes.

22       Q.  Okay.

23       A.  That's part of the process.  If the judge

24   doesn't think there was a possibly government

25   operation the judge would not have signed a warrant

1    in the first place.

2        Q.   Right.

3        A.   But the judge thought there was enough

4    evidence there for the destruction charge for not

5    identifying himself.

6        Q.   So what's the basis for -- what do you have

7    to have in order to demand someone give you

8    identification?

9        A.   Sir?

10       Q.   What is the prerequisite for a trooper to

11   demand identification from a pedestrian?

12       A.   From a pedestrian?  You have a reasonable

13   suspicion, probable cause.

14       Q.   Okay.   Reasonable suspicion of what?

15       A.   Reasonable suspicion of a crime.

16       Q.   Okay.   In this instance reasonable suspicion

17   of which crime?

18       A.   573-120.

19       Q.   Is that carrying a weapon?

20       A.   Yes.

21       Q.   Okay.   The reasonable suspicion was because

22   of the his gait, demeanor, the fact he said that he

23   was not with law enforcement; right?

24       A.   He was not law enforcement or he believed he

25   was permitted to carry.

1    Q.  So in all of the other instances with Drew

2    carrying a firearm, he never had to be arrested,

3    right, that you heard about?  He'd never had to be

4    detained?

5    A.  Not that I know of.

6    Q.  Okay.  He had never been violent with police

7    officers before; right?

8    A.  I don't have any knowledge of that.

9    Q.  Okay.  But you had never heard of him being

10   violent with police officers?

11   A.  I don't have any knowledge of that.

12   Q.  Okay.  So you were -- you were under the

13   impression that the concealed handgun license

14   department needed his driver's license -- or needed

15   his concealed handgun permit.  What if you were to

16   see a person walking down the street that you knew

17   had their driver's license but they weren't able to

18   the confiscate it during his DWI because he didn't

19   have it on him.  Do you believe you would be able to

20   detain someone and get their driver's license from

21   them at that point?

22   A.  He, by law, on a DWI, they are required to

23   surrender that in a DWI.  I believe that's in the --

24   Q.  Right, but let's say somebody, when they're

25   arrested, they not only have the DWI but they are

1    also driving without proof of their license on their

2    person.  And then you see them a few days later,

3    knowing that nobody ever got a hold of that license.

4    Do you think you have probably cause to or a

5    reasonable suspicion to come up to them and demand

6    that license?

7        A.   You're asking if they had a DWI; is that

8    correct?

9        Q.   Uh-huh.  And they are walking down the street

10   now.

11       A.   Because they were supposed to surrender it.

12   Yes, it would give cause because they were supposed

13   to surrender that according to law, on an arrest DWI

14   to surrender their driver's license to you.

15       Q.   Okay.  So you --

16       A.   Yes, I would -- I would ask them, "Did you

17   return the driver's license you were supposed to turn

18   in?  Do you have it with you?"

19       Q.   And what if they refuse to answer questions?

20       A.   If they refused, it would depend on the

21   totality of the circumstance.

22       Q.   Okay.  But you don't think just because them

23   refusing to the answer any questions gives you

24   reasonable suspicion to arrest them and take their

25   driver's license?

A.   Depends on how they handled themselves.

Q.   Okay.  So, there was e-mail from Mary Clair McLaurin where she told you to not discuss the second incident during the concealed handgun license revocation; do you recall that e-mail?

A.   I think I remember something to that effect.

Q.   Okay.  I have a copy of it here.  You mind looking over it for me and seeing if that's accurate to your recollection?

A.   Yes.

Q.   Okay.  And why did she tell you not to discuss the second encounter?

A.   Because the encounter with the concealed carry license, I assume, had nothing to do with the second encounter.  That was in the CHS concealed carry office hands.

Q.   Okay.

     MR. HYMAN:  I'm going to admit this as Plaintiff's Exhibit 7.

          (Exhibit No. 7 marked for identification.)
BY MR. HYMAN:

Q.   So, I believe earlier in some of your reports you said he had a confrontational history with the Searcy PD.  Can you explain your basis for that?

A.   What was just said in mention he would --

1    Q.   That was just said in what?

2    A.   Okay.  Your question again.

3    Q.   Yes.  I believe in some of your memos,

4    earlier statements, you stated that Drew was had a

5    confrontational history with the Searcy PD.

6    A.   They have reports of him walking around town

7    and to again -- to get -- they'd get calls, that's

8    what I understand, 911 calls or the police went out

9    to interact with him for carrying a weapon around

10   town.

11   Q.   Okay.  That was for carrying a rifle with the

12   Searcy PD, right, or do you recall?

13   A.   I believe there was some with a rifle but

14   others were with a handgun.

15   Q.   Okay.  Now what was your understanding about

16   open carrying a rifle in 2014?  Would that have been

17   legal prior to Act 746?

18   A.   I would ask why.

19   Q.   Right.  But would it have been legal just to

20   walk down the street with a rifle?  As long as it

21   was, you know, not your finger on the trigger.

22   A.   If it was strapped on the back and carried in

23   a position where it is not readily accessible as with

24   maybe persons carrying with a forearm for grip, it's

25   intent is be fired in that position, low ready.  That

1  would be, I consider, reasonable cause.

2      Q.  Okay.  So if it's on your back strap, that's

3  not reasonable suspicion.  But if it's in -- if

4  you're carrying a rifle with the front and your hand

5  is on the pistol grip or something like that, that's

6  enough?

7      A.  Sir?

8      Q.  And your hand's on the pistol grip, is that

9  enough for reasonable suspicion of something?

10     A.  Like if your finger's right there on the

11  trigger, you're talking like an AR style rifle?

12     Q.  Right.  But what if it's not on the trigger

13  but your hand's on the pistol grip; is that your

14  understanding?

15     A.  It would mean -- it would just depend on the

16  totality of the circumstance on how it was being

17  carried and how the person reacted to being

18  approached.

19     Q.  Okay.  So, you know, I believe you testified

20  that you were worried he was about to cause a scene

21  on December 3rd.  So, what were you worried exactly

22  that Mr. Tanner was going to do?

23     A.  I didn't know.  I mean it he may have had

24  someone there behind him.  He may not have.  He could

25  have become -- started becoming violent.  I don't

1   know.

2       Q.  Okay.  All right.  I believe all I have to do

3   is admit this video and we're done with Mr.

4   Ziegenhorn just about.

5           So finally for this clip that we were

6   looking at earlier, now this is what is labeled as

7   clip nine.  Do you recognize anybody in this image so

8   far in clip nine at 1:41 and 47 seconds?

9       A.  Appears to be somebody in uniform with boots.

10      Q.  And on December 3rd, 2014, 1:42 and --

11  roughly that's when the person with the uniform and

12  boots starts walking up?  So this person with boots,

13  you can kind of see them enter the screen 1:41:57.

14      A.  Yeah, I see a pair of uniform boots coming

15  from the east side of the store.

16      Q.  Okay.  You see they stop in front of another

17  person; do they not?

18      A.  Slacks and red shirt.

19      Q.  Right and that's at 1:42 and 2 seconds?

20  Right; is that correct as far as the timestamp?

21      A.  1:42:07.

22      Q.  Right, but he was stopped at 1:42:02; right?

23      A.  Right.  I wasn't looking up there.  I was

24  looking at the timestamp when he stopped the video.

25  Okay.  1:42:02.

 1    Q.  And that's when those pair of uniform boots

 2  stop in front of another person?

 3    A.  Yes.

 4    Q.  He's under arrest about 1:42:40, right, this

 5  person?  He was placed in handcuffs at about 1:42:40;

 6  is that accurate?  Right now it's 1:42:39 and he's

 7  got his arm behind him.

 8    A.  That would be an accurate statement.

 9    Q.  Now, do you recognize this as you and Drew at

10  the Wal-Mart?

11    A.  I'm assuming it is because at this point --

12  because my face is not visible, but this the date and

13  time I was there.

14    Q.  Okay.  Is that Mr. Tanner, from what you

15  could tell, at 1:43:33?

16    A.  That appears to be him.

17    Q.  So, that is you and Mr. Tanner at Wal-Mart

18  from your memory?

19    A.  My memory it is, yes.

20    Q.  Okay.  Okay.

21       MR. HYMAN:  And I would like to admit this

22  now as Exhibit 8.

23         (Exhibit No. 8 marked for identification.)

24       MR. HYMAN:  And we'll get you guys a copy.

25       MR. BIRD:  Did you talk about each one of

1    those clips that are on the discs?

2         MR. HYMAN:  Do you want to talk about each

3    one before it's admitted?

4         MR. BIRD:  No.  Are all of the clips -- all

5    the clips are from those two dates those, from

6    Wal-Mart?

7         MR. HYMAN:  Yes.

8         MR. BIRD:  Okay.

9         MR. HYMAN:  There's nothing extra.

10        MR. BIRD:  Okay.  That's fine.

11   BY MR. HYMAN:

12        Q.  Did you bring any evidence here today with

13   you that shows you were at the Wal-Mart with any

14   reason on December 3rd, 2014?

15        A.  Did I bring any evidence with me as far as

16   the reason for me being there in the first place?

17        Q.  Right, for glasses or any kind of medical?

18        A.  I did not bring anything with me pertaining

19   to that.

20        Q.  Or bank records or anything?

21        A.  I don't have any bank records.  It was either

22   a drop off or warranty issue on the glasses.

23        Q.  Right.

24        A.  From where I was parked, until I came from

25   the direction of the vision center in that last clip,

1 that was my main intention to be there.

2  Q. Your main intention to be there?

3  A. That was my only intention to be at Wal-Mart.

4  Q. Okay.

5  A. That's the main reason I was there.  The only

6 reason.

7  Q. Okay.

8   MR. HYMAN:  I think that's it.

9   MR. BIRD:  We'll reserve questions.

10    (Deposition concluded)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C-E-R-T-I-F-I-C-A-T-E

I, Cynthia Minks Myers, a Certified Court Reporter of Arkansas, duly certified under and by virtue of the laws of the State of Arkansas, do hereby certify that the proceedings had in the foregoing cause were taken in shorthand by myself and later reduced to typewritten form by me, and that the foregoing transcript contains a full, true, complete and correct transcript to the best of my ability of all of the proceedings had; that I am not an attorney for any of the parties in this matter, nor do I have an interest in the event of the same.

WITNESS MY HAND AND SEAL, in the City of Poteau, County of LeFlore, State of Oklahoma, this _____ date of _____, 2018.