## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION 4

**JAMES ANDREW TANNER**                                     **PLAINTIFF**

**vs.**                          **No. 4:17-CV-00780-DPM**

**KURT ZIEGENHORN IN HIS INDIVIDUAL CAPACITY,**
**COLONEL BILL BRYANT IN HIS OFFICIAL**                 **DEFENDANTS**
**CAPACITY AS HEAD OF THE ARKANSAS**
**STATE POLICE, AN AGENCY OF THE**
**STATE OF ARKANSAS; WILLIAM "BILL"**
**SADLER IN HIS INDIVIDUAL CAPACITY; MIKE KENNEDY, and**
**ELIZABETH CHAPMAN INDIVIDUALLY.**

## FOURTH AMENDED CIVIL RIGHTS COMPLAINT
## AND REQUEST FOR JURY TRIAL

COMES NOW the Plaintiff, JAMES ANDREW "DREW" TANNER, by and through his attorney of record, William Whitfield Hyman of King Law Group, PLLC, and for his Section 1983 and 1988 Civil Rights Complaint against Colonel Bill Bryant in his Official Capacity as head of the Arkansas State Police ("ASP"), Kurt Ziegenhorn in his individual capacity, William "Bill" Sadler in his individual capacity, Mike Kennedy in his individual capacity, and Elizabeth Chapman in her individual capacity, would state and allege the following:

## PARTIES:

1. Plaintiff James Andrew Tanner (hereafter referred to as "Drew") is an adult citizen and resident of Searcy, White County, Arkansas, in the Eastern District of Arkansas, Western Division 4, who at all material times herein did reside at 815 West Cherry, Searcy, Arkansas 72143.

1

2. Colonel Bill Bryant (hereafter referred to as "Bryant") is the administrative head of the ASP, an agency of the State of Arkansas. He works at 1 State Police Plaza Dr, Little Rock, AR 72209, and is being sued in his official capacity as such.

3. Kurt Ziegenhorn, (hereafter referred to as "Ziegenhorn") an Arkansas resident and a State Trooper, is, and was during all relevant times, in the employ of the ASP, an agency of the state of Arkansas. Ziegenhorn resides at 3205 North Washington, Forrest City, Arkansas 72335.

4. Defendants William "Bill" Sadler in his individual capacity (hereafter referred to as "Sadler"), Mike Kennedy (hereafter referred to as "Kennedy")  in his individual capacity, and Elizabeth Chapman (hereafter referred to as "Chapman")  in her individual capacity, all of whom work for the ASP at 1 State Police Plaza Dr, Little Rock, AR 72209.

5. Sadler is the Custodian of Records for purposes of FOIA at the ASP.

6. Chapman is the administrator of the ASP's official Facebook page.

7. Kennedy was Chapman's supervisor at the ASP during relevant portions of the lawsuit.

8. Ziegenhorn, Sadler, Kennedy, and Chapman are being sued because of their actions against the Plaintiff complained about in this action, they are accordingly liable to Plaintiffs for damages and other relief as set forth in this Complaint.

**JURISDICTION AND VENUE:**

9. This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343, 2201, and 2202, and supplemental, collateral and pendent jurisdiction over all the state causes of action. This Court has personal jurisdiction over the Plaintiff, Defendants Ziegenhorn, Sadler, Kennedy, and Chapman, as they are residents of the State of Arkansas, and the court has jurisdiction over the ASP (ASP) as it is a government entity, an agency of

the State of Arkansas, and all actions complained about herein took place within the geographical confines of Arkansas.

10. Venue is proper pursuant to 28 U.S.C. § 1391.

### Counts 1-14: Injunctive Relief Against ASP for Violations of Freedom of Speech Rights

11. Every paragraph in this complaint is incorporated as though fully stated herein.

12. Counts 1-14 are brought against Separate Defendant the State of Arkansas, by and through the administrative head of the ASP, Bryant so that the court may enter an injunction against Bryant ordering him to direct employees of the ASP to unblock Drew from participation in the Official ASP Facebook page so that Drew may be unblocked and have his comments restored.

13. Counts 1-6 represent Drew's six comments that were hidden, respectively, are brought under the First Amendment and the FCRA (hereinafter referred to as the Federal Civil Rights Act") for injunctive relief against the state of Arkansas to restore Drew's six respective comments.

14. Count 7 is brought under the First Amendment and the FCRA for injunctive relief against the state of Arkansas to unblock Drew from participation in the ASP Facebook Page.

15. Counts 8-13 represent Drew's six comments that were hidden, respectively, are brought under the ACRA as made available from Article II Section 6 of the Arkansas Constitution for injunctive relief to restore Drew's six respective comments.

16. Count 14 is brought under the ACRA as made available from Article II Section 6 of the Arkansas Constitution for injunctive relief to unblock Drew from the ASP Facebook Page.

17. Employees of the ASP (Separate Defendants Kennedy and Chapman) while acting under the color of law as employees of the ASP, banned the Plaintiff from participation in a

government owned and controlled Facebook page, in violation of the Plaintiff's First and Fourteenth Amendment rights protected under the United States Constitution, and Article II, Section 6 of the Arkansas Constitution.

18. Causes of Action 1-7 are brought under 42 U.S.C. § 1983 and 1985 and 8-14 are brought under the Arkansas Civil Rights Act (hereafter referred to as "ACRA").

19. The ASP used government resources to create and manage the ASP Facebook page.

20. In February and September 2016, Kennedy ordered that Chapman hide Drew's Facebook comments. Kennedy subsequently ordered that Drew be blocked from participating in the official ASP Facebook page.

21. On February 18th, 2016, the ASP decided to recognize the excellence of one of their officers, a Mike Foster, on their official Facebook page.

22. Drew, a follower of the page, recognized "Mike Foster" as someone who had conducted the internal investigation of Ziegenhorn, which cleared Ziegenhorn of wrongdoing.

23. Drew decided to take to social media to inform the public of the inadequacies of the ASP (ASP). In a comment underneath this picture, Drew stated "I have this guy's autograph. He supports crooked cops, so that makes him a crooked cop in my book. He needs to be held accountable as well if he is going to support the unlawful actions of his officers.... [link to image of letter from Mike Foster] This guy sucks." Drew attached a link to the picture of the notice from Mike Foster to this comment (Hereinafter referred to as "Comment 1").

24. Without warning or a chance to appeal, Drew's Comment 1 was subsequently hidden from view, however the post by the ASP remained visible to everyone (except those who may be blocked from participation in the page, such as Drew is now).

4

Case 4:17-cv-00780-DPM   Document 46   Filed 03/12/19   Page 5 of 28

25. At this point, there were no "terms and conditions" of using the ASP Facebook page or "policies and procedures" in place for deleting comments from the page.

26. The ASP do not consider the word "sucks" to be an obscene or vulgar word, so this cannot be their reasoning in deleting this comment.

27. As stated in their Response to Plaintiff's Interrogatory Number 22 propounded to Separate Defendant the State of Arkansas: "ASP has not posted obscene or vulgar words on its Facebook Page."

28. An ASP Post from 5/21/2017 reads in part: "Earlier tonight I was involved in a collision in the Bella Vista area. I was not at [sic] hurt, but it was the type of situation that just kind of ***sucks*** for everyone." Emphasis added.

29. The ASP later published unconstitutional terms and conditions sometime after Drew was blocked from participation in the page in September 2016.

30. There exists a continuing and widespread, persistent pattern of unconstitutional misconduct by the ASP employees; Defendant Bryant's deliberate indifference to or tacit authorization of such conduct after notice of that misconduct is the moving force behind the Constitutional violations. The misconduct continues because Drew is still blocked, and his comments are still hidden. A review of the ASP Facebook page "terms and conditions" demonstrates their continued unconstitutional policy. Drew informed them of their illegal activity.  Further, the official ASP Facebook page is listed under the "Contact Us" section of the official ASP Website, right next to a map for directions on the bottom right of the page. https://asp.arkansas.gov/. Accessed 9/20/2018. Finally, a previous version of this complaint enumerating his misconduct has been served on and answered by Bryant, yet Drew's comments are still hidden, and he is still blocked from participation. Despite this continued

notice, Bryant responded to interrogatories claiming ignorance of his employees' illegal actions until commencement of this lawsuit, demonstrating his deliberate indifference or tacit authorization of such conduct.

31. In February or March of 2016, the ASP posted about a little-known statute on their official Facebook page.

32. In response Drew posted in the comments section of that post: "Are you familiar with 5-54-122(c)(1)(b)? Because one of your troopers committed this crime, you know who it is." Hereinafter, this comment will be referred to as "Comment 2."

33. Drew's Comment 2 was a reference to Ziegenhorn's false statements against Drew in various reports and testimony.

34. Drew's Comment 2 was subsequently hidden from view by Chapman.

35. On September 14th, 2016 on a post about a new recruit class, at 7:03 p.m. Drew commented "Just don't be like that douche, Trooper Ziegenhorn." This comment will hereinafter be referred to as "Comment 3."

36. Drew's comment was a reference to Ziegenhorn's treatment of him and is protected speech.

37. Drew's Comment 3 was subsequently hidden from view by Chapman.

38. After Drew's Comment 3 was deleted, on September 14th, 2016 on a post about a new recruit class, at 7:31 p.m. Drew commented "Just don't be like that fascist pig, Trooper Ziegenhorn." This comment will hereinafter be referred to as "Comment 4."

39. Drew's comment was a reference to Ziegenhorn's treatment of him and altered because his previous comment had been removed because a message from an administrator claimed that "douche" was profanity.

40. Drew's comment was subsequently hidden from view by Chapman.

41. After Comment 4 was deleted on September 14th, 2016 on a post about a new recruit class, at 7:50 p.m. Drew wrote "Just don't be like that fascist pig, Trooper Ziegenhorn, aka douchebag." This comment will now be referred to as "Comment 5."

42. Drew's comment was out of frustration of his other comments being deleted.

43. Drew's comment was subsequently hidden from view.

44. After all of Drew's comments had been deleted on September 14th, 2016 on a post about a new recruit class, at 9:51 p.m., Drew commented: "So handcuffing someone and detaining them without any probable cause, stealing from them, then letting them go is taught in this class or is that something that DOUCHEBAG Ziegenhorn learned on his own?" This comment will hereinafter be referred to as "Comment 6."

45. Drew's comment was out of frustration of his other comments being deleted and he wanted to express his unhappiness with Ziegenhorn's treatment of him and the subsequent ASP response (or lack thereof).

46. Drew's comment was subsequently hidden from view, and Plaintiff was blocked from participation in the official Facebook Page.

***Counts 15 Through 42: Individual Liability for Violations of Freedom of Speech Rights***

47. Every paragraph in this complaint is incorporated as though fully stated herein.

48. Counts 15 through 21 are brought against Separate Defendant Kennedy in his individual capacity for violating Drew's federal freedom of speech rights by ordering that Drew be banned from participation in an official government Facebook page and ordering his comments to be deleted, in violation of the 1st and 14th Amendments to the US Constitution and these causes of action are brought under 42 U.S.C. § 1983 and 1985. Count 15 is for

ordering that Drew's participation be blocked, Count 16 is for comment 1, Count 17 is for comment 2, Count 18 is for comment 3, Count 19 is comment 4, Count 20 is for comment 5, and Count 21 is for comment 6.

49. Counts 22 through 28 are brought against Separate Defendant Kennedy for violating Drew's state freedom of speech rights by ordering that Drew's participation in the ASP Facebook page be blocked and for ordering comments 1-6 be deleted. These causes of action are brought under ACRA and Article II Section 6 of the Arkansas Constitution. Count 22 is for ordering that Drew's participation be blocked, Count 23 is for comment 1, Count 24 is for Comment 2, Count 25 is for comment 3, Count 26 is for comment 4, Count 27 is for comment 5, and Count 28 is for comment 6.

50. Counts 16-21 represent Drew's six respective comments and are brought under the First Amendment and the FCRA for individual liability against Kennedy for ordering that Drew's six respective comments be hidden from view.

51. Counts 22-28 represent Drew's six respective comments and are brought under the ACRA as made available from Article II Section 6 of the Arkansas Constitution against Kennedy for ordering that Drew's participation in the ASP Facebook page be blocked.

### *Elizabeth Chapman Free Speech Counts 29 to 43:*

52. Every paragraph in this complaint is incorporated as though fully stated herein.

53. In September 2016, Separate Defendant Chapman banned Drew from participation in the official ASP Facebook page after Drew continued to post negative comments about employees of the ASP on the page.

54. Chapman was also the person who hid all of Drew's comments from the ASP Facebook Page.

8

55. Counts 29 - 35 are brought against Defendant Chapman for violating Drew's rights under the 1st and 14th Amendments to the Constitution and these causes of action is brought under 42 U.S.C. § 1983 and 1985.

56. Count 29 is for Chapman's blocking Drew's participation in the ASP Facebook page.

57. Counts 30-35 represent Drew's six respective comments and are brought for Chapman's deleting Drew's respective Comments Number 1-6. Count 30 is for comment 1, Count 31 is for comment 2, Count 32 is for comment 3, Count 33 is for comment 4, Count 34 is for comment 5, Count 35 is for comment 6.

58. Counts 36 - 43 are brought against Separate Defendant Chapman for violating Drew's rights by banning him from participation in an official government Facebook page, as protected under Article 2, Section 6 of the Arkansas Constitution and the ACRA.

59. Count 36 is for blocking Drew's participation in the ASP Facebook page.

60. Count 37-43 represent Drew's six respective comments and are brought for Chapman's deleting Drew's respective Comments Number 1-6. Count 37 is for Comment 1, Count 38 is for Comment 2, Count 39 is for Comment 3, Count 40 is for Comment 4, Count 41 is for Comment 5, Count 42 is for Comment 6.

61. Separate Defendant Chapman acted maliciously with the intent to cause harm to the plaintiff when she deleted Drew's comments. This can be seen in how she allows racist comments, the use of the word "sucks" in their official posts, use of the word "shit" by random commenters, and these are just a few examples. Drew's comments were typically deleted in a matter of hours, these comments have been up for weeks, if not years. Chapman was informed during her deletions that what she was doing was illegal and given links to

news stories about the illegalities of her actions, yet she persisted and deleted Drew's comments anyway.

### Counts 44 – 53 Individual Capacity Claims Against Ziegenhorn

62. Every paragraph in this complaint is incorporated as though fully stated herein.

63. Counts 44 through 53 are brought against Separate Defendant Ziegenhorn.

64. Count 44 is brought under the FCRA and the 4th Amendment to the Constitution for violating Drew's federal right to be free from unreasonable searches and seizures against Ziegenhorn for when Ziegenhorn caused Tanner to be detained on 11/29/2014.

65. Count 45 is brought under the ACRA and Article II Section 5 of the Arkansas Constitution for violating Drew's state right to be free from unreasonable searches and seizures Ziegenhorn for when Ziegenhorn caused Tanner to be detained on 11/29/2014.

66. Count 46 is brought under the FCRA and the 2nd Amendment to the Constitution for retaliating against Drew for exercising his right to bear arms and Count 47 is brought under the ACRA and Article 2 Section 5 of the Arkansas Constitution for retaliating against Drew for exercising his right to bear arms on 11/27/2014 and the subsequent harassment on 12/3/2014 and 1/17/2015 arrest chilled Drew from bearing arms at a later date. The only reason Drew was initially detained on 11/27/2014 was for openly carrying a firearm.

67. Count 48 is brought under the FCRA and the 4th Amendment to the Constitution for violating Drew's federal right to be free from unreasonable searches and seizures against Ziegenhorn for when Ziegenhorn caused Tanner to be detained on 12/3/2014.

68. Count 49 is brought under the ACRA and Article II Section 5 of the Arkansas Constitution for violating Drew's state right to be free from unreasonable searches and seizures Ziegenhorn for when Ziegenhorn caused Tanner to be detained on 12/3/2014.

69. Count 50 is brought under the FCRA and the 4th Amendment to the Constitution for violating Drew's federal right to be free from unreasonable searches and seizures against Ziegenhorn for when Ziegenhorn caused Tanner to be detained and searched on 1/17/2015.

70. Count 51 is brought under the ACRA and Article II Section 5 of the Arkansas Constitution for violating Drew's state right to be free from unreasonable searches and seizures Ziegenhorn for when Ziegenhorn caused Tanner to be detained and searched on 1/17/2015.

71. Count 52 is brought under the FCRA and the 1st Amendment to the US Constitution and Count 53 is brought under Article II Section 6 of the Arkansas Constitution and the ACRA because Drew was detained and searched in retaliation for exercising his rights to freedom of speech and redress from the government because Ziegenhorn harassed Drew on 12/3/2014 and caused Drew to be arrested on 1/17/2015 in retaliation for Drew filing a complaint against Ziegenhorn and for otherwise exercising his free speech rights.

72. On November 29th, 2014, Drew Tanner was openly carrying a pistol in a holster while shopping at Wal-Mart in Searcy, Arkansas when a man later identified as Ziegenhorn began stalking toward him, demanding to know which law enforcement agency Drew was with. Drew responded that he was not with a law enforcement agency, then Ziegenhorn forcefully grabbed Drew by the arm said "State Police. Identify yourself."

73.  At that time Ziegenhorn was off-duty and out of his ASP troop zone.

74. At that time, there was nothing on Ziegenhorn's person visually identifying Ziegenhorn as a Trooper.

75. After being accosted, Drew wriggled from Ziegenhorn's repressive grasp and made a panicked call to 911.  In his 911 call, Drew identified himself while retreating to safety

toward the exit. The 911 dispatcher told Drew to stay in the building and wait for Searcy Police Department officers to arrive. During this time, Ziegenhorn eventually produced a badge that had been previously covered up by his shirt to the employees and the manager of the Wal-Mart.

76. At Ziegenhorn's behest, the Wal-Mart manager informed Drew, in contradiction to Wal-Mart's official policy, that Wal-Mart did not allow open carry of firearms in the store.

77. Although Drew complied with the manager's request to leave, Ziegenhorn insisted on escorting Drew outside of the Wal-Mart where he proceeded to further detain Drew.

78. During this detention Ziegenhorn yelled and hurled profanities while placing his finger within inches of Drew's face and cornering Drew against a wall. During this time, Defendant Ziegenhorn asserted, "I don't care who the fuck you think you are, when a fucking Trooper asks you to identify yourself, you fucking do it, is that clear?" (paraphrased).

79. Searcy police officers arrived, and Mr. Tanner identified himself to them and answered their questions.

80. Ziegenhorn's outrageous behavior during the November 29th, 2014, encounter, led Drew to call Ziegenhorn's Troop and ask how to lodge an official complaint against Ziegenhorn with the Arkansas State Police.

81. Mr. Tanner mailed in that complaint in the following days, however that initial complaint was mysteriously never received.

82. Drew also emailed Wal-Mart corporate, and was able to get confirmation and clarification that Wal-Mart did in fact allow open carry in their stores. On December 3rd, 2014, with this email in hand, Drew returned to the Searcy Wal-Mart (unarmed this time) to speak with the manager and inform him of Wal-Mart's official policy.

83. Ziegenhorn, cloaked in the authority of the Arkansas State Police in full uniform, arrived at the Searcy Wal-Mart within moments of Drew.

84. Searcy is about half an hour away from Ziegenhorn's base of operations in Forrest City.

85. Drew alleges that Ziegenhorn stalked him, approached him, and demanded, "Mr. Tanner, are you carrying a weapon today?" Drew politely responded that he did not have to answer that question.  Ziegenhorn relentlessly repeated his question and finally stated that he was going to give Drew "one last chance" to answer this question before he was arrested. Under duress, Drew eventually capitulated and admitted that he was not armed.

86. Ziegenhorn demanded Drew produce his identification, despite having already addressed Drew by name. Drew responded that he did not have to produce his identification because the Ziegenhorn knew who he was.  Ziegenhorn then handcuffed Drew, searched his person, confirmed he was not armed, and escorted him outside to a patrol car.

87. Defendant Ziegenhorn then detained Mr. Tanner for approximately 30 minutes and confiscated Drew's Concealed Handgun License before releasing Mr. Tanner without any charges.

88. Ziegenhorn never requested that Drew produce his Concealed Handgun License so that Ziegenhorn could confiscate it, Ziegenhorn simply handcuffed Drew and took the card.

89. That same day, Defendant Ziegenhorn filed a request for an arrest warrant for Drew for the charge of Obstructing Governmental Operations and Carrying a Weapon.

90. The warrant that Ziegenhorn requested was signed by a judge on January 16, 2015 and executed by the Searcy Police on January 17, 2015 at which point Drew was taken to the jail and later released.  After being forced through months of proceedings, bearing the cost of an

attorney to represent him, Drew was eventually found not guilty of all charges in White County Circuit Court.

91. Ziegenhorn applied for a warrant with misleading information on December 3rd, 2014 which resulted in Drew Tanner's January 17th, 2015 arrest. In Ziegenhorn's request for a warrant against Mr. Tanner, Ziegenhorn claimed that "There is good reason to believe that the above named person has committed the offense of 5-73-120 and 5-54-102..." 5-54-102 in this context would mean that Drew "Knowingly obstructs, impairs, or hinders the performance of any governmental function;" or "Falsely identifies himself or herself to a law enforcement officer or a code enforcement officer," which Drew did not do. In 5-73-120,

92. Ziegenhorn has a history of stalking and retaliatory behavior.

93. Ziegenhorn has failed to state a credulous reason for being at the Searcy Wal-Mart at the precise time Drew was there.

94. Drew alleges Ziegenhorn's presence at the Searcy Wal-Mart on December 3, 2014, and Ziegenhorn's subsequent affidavit for warrant are a demonstration of Ziegenhorn's established stalking and retaliatory behavior.

### *Counts 54 and 55:*

95. Every paragraph in this complaint is incorporated as though fully stated herein.

96. Counts 54 and 55 are brought against Separate Defendant Sadler in his individual capacity for conspiring to violate Drew's rights.

97. For Count 54 Sadler, conspired to deprive Drew of his state rights and cover up violations of his state rights, a cause of action viable under Arkansas Common Law.

98. For Count 55, Sadler conspired to deprive Drew of his federal rights and cover up violations of his federal Constitutional rights, a cause of action under 42 U.S. Code § 1985.

99. By illegally denying Drew's FOIA requests, Sadler used his position in government to illegally stifle Drew's attempt to seek redress against Ziegenhorn, the State of Arkansas, Chapman, and Kennedy. Without access to the FOIA records Drew could not inform the public of Ziegenhorn's version of events, find out who had been deleting his Facebook comments or who blocked him from Facebook, or obtain information Drew had a legal right to obtain.

100. By helping cover up for the illegalities of the agency and his coworkers, Sadler became guilty of conspiracy to deprive Drew of the rights that his coworkers had deprived him of.

101. Even if it is found that Chapman, Kennedy, Ziegenhorn, and the State of Arkansas did nothing illegal, Tanner still had a right to the information so that he could win in the court of public opinion. Sadler has interfered with Drew's right to receive and disseminate.

### *Counts 56 and 57*

102. Every paragraph in this complaint is incorporated as though fully stated herein.

103. Count 56 is brought against Separate Defendant Sadler in his individual capacity for denying some of Drew's FOIA requests, in violation of Drew's Equal Protection Rights under Article II, Section 3 of the Arkansas Constitution. "The equality of all persons before the law is recognized and shall ever remain inviolate; nor shall any citizen ever be deprived of any right, privilege or immunity…" actionable under the ACRA.

104. Count 56 is brought against Sadler for in violation of Drew's Equal Protection Rights under the 14th amendment for the same activities as Count 56 and actionable under the FCRA.

105. Drew had a right to the information he requested, and Sadler had a duty to provide that information, yet refused to do so. Sadler repeatedly ignored Drew's requests in violation of

Arkansas law. Sadler repeatedly responded to FOIA's well after the statutory deadline for Sadler to respond. Sadler has, through his past and current interactions with Drew Tanner, demonstrated extreme animus toward Drew. During an October 9th, 2018 deposition Sadler read an email from Tanner where Tanner forwarded Sadler's response to a FOIA request to a friend with the added commentary that Sadler was "insane." In reading this e-mail, Sadler became unhinged, irate, and irrationally angry while yelling at Drew, and only stopped after his attorney urged that Sadler stop addressing Drew.  This is a recent example of Defendant Sadler's mental state and intentions toward Drew. The FOIA laws that Sadler violated were so clear, well established, pervasive, and repetitive that Sadler's actions were obviously malicious and intentional, breaking the law in order to deprive Drew of those documents. This count is bolstered by the fact that Drew repeatedly informed Sadler of various statutes that Sadler was violating yet Sadler continued to violate these statutes for over a year before this suit was filed.

106. Sadler's denial of these FOIA requests, whether as policy or as the result of animus toward Sadler, is illegal and unconstitutional.

107. Drew had a property interest in the FOIA records and Sadler thwarted those interests. Drew also had a liberty interest in those FOIA records because they contained useful knowledge that Drew had a right to acquire, the responsibility of state employees to follow the law is implicit in the concept of ordered liberty.

### *Counts 58 and 59*

108. Every paragraph in this complaint is incorporated as though fully stated herein.

109. Counts 58 and 59 are brought against Separate Defendant Sadler in his individual capacity for denying some of Drew's FOIA requests, in violation of Drew's Freedom of Speech Rights.

110. Count 58 is brought under Article II, Section 6 of the Arkansas Constitution and the ACRA.

111. Count 59 is brought under the 1st Amendment to the Constitution, and the FCRA.

112.  Drew was seeking information from the ASP so that he could publish the outrageousness of their actions and convince the public at large to rally against their illegalities. By illegally denying Drew Access to those records, Sadler violated Drew's right to free speech.

113. Sadler's denial of these FOIA requests, whether as policy or as the result of animus toward Sadler, is illegal and unconstitutional.

114. Drew had a property interest in the FOIA records and Sadler thwarted those interests. Drew also had a liberty interest in those FOIA records because they contained useful knowledge that Drew had a right to acquire, and state employees have a responsibility to follow the law because it is implicit in the concept of ordered liberty.

### *FOIA Violations Counts 60 to 66*

115. Every paragraph in this complaint is incorporated as though fully stated herein. Plaintiff brings Counts 60 through 66 against the ASP as an appeal from the denial of rights pursuant to Ark. Code Ann. § 25-19-101 et seq. ("FOIA").

116. Public Information Officer Sadler illegally denied seven FOIA requests from Andrew Tanner from November 21st, 2016 to November 21, 2017.

117. Defendant Sadler received and denied seven (7) FOIA requests from Plaintiff Tanner, in violation of Arkansas law.

118. Count 60 is brought for a FOIA request that was dated Nov. 21, 2016 and requested "any and all information including but not limited to reports filed, dispatch logs, radio chatter, dashcam/MVR footage, emails, texts, and all records regarding the actions of Trooper Kurt Ziegenhorn on Wednesday December 4, 2014. Specifically, but not limited to, an incident at approximately 1:40 pm at a Walmart in Searcy, Ar. I request all information be delivered electronically to this email (drwtanner@gmail.com) and physical copies mailed to 815 W Cherry Ave, Searcy, Ar. 72143."

119. Sadler responded one week later, in violation of FOIA, denying the FOIA request in part because none of the records were "associated with an incident that occurred at a place of business on December 4, 2014." This, however, was not what Drew asked for.

120. Sadler did not release records about a citizen complaint filed by Tanner because of the "employee evaluation or job performance records" exemption because Ziegenhorn was not terminated or suspended as a result of the complaint. This was illegal, because Sadler was supposed to make that determination within 24 hours of receiving Tanner's request, and notify tanner as soon as possible, which Sadler did not do.

121. Additionally, Sadler illegally withheld those records because they were not created at the behest of a supervisor of Ziegenhorn's, nor were some of them evaluations, merely a narrative of what happened, the records could have been minimally redacted in order to make them appropriate for release, and those records included information about Tanner that he had a right to.

18

122. Sadler also denied the release of another memorandum by Ziegenhorn because it was used in a Concealed Handgun License revocation regarding Tanner. This was improperly denied because it could have been redacted with minimal effort and released to Tanner, and it allegedly involved a criminal act by Tanner and reports involving crimes by CHCL holders are releasable.

123. Some of the items requested that the Plaintiff knows exist that were not disclosed two narratives of Ziegenhorn's interactions with the Plaintiff, dispatch logs, and various emails.

124. Count 61 is brought for Drew's Second FOIA request dated Dec. 3, 2016 requested all emails sent by Ziegenhorn between Nov 29, 2014 and Dec 3, 2016.

125. Sadler denied this request in violation of FOIA law and provided no records in response to this request.

126. We know that several emails do exist. Sadler demanded $1,250 to $1,500  to redact information from these emails, in violation of the FOIA statute as the requestor must pay for reasonable costs associated with gathering records however, they do not have to pay for redaction costs. Sadler stated that the emails would be about 8,000-10,000 pages and requested 5 cents per page to cover copying costs, but Sadler's $1,250 to $1,500 down payment well eclipsed that maximum $500 copying cost estimate, and Sadler simply ignored supplemental requests for an itemized breakdown of the costs.

127.  Drew later offered to provide a USB flash drive to cut the costs, he also offered to make the copies himself, and he offered to only get electronic copies. Sadler never reduced the amount of money he was asking for in order to start on the request.

128. At one point, Sadler claimed that the ASP were not the custodians of their own emails, and those records had to be obtained from the Department of Information Systems (DIS).

However, Sadler still attempted to be the custodian of those records in various emails. Sadler had a statutory duty to direct Drew directly to the contact person at DIS and failed to do so in violation of FOIA.

129. Count 62 is brought because of the denial of a third FOIA request dated Dec. 5, 2016 which requested:

> "any and all information including but not limited to reports filed, dispatch logs, radio chatter, dashcam/MVR footage, emails, texts, and all records regarding the actions of Trooper Kurt Ziegenhorn on Wednesday December 4, 2014. Specifically, but not limited to, an incident at approximately 1:40 pm at a Walmart in Searcy, Ar. I also request all emails sent and received to and from Trooper Ziegenhorn between the dates of November 29, 2014 and today, December 5, 2016. I also request a copy of any policy and procedures regarding the ASP Facebook page, and a list of people with administrative access to the page during the week of September 11-17, 2016, with dates and times every person was accessing that page in an administrative capacity."

130. One of the items requested that the Plaintiff believes potentially existed was "terms and conditions" of the ASP Facebook page.

131. The Plaintiff knows that a list, available to all Facebook pages, of administrators existed as a downloadable portion of the Facebook page, that details who has administrative capability on the page, and each page must have at least one person with administrative capability.

132. Additionally, Sadler knew that Chapman was the Facebook page administrator, and knew generally of the existence of time sheets in use at the ASP.

133. Sadler failed to supply the document showing Chapman's hours worked for the time period requested.

134. Finally, all the other items that were requested should have been provided, including the emails, which arguments for their release from the earlier FOIA count are restated herein.

135. Count 63 regards the denial of a fourth FOIA request dated Dec. 7, 2016. This was the same request as Dec. 5, 2016 but for a different date range. This date range was for all records of actions on December 3rd, 2014.

136. Some of the items requested that the Plaintiff knows exist that were not disclosed are Dashcam videos of traffic stops, radio and dispatch logs, a factual narrative of Ziegenhorn's interactions with the Plaintiff, and various emails. Sadler continued to deny the FOIA requests and provided no records in response to this request, relying on his earlier responses even though Drew pointed out the date change to Sadler.

137. Even though Drew called Trooper Chapman on Tuesday, December 13th, 2016 to follow up on his December 7th, 2016 FOIA request, Sadler did not respond to Drew's FOIA request until Wednesday December 14th, 2016, a week after Drew's FOIA request, in violation of the FOIA statute.

138. Count 64 is for a fifth FOIA request which was denied on January 20th, 2017 which almost mirrored Drew's November 21, 2016 request except that it added an additional day to records regarding the actions of Trooper Ziegenhorn (11/29/2014), corrected a request for 12/4/2014 to actually be for 12/3/2014, and Drew offered to provide a USB drive, forgo physical copies, and make the copies himself in order to reduce costs.

139. Sadler did not release any records in response to this request and responded simply to look at Sadler's previous denial on 11/28/2016.

140. Drew also asked for the thousands of emails again, and Sadler did not provide a breakdown of costs and how they would be reduced if Drew provided a USB drive, Drew did not get physical copies, and Drew offered to make the copies himself as opposed to having

an employee do that. By not providing the itemized breakdown of costs Sadler violated FOIA law.

141. Plaintiff restates our arguments from the denials of the earlier FOIA requests into this count.

142. Count 65 is brought in response to a denial of the sixth FOIA request dated January 27th, 2017 which requested all communications regarding Drew's requests for public records on 11/21/2016, 12/3/2016, 12/5/2016, 12/7/2016, and 1/20/2017.

143. Sadler initially stated that Tanner's request was not specific enough under the FOIA law. Drew responded, limiting his request to just communications to and from Sadler regarding those requests. Sadler ignored this FOIA request and provided no records in violation of the FOIA statute.

144. Some of the items requested that the Plaintiff knows exist are letters to the Department of Information Systems from Sadler and other various emails.

145. Count 66 is brought to appeal the denial of a November 21st, 2017 FOIA request from Drew which requested all Ziegenhorn's emails from November 29th, 2014 to November 21st, 2017.

146. Sadler did not release any records in response to this request. And took a week to respond to the request, in violation of Arkansas FOIA law.

147. Again, Sadler asked for fees to cover costs of redaction, although that is specifically barred by statute, which Drew had repeatedly brought to his attention.

148. Some of the items requested that the Plaintiff knows exist that were not disclosed are various emails.

22

149. Denying all these FOIA requests violated Drew Tanner's statutory rights to this information therefore Plaintiff requests the State if Arkansas pay his attorney's fees and costs and provide the requested records.

### *Count 67: Malicious Prosecution*

150. Every paragraph in this complaint is incorporated as though fully stated herein.

151. Separate Defendant Ziegenhorn committed the tort of Malicious Prosecution against Drew when he filled out a misleading warrant for arrest on Drew that lacked probable cause. The warrant request omitted key facts of their November 29th, 2014 interaction and misrepresented others, causing the Plaintiff damages in the form of attorney's fees, appeal fees, missed work, time in jail, cots, and other extemporaneous fees.

152. At a trial in White County District Court Trooper Ziegenhorn perjured himself multiple times. For example, Ziegenhorn testified "As he [Drew] approached the area I was standing." Which was false, Mr. Ziegenhorn approached Mr. Tanner while Mr. Tanner was standing still. Mr. Ziegenhorn testified that he asked Drew "which department are you with?" and that Drew condescendingly replied "I ain't with nobody." In reality, Drew calmly responded that he was "Not with any department." At that point, Ziegenhorn testified that he identified himself as Trooper Ziegenhorn with the Arkansas State Police and asked Mr. Tanner for identification. That was also false. Mr. Ziegenhorn shouted, "STATE POLICE, IDENTIFY YOURSELF" and grabbed Mr. Tanner by the wrist and elbow. Mr. Ziegenhorn also testified that Mr. Tanner "reached his hand down toward his pistol," causing Ziegenhorn to grab Drew by the elbow and wrist. However, Mr. Tanner's hands were stationary and did not move before Mr. Ziegenhorn grabbed Mr. Tanner's arm. Additionally, Mr. Ziegenhorn testified his badge was visible during this time and before the interaction, clipped just below his firearm,

however it was not visible until Mr. Ziegenhorn pulled it out after Drew backed away from Ziegenhorn.  Ziegenhorn also testified that when he identified himself as Kurt Ziegenhorn with the Arkansas State Police and asked Mr. Tanner for his ID that Mr. Tanner responded a "condescending sense" copping an attitude and saying, "I don't have to show you nothing," and at that point Drew dropped his right hand down and that Drew had his pistol on his right side. Ziegenhorn claims this prompted him to grab Drew by the wrist and elbow.   Drew's tone was normal during this interaction and void of any attitude.

153. The prosecutor used Ziegenhorn's warrant application and testimony from White County District Court as well as reliance on equally false memos and in person statements to the prosecutor by Ziegenhorn to continue to prosecute Mr. Tanner in White County Circuit Court. Mr. Tanner was found "not guilty" of all charges on November 13th, 2015.

154. Ziegenhorn pursued Drew's criminal charges because of his dislike of Drew, in response to Drew's official complaints lodged with Ziegenhorn's employer, and Drew's refusal to obey Ziegenhorn, his belief that civilians should not be allowed to legally open carry, as well as other illegal reasons.

155. There was no probable cause for the proceedings that Defendant Ziegenhorn instigated against Plaintiff; Drew committed no crime, nor did he appear to do so.

156. Defendant Ziegenhorn acted with malice, which can be inferred from Defendant Ziegenhorn's attitude during the encounters with Drew as well as his stalking of the Plaintiff after Plaintiff inquired about filing a complaint against Ziegenhorn, and all the lies Ziegenhorn has made regarding Drew.

### *Count 68: Abuse of Process*

157. Every paragraph in this complaint is incorporated as though fully stated herein.

158. Defendant Ziegenhorn committed the tort of Abuse of Process against James Andrew Tanner when he filled out a misleading warrant for arrest that lacked probable cause and omitted key facts of their interaction, as well as misrepresenting other aspects, and generally lying about their interaction to the prosecutor, causing the Plaintiff damages in the form of attorney's fees, appeal fees, missed work, and other extemporaneous fees.

159. Ziegenhorn pursued Drew's criminal charges because of his dislike of Drew, in response to Drew's official complaints lodged with Ziegenhorn's employer, and other reasons. Drew was found not guilty of all charges.

160. Ziegenhorn cursed out Drew and made several misrepresentations of fact regarding their interactions in court and on sworn statements.

161. Defendant instituted and continued a proceeding against the Plaintiff by requesting a warrant; the proceedings ended in Plaintiff's favor with a not guilty; there was no probable cause for the proceedings Defendant instigated against Plaintiff; Defendant acted with malice out of his dislike of the Plaintiff.

162. Ziegenhorn set in motion legal proceedings directed at Plaintiff; the Defendant acted retributively in instigating these proceedings against Plaintiff after Plaintiff lodged official complaints against Defendant Ziegenhorn; Defendant did not believe that Drew's activity should be legal and therefore arrested Drew for it and charged him with a crime because Searcy Police Department would not, Defendant Ziegenhorn willfully used this process in a manner not proper in the regular conduct of the proceeding by filling out a misleading warrant for arrest and committing perjury on the stand.

### *Count 69: Felony Tort Statute for Perjury by Ziegenhorn*

163. Every paragraph in this complaint is incorporated as though fully stated herein.

164. Defendant Ziegenhorn perjured himself in his testimony in White County District Court when describing the November 29th, 2014 incident with Drew Tanner and interactions with Drew generally, and allowed the prosecutor to rely on his sworn statements to pursue Drew in White County Circuit Court.

165. Defendant Ziegenhorn then perjured himself on the stand during Drew's state district court trial and in official reports regarding the incident, claiming that Drew reached his hand down toward his gun during their interaction.

166. Ziegenhorn's perjury was malicious, because he knew that lying under oath would likely harm Drew, which it did.

167. These perjurious statements cost Drew attorney's fees, appeal fees and costs, as well as lost wages and time.

168. Perjury is a class C felony. See A.C.A. § 5-53-102. "A person commits perjury if in an official proceeding he or she knowingly: (1) Makes a false material statement under an oath required or authorized by law... or (3) Makes a false unsworn declaration under the Uniform Unsworn Foreign Declarations Act, § 16-2-201 et seq."

169. Victims of felonies may sue the perpetrator under A.C.A. § 16-118-107 and are entitled to punitive damages and attorney's fees, which Drew is seeking in this count.

**WHEREFORE, Plaintiffs pray for the following relief:**

170. Declaratory judgment that Defendant State of Arkansas' administration of their Facebook page and the policies governing its use violate the First Amendment of the United States Constitution.

171. A permanent restraining order compelling Defendant State of Arkansas and all persons in concert with them who receive notice of this injunction, to restore Plaintiff's deleted posts; to permit Plaintiff to participate in the forum discussions; and restraining Defendants and all persons in concert with them who receive notice of this injunction from banning not only Plaintiff; but any person for protected speech made on the ASP Facebook page and/or from removing protected speech from the Facebook page.

172. A permanent restraining order compelling Defendant State of Arkansas to respond legally to future FOIA requests from Drew and others because their previous responses have been illegal.

173. Such other and further relief including injunctive relief against all Defendants, as may be necessary to effectuate the Court's judgment, or as the Court otherwise deems just and equitable.

174. Damages from Separate Defendant Ziegenhorn that Ziegenhorn pay Drew Tanner's attorney's fees and costs regarding his criminal defense, attorney's fees for all of Drew's civil claims, compensatory damages, court costs, appeal fees, certified copy fees, lost wages, deposition fees, emotional damages, pain and suffering, mental anguish, nominal damages, costs, punitive damages, damage to reputation, pre and post judgment interest, and other damages not heretofore calculated or conceived.

175. In all of the separate counts, Drew is seeking Defendants to pay Drew's attorney's fees, statutory fees and costs pursuant to 42 U.S.C. § 1988,  A.C.A. §16-118-107, attorney's fees and statutory fees under the ACRA as well as the mandatory punitive damages in the ACRA for retaliatory infringements of or interference with civil rights under A.C.A. 16-123-107(b) as well as compensatory damages, court costs, appeal fees, lost wages, emotional damages, pain and suffering, mental anguish, nominal damages, costs, punitive damages, damage to

reputation, pre and post judgment interest, any other statutory fees he may be entitled, and other damages not heretofore calculated or conceived.

Respectfully submitted,
James Andrew Tanner *Plaintiff*
By: /s William Whitfield Hyman
William Whitfield Hyman,
ARKBAR2013237
King Law Group, PLLC,
Attorneys for Plaintiff,
300 N Sixth Street
Fort Smith Arkansas, 72901
P: (479) 782-1125  F: (479) 316-2252