## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION 4

**JAMES ANDREW TANNER**                                    **PLAINTIFF**

**vs.**                                    **No. 4:17-CV-00780-DPM**

**KURT ZIEGENHORN, ET. AL.**                                    **DEFENDANTS**

### BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE
### TO DEFENDANT'S MOTION TO DISMISS

   Comes now, the Plaintiff James Andrew Tanner, by and through his attorney, W. Whitfield Hyman of King Law Group, PLLC and for his brief in support of Plaintiff's response to Defendant's motion to dismiss (Doc. 50) states the following:

### STANDARD OF REVIEW

   The Court resolves motions to dismiss by taking the pleaded facts as true, examining whether this is an unusual case only where the complaint demonstrates "some insuperable bar to relief." Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir.1995) (omitting quotation and discussing identical standard for 12(b)(6) motion). Hirsh v. lecuona, No. 8:06CV13, 2006 WL 2873664, at 1 (D. Neb. Oct. 6, 2006), citing Schmedding, infra.

### I.   Government Facebook Pages Are Not Government Speech

   Defendants use the terms nonpublic forum and government speech interchangeably, but they are not the same. Arkansas Courts have never relied on the "government speech" doctrine in any recorded case to date. Therefore, the "government speech" defense is not applicable to the state law claims. The "government speech" doctrine is incredibly limited, and the Supreme Court has recognized the dangers of misuse: "This Court exercises great caution in extending its government-speech precedents, for if private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the

expression of disfavored viewpoints." <u>Matal v. Tam</u>, 137 S. Ct. 1744, 1748 (2017). The Supreme

Court established a three-factor test to determine whether speech was government speech: 1)

whether the government has a history of using this medium of communication to convey

government speech; 2) whether a reasonable observer would conclude the government was

speaking; and 3) whether the government exercises direct control over the message. <u>Walker v.

Texas Div., Sons of Confederate Veterans, Inc.</u>, 135 S. Ct. 2239, 2248 (2015). The Defense has

cobbled together a few out of context sentences from <u>Cornelius v. NAACP Legal Def. & Educ.

Fund, Inc</u>., 473 U.S. 788, 801 (1985), <u>Int'l Soc'y for Krishna consciousness, Inc., v. Lee</u>, 505

U.S. 672, 686 (1992), and <u>Pleasant Grove City, Utah v. Summum</u>, 555 U.S. 460, 479-80 (2009)

in an attempt to bolster their inapplicable government speech claims. In <u>Cornelius,</u> the court used

nonpublic forum analysis and remanded the case back for a viewpoint discrimination analysis; in

<u>Krishna,</u> the court used nonpublic forum analysis and remanded the case to determine whether

the restrictions were reasonable; and, in <u>Pleasant</u> <u>Grove,</u> the reference to the forum having to be

"shut down" if forum analysis was applied is literally referencing the physical space of a public

park being able to accommodate a never ending number of monuments. <u>Id</u>.

 Government speech does not apply to an interactive forum like the ASP Facebook Page.

The Arkansas State Police's posts generally elicit many comments from members of the

community. See: Plaintiff's Exhibit A; also see the Arkansas State Police Facebook page

generally at www.Facebook.com/ArStatePolice. If the ASP page's purpose was to merely

convey a non-interactive message (government speech), The ASP could have deleted all

comments from users after they were published. See: the Facebook Help Center

https://www.facebook.com/help/www/297845860255949?helpref=faq_content. The ASP could

have developed a viewpoint-neutral commenting and posting policy, however they failed to do

that as well. See Plaintiff's Exhibit B. Instead, the ASP had no policies at the time of Drew's comments.  Doc. 48 p. 5 line 25. The ASP later instituted the policy in Plaintiff's Exhibit B. Indeed, even the ASP's "terms and conditions" as written acknowledges that people have been and are allowed to make comments on the ASP's posts in a variety of ways. "ALL COMMENTS submitted/posted to this page are actively monitored and reviewed by the Arkansas State Police. The Arkansas State Police reserve the right to restrict, remove, or delete any posting/comment that is contrary to and/or inconsistent with the purpose of the page or in violation of the applicable terms and conditions." See Plaintiff's Exhibit B. The purpose of the ASP page was in fact to "interact" with the individuals that like or follow the page, which Facebook itself describes as the purpose of pages. See: https://www.facebook.com/notes/facebook/facebook-tips-whats-the-difference-between-a-facebook-page-and-group/324706977130/. While the actual "post" from the Arkansas State Police may be "government speech," the Page itself and the comments under the posts are not.

If the Arkansas State Police wanted to have the one-sided conversation required by "government speech", they have chosen the wrong medium. The Court should compare the ASP page and policies in conjunction to other state police page policies. Many police departments maintaining a Facebook page describe their pages as "limited public forums." Take, for example, the Little Rock Police Department. See Plaintiff's Exhibit C, A Survey of Police Department Facebook Pages. The description of "limited public forum" seems to be pervasive throughout most department Facebook pages; a cursory search revealed the following police department Facebook pages (and many more) that declared themselves to be "limited public forums."  See Plaintiff's Exhibit C. It is unknown whether these police department pages attempt to create a limited public forum but actually created a traditional public forum. Nevertheless, the Arkansas

State Police certainly go against the trend of government pages by declaring their page "government speech" as opposed to limited public forums.

In <u>Walker and Summum</u>, the Supreme Court said license plates designs "are often closely identified in the public mind with the [State]." <u>Summum</u>, supra, at 472, 129 S. Ct. 1125. <u>Walker v. Texas Div., Sons of Confederate Veterans, Inc.</u>, 135 S. Ct. 2239, 2248 (2015). The Court went on to explain why a Confederate battle flag on a license plate might be considered speech by a reasonable observer:

> "Each Texas license plate is a government article serving the governmental purposes of vehicle registration and identification. The governmental nature of the plates is clear from their faces: The State places the name "TEXAS" in large letters at the top of every plate. Moreover, the State requires Texas vehicle owners to display license plates, and every Texas license plate is issued by the State. See § 504.943. Texas also owns the designs on its license plates, including the designs that Texas adopts on the basis of proposals made by private individuals and organizations. See § 504.002(3). And Texas dictates the manner in which drivers may dispose of unused plates. See § 504.901(c). See also § 504.008(g) (requiring that vehicle owners return unused specialty plates to the State)." Id. at 2248.

On Facebook, an accountholder's portrait and name appear beside their comment. See Plaintiffs' Exhibit A. The person's speech is entirely inside a box next to the name and portrait, and it is evident to anyone viewing the page who is making what comment. The ASP could clear potential confusion with a blanket "disclaimer" in every ASP post that the any comments made on the post are "not necessarily the views of the ASP." In fact. The ASP has since implemented a disclaimer in their current "Terms and Conditions." See Plaintiff's Exhibit B. The department could also single out particularly egregious comments and respond directly by disavowing that viewpoint. In any event, no such policy was in place at the time Drew's comments were made, and no reasonable person on Facebook would confuse the third-party speech of those who comment on the page with that of the main Facebook page.

In <u>Walker</u> the Supreme Court stated Texas law provides that the State "has sole control over the design, typeface, color, and alphanumeric pattern for all license plates." Id. at 2249. The Board must approve every specialty plate design proposal before the design can appear on a Texas plate. Id. Accordingly, like the city government in <u>Summum</u>, Texas had "effectively controlled' the messages [conveyed] by exercising 'final approval authority' over their selection." 555 U.S., at 473, 129 S. Ct. 1125 (quoting <u>Johanns</u>, 544 U.S., at 560–561, 125 S.Ct. 2055). <u>Walker</u>, supra.  Facebook is a publicly traded private company, and therefore not owned by the State. See: https://www.nasdaq.com/symbol/fb.  A commenter on the ASP Page may choose from what appears to be hundreds of thousands of gifs (moving pictures) and "stickers." See Plaintiff's Exhibit D. A Facebook page may not prevent comments on its posts, but it can delete or hide them after they have been made. (citing "How do I control what visitors can post on my Page?" https://www.facebook.com/help/www/248844142141117/?helpref=hc_fnav ). This demonstrates that the Arkansas State Police Department never had control over the type of message being conveyed. They could retroactively "fix" a message, but the initial message was shown to the public and the page administrators at the same time. There was no "final approval authority" built into the Facebook platform. The ASP never had control of any message because the ASP did not even exercise the fullest amount of control that it had available.  The ASP only censored Drew's comments after they had been made visible to the public. Additionally, the Arkansas State Police do not even have final say over what may or may not be posted in the comments section of their own page. The Arkansas State Police "Terms and Conditions" acknowledge this: "By using or accessing Facebook and this page, you are, in addition to accepting the terms and conditions for use established by Facebook and the Arkansas State Police, also accepting the practices described in the Facebook Data Use Policy..." See ASP

Facebook Terms and Conditions. The ASP does not have final control over who may comment

or even be a user: "You cannot use Facebook if: You are under 13 years old. You are a convicted

sex offender. We previously disabled your account for violations of our terms or policies. You

are prohibited from receiving our products, services, or software under applicable laws." See:

https://www.facebook.com/legal/terms/update. Some of the content prohibited by Facebook

includes content this is considered hate speech, violence and graphic content, adult nudity and

sexual activity, sexual solicitation, or cruel and insensitive—determinations that are not made by

the ASP.  See https://www.facebook.com/communitystandards/objectionable_content

## II. INDIVIDUAL LIABILITY FOR FREEDOM OF SPEECH VIOLATIONS

Defendants have the burden of proving Plaintiff did not have a clearly-established First

Amendment right at the time of the events in question.  Burnham v. Ianni, 119 F.3d 668, 674

(8th Cir. 1997).  Contrary to Defendants' insinuation, there need not be such a painfully specific

case on point for Plaintiff to prevail.  "In the absence of binding precedent, a court should look to

all available decisional law including decisions of state courts, other circuits and district

courts...." Burnham, supra, at 677. Indeed, this Court should consider Burnham v. Ianni, which

revolved around a display case in a university, where several staff members displayed

photographs of themselves holding weapons.  Id. at 671.  The school chancellor removed only

photographs displaying weapons from the display.  Id. at 672.  Determining that the chancellor

was not entitled to qualified immunity, the court stated that the nature of the forum did not

matter, but, rather, the issue was that the protected speech was a clearly established right.  "The

display case was designated for precisely the type of activity for which the Kohns and Professors

Burnham and Marchese were using it. It was intended to inform students, faculty and community

members of events in and interests of the history department. The University was not obligated

to create the display case, nor did it have to open the case for use by history department faculty and students. However, once it chose to open the case, it was prevented from unreasonably distinguishing among the types of speech it would allow within the forum." Id. at 676.  In rejecting the chancellor's claim to qualified immunity, the Burnham court stated, "Here, ...we have long established, binding precedent totally supportive of plaintiffs' claims. The Supreme Court and this court have both clearly and directly spoken on the subject on numerous occasions and in years long prior to the 1992 censorship by Ianni."  Id. at 677.

The Fourth Circuit has stated that the government "of course" would open a forum for speech by creating a website that includes a " 'chat room' or 'bulletin board' in which private viewers could express opinions or post information," or that otherwise "invite[s] or allow[s] private persons to publish information or their positions." Page v. Lexington Cnty. Sch. Dist. One, 531 F.3d 275, 284 (4th Cir. 2008). Government Facebook pages are such websites, "Upon concluding that interactive component of the Chair's Facebook Page amounts to a public forum, we would normally need to determine whether it constitutes a traditional public forum or designated or limited public forum. In the present case, however, we need not decide that question because Randall's ban of Davison amounted to 'viewpoint discrimination,' which is 'prohibited in all forums.' Davison v. Randall, 912 F.3d 666, 687 (4th Cir. 2019), as amended (Jan. 9, 2019). Just as the Burnham court, this Court should not allow Defendant to erect a barrier to Plaintiff's claim based on lack of an eerily similar Facebook case.  Rather, this Court must recognize the large body of case law concerning freedom of speech, regardless of forum, and deny Defendants' motion on this ground.

## III. RES JUDICATA AND COLLATERAL ESTOPPEL

The burden of claim and issue preclusion lies on the party wishing to avail themselves to that protection. See Fariss v. State, 303 Ark. 541, 798 S.W.2d 103 (1990). Defendants fail to meet the elements of claim preclusion, namely that the first suit was fully contested in good faith; that both suits involve the same claim or cause of action; and both suits involve the same parties or their privies. Jayel Corp. v. Cochran, 366 Ark. 175, 178, 234 S.W.3d 278, 281 (2006). Further, they fail to meet the elements required for issue preclusion: (1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) that issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and  (4) the determination must have been essential to the judgment." See Powell v. Lane, 375 Ark. 178, 185, 289 S.W.3d 440, 444 (2008).

### The Issues Sought to be Precluded Are Not the Same

Drew's concealed carry license revocation appeal involved a finding that he had violated Arkansas Concealed Handgun Carry License (CHCL) Rules 1.2 (h) and 3.2. The Circuit Court held that Rule 1.2 (h) requires concealed handgun license holders to carry concealed and Rule 3.2 required Drew to identify himself, declare that he is a concealed handgun license holder, and indicate that he is carrying a firearm. See Doc. 33, Defense Exhibit 4, p. 2-3.

Regardless, this does not mean that a police officer may detain someone under suspicion of violating the CHCL rules, because carrying a firearm openly or concealed is not a crime. See Taff v. State, 2018 Ark. App. 488 (where an officer did not have reasonable suspicion to detain Taff, who had been seen openly carrying a firearm which he later concealed):

> Merely possessing a weapon is not a crime in the State of Arkansas. See Ark. Code Ann. § 5-73-120(a) (providing that "[a] person commits the offense of carrying a weapon if he or she possesses a handgun . . . on or about his person . . . with a purpose to attempt to unlawfully employ the handgun . . . as a weapon against a person"); see also Op. Ark.

Att'y No. 064 (2015) ("[I]n general merely possessing a handgun on your person . . . does not violate § 5-73-120(a) and may be done if it does not violate other laws or regulations."). Under the clear language of section 5-73-120(a), the possessor of a handgun must have an unlawful intent to employ it as a weapon against a person in order to make that possession a criminal act. Under the rule of lenity, any doubts as to the interpretation of a criminal statute are resolved in favor of the defendant. See Williams v. State, 364 Ark. 203, 208, 217 S.W.3d 817, 819–20 (2005)

CHCL Rule 7.0, cited by the Pulaski County Circuit Court, states anyone violating these rules may have their license suspended or revoked, but is silent as to detention or arrest. See Doc. 33, Defense Exhibit 6, p. 2. The Court further opined that Drew may not be guilty of Carrying a Weapon because he did not possess the requisite "mens rea," only the "actus reus":

"The decision to arrest or charge someone with a crime is one for law enforcement and prosecutors. The proceedings below were not criminal proceedings. ***The only issue was whether Tanner violated the CHCL Rules***. While Tanner may not have had the requisite *mens rea* to be guilty of the crime of carrying a weapon, the requisite *actus reus* was present - he possessed a weapon. " Doc. 33, Defense Exhibit 4, p. 6. Emphasis added.

### The CHCL Appeal Issues is Differ from this Case

When analyzing collateral estoppel, Arkansas courts consider the difference between issues and the legal determinations' essential nature to the final judgment. "For collateral estoppel to apply, the following elements must be met: (1) ***the issue sought to be precluded must be the same as that involved in the prior litigation***…(4) ***the determination must have been essential to the judgment***." Van Curen v. Arkansas Prof'l Bail Bondsman Licensing Bd., 79 Ark. App. 43, 55, 84 S.W.3d 47, 56 (2002). Emphasis Added. The issue in the CHCL appeal was whether Drew's license would be revoked for violating the CHCL rules. The judge's comment about Drew's 4th amendment rights was not essential to the ruling because the officer seeing Drew open carry was enough to revoke the license. Doc. 33, Defense Exhibit 4, p. 3, lines 12-15.

Even in a consensual encounter with law enforcement, a license holder would technically be in

violation of these same rules if he does not state that they are carrying and provide their CHCL

license. Consensual encounters and the doctrine of "plain view" do not invoke 4th amendment

rights or the Arkansas equivalent. See <u>Lewis v. State</u>, 2017 Ark. 211, 521 S.W.3d 466.

      Collateral estoppel does not preclude litigation of previously decided issues unless the

prior judgment could not have been rendered absent a conclusive finding as to the particular

issue. See <u>Beaver v. John Q. Hammons Hotels</u>, L.P., 355 Ark. 359, 138 S.W.3d 664 (2003). The

judge in the CHCL appeal was explicit about his decision:

> "Tanner's weapon was not concealed; it was not covered from observation as to prevent
> public view. There is substantial evidence in the record to support the State Police's
> decision to revoke Tanner's CHCL based on this violation alone. Second, Tanner refused
> to provide identification when requested by a law enforcement officer, and instead
> proceeded to leave the scene--yet another violation of the CHCL rules for which there is
> substantial evidence in the record to support revocation of Tanner's CHCL."

See Doc. 33, Defense Exhibit 4, p. 3. Both of those conclusions of fact and law could be true,

and Drew would still have a viable claim that Ziegenhorn grabbed him and demanded

identification in violation of the 4th amendment. That hearing only precluded Drew from seeking

damages resulting from losing his CHCL and arguing that his right to it was violated by

Ziegenhorn. Drew may still proceed on 4th Amendment grounds as well as any other rights.

### <u>The Damaging Portions of The Administrative Appeal Are Obiter Dictum and May Not be Used for Preclusion Purposes</u>

      Subsequent courts are not bound by previous courts' obiter dictum. <u>Clemmons v. Office</u>

<u>of Child Support Enforcement</u>, 345 Ark. 330, 47 S.W.3d 227 (2001) (holding that, while a

decision of the court will not be disturbed because it is law of the case under res judicata, the

court is not bound by a conclusion stated as obiter dictum). Obiter dictum is not binding, even if

it is "couched in terms that infer the [appellate] court reached a conclusion on the matter." <u>Green</u>

v. State, 343 Ark. 244, 251, 33 S.W.3d 485, 489 (2000). Accord, Byme, Inc. v. Ivy, 367 Ark.

451, 241 S.W.3d 229 (2006); Superior Federal Bank v. Jones & Mackey Const. Co., LLC, 93

Ark. App. 317, 219 S.W.3d 643 (2005).

Eventually, the CHCL judge stated that he did not believe Drew's state and federal rights

to be free from unreasonable searches and seizures had been violated. See Defense Exhibit Pages

7-8. However, this is mere obiter dictum. The judge did not have to rule on the Constitutionality

of the detention to determine that Drew violated the CHCL rules, the judge concluded that

because Drew was not carrying pursuant to rules 1.2 and 3.2 he could have his CHCL revoked or

suspended, full stop. Cf. "Tanner's weapon was not concealed...There is substantial evidence in

the record to support the State Police's decision to revoke Tanner's CHCL based on this violation

alone." Doc. 33, Exhibit 4, p. 3, lines 12-15. With: "[E]ach violation, even standing alone is

sufficient to justify revocation of Tanner's CHCL." See Doc. 33, Defense Exhibit 4, pg. 7, lines

5-6. An issue is not essential if its resolution has no bearing on the ultimate outcome of the case,

e.g., when the court finds that the defendant committed no fraudulent act but holds that the action

is barred whether or not the plaintiff's allegations are true. Alexander v. Twin City Bank, 322

Ark. 478, 910 S.W.2d 196 (1995). The Arkansas Supreme Court has even held that a prior §

1983 action in federal court that was dismissed did not necessarily have subsequent precursory

affects in state court civil rights claims, even if the order dismissing the case states a civil rights

violation did not happen: "Appellants first contend the dismissal by the District Court renders

appellee's § 1983 cause of action res judicata. We disagree. The order itself (which is all the

record contains pertinent to this issue) reflects that dismissal was grounded on the abstention

doctrine, and the general comments questioning whether a § 1983 cause of action was stated

were merely dicta. ***Those comments, seemingly gratuitous, were not essential to the holding of***

***the District Court and do not preclude the appellee from filing suit in state court***. Virden v. Roper, 302 Ark. 125, 129, 788 S.W.2d 470, 472 (1990). Emphasis Added. In reaching that conclusion, Virden cites Leslie v. Bolen, 762 F.2d 663 (8th Cir.1985), which states "In a federal civil rights action involving an issue of collateral estoppel, a federal court will give the same preclusive effect to a prior state court decision as would the courts of the state in which the prior judgment was entered. See Allen v. McCurry, 449 U.S. 90, 104, 101 S.Ct. 411, 419, 66 L.Ed.2d 308 (1980); Smith v. Updegraff, 744 F.2d 1354, 1362 (8th Cir.1984)." It is clear from case law that Arkansas courts treat federal courts differently and with a very discerning eye to the actual previous orders. That means that the court must do the same here.

### Higher Burden of Proof Differences Bar Preclusion

The burden of proof differences between this case, preponderance of the evidence, and the previous administrative appeal (absence of substantial evidence) make the issues of law and fact nontransferable and inapplicable to issue or claim preclusion. Arkansas Courts have considered applying collateral estoppel from a civil mental commitment case (clear and convincing) to a criminal case regarding the defense of mental disease or defect (preponderance), and they held that the differences in the burden of proof made the cases incompatible for such purposes. Edwards v. State, 328 Ark. 394, 943 S.W.2d 600 (1997). In another case that Cited Edwards, the court found that the two different burdens of proof, as well as the differing ultimate issue to be decided, preclude application of collateral estoppel and res judicata. Vancleave v. Arkansas Dep't of Health & Human Servs., 98 Ark. App. 299, 303–04, 254 S.W.3d 770, 774–75 (2007). In Vancleave, a man was found not guilty of sexual abuse after a criminal trial yet was placed on the Child Maltreatment Central Registry for the same allegations after losing an administrative hearing based on the preponderance of the evidence. Id. The court held that these

were not the same matters at issue in both proceedings. ""First, appellant is incorrect that the same matter was at issue in both proceedings. The issue to be determined in the criminal proceeding was whether appellant was guilty of committing acts of sexual abuse, to be proven beyond a reasonable doubt; the issue to be determined in the administrative proceeding was whether appellant's name should remain on the child maltreatment registry, based on a preponderance of the evidence. These are clearly two different issues with two different standards of proof." Id. Finally, in Fariss v. State, the court held collateral estoppel did not bar criminal prosecution of appellant for incest after he won a civil proceeding to determine whether appellant's adopted child was dependent-neglected. Fariss v. State, 303 Ark. 541, 798 S. W. 2d 103 (1990). The court has consistently held differing standards of proof in two different types of cases do not preclude a subsequent lower standard of proof claim from moving forward. In the case at hand, Drew has to prove by a preponderance of the evidence that he was unlawfully detained, whereas the in the CHCL hearing, he had to prove there was no substantial evidence that he should have had his Concealed Handgun Carry License revoked. In Van Curen, a bondsman was accused of falsifying a client's signature on a receipt allegedly indicating the client had received the amount in excess from the bondsman. The client's attorney filed a motion in the criminal court to have the bond returned to the client. The court determined at a hearing the signature and receipt looked valid and denied the client's request. The client subsequently filed a complaint with the Bail Bondsman Licensing Board, where the bondsman attempted to raise res judicata and collateral estoppel. The subsequent appeals court held that the criminal court hearing did not involve the same issues and had differing standards of proof, and therefore collateral estoppel and res judicata could not apply. While the facts presented in the criminal hearing and the administrative hearing were the same, the court ruled that the ultimate issue at

the Bondsman Licensing Board hearing related only to a license revocation, which is different than the ultimate issue in the criminal hearing.

Not only does the ultimate issue have to be the same, but <u>Van Cleave</u> held that the purpose must be the same as well. "In addition to the difference in the degrees of proof required, ***although the issues involved in the administrative hearing and the criminal proceeding may overlap, the purpose of a revocation proceeding substantially differs from a criminal proceeding***." <u>Id</u>. The CHCL court stated that the issue at stake in this appeal was different than the issues at stake in the criminal case: "***The only issue was whether Tanner violated the CHCL Rules***." Doc. 33, Defense Exhibit 4, p. 6. Emphasis added.

### i.     <u>When OFFENSIVE Use of Collateral Estoppel has been Deemed Unfair</u>

The Court has declared that the offensive use of collateral estoppel may be unfair when:

> "(1) where the defendant in the first action is sued for small or nominal damages and thus may not have had great incentive to defend vigorously;
> (2) where the judgment relied upon as a basis for estoppel is itself inconsistent with one or more previous judgments in favor of the defendant; and
> (3) where the second action affords the defendant procedural opportunities unavailable in the first action that could cause a different result."
> <u>Johnson v. Union Pac. R.R.</u>, 352 Ark. 534, 545–46, 104 S.W.3d 745, 751 (2003).

It is unfair to use collateral estoppel defensively in this case. Because the law now allows Drew to carry a firearm openly or concealed, he has not needed his concealed carry license. See <u>Taff v. State</u>. He has no need to appeal the prior decision because it does not grant him any benefit to do so. Drew would not need to defend himself vigorously, in line with the first element of unfairness that Arkansas courts have addressed. As discussed, the burden of proof in the administrative appeal was the much harsher "substantial evidence" standard, where the burden was on Drew. See <u>Ahmad v. Arkansas State Med. Bd.</u>, 2018 Ark. App. 111, 6, 542 S.W.3d 224, 228 (2018), reh'g denied (Mar. 28, 2018). The judge in the administrative appeal specifically

addressed collateral estoppel and concluded that the issues in a criminal case were too different than those regarding a CHCL appeal. Doc. 33, Defense Exhibit 4, p. 6. Nothing the Defense presents should preclude this court from determining the facts or law at issue.

"[C]ollateral estoppel may be unfair…where the second action affords the defendant procedural opportunities unavailable in the first action that could cause a different result." See Johnson v. Union Pac. R. R. In an administrative hearing and appeal, Drew was not allowed to subpoena witnesses to the hearing, or subpoena records from Ziegenhorn, nor was he allowed to have a jury or judge hear the witnesses in his case, nor was he even given the standard of preponderance of the evidence. If a civil rights lawsuit is collaterally estopped from moving forward because an employee of the Arkansas State Police, who was not even present during the testimony given, found by "substantial evidence" that another employee of the Arkansas State Police was telling the truth over an encounter with a civilian shocks the conscience. See: Doc. 33, Exhibit 4, page 2, lines 7-10 and Plaintiff's Exhibit D, p. 3 (where transcript shows Bill Bryant was not present at the hearing).

This is important because there are factual differences in what the administrative appeal found and what Drew has stated in his brief statement of facts and in his testimony at the administrative hearing. Drew plead and testified for the administrative hearing that Ziegenhorn grabbed onto his wrist and elbow and then demanded Drew identify himself, while the administrative appeals court found that Drew was requested to identify himself and was only grabbed once he refused to do so. Plaintiff's Exhibit D, cf. p. 7, lines 19 - 25, with p. 29, lines 7 – 23, Doc. 46 p. 11 line 72.

### IV. Defendant Ziegenhorn Violated Plaintiffs Fourth Amendment Rights

Much of Defendant Ziegenhorn's argument on this front revolves around his belief that his actions were reasonable.  Such analysis is improper where the Court must not consider the evidence outside of a light most favorable to the Plaintiff and consider pleaded facts as true. Frey, Schmedding, supra.  Ziegenhorn offers no contrary evidence in the pleadings, and the Fourth Amended Complaint provides further evidence of his stalking and aggressive behavior in relation to Plaintiff's Fourth Amendment rights.  Defendants' motion must be denied on this point.

On 11/29/2014, contrary to the Defendant's assertions, Ziegenhorn did not identify himself as state police, Ziegenhorn simply stated "state police identify yourself," while wearing a t-shirt and jeans, with no visible badge present. Doc. 46 p. 11 line 72. Drew submitted to the lawful authority of uniformed officers and Ziegenhorn had not asked for his identification again. Id at p. 12 line 79. Drew was armed and could not allow just anyone to gain control of him and by proxy his firearm. On 12/3/2014 Ziegenhorn was not effectuating an arrest like the Defense claims. Drew had a history of open carrying, not concealed carrying, so it was unreasonable for Ziegenhorn to believe Drew was armed, particularly when Drew eventually responded to Ziegenhorn's question confirming that he was not armed. Ziegenhorn could have asked for Drew's concealed handgun license, he did not, he chose to arrest and search instead.

### i.    Defendant Sadler Violated Plaintiffs Fourteenth Amendment Rights

Sadler improperly interpreted the state statute in an effort to further keep this information unobtainable by Plaintiff absent great financial burden.  This is tantamount to Defendant Sadler holding the information hostage, although Plaintiff was entitled to it, and a violation of Plaintiff's due process rights.  At this juncture, Plaintiff's only choices were to abandon pursuit of the information; pay an exorbitant, unnecessary, and unmandated fee; or, sue.  Drew was clearly

singled out as someone who was complaining about the actions of the State Police creating a "class of one" equal protection violation.

ii.     **Conspiracy to Interfere with Civil Rights Under U.S. § 1985 (3)**

Plaintiff  has asserted with specificity in his Fourth Amended Complaint that Sadler did conspire for the purpose of depriving, whether directly or indirectly, equal privileges under the law when Sadler put an exorbitant price tag on the information regarding Ziegenhorn, to which Plaintiff was entitled by his FOIA request.  Sadler's holding the documents hostage was absolutely an act in furtherance of the object of the conspiracy, served no legitimate police function, and Plaintiff was deprived of his statutory right to this information.

Defendants contend that Plaintiff cannot bring conspiracy claims because they are barred by the intracorporate conspiracy doctrine.  See Larson by Larson v. Miller, 76 F. 3d 1446, 1456 n. 6 (8th Cir. 1996).  However, there is an exception to this rule: "When the interests of principal and agents diverge, and the agents at the time of the conspiracy are acting beyond the scope of their authority or for their own benefit rather than that of the principal" the agent is legally capable of conspiring with the corporate principal. Colonia Ins. Co. v. City Nat. Bank, 13 F. Supp. 2d 891, 899 (W.D. Ark. 1998), citing Pink Supply Corp. v. Hiebert, Inc., 788 F.2d 1313, 1317 (8th Cir.1986) and Ripplemeyer v. Nat'l Grape Co-op. Ass'n, Inc., 807 F.Supp. 1439 (W.D.Ark.1992).

Further, though not a controlling case, the Eighth Circuit has acknowledged that the intracorporate conspiracy doctrine may not protect certain actors in certain situations, where their actions were more than just routine, collaborative business decisions that could later be viewed in an unflattering light. Golden v. Moutray, No. 4:17 CV 284 DDN, 2018 WL 1784395, at 4 (E.D. Mo. Apr. 13, 2018).  In Golden, the court notes that police misconduct is not the product of

routine decision making, and that it is not proper to apply the intracorporate conspiracy doctrine at the dismissal stage in § 1983 cases.  Id.

### iii.    Defendant Ziegenhorn Violated Plaintiff's Second Amendment Rights

Defendants attempt to undermine and underplay the Second Amendment its treatment in seminal cases such as McDonald and Heller.  561 U.S. 742 (2010), 554 U.S. 570 (2008).  However, these holdings are not as narrow as Defendants purport.

"In numerous instances, 'bear arms' was unambiguously used to refer to the carrying of weapons outside of an organized militia."  Heller at 584.  "It is clear rom those formulations that 'bear arms' did not refer only to carrying a weapon in an organized military unit."  Id. at 586.  "In any event, the meaning of 'bear arms' .... is *not even* the (sometimes) idiomatic meaning..."  Id.  "We therefore believe that the most likely reading...is that they secured an individual right to bear arms for defensive purposes."  Id. at 602.  "We conclude that nothing in our precedents forecloses our adoption of the original understanding of the Second Amendment."  Id. at 625.

Defendants' statements regarding limitations on individual rights to carry a weapon is not transparent.  Doc. 15, p. 19.  While he United States Supreme Court does recognize that there are limitations upon carrying a weapon, it describes "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  Id at 626-27.  That list also pertains to "dangerous and unusual weapons."  Id. at 627. The Eighth Circuit recognizes that it is a possible cause of action "that some plaintiff could show that a state actor violated the Second Amendment by depriving an individual of a specific firearm that he or she otherwise lawfully possessed for self-defense."  Walters v. Wolf, 660 F.3d 307, 318 (8th Cir. 2011).  This is such a case. Defendants argue that

Drew has failed to plead sufficient facts to assert a plausible Second Amendment claim.  In Drew's Fourth Amended Complaint, he outlines Zeigenhorn's unconstitutional contact based on the fact that Drew was carrying a gun.  The Court must take the pleaded facts as true, and must liberally construe the complaint in the light most favorable to the plaintiff. Frey, Schmedding, supra.  Given this standard, the Court cannot consider whether Zeigenhorn's confrontation, sparked by Drew's possession of a weapon, was reasonable.  The facts pleaded demonstrate that Drew's weapon instigated Zeigenhorn's constant harassment of him.  Using the gun as basis for his confrontations with Drew is in and of itself a violation of Drew's Second Amendment right to carry a weapon.  Further, as a result of Zeigenhorn's unlawful actions, Drew underwent a lengthy and expensive criminal court process and suffered loss of his concealed carry handgun license.  As alleged in Plaintiff's Fourth Amended Complaint, Zeigenhorn's unlawful actions are the proximate cause for Drew's loss of his concealed carry license and the reason he did not carry a firearm on later dates, a Second Amendment violation directly attributable to Zeigenhorn.  Defendants' motion should be denied on this ground for the above stated reasons.

### III. State-Law Claims Are Not Barred By Statutory Immunity

"Officers and employees of the State of Arkansas are immune from liability and from suit, except to the extent that they may be covered by liability insurance, for damages for acts or omissions, other than malicious acts or omissions, occurring within the course and scope of their employment."  Ark. Code Ann. § 19-10-305 (a). In Plaintiff's Fourth Amended Complaint, he overcomes this bar by alleging with specificity that the defendants acted maliciously in order to harass Drew, and deprive him of his freedom of speech, due process, and second amendment rights. Drew has substantiated these claims by describing how Defendants Chapman and Kennedy maliciously blocked him from interacting with the ASP Facebook page without any

right to appeal his interaction in a public forum the State created.  Drew also describes

Ziegenhorn's malicious treatment of him on two occasions at the Searcy Walmart, and the

malicious prosecution of a baseless case against him, as well as an instance where he has done

this to another person  Next, Drew outlines the malfeasance of Defendant Sadler unlawfully

imposing a high dollar value on the information he sought about Ziegenhorn in a FOIA request,

as well as evidence of Sadler's other malicious acts.  Drew alleges that these state actors meant

to do him harm by depriving him of his rights, compelling him to endure a lengthy and expensive

trial process, among other harms, which illustrates their malice. In order to pierce qualified

immunity the Plaintiff must only show malice, which "is not necessarily personal hate. It is

rather an intent and disposition to do a wrongful act greatly injurious to another." Satterfield v.

Rebsamen Ford, Inc., 253 Ark. 181, 185, 485 S.W.2d 192, 195 (1972).

     For the foregoing reasons, and the standard of review for such motions, Defendants' must

fail.

                                                           Respectfully submitted,
                                                           JAMES ANDREW tanner
                                                           Plaintiff

By:     /s/ *William Whitfield Hyman*_____

               W. Whitfield Hyman
               King Law Group PLLC
               300 N. Sixth Street
               Fort Smith, AR 72901
               479-782-1125
               479-785-1657 Fax
               ABA # 2013081
               Hyman@arkansaslawking.com
               ATTORNEY FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I, William Whitfield Hyman, Attorney for Plaintiff, do hereby certify that on this 10th day of April, 2019, I electronically filed the forgoing with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

By:     /s/ *William Whitfield Hyman*