IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION 4

JAMES ANDREW TANNER                                                        PLAINTIFF

vs.                        No. 4:17-CV-00780-DPM

KURT ZIEGENHORN, ET. AL.                                       DEFENDANTS

**BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**

Comes now, the Plaintiff James Andrew Tanner, by and through his attorney, W. Whitfield Hyman of King Law Group, PLLC and for his brief in support of Plaintiff's response in opposition to Defendant's motion to dismiss (Doc. 57) states the following:

**Factual Background**

Mr. Tanner posted many Facebooks comments on the Arkansas State Police Facebook page. Mr. Tanner only has a record of six such comments. See Document 42, pg 3 paragraph 13. All of those comments were deleted or hidden from view on the ASP page by Arkansas State Police employees. Id. Eventually, Mr. Tanner was blocked form participation in the ASP Facebook page. Id at pg 4, paragraph 20. Col. Bill Bryant was not even aware that anyone was having their Facebook comments hidden from the ASP Facebook page or their participation banned from the ASP Facebook page until he was served with this lawsuit. See Id at pg 6, paragraph 30.

1. The First Deleted Comment

All of the facts regarding this incident may be found in the complaint, Document 42, page 4 and 5, from paragraphs 21-28. In February, 2016, the Arkansas State Police decided to recognize the promotion of one of their officers in a post on the Arkansas State Police Facebook

page. The post read, in relevant portion: "The State Police Commission also approved the recommendations for promotion of four other State Troopers. Lieutenant Mike Kennedy was promoted to the rank of captain. Kennedy, 42, of Benton, is a twenty-two year veteran of the department. Captain Kennedy has devoted the past nine years of his career assigned to the department's training section and as assistant commander of the Arkansas State Police Administrative Services Division where he will continue in that role." Drew, a follower of the page, recognized the name "Mike Kennedy" as one of the men who had conducted the internal investigation in response to Drew's complaints. This individual had investigated Drew's complaints and determined that Ziegenhorn had done nothing wrong. Drew decided to take to social media in order to inform the public of the corruption in the ASP. Drew stated "I have this guy's autograph. He supports crooked cops, so that makes him a crooked cop in my book. He needs to be held accountable as well if he is going to support the unlawful actions of his officers...[link to picture of document from ASP]... This guy sucks." and attached a link to picture of the notice from the ASP to the comment. This comment was deleted by employees of the Arkansas State Police, Elizabeth Chapman and ordered by Mike Kennedy. The Arkansas State Police claim that "All of the reasons why" Drew Tanner's Facebook comments were deleted were because they were "Abusive comments and/or profanity in violation of the Arkansas State Police Facebook Terms and Conditions." When asked if the Arkansas State Police had ever used a post containing profanity, they responded that they never have. However, the Arkansas State Police have used the word "sucks" in this context in one of their posts. Therefore, the word "sucks" is not profanity and that was not the reason why Drew's comment was deleted the next day. Although Mr. Tanner was informed by a page administrator that he

may repost his comment, Mr. Tanner did so and yet his subsequent identical comment was still deleted.

### 2. The Second Deleted Comment

All of the facts regarding this incident may be found in the complaint, Document 42, page 6, from paragraphs 31-33.

Drew's next deleted comment was under the following post on the ASP page dated Tuesday, March 1, 2016 about a little-known statute. Under that post, Drew commented: "Are you familiar with 5-54-122? Specifically (c)(1) D and E? At least one of your troopers committed this crime. You know who it is." A.C.A. 5-54-122 is the "Filing False Report with Law Enforcement Agency" statute. Subsection (c)(1) lists different ways you can violate the statute for it to be a class D felony. In that list is (D) which describes a violation where the intent of the person filing the false report has to be an attempt by the filer to cover up their own crime, and (E) which describes a violation where the false report has to lead to the arrest of another person. This comment was deleted by employees of the Arkansas State Police, Elizabeth Chapman by order of Mike Kennedy the next day.

### 3. The Third, Fourth, Fifth, and Sixth Deleted Comments

All of the facts regarding this incident may be found in the complaint, Document 42, page 6, from paragraphs 35-46.

Under a September 14th, 2016 post by the Arkansas State Police showing a recent class of Arkansas State Troopers, Mr. Tanner made the following comment at 7:03 p.m.: "Just don't be like that douche, Trooper Ziegenhorn." Mr. Tanner quickly realized it had been deleted, so he made another comment that used different terms at 7:27 pm: "Just don't be like that fascist

pig, Trooper Ziegenhorn. Frustrated that these comments had been deleted, he changed them one last time at 7:29 p.m. "Just don't be like that fascist pig, Trooper Ziegenhorn, aka douchebag." At 8:01 pm Mr. Tanner sent a message to an administrator of the Facebook page telling them "go fuck yourself you fascist pig." Mr. Tanner's sixth comment was "So handcuffing someone and detaining them without any probable cause, stealing from them, then letting them go is taught in this class, or is that something that DOUCHEBAG Ziegenhorn learned on his own?" Shortly after this comment, Mr. Tanner was banned from participation in the Arkansas State Police Facebook page.

Mr. Tanner contends there were no policies and procedures or terms and conditions for using the Arkansas State Police Facebook Page publicly available. See Document 42, page 5, paragraph 25.

## STANDARD OF REVIEW

The Court resolves motions to dismiss by taking the pleaded facts as true, examining whether this is an unusual case only where the complaint demonstrates "some insuperable bar to relief." Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir.1995) (omitting quotation and discussing identical standard for 12(b)(6) motion). Hirsh v. lecuona, No. 8:06CV13, 2006 WL 2873664, at 1 (D. Neb. Oct. 6, 2006), citing Schmedding, infra.

## ARGUMENT

The Plaintiff does not want to rehash all of the arguments outlined in his response as to why the Facebook page is currently considered at least a nonpublic forum, for those arguments we urge the court to examine our response to the Defendant's Motion to Dismiss in Document 50. While it is true the law evolves, the Defendant's alleged "confusion" on what Drew's first amendment rights were at the time should be evaluated with the understanding that there has

never been a "government speech" analysis that would conceivably cover a government owned Facebook page in the 8th Circuit or elsewhere, and viewpoint discrimination has never been acceptable. Moreover, criticism of the police has been a bedrock of free speech rights and has always been treated with increased protection by the courts. The Fourth Circuit has stated that the government "of course" would open a forum for speech by creating a website that includes a " 'chat room' or 'bulletin board' in which private viewers could express opinions or post information," or that otherwise "invite[s] or allow[s] private persons to publish information or their positions." Page v. Lexington Cnty. Sch. Dist. One, 531 F.3d 275, 284 (4th Cir. 2008). Government Facebook pages are such websites, "Upon concluding that interactive component of the Chair's Facebook Page amounts to a public forum, we would normally need to determine whether it constitutes a traditional public forum or designated or limited public forum. In the present case, however, we need not decide that question because Randall's ban of Davison amounted to 'viewpoint discrimination,' which is 'prohibited in all forums.' Davison v. Randall, 912 F.3d 666, 687 (4th Cir. 2019), as amended (Jan. 9, 2019).

## I. The ASP Facebook Page Does Not Meet Previous 8th Circuit Standards for Government Speech

Although the Supreme Court has taken up the idea of government speech many times after *Roach,* the 8th Circuit's Roach test has not been explicitly overturned, and may still be relevant when evaluating government speech. To determine whether speech is government speech, the 8th circuit has followed a four-point test set out by the other circuits after Johanns: (1) the central "purpose" of the program in which the speech in question occurs;

(2) the degree of "editorial control" exercised by the government or private entities over the content of the speech;

(3) the identity of the "literal speaker"; and

(4) whether the government or the private entity bears the "ultimate responsibility" for the content of the speech. *Roach v. Stouffer*, 560 F.3d 860, 865 (8th Cir. 2009).

### i. Central Purpose

"The primary purpose of Missouri's specialty plate program is to allow private organizations to promote their messages and raise money and to allow private individuals to support these organizations and their messages." Id. The Arkansas State Police states they would like us to believe the purpose of their Facebook page in their "terms and conditions":

"The purpose of the Arkansas State Police Facebook page is to permit authorized employees of the Department to provide the public with information concerning the Arkansas State Police's mission, goals, programs, activities, events, news, stories, photographs, and videos and to disseminate other information and material intended to increase public awareness of and enhance respect for the Arkansas State Police and its members and employees. Please note that this is a purposefully controlled online site established for this limited purpose."

See "Terms and Conditions"
https://www.facebook.com/pg/ARStatePolice/about/?ref=page_internal

However, over the past few years the Arkansas State Police Facebook page has solicited input from their users to create non-pre-approved content in the comments of the page hundreds of times. See https://www.facebook.com/ARStatePolice/photos/a.318590841644604/925902487580100/?type=3&theater . Finally, Facebook itself describes Pages as a way for entities to have a multi-faceted interaction with users, which is much more than merely "disseminating information."

See: https://www.facebook.com/notes/facebook/facebook-tips-whats-the-difference-between-a-facebook-page-and-group/324706977130/. In the "Help Section" of Facebook, the portion concerning Pages starts off with the first subheading as how to "Like and Interact With Pages." https://www.facebook.com/help/1771297453117418/?helpref=hc_fnav. Disseminating information is for static websites, which the ASP already has. See http://asp.arkansas.gov/.

Based on this information, it is easy to conclude that the "central purpose" to engage with users on the Facebook platform, a large portion of which includes soliciting comments from private actors. This factor puts the Plaintiffs' comments squarely in the private speech analysis, not government speech analysis.

### ii. Degree of Editorial Control

The 8th circuit agreed with the 9th circuit when it sampled this quote in reference to license plates "de minimis editorial control over the plate design and color does not support a finding that the messages conveyed by the organization constitute government speech." <u>Roach v. Stouffer</u>, 560 F.3d 860, 866 (8th Cir. 2009). "[T]he statutory requirements address[ed] who may speak, not what they may say." The Supreme Court determined that when "the government sets the overall message to be communicated and approves every word that is disseminated," the speech is government speech. <u>Johanns v. Livestock Mktg. Ass'n</u>., 125 S.Ct. 2055 (2005). The State allowed up to hundreds of comments on each post, in order for them to invoke this factor in their favor they would have to assert that they chose who spoke, chose which words each user specifically could use, and approved every word of every comment. That is not the case, therefore they did not have the degree of editorial control that is necessary to tilt this factor in their favor, and Plaintiff's comments would be considered private speech under this analysis.

### iii.    Literal Speaker

The Identity of the "Literal Speaker" This is the most obvious factor that would not be in the Defendants' favor when evaluating whether speech is private or governmental. On Facebook each comment has a name next to it along with a picture of the commenter. See https://www.facebook.com/ARStatePolice/photos/a.318590841644604/925902487580100/?type=3&theater . Clearly, the "literal speaker" in this case would be the private citizen, tipping this factor in favor of evaluating the comments at hand as "private speech."

### iv.    Who Bears the Ultimate Responsibility for the Content of the Speech

Whether it be a defamation case or the criminal charge of terroristic threatening, obviously the ultimate responsibility of what is posted on the page would lie on the shoulders of the commenter, not of the governmental entity providing the forum. Summum and would not apply according to the Dissent in Walker "[T]here is no history of landowners allowing their property to be used by third parties as the site of large permanent monuments that do not express messages that the landowners wish to convey. Walker v. Texas Div., Sons of Confederate Veterans, Inc., 135 S. Ct. 2239, 2259 (2015). However, social media is often a hub for lively debate. While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the "vast democratic forums of the Internet" in general... and social media in particular. Packingham v. North Carolina, 137 S. Ct. 1730, 1735, 198 L. Ed. 2d 273 (U.S. 2017) (internal citations omitted). As Packingham alludes, Facebook pages and profiles are often used for communication, argument, and debate. "Spatial limitations played a prominent part in our analysis. 'Public parks can accommodate only a limited number of permanent monuments,' and consequently permanent monuments 'monopolize the use of the land on which they stand and

interfere permanently with other uses of public space.'" Walker at 2239, 2259. The amount of space allowed on a Facebook post or comment is unlimited. In fact, if a comment is too long, Facebook requires you to click "more" if you want to see that comment expanded. A Facebook user would not be able to monopolize an entire thread. In fact, the ASP could have had a policy of "no more than one comment per post per Facebook user" and that would have been Constitutional. However, the ASP chose to practice an illegal "viewpoint discrimination" policy.

### iv.     The ASP Created a Forum

If the speech at issue not "government speech" and the speech is in a space controlled by the government, the speech is occurring in one of four types of forums created by the government: public forums, designated public forums, limited public forums, and nonpublic forums. See Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 484, 129 S. Ct. 1125, 1127, 1140, (2009). Once it has opened a limited forum the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not "reasonable in light of the purpose served by the forum… nor may it discriminate against speech on the basis of its viewpoint." Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 829, 115 S. Ct. 2510, 2517, 132 L. Ed. 2d 700 (1995. The type of forum created by the ASP is not important here, because the Plaintiffs have sufficiently plead viewpoint discrimination, which is impermissible in any of the forums created by a government entity. Id.

### II. INDIVIDUAL LIABILITY FOR DELETING FACEBOOK COMMENTS

Defendants have the burden of proving Plaintiff did not have a clearly-established First Amendment right at the time of the events in question. See e.g., Siegert v. Gilley, 500 U.S. 226, 231, 111 S. Ct. 1789, 1792–93, 114 L.Ed.2d 277 (1991); Watertown Equip. Co. v. Norwest Bank Watertown, 830 F.2d 1487, 1490 (8th Cir.1987); and Burnham v. Ianni, 119 F.3d 668, 674 (8th

Cir. 1997). Contrary to Defendants' insinuation, there need not be such a painfully specific case on point for Plaintiff to prevail. "In the absence of binding precedent, a court should look to all available decisional law including decisions of state courts, other circuits and district courts...." Burnham, supra, at 677. The Facebook page at issue in this case is at best a nonpublic forum, but probably a limited public forum, the individual Defendants should be judged on their actions as if they were evaluating forum analysis, not hiding behind the smoke screen of how new social media is. Indeed, this Court should consider Burnham v. Ianni, which revolved around a display case in a university, where several staff members displayed photographs of themselves holding weapons. Id. at 671. The school chancellor removed only photographs displaying weapons from the display. Id. at 672. Determining that the chancellor was not entitled to qualified immunity, the court stated that the nature of the forum did not matter, but, rather, the issue was that the protected speech was a clearly established right. "The display case was designated for precisely the type of activity for which the Kohns and Professors Burnham and Marchese were using it. It was intended to inform students, faculty and community members of events in and interests of the history department. The University was not obligated to create the display case, nor did it have to open the case for use by history department faculty and students. However, once it chose to open the case, it was prevented from unreasonably distinguishing among the types of speech it would allow within the forum." Id. at 676. In rejecting the chancellor's claim to qualified immunity, the Burnham court stated, "Here, ...we have long established, binding precedent totally supportive of plaintiffs' claims. The Supreme Court and this court have both clearly and directly spoken on the subject on numerous occasions and in years long prior to the 1992 censorship by Ianni." Id. at 677.

Due to the extensive case law that suppressing speech critical of police departments outweighs other government interests, the Defendants were on notice that deleting the Facebook comments and posts outweighed the government's interest in practicing "government speech." The egregiousness of that scenario and the importance that it be heard far outweighed any other governmental interest. The Federal District Courts are littered with successful claims Facebook comment deletion free speech claims, in addition to the case cited by the Defendants, there have been successful cases in Virginia, Hawai'i, Maine, and Indiana. See: Davison v. Loudoun City. Bd. of Supervisors, 267 F. Supp. 3d 702, 716 (E.D. Va. 2017), Hawaii Def. Found. v. City & City. of Honolulu, No. CIV. 12-00469 JMS, 2014 WL 2804448, (D. Haw. June 19, 2014), Leuthy v. LePage, No. 1:17-CV-00296-JAW, 2018 WL 4134628 (D. Me. Aug. 29, 2018), and citing https://www.indystar.com/story/news/2016/08/04/beech-grove-aclu-reach-settlement-facebook-case/88075666/ accessed on 10/30/2018. The District Court in LePage held "The Governor is correct that the government's own speech is immune from First Amendment scrutiny,… however, he fails to persuade the Court on this motion to dismiss that his speech is at issue in this case. Based solely on the allegations in the Complaint, the Court must disagree with the premise that all of the information on the Governor's Facebook page constitutes his speech. The posts on the Facebook page are labeled with the name of the person who posted them, and the Governor's speech—his posts—is distinct from the private citizen posts." ), Leuthy v. LePage, No. 1:17-CV-00296-JAW, 2018 WL 4134628 (D. Me. Aug. 29, 2018). LePage went further to decline to extend the legal reasoning in Morgan and also noted that there were factual differences in the cases. Id. and Morgan v. Bevin, 298 F. Supp. 3d 1003 (E.D. Ky. 2018). The district court in Morgan deemed the accounts "privately owned channels of communication and are not converted to public property by the use of a public official." Id. at 1011. Morgan is also

distinguishable from this case, Governor Bevin stated that he blocks both positive and negative comments that are off topic. Id at 1003, 1008. Also the Court held that it was the governor's "personal" speech, because he is speaking on his own behalf, even if it was on his own behalf as a public official. Id at 1003, 1010–11. That analysis does not translate to this case where the Facebook page in question is the name of a governmental department, the department is not an elected politician who may have greater or different levels of immunity regarding his suppression of speech, and the Governor was at least attempting to enforce the rules of a limited public forum. Id.

Just as the Burnham court, this Court should not allow Defendant to erect a barrier to Plaintiff's claim based on lack of an eerily similar Facebook case. Rather, this Court must recognize the large body of case law concerning freedom of speech, evaluate the principles of the law, regardless of forum, and deny Defendants' motion on this ground.

For the foregoing reasons, and the standard of review for such motions, Defendants' must fail.

                              Respectfully submitted,
                              JAMES ANDREW tanner
                              Plaintiff

By:    /s/ *William Whitfield Hyman*_____

        W. Whitfield Hyman
        King Law Group PLLC
        300 N. Sixth Street
        Fort Smith, AR 72901
        479-782-1125
        479-785-1657 Fax
        ABA # 2013081
        Hyman@arkansaslawking.com
        ATTORNEY FOR PLAINTIFF