**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION 4**

**JAMES ANDREW TANNER**                                              **PLAINTIFF**

**vs.**                            **No. 4:17-CV-00780-DPM**

**KURT ZIEGENHORN IN HIS INDIVIDUAL CAPACITY,**
**COLONEL BILL BRYANT IN HIS OFFICIAL**                      **DEFENDANTS**
**CAPACITY AS HEAD OF THE ARKANSAS**
**STATE POLICE, AN AGENCY OF THE**
**STATE OF ARKANSAS;**

**FIFTH AMENDED CIVIL RIGHTS COMPLAINT**
**AND REQUEST FOR JURY TRIAL**

COMES NOW the Plaintiff, JAMES ANDREW "DREW" TANNER, by and

through his attorney of record, William Whitfield Hyman of King Law Group, PLLC, and for

his Section 1983 and 1988 Civil Rights Complaint against Colonel Bill Bryant in his Official

Capacity as head of the Arkansas State Police ("ASP"), and Kurt Ziegenhorn in his

individual capacity, would state and allege the following:

**PARTIES:**

1. Plaintiff James Andrew Tanner (hereafter referred to as "Drew") is an adult citizen and

resident of Searcy, White County, Arkansas, in the Eastern District of Arkansas, Western

Division 4, who at all material times herein did reside at 815 West Cherry, Searcy, Arkansas

72143.

2. Colonel Bill Bryant (hereafter referred to as "Bryant") is the administrative head of the

ASP, an agency of the State of Arkansas. He works at 1 State Police Plaza Dr, Little Rock,

AR 72209, and is being sued in his official capacity as such.

3. Kurt Ziegenhorn, (hereafter referred to as "Ziegenhorn") an Arkansas resident and a State

Trooper, is, and was during all relevant times, in the employ of the ASP, an agency of the

1

state of Arkansas. Ziegenhorn resides at 3205 North Washington, Forrest City, Arkansas 72335.

4. Ziegenhorn,  is  being sued because of his  actions against the Plaintiff complained about in this action,  he is accordingly liable to Plaintiffs for damages and other relief as set forth in this Complaint.

## JURISDICTION AND VENUE:

5. This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343, 2201, and 2202, and supplemental, collateral and pendent jurisdiction over all the state causes of action. This Court has personal jurisdiction over the Plaintiff, Defendant Ziegenhorn, , as they are residents of the State of Arkansas, and the court has jurisdiction over the ASP (ASP) as it is a government entity, an agency of the State of Arkansas, and all actions complained about herein took place within the geographical confines of Arkansas.

6. Venue is proper pursuant to 28 U.S.C. § 1391. Plaintiff also requests a jury trial.

*Counts 1-14: Injunctive Relief Against ASP for Violations of Freedom of Speech Rights*

7. Every paragraph in this complaint is incorporated as though fully stated herein.

8. Counts 1-14 are brought against Separate Defendant the State of Arkansas, by and through the administrative head of the ASP, Bryant so that the court may enter an injunction against Bryant ordering him to direct employees of the ASP to unblock Drew from participation in the Official ASP Facebook page so that Drew may be unblocked and have his comments restored.

9. Counts 1-6 represent Drew's six comments that were hidden, respectively, are brought under the First Amendment and the FCRA (hereinafter referred to as the Federal Civil Rights Act") for injunctive relief against the state of Arkansas to restore Drew's six respective

comments. Count 7 is brought under the First Amendment and the FCRA for injunctive relief against the state of Arkansas to unblock Drew from participation in the ASP Facebook Page.

10. Counts 8-13 represent Drew's six comments that were hidden, respectively, are brought under the ACRA as made available from Article II Section 6 of the Arkansas Constitution for injunctive relief to restore Drew's six respective comments.

11. Count 14 is brought under the ACRA as made available from Article II Section 6 of the Arkansas Constitution for injunctive relief to unblock Drew from the ASP Facebook Page.

12. Employees of the ASP (Mike Kennedy and Elizabeth Chapman) while acting under the color of law as employees of the ASP, banned the Plaintiff from participation in a government owned and controlled Facebook page, in violation of the Plaintiff's First and Fourteenth Amendment rights protected under the United States Constitution, and Article II, Section 6 of the Arkansas Constitution.

13. Causes of Action 1-7 are brought under 42 U.S.C. § 1983 and 1985 and 8-14 are brought under the Arkansas Civil Rights Act (hereafter referred to as "ACRA").

14. The ASP used government resources to create and manage the ASP Facebook page.

15. In February and September 2016, Kennedy ordered that Chapman hide Drew's Facebook comments. Kennedy subsequently ordered that Drew be blocked from participating in the official ASP Facebook page.

16. On February 18th, 2016, the ASP decided to recognize the excellence of one of their officers, a Mike Foster, on their official Facebook page.

17. Drew, a follower of the page, recognized "Mike Foster" as someone who had conducted the internal investigation of Ziegenhorn, which cleared Ziegenhorn of wrongdoing.

18. Drew decided to take to social media to inform the public of the inadequacies of the ASP (ASP). In a comment underneath this picture, Drew stated "I have this guy's autograph. He supports crooked cops, so that makes him a crooked cop in my book. He needs to be held accountable as well if he is going to support the unlawful actions of his officers.... [link to image of letter from Mike Foster] This guy sucks." Drew attached a link to the picture of the notice from Mike Foster to this comment (Hereinafter referred to as "Comment 1").

19. Without warning or a chance to appeal, Drew's Comment 1 was subsequently hidden from view, however the post by the ASP remained visible to everyone (except those who may be blocked from participation in the page, such as Drew is now).

20. The ASP may argue that Drew's Comment 1 was deleted because it linked to another page or an image, however the ASP has allowed hundreds of other commenters to link to other Facebook pages or outside links on at least dozens (if not hundreds) of other occasions. See Plaintiff's Exhibit 1. The comments on the ASP Facebook page also allow people to make use of a seemingly near infinite number of "gifs" or moving pictures. Id. Drew has personal knowledge that at least several of these people are not employees of the ASP, however it is readily apparent to any reader that the people commenting are obviously not employees.

21. At this point, there were no "terms and conditions" of using the ASP Facebook page or "policies and procedures" in place for deleting comments from the page, however the ASP claims otherwise. If there were terms and conditions, they were not visible to the public and were not provided upon Drew's request for them. Compare a screenshot of the October 5th, 2016 ASP Facebook page and the December 14th, 2016 ASP Facebook Page. Plaintiff's Exhibit 2, a screenshot from http://web.archive.org an archive of old websites.

4

22. The ASP do not consider the word "sucks" to be an obscene or vulgar word, so this cannot be their reasoning in deleting this comment.

23. As stated in their Response to Plaintiff's Interrogatory Number 22 propounded to Separate Defendant the State of Arkansas: "ASP has not posted obscene or vulgar words on its Facebook Page."

24. An ASP Post from 5/21/2017 reads in part: "Earlier tonight I was involved in a collision in the Bella Vista area. I was not at [sic] hurt, but it was the type of situation that just kind of ***sucks*** for everyone." Emphasis added.

25. The ASP later published unconstitutional terms and conditions sometime after Drew was blocked from participation in the page in September 2016.

26. There exists a continuing and widespread, persistent pattern of unconstitutional misconduct by the ASP employees; Defendant Bryant's deliberate indifference to or tacit authorization of such conduct after notice of that misconduct is the moving force behind the Constitutional violations. The misconduct continues because Drew is still blocked, and his comments are still hidden. A review of the ASP Facebook page "terms and conditions" demonstrates their continued unconstitutional policy. See Plaintiff's Exhibit 3 (These terms and conditions were not visible to Drew or anyone else during the times Drew commented, and when Drew asked for the policies and procedures regarding Facebook comments, Drew was told no such document existed by the Public Information officer). Drew informed the ASP of their illegal activity by contacting the ASP via Facebook message.  Further, the official ASP Facebook page is listed under the "Contact Us" section of the official ASP Website, right next to a map for directions on the bottom right of the page. https://asp.arkansas.gov/. Accessed 9/20/2018. Finally, a previous version of this complaint

enumerating this misconduct has been served on and answered by Bryant, yet Drew's comments are still hidden, and Drew is still blocked from participation. Despite this continued notice, Bryant responded to interrogatories claiming ignorance of his employees' illegal actions until commencement of this lawsuit, demonstrating his deliberate indifference or tacit authorization of such conduct.

27. In February or March of 2016, the ASP posted about a little-known statute on their official Facebook page. In response Drew posted in the comments section of that post: "Are you familiar with 5-54-122(c)(1)(b)? Because one of your troopers committed this crime, you know who it is." Hereinafter, this comment will be referred to as "Comment 2."

28. Drew's Comment 2 was a reference to Ziegenhorn's false statements against Drew in various reports and testimony. Drew's Comment 2 was subsequently hidden from view by Chapman.

29. On September 14th, 2016 on a post about a new recruit class, at 7:03 p.m. Drew commented "Just don't be like that douche, Trooper Ziegenhorn." This comment will hereinafter be referred to as "Comment 3."

30. Drew's comment was a reference to Ziegenhorn's treatment of him and is protected speech. Drew's Comment 3 was subsequently hidden from view by Chapman.

31. After Drew's Comment 3 was deleted, on September 14th, 2016 on a post about a new recruit class, at 7:31 p.m. Drew commented "Just don't be like that fascist pig, Trooper Ziegenhorn." This comment will hereinafter be referred to as "Comment 4."

32. Drew's comment was a reference to Ziegenhorn's treatment of him and altered because his previous comment had been removed because a message from an administrator claimed that "douche" was profanity. Drew's comment was subsequently hidden from view by

Chapman. After Comment 4 was deleted on September 14th, 2016 on a post about a new recruit class, at 7:50 p.m. Drew wrote "Just don't be like that fascist pig, Trooper Ziegenhorn, aka douchebag." This comment will now be referred to as "Comment 5." Drew's comment was out of frustration of his other comments being deleted. Drew's comment was subsequently hidden from view. After all of Drew's comments had been deleted on September 14th, 2016 on a post about a new recruit class, at 9:51 p.m., Drew commented: "So handcuffing someone and detaining them without any probable cause, stealing from them, then letting them go is taught in this class or is that something that DOUCHEBAG Ziegenhorn learned on his own?" This comment will hereinafter be referred to as "Comment 6." Drew's comment was out of frustration of his other comments being deleted and he wanted to express his unhappiness with Ziegenhorn's treatment of him and the subsequent ASP response (or lack thereof). Drew's comment was subsequently hidden from view, and Plaintiff was blocked from participation in the official Facebook Page.

***Counts 15-18 Individual Unreasonable Search and Seizure Claims Against Ziegenhorn***

33. Every paragraph in this complaint is incorporated as though fully stated herein.

34. Counts 15 through 18  are brought against Separate Defendant Ziegenhorn.

35. Count 15 is brought under the FCRA and the 4th Amendment to the Constitution for violating Drew's federal right to be free from unreasonable searches and seizures against Ziegenhorn for when Ziegenhorn caused Tanner to be detained on 12/3/2014.

36. Count 16 is brought under the ACRA and Article II Section 5 of the Arkansas Constitution for violating Drew's state right to be free from unreasonable searches and seizures Ziegenhorn for when Ziegenhorn caused Tanner to be detained on 12/3/2014.

37. Count 17  is brought under the FCRA and the 4th Amendment to the Constitution for violating Drew's federal right to be free from unreasonable searches and seizures against Ziegenhorn for when Ziegenhorn caused Drew to be detained and searched on 1/17/2015.

38. Count 18 is brought under the ACRA and Article II Section 5 of the Arkansas Constitution for violating Drew's state right to be free from unreasonable searches and seizures Ziegenhorn for when Ziegenhorn caused Tanner to be detained and searched on 1/17/2015.

39. On November 29th, 2014, Drew Tanner was openly carrying a pistol in a holster while shopping at Wal-Mart in Searcy, Arkansas when a man later identified as Ziegenhorn began stalking toward him, demanding to know which law enforcement agency Drew was with. Drew responded that he was not with a law enforcement agency, then Ziegenhorn forcefully grabbed Drew by the arm said "State Police. Identify yourself."

40.  At that time Ziegenhorn was off-duty and out of his ASP troop zone.

41. At that time, there was nothing on Ziegenhorn's person visually identifying Ziegenhorn as a Trooper.

42. After being accosted, Drew wriggled from Ziegenhorn's repressive grasp and made a panicked call to 911.  In his 911 call, Drew identified himself while retreating to safety toward the exit. The 911 dispatcher told Drew to stay in the building and wait for Searcy Police Department officers to arrive. During this time, Ziegenhorn eventually produced a badge that had been previously covered up by his shirt to the employees and the manager of the Wal-Mart.

43. At Ziegenhorn's behest, the Wal-Mart manager informed Drew, in contradiction to Wal-Mart's official policy, that Wal-Mart did not allow open carry of firearms in the store.

44. Although Drew complied with the manager's request to leave, Ziegenhorn insisted on escorting Drew outside of the Wal-Mart where Ziegenhorn proceeded to further detain Drew.

45. During this detention Ziegenhorn yelled and hurled profanities while placing his finger within inches of Drew's face and cornering Drew against a wall. During this time, Defendant Ziegenhorn asserted, "I don't care who the fuck you think you are, when a fucking Trooper asks you to identify yourself, you fucking do it, is that clear?" (paraphrased).

46. Searcy police officers arrived, and Mr. Tanner identified himself to them and answered their questions.

47. Ziegenhorn's outrageous behavior during the November 29th, 2014, encounter, led Drew to call Ziegenhorn's Troop and ask how to lodge an official complaint against Ziegenhorn with the Arkansas State Police. Ziegenhorn's account of that interaction with Tanner and the subsequent December 3rd, 2014 encounter with Tanner is attached as Plaintiff's Exhibit 4. Mr. Tanner sent in that complaint shortly thereafter, before the December 3rd encounter.

48. Drew also emailed Wal-Mart corporate, and was able to get confirmation and clarification that Wal-Mart did in fact allow open carry in their stores. On December 3rd, 2014, with this email in hand, Drew returned to the Searcy Wal-Mart (unarmed this time) to speak with the manager and inform him of Wal-Mart's official policy.

49. Ziegenhorn, cloaked in the authority of the Arkansas State Police in full uniform, arrived at the Searcy Wal-Mart within moments of Drew. Searcy is about half an hour away from Ziegenhorn's base of operations.

50. Drew alleges that Ziegenhorn stalked him, approached him, and demanded, "Mr. Tanner, are you carrying a weapon today?" Drew politely responded that he did not have to answer that question.  Ziegenhorn stated that he was going to give Drew "one last chance" to answer

this question before he was arrested. Under duress, Drew capitulated and admitted that he was not armed. Ziegenhorn then demanded Drew produce his identification, despite having already addressed Drew by name and the fact that Drew had identified himself in front of Ziegenhorn just a few days before this incident, produced a copy of his ID to the Searcy Police in front of Ziegenhorn, and had filed and sent off a complaint against Ziegenhorn prior to this date. After the November interaction, Ziegenhorn had told other ASP employees that he would get Drew Tanner's concealed handgun license if he happened to come across it. Drew responded to Ziegenhorn's request that Drew did not have to produce his identification because Ziegenhorn knew who he was.  Ziegenhorn then handcuffed Drew, searched his person, confirmed Drew was not armed, and escorted Drew outside to a patrol car.

51. Defendant Ziegenhorn then detained Mr. Tanner for approximately 30 minutes and confiscated Drew's Concealed Handgun License before releasing Mr. Tanner without any charges.  Ziegenhorn never requested that Drew produce his Concealed Handgun License so that Ziegenhorn could confiscate it, Ziegenhorn simply handcuffed Drew and took the card.

52. That same day, Defendant Ziegenhorn filed a request for an arrest warrant for Drew for the charge of Obstructing Governmental Operations and Carrying a Weapon.

53. The warrant that Ziegenhorn requested was signed by a judge on January 16, 2015 and executed by the Searcy Police on January 17, 2015 at which point Drew was taken to the jail and later released.  After being forced through months of proceedings, bearing the cost of an attorney to represent him, Drew was eventually found not guilty of all charges in White County Circuit Court.

54. Ziegenhorn applied for a warrant with misleading information on December 3rd, 2014 which resulted in Drew Tanner's January 17th, 2015 arrest. In Ziegenhorn's request for a

warrant against Mr. Tanner, Ziegenhorn claimed that "There is good reason to believe that the above named person has committed the offense of 5-73-120 and 5-54-102..." 5-54-102 in this context would mean that Drew "Knowingly obstructs, impairs, or hinders the performance of any governmental function;" or "Falsely identifies himself or herself to a law enforcement officer or a code enforcement officer," which Drew did not do. In 5-73-120, Drew would have had to carry his firearm with the intent to use the firearm unlawfully against a person. There was nothing in the interaction between Drew and Ziegenhorn that would have lead Ziegenhorn to believe that was accurate. When signing the warrant, the judge struck through the warrant for 5-73-120, leaving only 5-54-102 as the reason for Drew's warrant. See Plaintiff's Exhibit 5.

55. Ziegenhorn's warrant was for his interaction with Tanner in November 29th, 2014. Ziegenhorn has a history of stalking and retaliatory behavior against a person that filed a complaint against him, a man named Al Brodbent. Ziegenhorn has failed to state a credulous reason for being at the Searcy Wal-Mart at the precise time Drew was there. Drew alleges Ziegenhorn's presence at the Searcy Wal-Mart on December 3, 2014, and Ziegenhorn's subsequent affidavit for warrant are a demonstration of Ziegenhorn's established stalking and retaliatory behavior. Ziegenhorn has claimed that he was at Wal-Mart to pick up glasses, a different time he claimed he was dropping off glasses, and Wal-Mart records show that the glasses were not picked up on December 3rd, and that they were picked up by a female.

### Count 19: Malicious Prosecution

56. Every paragraph in this complaint is incorporated as though fully stated herein.

57. Separate Defendant Ziegenhorn committed the tort of Malicious Prosecution against Drew when he filled out a misleading warrant for arrest on Drew that lacked probable cause.

The warrant request omitted key facts of their November 29th, 2014 interaction and misrepresented others, causing the Plaintiff damages in the form of attorney's fees, appeal fees, missed work, time in jail, cots, and other extemporaneous fees.

58. At a trial in White County District Court Trooper Ziegenhorn perjured himself multiple times. For example, Ziegenhorn testified "As he [Drew] approached the area I was standing." Which was false, Mr. Ziegenhorn approached Mr. Tanner while Mr. Tanner was standing still. Mr. Ziegenhorn testified that he asked Drew "which department are you with?" and that Drew condescendingly replied "I ain't with nobody." In reality, Drew calmly responded that he was "Not with any department." At that point, Ziegenhorn testified that he identified himself as Trooper Ziegenhorn with the Arkansas State Police and asked Mr. Tanner for identification. That was also false. Mr. Ziegenhorn shouted, "STATE POLICE, IDENTIFY YOURSELF" and grabbed Mr. Tanner by the wrist and elbow. Mr. Ziegenhorn also testified that Mr. Tanner "reached his hand down toward his pistol," causing Ziegenhorn to grab Drew by the elbow and wrist. However, Mr. Tanner's hands were stationary and did not move before Mr. Ziegenhorn grabbed Mr. Tanner's arm. Additionally, Mr. Ziegenhorn testified his badge was visible during this time and before the interaction, clipped just below his firearm, however it was not visible until Mr. Ziegenhorn pulled it out after Drew backed away from Ziegenhorn.  Ziegenhorn also testified that when he identified himself as Kurt Ziegenhorn with the Arkansas State Police and asked Mr. Tanner for his ID that Mr. Tanner responded in a "condescending sense" copping an attitude and saying, "I don't have to show you nothing," and at that point Drew dropped his right hand down and that Drew had his pistol on his right side. Ziegenhorn claims this prompted him to grab Drew by the wrist and elbow.   Drew's tone was normal during this interaction and void of any attitude.

59. The prosecutor used Ziegenhorn's warrant application and testimony from White County District Court as well as reliance on equally false memos and in person statements to the prosecutor by Ziegenhorn to continue to prosecute Mr. Tanner in White County Circuit Court. Mr. Tanner was found "not guilty" of all charges on November 13th, 2015.

60. Ziegenhorn pursued Drew's criminal charges because of his dislike of Drew, in response to Drew's official complaints lodged with Ziegenhorn's employer, and Drew's refusal to obey Ziegenhorn, his belief that civilians should not be allowed to legally open carry, as well as other illegal reasons. There was no probable cause for the proceedings that Defendant Ziegenhorn instigated against Plaintiff; Drew committed no crime, nor did he appear to do so.

61. Defendant Ziegenhorn acted with malice, which can be inferred from Defendant Ziegenhorn's attitude during the encounters with Drew as well as his stalking of the Plaintiff after Plaintiff inquired about filing a complaint against Ziegenhorn, and all the lies Ziegenhorn has made regarding Drew.

### Count 20: Felony Tort Statute for Perjury by Ziegenhorn

62. Every paragraph in this complaint is incorporated as though fully stated herein.

63. Defendant Ziegenhorn perjured himself in his testimony in White County District Court when describing the November 29th, 2014 incident with Drew Tanner and interactions with Drew generally, and allowed the prosecutor to rely on his sworn statements to pursue Drew in White County Circuit Court. Defendant Ziegenhorn then perjured himself on the stand during Drew's state district court trial and in official reports regarding the incident, claiming that Drew reached his hand down toward his gun during their interaction.

64. Ziegenhorn's perjury was malicious, because he knew that lying under oath would likely harm Drew, which it did. These perjurious statements cost Drew attorney's fees, appeal fees and costs, as well as lost wages and time.

65. Perjury is a class C felony. See A.C.A. § 5-53-102.  "A person commits perjury if in an official proceeding he or she knowingly: (1) Makes a false material statement under an oath required or authorized by law... or (3) Makes a false unsworn declaration under the Uniform Unsworn Foreign Declarations Act, § 16-2-201 et seq."

66. Victims of felonies may sue the perpetrator under A.C.A. § 16-118-107 and are entitled to punitive damages and attorney's fees, which Drew is seeking in this count.

***WHEREFORE, Plaintiffs pray for the following relief:***

87. Declaratory judgment that Defendant State of Arkansas' administration of their Facebook page and the policies governing its use violate the First Amendment of the United States Constitution. A permanent restraining order compelling Defendant State of Arkansas and all persons in concert with them who receive notice of this injunction, to restore Plaintiff's deleted or hidden posts; to permit Plaintiff to participate in the forum discussions; and restraining Defendants and all persons in concert with them who receive notice of this injunction from banning not only Plaintiff; but any person for protected speech made on the ASP Facebook page and/or from removing protected speech from the Facebook page.

89. Such other and further relief including injunctive relief against all Defendants, as may be necessary to effectuate the Court's judgment, or as the Court otherwise deems just and equitable.

90. Damages from Separate Defendant Ziegenhorn that Ziegenhorn pay Drew Tanner's attorney's fees and costs regarding his criminal defense, attorney's fees for all of Drew's civil claims, compensatory damages, court costs, appeal fees, certified copy fees, lost wages, deposition fees,

emotional damages, pain and suffering, mental anguish, nominal damages, costs, punitive

damages, damage to reputation, pre and post judgment interest, and other damages not heretofore

calculated or conceived.

91. In all of the separate counts, Drew is seeking Defendants to pay Drew's attorney's fees,

statutory fees and costs pursuant to 42 U.S.C. § 1988,  A.C.A. §16-118-107, attorney's fees and

statutory fees under the ACRA as well as the mandatory punitive damages in the ACRA for

retaliatory infringements of or interference with civil rights under A.C.A. 16-123-107(b) as well

as compensatory damages, court costs, appeal fees, lost wages, emotional damages, pain and

suffering, mental anguish, nominal damages, costs, punitive damages, damage to reputation, pre

and post judgment interest, any other statutory fees he may be entitled, and other damages not

heretofore calculated or conceived.

Respectfully submitted,
James Andrew Tanner *Plaintiff*
By:/s William Whitfield Hyman
William Whitfield Hyman,
ARKBAR2013237
King Law Group, PLLC,
Attorneys for Plaintiff,
300 N Sixth Street
Fort Smith Arkansas, 72901
P: 901-413-2625  F: (479) 316-2252


## CERTIFICATE OF SERVICE

I, William Whitfield Hyman, Attorney for Plaintiff, do hereby certify that on this 20th

day of June, 2019, I electronically filed the forgoing with the Clerk of the Court using the

CM/ECF system, which shall send notification of such filing to any CM/ECF participants,

including counsel for Defendants Ziegenhorn and Bryant, specifically Reid Atkins and William

Byrd. William.Bird@arkansasag.gov, Reid.Adkins@arkansasag.gov