ASP-46



# MEMORANDUM

**TO:** GREG DOWNS
CORA GENTRY

**FROM:** TFC KURT ZIEGENHORN #501

**RE:** JAMES TANNER

**DATE:** DECEMBER 3, 2014

On November 29, 2014, approximately 10:50 P.M., while off duty shopping at Wal-Mart in Searcy, AR, with my family, with my pistol covered and my badge visible(clipped on the lower part of my pants pocket below my weapon. I came into contact with a subject later identified as James Tanner. The subject was wearing a tactical holster with a firearm strapped to his right thigh (between waist and knee) in an open carry position. I first assumed he was law enforcement but did not notice a badge or any identification. As he approached the area I was standing. I curiously asked the subject what law enforcement department he was with, and the subject stated in a condescending manor that he was with no one. I then identified myself as Trooper Ziegenhorn with the Arkansas State Police and asked him for his name and ID. He moved his right hand downward in the area of his pistol. I then reached and grabbed his right wrist and elbow and again identified myself. He became very defensive and agitated and stated he did not have to tell me anything. I informed him that he could not open carry and suggested that he needed to leave. He stated he was leaving and I allowed him to walk out in front of me to the front of the store.

Before I could call for assistance, he said he was calling the police, which was fine, as it left my hands free. As we approached the front, he found a Manager, which I presented my State ID and the manager stated that he did not want Mr. Tanner in the store. Mr. Tanner's demeanor was very nervous and confrontational.

ASP-46

Once outside we encountered Officers with Searcy Police Department (Searcy PD report #2) attached. They performed an ID check and found that Mr. Tanner did not have any current warrants and had a valid CHCL permit. The Searcy officers told Mr. Tanner to leave and to not come back wearing a weapon.

The Searcy officers informed me that this was not the first encounter with Mr. Tanner (Searcy PD report #1).

An affidavit for arrest has been signed by Searcy Prosecutor Buck Gibson for 5-73-120 and 5-54-102 and sent to White County Judge for Warrant.

I strongly believe that Mr. Tanner's neglect of CHCL rules and the Laws of the state of Arkansas are just cause to Suspend or Revoke his CHCL License.


Included 5 attachments



# MEMORANDUM

**TO:** GREG DOWNS
CORA GENTRY

**FROM:** TFC KURT ZIEGENHORN #501

**RE:** JAMES TANNER

**DATE:** DECEMBER 3, 2014

On December 3, 2014, at approximately 1:50 p.m., while in Searcy on duty doing paperwork on an affidavit on Mr. James Tanner, I happened to come in contact with him again as I was exchanging eyeglasses at the Vision Center at Wal-Mart.

As I was leaving I approached Mr. Tanner and asked him for his ID and if he was carrying a weapon. He said he was not carrying a weapon at the time and he strongly opposed and stated he did not have to show me an ID. He appeared to becoming Disorderly and to keep from having any confrontation in front of a large group of people inside a business, I quickly restrained him for my safety and escorted him outside to my patrol car.

I then asked for his ID again and he stated no. I searched Mr. Tanner for an ID a found his Driver's License and CHCL permit visible upon initial opening of his wallet.

I informed him that his CHCL was under review for revocation and was going to be sent to Little Rock. I told him that I was not going to charge him now, and informed him of pending charges by the prosecutor. He subsequently released as he had calmed.

I attempted to start my car camera remotely, but it had evidently become unsynchronized while I was inside.

ASP-46

It appeared to me that Mr. Tanner shows cynicism towards law enforcement and authority. His refusal to comply, references to the constitution, invoking silence in conversation, and his attempts to quote law were repetitive.

 

# ARKANSAS STATE POLICE

## Case Form

| | |
|---|---|
| Date: | January 14, 2015 |
| Dictated by: | Corporal Jeff Whitlock |
| Date typed: | January 17, 2015 |
| Copies to: | Office of Professional Standards / Corporal Jeff Whitlock |

### INTERVIEW OF DEPARTMENT MEMBER

**JW:** Corporal Jeff Whitlock with the Arkansas State Police. This is the 14th day of January 2015. The time is 2:26 PM. I will be interviewing Trooper First Class Kurt Ziegenhorn. All right. What we're here for today, Kurt, is a complaint that was issued, brought to the attention of the Arkansas State Police on December 9th of last year from a gentleman by the name of James Tanner. He references two dates 11-29-14 and 12-3-14. Let's start on 11-29, both of these at Searcy Walmart Supercenter. Can you start on 11-29 and kind of tell me what transpired on that date with this gentleman, James Tanner.

**KZ:** Um, November 29th, it was about 10:50, 10:30, 11:00 o'clock, somewhere in that neighborhood.

**JW:** At night?

**KZ:** At night.

**JW:** Okay.

**KZ:** I was off duty shopping with wife and family. We were in the toy section of Walmart in Searcy. Then a gentleman strolling down the aisle just (inaudible, 01:0809) something in his hand just out of place and he was wearing a side drop tactical holster that was strapped. First notion as he was coming towards the toy aisle, toy area where we were. My first inclination was it was an off duty police officer. I was sitting on one side of a 4X4 crate and he come…he walked up. I just calmly asked who he was with. Mind you by my gun at the time was covered by my tee shirt but my badge was down on the bottom part of my pants pocket, my Arkansas State Police badge. It was visible where my gun was not at the time. Like I said I thought he may with a local PD so I asked him who he was with and instead of a calm response or he said I'm not with anybody, he says in a loud,

**File Number:**  **Crime: OPS**

       sharp tone and kind of shrugs his head back, "I'm not with anybody." Well that garners my attentions, it's like something's amiss. At that point I identified myself as Trooper Ziegenhorn with the Arkansas State Police and I said, "I need to see your identification." And again he struck back, says "I don't have to show you anything. I ain't got to do nothing." At that time his right hand came down to his side a little bit at that point I grabbed his right wrist and my other hand was at his elbow.

**JW:** Mm-Hm.

**KZ:** Just to control...

**JW:** Right hand side that the gun was on?

**KZ:** That was the side that the gun was on. It was a right hand holster on his right leg and that was his right arm. I did that to control his...any arm movement. And so I could feel the suspect, subject out. I asked him, I said, "You can't be carrying that in here." And he says, "Leave me alone." I said I have this ID. You know I identified myself am a State Trooper with the Arkansas State Police. I identified myself twice. He calmed down a little bit. "Leave me alone," or whatever and stuff, "I'm going to call the police." He kind of relaxed a little bit. My mistake, I didn't have any handcuffs with me. But when I realized he loosened up and he was a little calmer, that's when I come back, I rolled my shirt up, moved my shirt up over my pistol. It was now visible along with my badge. Without having handcuffs, the options was for him to comply and he seemed to be complying. He told me, "I'm going to call 911." I told him, I said he needs to leave. He said, "I'm leaving." He starts walking out ahead. I let him walk ahead of me. I walked see how, in front of me and he said he's calling 911. I can hear him. Right in front of the store I follow him up. The guy looks over. I'm keeping an eye on the, he's using his right hand on the phone so now I don't have to worry about his hand towards his pistol so much. I then also moved, I moved my state identification, the big blue state police identification out of my pocket and went and approached the front. He went up there with one of the Walmart people trying to say, "This guy is bothering me," and all this stuff. I said, "I need to see your ID." "I ain't got to show you nothing." I said, "Who are you?" And I think he said, told me, "Rick Tanner." And I said...he did tell me his date of birth at the time.

**JW:** He did tell you?

**KZ:** Yes.

**JW:** Okay.

**KZ:** At the front of the store.

**JW:** Okay.

**KZ:** After I advised him you are required to tell me. He already refused that to me again. Well the Walmart, the people at Walmart told him he needed to leave. And I said, "He had called 911," and (inaudible) PD was outside or standing at the door

**Kurt Ziegenhorn Interview**

and we walked around with him. At that point I figured Searcy PD would take it as far as carrying open weapons of that nature and a tactical holster. I showed them where the tactical holster would be, it's not like a regular holster. His demeanor at the time was fidgety. He was not calm. It's just...it caught, it caught my eye. Um, Searcy PD, they released him. Told him not to come back here with a weapon. At that point he went on, I thought they allowed him, went home and left. Two officers there, I believe I've got their names here, um, he never showed me his driver's license. Said he had a concealed carry permit. They have run it. I never laid hands on his driver's license or either one at the time. Um, at that point when the night was done, Searcy PD, they let go, I was there with my family, wife, two young kids, and they let him go to the house, well I'll come back and I can do an affidavit on Monday. Ah, that was about the extent of that.

**JW:** Okay.

**KZ:** Until the 29th.

**JW:** Did you ever handcuff him that night? Did you ever take him into custody, anything like that, that night?

**KZ:** I never handcuffed him. At that time I didn't have any.

**JW:** Okay.

**KZ:** I was at a disadvantage because I didn't have any.

**JW:** Okay, did you detain him in any way? Or were you allowing him to freely move in front of you?

**KZ:** I kept a safe distance away and never had to take any action. That can correspond with just trying to keep myself in a tactical advantage on him.

**JW:** So that night ends, you're in the mindset, I'm going to go back, this is a Saturday night, is that right?

**KZ:** I believe it was a Saturday night. Saturday night.

**JW:** So you're in the mindset I'm going to go on Monday to White County?

**KZ:** I was off Monday, so probably went...

**JW:** Tuesday, I'm going to go...Tuesday was my first day back to work, go to White County, do an affidavit, submit that to the city attorney and blah, blah, blah, so, okay, continue on.

**KZ:** At that time I called, like Monday, Monday I had called down here to Cora Gentry.

**JW:** You're off Monday but you called down here?

**KZ:** Yeah, I was off Monday.

**File Number:**  3  **Crime: OPS**

**Kurt Ziegenhorn Interview**

**JW:** Okay, I got ya. Okay.

**KZ:** But I called down to Cora Gentry conceal carry and got in touch with Greg Downs and as far as grounds, you know, do it, revoke his concealed carrying. I told him it's, we'd like to get our hands on that.

**JW:** On the license itself?

**KZ:** On the conceal carry license and make it to revoke it.

**JW:** We're they willing to revoke it either way but they wanted it...

**KZ:** They said it's, that way it could be, it's not in his hands, they'd like to have it.

**JW:** Okay.

**KZ:** (Inaudible) If I run across him, I'd see about it.

**JW:** Okay.

**KZ:** But I don't work in White County. I went over and did the affidavit. I went to attorney, city attorney Bud Gibson's office, did the, did the affidavit, turned in the affidavit, and um, arrest warrant, but they don't set that; that goes before the judge first so I dropped off at court county, the District court's office. At that point my son had a pair of glasses that needed to be fixed so I dropped them off at Searcy Vision Care. On my way back to Woodruff County.

**JW:** Is that in the Walmart?

**KZ:** That's in the Walmart.

**JW:** Okay.

**KZ:** I proceeded around, parked. I walk in, walk down the front between the registers and the, from like Subway about to the...the long way towards the vision center. I happened to see him there, Mr. Tanner. I said well he's there, let me go ahead and drop these glasses off. If he's here, I'll go up and talk to him.

**JW:** We're you in uniform?

**KZ:** I was in full uniform at this time.

**JW:** Okay. All right.

**KZ:** And I went down to drop my son's glasses off and have them fixed because they were broke. I then did that and I proceeded to come out. He was standing there in the service department area. So I approached him. I asked, "Mr. Tanner, how are you doing today? Are you carrying a weapon today?" He kind of jilts up, "No, I'm not carrying." And I thought this is kind of the same thing I run into, he's going

**File Number:**            **4**            **Crime: OPS**

**Kurt Ziegenhorn Interview**

to jump up and be kind of erratic, sporadic and so I'd like to see you carry conceal carry permit. I wanted to look at it, you know, get it, retrieve it for our conceal carry division but he at that point just stiffens up, kind of bows up and it's like I tell myself I can't have this in the service center in front of Walmart, 50 people up there. For my safety and everybody else's safety around, I said I got to move it outside. With the way his actions were I knew if I just tried politely it's like 'let's go', it's not going to happen. So at that point for my safety and everyone else's I put him in cuffs, I said, and walked outside to my car. I explained to him, I said we come out here to get out of all the people. He started messing around. I said you can sit in the car with me real quick and we'll talk. He said, "I'm not sitting nowhere. I'm going to go." I said, "All right, we're going to go. I'm just going to ask a couple questions. I need to see your identification." I said, "You have a conceal carry." I advised him that it's in the process of being revoked for carrying, you know carrying a weapon. Conceal carry license has to return to Little Rock. It was kind of I'll have to give you the up and down as I pull out his wallet and I flip his wallet open just a little. His conceal carry is visible. I said this is it right here. I said this is privileged by Arkansas State, issued by the state police. It's going to be returned to Little Rock and charges for that night and you're going to hear from the prosecutor office on that. I tried to calmly…I tried to explain myself, talk to him, tried to talk some sense into him. It's like man, you just got to calm down. He didn't want to talk. He wanted to start rattling off, ah, act 746, legal right to carry anywhere, violation of his 4th amendment, taking his conceal carry, violation of his fourth amendment, taken, you know, carry, violation fourteenth amendment, and I've heard this before from (inaudible) this guy…I don't know where he's going. I said after I got the calls, I explained to him he'd be hearing from the prosecutor's office on the charges, released him without charges. I let him walk away. I visually observed him until he was out of my sight before I then left.

JW: Okay.

KZ: I did a memo and sent it down to Cora Gentry and Greg Downs called them about that encounter also.

JW: Okay.

KZ: I mailed, I then mailed the conceal carry, which I called and said we had it, and sent it down to conceal carry department.

JW: Okay. So did you arrest him that day? How do you think that interaction went in the store? Did you…was he under arrest or what was your thought process that day?

KZ: On the 3rd?

JW: Yes, Mm-Hm.

KZ: With my previous interaction, I wanted to make sure he wasn't carrying a weapon. He's confrontational. I've learned that with…he had been confrontational with Searcy PD. I've learned from the other and that's the last place for public

**File Number:**           5           **Crime: OPS**

**Kurt Ziegenhorn Interview**

safety...I didn't want to be confrontational, you know, with 50, 50 more people out in the front part of Walmart.

JW: So is it fair to say you thought that a confrontation was...was in the near future if you didn't take control of the situation?

KZ: That's the reason I did it, to control the situation, move it outside.

JW: Okay.

KZ: And out there he was being....kind of up and I left him in cuffs for just a little bit and then took him out.

JW: Okay. Um, had he calmed down by the time you took him out of the handcuffs?

KZ: He had calmed down a little bit but he was still...he was not armed there at that time. I patted him down, checked him, make sure he wasn't carrying anything.

JW: So you didn't take the conceal carry license reference the incident on the 3rd, you took the license from what you had witnessed on the 29th? Him carrying that weapon in the open, even with a conceal handgun license, they said we'll start the process to revoke but it would be best if you had the license. You were just following through with a previous encounter is basically what it boils down to?

KZ: That's correct.

JW: Okay. Okay. So this is really one incident, not two separate incidents? You took the license because of what happened previously, because of what you witnessed in your official capacity?

KZ: That's correct.

JW: Is there anything else you want to add about this incident?

KZ: Um, on the previous, on the 29th...

JW: Mm-Hm.

KZ: Officer Naggles with the Augusta Police Department was off duty at the time. He had ran into me and he had saw us at Walmart and he had asked me about that and he said, "I had seen that guy running around in the medicine area." You know, just walking around. He saw that he was out of place. Like I said, I seen the guy and was some not right because of the type of holster, the way he was carrying and the way his gait that he walked.

JW: You could tell something wasn't...

KZ: Something...it wasn't a normal, normal, just, you know, wasn't there with family or there...

**File Number:**                                                  6                                      **Crime:** OPS

**Kurt Ziegenhorn Interview**

JW: Did he purchase anything at the store that you witnessed?

KZ: If he had something, he had one little item but not when I had seen him.

JW: So it wasn't like he had bunch of groceries?

KZ: He didn't, he didn't have a buggy.

JW: Okay. Okay. Okay, anything else?

KZ: That's all I...

JW: Okay, I'm going to conclude this interview at 2:42. We're going to go back on the recording again at 3:18. I want to touch base back for a minute. Kurt, on the afternoon of the 3rd, when you again saw at Walmart following the incident on the 29th, when you attempted to take his license on that day, which was requested of you, you said, Lt. Gentry, said that it would be best if you had it. They could go start the revocation process but it would be best if you had...

KZ: The actual license.

JW: The license itself. When you confronted him at the Walmart and attempted to take that license, do you feel his actions were disorderly? Was he creating a scene at that Walmart?

KZ: He was starting to create a scene by his...his tone of voice became, started to become loud. As far as noise around people, there were people...there was probably six people within arm's length. Plus there was others. I mean there was probably, let's see, probably six there, probably 10-15 right there in front of him. Plus there was probably another 20-30 right behind us.

JW: So 50 people?

KZ: Yes. There's at least that many up front.

JW: Okay. What was his personal action? I mean, you say he became loud.

KZ: He kind of, he stiffened up like...it appears he was going to become confrontational.

JW: Okay.

KZ: His tone of voice changed. From normal to higher pitch.

JW: Okay.

KZ: And, just by me watching, as soon as he started yelling and getting everyone's attention around to focus on what was going rather than me just passing through. In other words his actions already confirm that everyone else will draw their attention to that area.

**File Number:**  7  **Crime: OPS**

**Kurt Ziegenhorn Interview**

**JW:** Because he was being lined up with the people around him, witnessed what he was saying?

**KZ:** Right. Correct.

**JW:** Okay. Okay. Did you feel that if you did not take immediate action that it could have potentially deteriorated?

**KZ:** Yes, it could have deteriorated and become...I feel like he would have became louder, more confrontational in the public place with that many people around. His, again, they asked in the past he's had other people with him. I (inaudible) I needed to get him out in my space where I didn't have my back to so many people because he has confronted, I know, Searcy PD in the past with someone at the side.

**JW:** Okay.

**KZ:** So it's my, like I said, being with tactical advantage, I don't want to confront somebody that has the possibility of going south when I've got 50-60 people around me and don't know it one of them is with him.

**JW:** Okay. At any point during that encounter on the 3rd inside the store did you fear that there may be a violent encounter with him? A physical encounter with him? Did you feel that he may have became at some point physical with you had you not intervened and taken control of that situation?

**KZ:** I feel like it would have. Yes.

**JW:** No doubt in your mind?

**KZ:** There's no doubt in mine he would have got loud, obnoxious, I mean, at some point there and that's when I took immediate action, moved it outside, clear everybody else.

**JW:** Okay.

**KZ:** And it went down smoothly.

**JW:** Okay. All right. This concludes at 3:21.

**File Number:**                                     8                          **Crime: OPS**