1    Arkansas?

2        A.   Troop D typically covers Searcy.  That's the

3    troop that we -- our general run.

4        Q.   Okay.

5        A.   It's -- I misunderstood the question.

6        Q.   Okay.

7        A.   Searcy is not in troop D.

8        Q.   Okay.  That's the answer to the question?

9    Okay.  So but you live in McCrory.  McCrory is pretty

10   close to Searcy; right?

11       A.   Yes.

12       Q.   How far is that?

13       A.   It's approximately 33 miles.

14       Q.   Okay.  Do you have any hobbies out there?  Do

15   you go hunting?  Do you go fishing?

16       A.   In?

17       Q.   In McCrory.

18       A.   In McCrory, yes.  I didn't know whether you

19   were referring to Searcy or not.

20       Q.   Okay.  Do you go hunting or fishing nears

21   Searcy?

22       A.   I go to Pangburn.

23       Q.   Now, you have a bunch of children that go to

24   the school in McCrory I'm sure?

25       A.   Yes.

1   get rid of him, the trustees wound up closing the

2   church.

3       Q.  Right.

4       A.  Because he had run basically everyone off.

5       Q.  Okay.  But he claims that you followed him

6   for about ten miles, right, if you --

7       A.  Well, from Fair Oaks to Winn.

8       Q.  From Fair Oaks to Winn.

9       A.  That's where I was going.

10      Q.  Okay.  But that's what he claimed, right,

11  regardless of --

12      A.  Well, he was in front of me.  I wasn't

13  particularly following him.  I would rather me be

14  behind him than him behind me.

15      Q.  Right.  Okay.

16      A.  He was a convicted felony and served time in

17  the prison in Florida.

18      Q.  So, now do you remember an incident with Mr.

19  Tanner, from November 29th, 2014?

20      A.  I do.

21      Q.  Okay.  What do you recall about that incident

22  in a Wal-Mart?

23      A.  Most everything is stated in the memo I've

24  written, an OPS file.  I don't have those in front of

25  me.  I will try to be as close to it, because that's

1    exactly how it was.

2          On the 29th I had it happened to be in

3    Wal-Mart.  We was shopping at the time towards the

4    back of the store, my wife and two kids.  I see a

5    gentleman coming down the -- down the aisle.  He was

6    wearing what we consider a tactical-type holster, the

7    one that is slung from the knee to the thigh with a

8    strap around it.  My immediate thought was, okay.

9    Here's a local police officer from the local -- I

10   figured Judsonia, or Bradford, or some local area.

11   The kids were in the toy aisle at the time and I

12   said, well, I'll talk to him.  So, I walked to the

13   center aisle where we met and he was coming my

14   direction.  I asked him -- I don't remember exact

15   words but, how are you doing or whatever it may have

16   been.  I asked him what department he was with.  Mr.

17   Tanner replied that he was not with anyone at the

18   time, with anyone as far as being a law enforcement.

19   And it was kind of a surprise.  It was normal

20   reaction to him saying I'm not with anybody.  It was

21   not that tone.  It was more of a head back, I'm not

22   with anybody.

23       Q.  Okay.

24       A.  And at that time, I identified myself, as

25   being with the Arkansas State Police.  Name and had

1    believe.

2        A.   December 3rd, 2014.  How far would you want

3    to go back or just where -- what do you want me to

4    start on?

5        Q.   Let's talk about why you were in -- what you

6    were doing in Searcy that day?

7        A.   I was in Searcy that day.  I had brought over

8    the affidavit that I had filled out.  I went to the

9    prosecutor's office, Buck Gibson, we reviewed the

10   affidavit.  Approved and notarized by -- down at the

11   bottom, took the affidavit over to the -- what do

12   they call that the place -- center where the district

13   courts office is.  I took it over there to have a

14   warrant signed.  I get over there, ask the lady and

15   she said, "No, we do our own warrants."  So, it was

16   submitted through the district court because the

17   judge likes to look over them and take care of that,

18   is what I was told.  And they -- and they do the

19   whole warrant.

20       Q.   Okay.  So tell me about -- have you talked to

21   the -- you went to the prosecutor's office?

22       A.   Yeah, city prosecutor.

23       Q.   City prosecutor.  To talk to them about this

24   case or try to get a warrant or what?

25       A.   I always -- on the affidavit, I called him

1   standing there.  And recollection to the conversation

2   I had had with the concealed carry division, about

3   obtaining a permit because it was under revocation, I

4   will talk to him.  Maybe he's in a little calmer, a

5   little something at this time.  So, I approach him.

6   I refer to him by name and asked him if he was

7   carrying.  Mr. Tanner at this point, he turns around

8   -- you know, I don't remember the exact -- any of the

9   exact words he said but he became loud.  And, this is

10  in a store with a lot of people.  His voice was

11  elevated.  Speaking with some Searcy officer in a

12  prior complaint that I had seen, that he had a knack

13  for, around Searcy, he would carry weapon around

14  Searcy he would have somebody else film it and

15  someone else waiting to the side.

16      So, I approached Mr. Tanner I knew it was

17  like okay.  Is there anyone else here with him behind

18  me?  My back is to a lot of people.  It was at the

19  point that I felt that the conversation at the point

20  it was becoming disorder.  It was disorderly and the

21  in a public place.  Because I did not have any backup

22  or no one watching my back, didn't know if he had

23  someone with him, it was safe -- I figured it was

24  safer to go ahead and place him in custody.

25      Q.  Let's go back.  You asked him if he was

1    carrying.  He answered you; didn't he?

2        A.  Yes.

3        Q.  What was his answer?

4        A.  He said no.

5        Q.  Okay.

6        A.  Then we proceeded outside.  I tried to talk

7    to him calmly.  Mr. Tanner just would not be in a

8    calm state, a normal conversation as you and I have

9    right now.  So, I went through the proper steps to

10   properly identify him because I'd never seen, you

11   know, actually looked at his driver's license.

12   Properly ID him, which I know I do.  In a case when,

13   because he was cuffed at the time, I removed his

14   wallet from his back pocket.  When I flip it over,

15   you can see his driver's license and there in plain

16   view, upon his driver's license I can also see that

17   his concealed carrier permit is there with him.  I

18   believe that I told Mr. Tanner that his concealed

19   carrier was under revocation consideration and that

20   the Little Rock wanted those back.  That is -- and it

21   was -- the concealed carry permit was property of the

22   state police.  I then took that and gave it back to

23   him or gave his -- put his wallet back after properly

24   identifying his -- who he was, visually.  I tried to

25   talk to him.  He would not talk.  Just kept on and

1    Q.   You don't recall anything --

2    A.   That he was carrying a weapon was the reason

3    for the call.

4    Q.   Okay.  But there was -- did you recall

5    anything where he had a negative interaction with law

6    enforcement?

7    A.   I don't recall the interaction unless I

8    looked at the report.

9    Q.   Okay.

10   A.   Do you have it?

11   Q.   I believe I have one of them that you sent in

12   an e-mail to somebody potentially.  Let's see.

13        Let's go back to when you first came up to

14   the him at the Wal-Mart.  You were talking to him.

15   From what you remember, the first thing you said to

16   him is, "Mr. Tanner, are you carrying a weapon?"  Or

17   are you carrying something -

18   A.   Something of that nature.

19   Q.   Okay.  So then his response is no.  And then,

20   what are you talking to him about after that

21   generally?

22   A.   I would have to see my statement because I

23   remember it better back then than I do now.

24   Q.   Your OPS report statement or which statement?

25   A.   The OPS statement would have it in it.

1      Q.   Okay.   Let me see if we got it.   Is this your

2  OPS report?

3      A.   Yes.

4      Q.   Okay.   Do you want to refresh your memory

5  with your second incident with him?

6      A.   It's been a long morning.

7      Q.   Yeah.

8      A.   Okay.

9      Q.   Okay.   So, do you remember what you talked to

10  him about?   What you said to him after he responded,

11  no, he was not carrying?

12      A.   It was pertaining to his concealed carry

13  license, I believe, is what I stated here.

14      Q.   Let me see if I can -- I think you might have

15  my copy.   May I have it?

16          So according to original OPS report, "Mr.

17  Tanner how are you doing today?   Are you carrying a

18  weapon today?"   And he says, "No, I'm not carrying."

19      A.   What page is that?

20      Q.   Four.

21      A.   Oh, I'm on seven.

22      Q.   So then you say, "So, I would like to see

23  your concealed carry permit."   I wanted to look at

24  it, you know, get it, retrieve it for Arkansas carry

25  division but he at that point just stiffens up.   Kind

1      A.   What was your question again?

2      Q.   Okay.  So, you say he was being disorderly

3  after you asked him if he was carrying and if you

4  could see his concealed handgun license.  How did you

5  ask that question?  Let's start there.  To the best

6  of your knowledge how did you ask that question?

7      A.   The best of my knowledge on how the question

8  was asked?  I can't recall.

9      Q.   Okay.  Lets talk about his answer.  To the

10  best of your knowledge how was he answering your

11  questions?

12      A.   He was answering back.  He didn't have to

13  talk.  He started rattling off about Act 746, legal

14  right to carry anywhere.

15      Q.   Isn't that after you arrested him?  After you

16  put him in cuffs according to the -- according to the

17  OPS report?

18      A.   Some of that was inside too.

19      Q.   Right.  But he was in cuffs once he was

20  inside, right?  You put him in cuffs inside the

21  Wal-Mart?

22      A.   Inside and we walked to the front.

23      Q.   Right.

24      A.   Walked to the front, outside by my car.

25      Q.   Okay.  So I'm just worried about what exactly

 1   was said before you started to restrain him and put

 2   cuffs on him.

 3        A.   I believe it was -- I asked him if he was

 4   carrying and he said, "No, I'm not."

 5        Q.   Didn't you ask for his identification because

 6   you hadn't had his identification yet?

 7        A.   I may have.

 8        Q.   Okay.

 9        A.   Because I never actually seen -- laid eyes on

10   his identification.

11        Q.   Okay.  And then once you asked for his

12   identification, that's when he said I don't have to

13   the provide that to you or something along those

14   lines?

15        A.   I don't know all of the timeframe of the many

16   things that was said.  What was coming there was

17   getting louder.  And with people around --

18        Q.   How loud?  Was he yelling at you?

19        A.   It attracted the notice of people around.

20        Q.   Okay.

21        A.   I had people standing at arms length of me.

22   There was people in the service center.  There was

23   people behind me.  I don't know how close they were

24   behind me.

25        Q.   Okay.  So where were you parked when you

```
1    pulled up to the Wal-Mart?
2         A.  I was parked on the west side.
3         Q.  Were you parked in the fire lane?
4         A.  Either up inside the fire lane, up in the
5    area of past the street right there, by the guard
6    center.
7         Q.  Okay.
8         A.  An area there.
9         Q.  Was that in the fire lane or was it not?
10        A.  I'm not sure exactly where it's located.  I
11   think all of that is considered a fire lane.
12        Q.  Okay.  So you parked in the fire lane and
13   then went to go pick up or drop off a pair of
14   glasses?
15        A.  Yes.
16        Q.  Okay.  And then coordinating to your
17   timesheet at that time were not officially on duty
18   yet at that point; right?
19        A.  I had checked in.
20        Q.  You had checked in?
21        A.  Yeah.
22        Q.  Okay.
23             MR. HYMAN:  At this point I'm going to the
24   admit your OPS interview as Plaintiff's Exhibit 3.
25             (Exhibit No. 3 marked for identification.)
```

1          MR. HYMAN:  Okay.

2          MR. BIRD:  And we have not sent you any

3     written discovery requests but we will make a request

4     for the complete copy of that.

5          MR. HYMAN:  Yeah.  I think you guys have

6     it.

7          MR. BIRD:  We have it, yeah, we do.

8          MR. HYMAN:  It's available on line.

9     BY MR. HYMAN:

10    Q.  So would you say that you consistently told

11    the same story over and over and that this was

12    truthful with no embellishments?

13    A.  It's the same story.  As it goes on, I get

14    older and I forget.

15    Q.  So you were at the Wal-Mart and you were

16    off-duty on November 29th, 2014; right?

17    A.  That is correct.

18    Q.  Okay.  So I actually have the video here of

19    that interaction and I was going to ask you some

20    questions about it.  Now as part of your many of your

21    memos and testimony, you consistently say that Drew

22    was carrying in his -- or calling -- had the phone in

23    his right hand; right?

24    A.  That's the best of my knowledge, yes.

25    Q.  Okay.  So here's a video.  I'm going to come

1       Q.   10:51:30?

2       A.   Or before.  Because I could see down the

3   aisle when I come across.  I'm over here because my

4   children should have been over in this area somewhere

5   in the store.

6       Q.   This area being past the bicycles to the

7   right?

8       A.   Over near the toy area.

9       Q.   Okay.  Can you freeze frame the video when

10  you think the first time you say something to Mr.

11  Tanner is?

12      A.   From about right now.

13      Q.   Okay.

14      A.   Or somewhere.

15      Q.   Further back or?

16      A.   I mean right in there.

17      Q.   Okay.  Have you said anything yet do you

18  think?

19      A.   Do I think?  I don't see an interaction or

20  reaction from him so I'm assuming not.

21      Q.   You haven't said anything to him as of

22  10:52:28 seconds?

23      A.   No, it doesn't appear.  I mean I'm -- he just

24  looked up.  And it's possible I said something at

25  that time frame.

```
 1        Q.  10:52 and 30 seconds?

 2        A.  Or 31 or 29 or 30.

 3        Q.  Okay.

 4        A.  Because it's initially when you say something

 5    to somebody there are -- they look up or look at you.

 6        Q.  Okay.

 7        A.  But I'm only guessing because there's not

 8    audio.

 9        Q.  So at what point do you grab ahold of him?

10        A.  Right there.

11        Q.  At 10:52 and 35 seconds?

12        A.  I believe that's it.

13        Q.  Okay.  Have you grabbed ahold of him at --

14    let's see?

15        A.  Well, I mean I can't see from that video

16    whether I have ahold of him yet or not.

17        Q.  Okay.  And can you tell in this video if Mr.

18    Tanner ever takes his hands and moves them down?

19        A.  I can't see from that vantage point.

20        Q.  Okay.  And at any point in this video, have

21    you been able to see your badge from this clip one?

22        A.  I wasn't paying attention to the badge.

23        Q.  Okay.  Okay.  So, just tell me when you think

24    you can see your badge.

25                MR. HYMAN:  For the record we're playing
```

1    the video from the beginning of clip one.

2        A.   I thought I saw a glimpse of it.  There's a

3    bright spot.  I'm not sure if that was it or a glare.

4    Because it's going to be right there, that glare.

5        Q.   At --

6        A.   Off of it.

7        Q.   -- 10:51:50.  You think you can see it there?

8        A.   Because I know what where it's at and where

9    I'm looking.  It appears to be a glare, it maybe

10   possible, off of it right there.

11       Q.   Okay.

12       A.   It's hard from that angle.

13       Q.   Is it on your right-hand side at this point?

14       A.   It's on my right-hand side.

15       Q.   Okay.  Tell me to stop it again if you ever

16   get another glare from it as we continue to play it;

17   okay?

18       A.   The video is too far away.

19       Q.   Okay.  So, did you see anything in the clip

20   one where Drew reached down for his phone and you can

21   tell what hand he had his phone in, according to clip

22   one?

23       A.   Clip one?  Which one's clip one again?

24       Q.   The one we just watched.

25       A.   The one we just watched?

1    to take over.

2        Q.   Okay.

3        A.   They were in route.

4        Q.   Okay.  Now, do you rememberer what time you

5    pulled up to the Wal-Mart on December 3rd?

6        A.   Exact time, I do not.

7        Q.   Okay.  I think this is the video that has the

8    exact time in clip 12.  Does that show you here

9    parking at about 1:36?

10       A.   1:36.

11       Q.   And you're out of your vehicle.  Are you out

12   of your vehicle, see yourself exit the vehicle?  You

13   exit your vehicle at 1:36:40; right?  Did you exit

14   the vehicle about 1:36:40?

15       A.   Yeah.

16       Q.   Okay.  All right.  I think that's all I've

17   got from there.

18            MR. HYMAN:  I will admit that copy in a

19   second.

20   BY HYMAN:

21       Q.   I have here a copy of the statute for

22   carrying a weapon as it was in 2014.  You said, I

23   believe you read of changes in that statute and you

24   read that statute?

25            MR. HYMAN::  I think this might be it

1    it would be permissible to open carry; right?

2        A.  Correct.

3        Q.  So and you'd read the statute before your

4    interaction with Mr. Tanner?

5        A.  I have been -- been over it.

6        Q.  Okay.  And there's also, you know, you could

7    be a prosecutor or deputy prosecuting attorney, or

8    that you could be retired law enforcement, or some

9    other -- other exemptions; right?  So, how did you

10   know that Drew was not any of these things when you

11   detained him?

12       A.  Initially, I did not.

13       Q.  Okay.  When this statute says it is

14   permissible doesn't that mean, you know, the person

15   can do it, if -- if it's one of these things and so

16   therefore the burden is on the trooper to think

17   otherwise?

18       A.  You would have to determine that those aren't

19   the facts of the case.

20       Q.  Okay.

21           MR. HYMAN:  I would like to admit this as

22   Plaintiff's Exhibit 6.

23           (Exhibit No. 6 marked for identification.)

24   BY MR. HYMAN:

25       Q.  So before interacting with Drew on

1    December 30th did you specifically lift up your shirt

2    so your badge would become more visible before

3    walking over to him or anything like that?

4         A.   You said December 3rd?

5         Q.   I'm sorry.  On November 29th.

6         A.   November 29th, I do not remember initially

7    doing it.  Because -- again, because I thought he may

8    have been law enforcement.

9         Q.   So why did you go and apply for a warrant for

10   Mr. Tanner for his action on November 29th?

11        A.   For actions on November 29th I applied for a

12   warrant for his fairly to identify himself to a law

13   enforcement officer.

14        Q.   Okay.  But didn't you in your application

15   also list carrying a weapon?

16        A.   I did.

17        Q.   And then the judge struck through that;

18   right --

19        A.   Yes.

20        Q.   -- when he actually issued the warrant?

21        A.   Yes.

22        Q.   Okay.

23        A.   That's part of the process.  If the judge

24   doesn't think there was a possibly government

25   operation the judge would not have signed a warrant

1      Q.  So in all of the other instances with Drew

2   carrying a firearm, he never had to be arrested,

3   right, that you heard about?  He'd never had to be

4   detained?

5      A.  Not that I know of.

6      Q.  Okay.  He had never been violent with police

7   officers before; right?

8      A.  I don't have any knowledge of that.

9      Q.  Okay.  But you had never heard of him being

10  violent with police officers?

11     A.  I don't have any knowledge of that.

12     Q.  Okay.  So you were -- you were under the

13  impression that the concealed handgun license

14  department needed his driver's license -- or needed

15  his concealed handgun permit.  What if you were to

16  see a person walking down the street that you knew

17  had their driver's license but they weren't able to

18  the confiscate it during his DWI because he didn't

19  have it on him.  Do you believe you would be able to

20  detain someone and get their driver's license from

21  them at that point?

22     A.  He, by law, on a DWI, they are required to

23  surrender that in a DWI.  I believe that's in the --

24     Q.  Right, but let's say somebody, when they're

25  arrested, they not only have the DWI but they are

1    would be, I consider, reasonable cause.

2         Q.   Okay.  So if it's on your back strap, that's

3    not reasonable suspicion.  But if it's in -- if

4    you're carrying a rifle with the front and your hand

5    is on the pistol grip or something like that, that's

6    enough?

7         A.   Sir?

8         Q.   And your hand's on the pistol grip, is that

9    enough for reasonable suspicion of something?

10        A.   Like if your finger's right there on the

11   trigger, you're talking like an AR style rifle?

12        Q.   Right.  But what if it's not on the trigger

13   but your hand's on the pistol grip; is that your

14   understanding?

15        A.   It would mean -- it would just depend on the

16   totality of the circumstance on how it was being

17   carried and how the person reacted to being

18   approached.

19        Q.   Okay.  So, you know, I believe you testified

20   that you were worried he was about to cause a scene

21   on December 3rd.  So, what were you worried exactly

22   that Mr. Tanner was going to do?

23        A.   I didn't know.  I mean it he may have had

24   someone there behind him.  He may not have.  He could

25   have become -- started becoming violent.  I don't