IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

CENTRAL DIVISION

| | | |
|---|---|---|
| JAMES ANDREW TANNER | | PLAINTIFF |
| | v. 4:17-cv-780-DPM | |
| KURT ZIEGENHORN in his individual capacity and BILL BRYANT, Colonel, in his official capacity as head of the Arkansas State Police | | DEFENDANTS |

### PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS

#### Plaintiff's Facebook Comments

1. In February of 2016, Mr. Tanner commented on an Arkansas State Police Facebook Page post commending an officer's promotion. Doc 61 at 3. Mr. Tanner, who recognized the name of the officer as one who had investigated Arkansas State Trooper Kurt Zeigenhorn's previous unlawful detention and later arrest of Mr. Tanner. Exhibit 8.

2. Mr. Tanner commented on this particular Facebook post, "I have this guy's autograph. He supports crooked cops, so that makes him a crooked cop in my book. He needs to be held accountable as well if he is going to support the unlawful actions of his officers...This guy sucks." Exhibit 1, pg. 3.. Mr. Tanner then attached a link to a picture of the notice from the ASP to the comment. Id.

3. This comment was deleted by employees of the ASP, either Elizabeth Chapman or Mike Kennedy because, according to the ASP, "Abusive comments and/or profanity in violation of the Arkansas State Police Facebook Terms and Conditions." Exhibit 6, pg. 1 and Exhibit 5, pg. 1, lines 5-10.

4. It is the ASP's position that they do not allow any posts containing profanity and never have. Exhibit 6, pg. 22, ROG 22. However, the ASP have used the pejorative, "sucks," themselves in one of their own posts, indicating they do not consider this word to be vulgar or profane. Exhibit 1, pg. 16.

5. Mr. Tanner was informed by a page administrator that he may repost his comment, yet when he did so, the ASP still deleted the subsequent identical comment. Exhibit 8 and Exhibit 1, pg 1.

6. On March 1, 2016, Mr. Tanner made a comment on an ASP Official Facebook Page post. The ASP's post stated, in relevant parts,: "#learnthelawtuesdays The Arkansas State Police wants YOU to know the laws!! Every week, we will post an Arkansas statute and answer a few of the common questions that we get concerning that specific law. If you have questions about a certain law, or would like to know more, please ask us and we might use it in our new #learnthelawtuesdays! Today we are covering "impeding traffic" and the law that covers this issue. The law states that you must drive on the right side of the roadway, aka, the right lane. Some common questions that we receive concerning this law are...Impeding traffic falls under Arkansas Law: 27-51-301. Vehicles to be driven on right side of roadway..." Exhibit 1, pg. 4.

7. Mr. Tanner commented under that post, "Are you familiar with 5-54-122? Specifically (c)(1) D and E? At least one of your troopers committed this crime. You know who it is." Exhibit 1, pg. 4.

8. This comment was deleted by employees of the ASP, either Elizabeth Chapman or Mike Kennedy the next day. Exhibit 8, Tanner Affidavit and Exhibit 6, pg. 1.

9. As Mr. Tanner's comment contained no profanity, ASP decidedly deleted this comment because they considered it "abusive." Exhibit 6, p. 1, Response 19.

10. On September 14, 2016, the ASP posted a photo of a recent class of Arkansas State Troopers. where Mr. Tanner commented, "Just don't be like that douche, Trooper Ziegenhorn." Exhibit 1, pg. 5.

11. Soon after this, Mr. Tanner realized his comment had been deleted, and he made another comment, "Just don't be like that fascist pig, Trooper Ziegenhorn." Exhibit 1, pg. 6.

12. Frustrated that his comments were deleted again, Mr. Tanner commented one last time, "Just don't be like that fascist pig, Trooper Ziegenhorn, aka douchebag." Exhibit 1, pg. 7.

13. Soon after this last comment, Mr. Tanner sent a message to an administrator of the Facebook page that said, "go fuck yourself you fascist pig." Exhibit 1, pg. 2.

14. Then, Mr. Tanner commented on the post, "So handcuffing someone and detaining them without any probable cause, stealing from them, then letting them go is taught in this class, or is that something DOUCHEBAG Ziegenhorn learned on his own?" Exhibit 1, pg 8. This comment was deleted, shortly followed by a ban preventing Mr. Tanner from participation in the Arkansas State Police Official Facebook Page. Exhibit 8, Tanner Affidavit. To date, Tanner's comments remain hidden or deleted. Exhibit 8.

15. At the time these comments were made, no policies or procedures or terms and conditions for using the Arkansas State Police Facebook Page was publicly available. Exhibit 8, Tanner Affidavit; Exhibit 1, pg. 10, Way Back Machine pg. 14-42, and Exhibit 5, pg. 2-3 (Information Officer Bill Sadler testified there were no "policies and

procedures" for ASP Facebook page.)

16. ASP has a history of soliciting input from their Facebook Page participants regarding non pre-approved content.  Exhibit 9, All ASP Facebook Information, 2015-2018 Timelines, Index.

17. At the end of these deletions and banning, Mr. Tanner contacted the ASP administrators to inform them of the illegality of their actions in real time.  Exhibit 1, pg. 1.

18. Following this correspondence, Elizabeth Chapman issued a memo to her superiors regarding the unconstitutionality of deleting comments on Facebook, demonstrating the agency's awareness of their illegal actions; at the very least, putting them on notice. Exhibit 6, pg. 16.

### Arrests of Plaintiff

19. Ziegenhorn had taken his annual leave and was not working on November 29th, 2014. Exhibit 3, pg. 1 and 3.

20. On November 29th, Kurt Ziegenhorn was in the Searcy, White County, Arkansas Walmart with his family. Exhibit 4, Ziegenhorn Deposition, pg. page 14 lines 2-4.

21. While there, Ziegenhorn saw a man later identified as Tanner openly carrying a firearm. Exhibit 4, Ziegenhorn Deposition, Pg. 14, lines 5-8.

22. Ziegenhorn then asked Tanner which law enforcement department Tanner was with, Tanner responded that he was not with anybody. Exhibit 3, Ziegenhorn OPS Interview, Pg. 19-20, and Exhibit 4, Ziegenhorn Deposition, Pg. 14 lines 14-18.

23. Ziegenhorn then demanded Tanner identify himself and demanded to see Tanner's identification. Exhibit 3, Ziegenhorn OPS Interview, pg. 20-21, Exhibit 3, Probable

Cause Affidavit pg 11, Ziegenhorn 1st Memo pg. 9.

24. Ziegenhorn has offered three different versions of what happened next. <u>Exhibit 3, Probable Cause Affidavit, pg. 11, Ziegenhorn Memo pg. 9 and OPS Interview, Pg. 19-20, Ziegenhorn OPS Interview, pg. 19-20.</u>

25. Ziegenhorn grabbed Drew Tanner's arm. <u>Exhibit 3, 1st Ziegenhorn Memo, pg. 9, Ziegenhorn OPS Interview, Pg. 19-20.</u>

26. On December 3rd, 2014 Ziegenhorn was only scheduled to work from 3:00 pm to 7:00 pm, and 8:00 pm to midnight. <u>Exhibit 3, Ziegenhorn's Timesheet, pg. 2</u>.

27. On December 3rd Ziegenhorn went to Searcy to file for an affidavit warrant against Tanner for the events of November 29th, 2014. <u>Exhibit 4, Ziegenhorn Deposition, pg. 58, Lines 2 - 19.</u>

28. At 12:11 p.m. on December 3rd Ziegenhorn sent an email with a memo about the November 29th, 2014, incident to Greg Downs and Cora Gentry. <u>Exhibit 3, pp. 8-10 (email from Ziegenhorn to Downs with attachments).</u>

29. Attachments to that email stated that on November 29th, 2014, Searcy Police Department had performed an ID check and found that Tanner did not have any current warrants. <u>Exhibit 3, pp. 9-10.</u>

30. Searcy officers informed Ziegenhorn that this was not their first encounter with Tanner. <u>Id.</u>  The other encounter with Tanner had a one-line report which read: "ESCORTING SUBJECT BACK TO HIS HOME SO HE CAN PROPERLY SECURE THE WEAPON." <u>Exhibit 3, Searcy Police Report, p. 16.</u>

31. At 9:37 a.m. on December 3rd, 2014, Ziegenhorn checked in with dispatch that he was

headed to the White County Prosecutor's Office. Exhibit 3, p. 18.

32. The next time Ziegenhorn would check in on the radio was at 3:36 p.m. to let dispatch know he was headed to the Brinkley Office. Exhibit 3, p. 17.

33. At approximately 1:50 p.m. on December 3rd, 2014, while in the Searcy Walmart again, Ziegenhorn saw Drew Tanner for the second time. Exhibit 3, Dec. 3rd Ziegenhorn Memo, Pg. 6, lines 1-3.

34. Drew Tanner is seen exiting his vehicle at approximately 1:35:30pm in Clip 13, and walks toward the Wal-Mart. He is seen wearing a red shirt and what appear to be khaki cargo pants. Exhibit 9, Clip 13 at 1:35:41.

35. Ziegenhorn's vehicle is seen driving in front of Wal-Mart at 1:35:57 and Ziegenhorn exits his vehicle at exactly 1:36:40. Exhibit 4, Ziegenhorn Deposition, pg. 101, lines 7-15 and Exhibit 9, Clip 11

36. Ziegenhorn claims he had just parked in the fire-lane to either pick up or drop off a pair of glasses. Exhibit 4, Ziegenhorn Deposition, pg. 76, lines 12-15.

37. Wal-Mart medical records show that Ziegenhorn arrived at the Wal-Mart Vision Center on December 6th, 2014 to turn in the glasses, and Ziegenhorn's wife arrived on December 9th, 2014, to pick up the new pair. Exhibit 3, Ziegenhorn Medical Records, pg. 26 and 27.

38. Based on the security footage, Ziegenhorn arrives at the exact Wal-Mart less than 10 seconds after Tanner, just mere hours after looking into a warrant for Tanner, out of the way from his job assignment and more than 30 miles from his home. Exhibit 9, Video Clip 11, 13; Exhibit 4, Ziegenhorn Deposition, pg. 6.

39. Ziegenhorn had never heard of Tanner having to be arrested or becoming violent with police officers prior to Ziegenhorn's interactions with Tanner. <u>Exhibit 4, Ziegenhorn Deposition, pg. 107, lines 1-11.</u>

40. Ziegenhorn approaches the Wal-Mart entrance at approximately 1:37:04pm. <u>Exhibit 9, Clip 12.</u>

41. At approximately 1:41:41pm, Tanner is seen waiting by the customer service area in Walmart. <u>Exhibit 9, Clip 9.</u>

42. At 1:41:57pm, Ziegenhorn is seen entering the customer service area where Tanner is waiting, less than five minutes from when he approached the Wal-Mart entrance. <u>Exhibit 9, Clip 9.</u>

43. Ziegenhorn then approached Tanner, called Tanner by name, and asked Tanner for his ID and asked if Tanner was carrying a weapon. <u>Exhibit 3, 2nd Ziegenhorn Memo, pg. 6 at lines 4-5, Exhibit 4 Ziegenhorn Deposition at 69, 70.</u>

44. Tanner responded that he was not carrying a weapon at the time. <u>Exhibit 4, at 69 and 70.</u> Tanner also contended that he did not have to show Ziegenhorn his identification because Ziegenhorn had called him out by name. <u>Id at lines 5-6</u>.

45. Ziegenhorn cuffed then searched Mr. Tanner for an ID. <u>Exhibit 3, 2nd Ziegenhorn Memo, pg. 6, lines 9-10.</u>

46. Ziegenhorn ended his report that "It appeared to me that Mr. Tanner shows cynicism towards law enforcement and authority. His refusal to comply, references to the constitution, invoking silence in conversation, and his attempts to quote law were repetitive." <u>Id. at Pg. 2, lines 1-3.</u>

47. Ziegenhorn admitted that when he approached Tanner, Ziegenhorn referred to Tanner by name. Exhibit 4, Ziegenhorn Deposition, Pg. 65, lines 5-7.

48. Ziegenhorn asked Tanner if Tanner was armed, Tanner said he was not. Exhibit 4, Ziegenhorn Deposition, pg. 65, line 25, and pg. 66 lines 1-4.

49. Ziegenhorn claims that he read a report from Searcy Police Department about how Tanner carries a weapon and has someone else film him. Exhibit 4, Ziegenhorn's deposition, pg. 65, 11-15.

50. There are Searcy Department police reports about Tanner openly carrying firearms, however none of the reports mention that Tanner has another person film him, none of the reports produced by Defendants in discovery indicate that Tanner was breaking any laws or disrespectful to law enforcement, and none of the reports ever indicate that Tanner carries his firearm concealed. Exhibit 3, Searcy Police Reports pages 12-16.

51. Ziegenhorn claims that because Ziegenhorn felt Tanner was becoming disorderly and because Ziegenhorn's back was to a large crowd, he felt it would be safer to continue the interaction with Tanner in handcuffs. Exhibit 4, Ziegenhorn Deposition, pg. 65, lines 16-24.

52. The video of this incident shows that Ziegenhorn's back was not to a single person, and it does not appear that anyone gathered to watch this confrontation. Exhibit 9, Clip 9, from 1:42:02-1:42:40.

53. Tanner had not yet become loud and obnoxious. "There is no doubt in my mine [sic] he ***would have got*** loud, obnoxious, I mean, at some point there and that's when I took immediate action, moved it outside, clear everybody else." Exhibit 3, pg. 26, *emphasis*

*added*.

54. In the video, Tanner remains relatively still the entire time. See Plaintiff's Exhibit Video Clip 9 from 1:42:00-1:42:40. A crowd did not gather and it does not appear that a single additional person came to the area. Id.

55. Ziegenhorn never demanded Tanner's Concealed Handgun License before Ziegenhorn arrested Tanner on December 3rd, 2014. Exhibit 3, pg. 6-7, and 24-25.

Respectfully Submitted,

W. WHITFIELD HYMAN
ATTORNEY FOR PLAINTIFF

By: /s/ W. Whitfield Hyman
W. Whitfield Hyman
Attorney for James Andrew Tanner
King Law Group, PLLC
300 N. Sixth Street
Fort Smith, AR 72901
479-782-1125
479-316-2252 Fax
ABA# 2013-237
hyman@arkansaslawking.com
