**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**JAMES ANDREW TANNER**                                        **PLAINTIFF**

**V.**                         **CASE NO. 4:17-CV-780-DPM**

**KURT ZIEGENHORN, ET AL.**                                   **DEFENDANTS**

BRIEF IN SUPPORT OF ASP DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

On November 27, 2017, Plaintiff James A. Tanner ("Tanner") filed his complaint alleging that the Arkansas State Police Defendants violated his constitutional rights under the Federal Civil Rights Act and the Arkansas Civil Rights act as well as several state-law claims. (DE 1). After subsequent amended complaints, ASP Defendants filed a motion to dismiss Tanner's claims against them. (DE 47, 48, 53, 54). This Court partly granted and partly denied ASP Defendants' motion to dismiss and directed Tanner to file a fifth amended complaint that only includes the surviving claims. (DE 60). On June 20, 2019, Tanner filed his Fifth Amended Complaint ("Complaint"). (DE 61).

In the Complaint, Tanner specifically alleges that ASP Defendant Ziegenhorn ("Ziegenhorn") violated Tanner's Fourth Amendment rights under the Federal Civil Rights Act and Arkansas Civil Rights Act when: (1) on December 3, 2014, Ziegenhorn allegedly unlawfully searched and seized Tanner at the Wal-Mart in Searcy, Arkansas; (2) on January 17, 2015, Tanner was arrested by the Searcy Police Department on an affidavit of arrest Ziegenhorn submitted to the White County District Court arising from an encounter between Ziegenhorn and Tanner in the same Wal-Mart on November 29, 2014; and (3) Ziegenhorn allegedly applied for a warrant for

arrest with misleading information. (DE 61). Additionally, Tanner alleges ASP, through Colonel Bryant in his official capacity, violated his First Amendment rights under the Federal Civil Rights Act and the Arkansas Civil Rights Act when ASP employees hide or deleted his comments made to the ASP Facebook page and subsequently blocked him from the page. (DE 61). Lastly, Tanner's Complaint claims Ziegenhorn maliciously prosecuted him because of the incident occurring on November 29, 2014, and committed perjury when Ziegenhorn allegedly stretched the truth at a criminal hearing against Tanner in the White County District Court. (DE 61, pp. 12-14).

For the reasons below, Tanner's claims against ASP Defendants should be dismissed.

## II.    FACTUAL BACKGROUND

A.    <u>Ziegenhorn's Encounters with Tanner</u>.

1.    *Wal-Mart in Searcy, Arkansas, on November 29, 2014*:

On November 29, 2014, Ziegenhorn was off duty shopping at the Searcy, Arkansas, Wal-Mart with his family at approximately 10:50 p.m. Ex. A, Ziegenhorn Depo., 13:18-14:4. While shopping, Ziegenhorn noticed an individual walking around Wal-Mart openly carrying a pistol in a holster strapped to his right thigh. Ex. A, Ziegenhorn Depo., 14:4-8. That individual was Tanner. Ex. A.

In an attempt to determine who the individual was, Ziegenhorn approached Tanner asking what law enforcement group he was with. Ex. A, 14:8-22; Ex. B, Tanner Depo., 21:4-14. Tanner responded to the affect that he was not with any law enforcement group. Ex. A, Ziegenhorn Depo., 14:16-22. At that time, Ziegenhorn identified himself as being with the Arkansas State Police. Ex. A, Ziegenhorn Depo., 14:24-15:1. Ziegenhorn requested Tanner to identify himself, but Tanner refused to do so. Ex C, p. 7; Ex. I, p. 2. Tanner's demeanor changed, he grew defensive and agitated. Ex. C, p. 7. As Ziegenhorn approached Tanner, it appeared to Ziegenhorn that Tanner's

right arm began to fall in a downward motion towards his weapon. Ex. A, Ziegenhorn Depo., 15:1-3. Based on his training, Ziegenhorn believed it was necessary to gain control of the arm temporarily by grabbing ahold of Tanner's right arm and elbow so that Tanner would not have access to the weapon. Ex. A, Ziegenhorn Depo., 15:3-7. While grasping Tanner's arm, Ziegenhorn again asked Tanner to identify himself. Ex. A, Ziegenhorn Depo, 15:9-12; Ex. B, Tanner Depo., 22:24-23:7. Tanner again refused to identify himself to Ziegenhorn at this time. *Id*.

After a brief moment, Ziegenhorn believed Tanner had calmed down, so he released his grip on Tanner's arm. Ex. A, Ziegenhorn Depo., 15:17-18:9. Tanner told Ziegenhorn that he was going to call 911. Ex. A, Ziegenhorn Depo., 15:17-23. Ziegenhorn responded for him to do so. *Id*. Ziegenhorn believed Tanner was not a threat at that time because it appeared Tanner had his cell phone in his right hand. Ex. A, Ziegenhorn Depo., 15:17-18:9. Tanner admits to having an object in his right hand. Ex. B, Tanner Depo., 24:20-25:7. Ziegenhorn followed Tanner out of Wal-Mart where they were met by local Searcy Police officers. Ex. A., Ziegenhorn Depo., 41:17-14. From that point forward, Ziegenhorn allowed the Searcy PD to take over the situation. Ex. A, Ziegenhorn Depo., 43:5-13. On the night of November 29, 2014, Ziegenhorn did not see any identification from Tanner, including his concealed carry handgun license ("CHCL"). Ex. A, Ziegenhorn Depo., 23:7-16. Ziegenhorn was not aware Tanner had a CHCL at the time of the encounter. Ex. A, Ziegenhorn Depo, 23:7-16.

At the time of the incident, the guidance provided by ASP to its officers was that open carry was not allowed even under the recent legislative Act 746. Ex. D, p. 10. ASP's guidance included an opinion from the Arkansas Attorney General's Office that stated "Act 746 does not authorize 'open carry.'" Ex. E. Based on the guidance provided from ASP, Ziegenhorn believed openly carrying a weapon was illegal. Ex. A, Ziegenhorn Depo., 49:17-50:13.

2.   *Searcy, Arkansas, December 3, 2014*:

On December 3, 2014, Ziegenhorn was in Searcy, Arkansas, for the purpose of submitting an affidavit of arrest against Tanner (the "Affidavit") to the White County District Court. Ex. A, Ziegenhorn Depo., 58:2-19. The Affidavit completed by Ziegenhorn was based on the incident on November 29, 2014, where Ziegenhorn confronted Tanner in the Searcy Wal-Mart because Tanner was wearing a tactical holster with a firearm strapped to his right thigh in an open carry manner and refused to identify himself. Ex. F. The Affidavit stated that Ziegenhorn believed Tanner committed the offenses of Ark. Code Ann. §§ 5-73-120 (carrying a prohibited weapon) and 5-54-102 (obstruction of governmental operations). *Id*.

Prior to submitting the Affidavit to the district court, Ziegenhorn sought the approval of the local prosecutor. Ex. A, Ziegenhorn Depo., 58:2-19. In route to the prosecutor's office, Ziegenhorn picked up a police report from the Searcy Police Department for the November 29, 2014, incident; Ziegenhorn also obtained a police report relating to Tanner walking down the street in Searcy with a firearm on October 7, 2014. Ex. A, Ziegenhorn Depo., 78:17-79:7. At the prosecutor's office, Ziegenhorn and the prosecutor reviewed the Affidavit. Ex. A, Ziegenhorn Depo., 58:7-59:14. Ziegenhorn's general practice is to seek the approval of an affidavit of arrest by the local prosecutor before submitting an affidavit of arrest to the court. *Id*.

After the local prosecutor approved the Affidavit, Ziegenhorn submitted the Affidavit to the White County District Court. Ex. A, Ziegenhorn Depo., 58:7-59:14. Ziegenhorn was not provided a definite timeframe of when a judge would review the Affidavit, but he was told that the district court likes to review affidavits of arrest and the court issues their own warrants of arrest. Ex. A, Ziegenhorn Depo., 62:4-8. So Ziegenhorn left the Affidavit with the court. *Id*.

From the district court's office, Ziegenhorn proceeded to the Wal-Mart in Searcy, Arkansas, to go to the vision care center. Ex. A, Ziegenhorn Depo., 62:11-16. After entering Wal-Mart, while on his way to the vision care center, Ziegenhorn noticed Tanner in the customer service area. Ex. A, Ziegenhorn Depo., 64:19-22. Ziegenhorn was not previously aware that Tanner was at the Searcy Wal-Mart. Ex. A. Ziegenhorn continued to the vision care center. Ex. A, Ziegenhorn Depo., 64:19-25. When Ziegenhorn left the vision care center and was approaching the customer service area, Tanner was still standing there. Ex. A, Ziegenhorn Depo., 64:25-65:1. Based on the November 29th incident, the CHCL Division of ASP had started the process to revoke Tanner's CHCL. Ex. A, Ziegenhorn Depo., 65:1-4. Ziegenhorn was aware of this and decided to approach Tanner to see if Tanner would voluntarily surrender his CHCL. Ex. A, Ziegenhorn Depo., 65:1-7.

Ziegenhorn approached Tanner and asked him how he was doing. Ex. I, p. 4. Ziegenhorn then asked Tanner if he was carrying a weapon. Ex. I, p. 4. Tanner replied that he did not have to answer that question and that he does not have to answer any of Ziegenhorn's questions. Ex. B, Tanner Depo., 48:14-17. Ziegenhorn asked Tanner several more times if he was carrying a weapon. Ex. B, Tanner Depo., 48:18-19. Tanner eventually stated that he was not carrying a weapon. Ex. B, Tanner Depo., 48:19-20. Ziegenhorn then asked Tanner if he could see his identification. Ex. B, Tanner Depo., 48:20-22. Tanner strongly opposed showing Ziegenhorn his identification. Ex. G, p. 3.

Next, Ziegenhorn asks Tanner if he can see his CHCL. Ex A, Ziegenhorn Depo., 70:22-21:8. At this point in the conversation, Ziegenhorn believed Tanner was becoming disorderly in an area of Wal-Mart that contained a large number of people. Ex. A, Ziegenhorn Depo., 65:18-21. From Ziegenhorn's perspective, Tanner raised his voice to a level where he started attracting peoples' attention at the front of Wal-Mart. Ex. I, p. 7. Tanner's demeanor also changed. Tanner

stiffened and bowed up as if he was going to be confrontational. Ex. I, pp. 5-7. Ziegenhorn could not see who was to his back and believed it was possible for Tanner to have someone spectating within a close proximity based on a previous conversation he had with a Searcy Police Officer. Ex. A, Ziegenhorn Depo., 65:11-15. At this time, Ziegenhorn believed it was necessary to place Tanner in custody for his and the public's safety and to move the situation outside before it escalated. Ex. A, Ziegenhorn Depo., 65:16-24.

Ziegenhorn subsequently proceeded to escort Tanner outside the Wal-Mart to his patrol car and attempted to talk to Tanner in a calm manner. Ex. A, Ziegenhorn Depo., 66:6-9. While at Ziegenhorn's patrol car, Ziegenhorn went through the proper steps to identify Tanner by viewing his driver's license, which was located in Tanner's wallet. Ex. A, Ziegenhorn Depo., 66:9-12. Tanner's CHCL was visible upon the initial opening of his wallet. Ex. A, Ziegenhorn Depo., 66:14-16. Ziegenhorn confiscated Tanner's CHCL and informed Tanner that he was sending it to Little Rock because it was under review for revocation. Ex. A, Ziegenhorn Depo., 66:17-23. Based on the encounter with Tanner five days prior, Ziegenhorn also wanted to make sure Tanner was not carrying a weapon. Ex. I, p. 5. Ziegenhorn patted Tanner down and determined he was not carrying a weapon at that time. Ex. I, p. 5.

Ultimately, Ziegenhorn decided to release Tanner without any charges on December 3, 2014, so Ziegenhorn returned Tanner's wallet and driver's license. Ex. I, p. 5. Ziegenhorn explained that he was not going to charge him now and informed him of the pending charges by the prosecutor. Ex. G, p. 3. After the December 3, 2014, encounter, Ziegenhorn sent a memorandum for each encounter and Tanner's CHCL to ASP. Ex. I, p. 5; Ex. G.

3. *Tanner's arrest on January 17, 2015*:

On January 16, 2015, the White County District Court issued an arrest warrant for obstructing governmental operations against Tanner based on the Affidavit submitted by Ziegenhorn. Ex. H. The Searcy Police Department served the arrest warrant on Tanner at his place of residence on January 17, 2015. Ex. B, Tanner Depo., 63:5-64:3; Ex. J. Ziegenhorn was not present at any point of the arrest on January 17, 2015. Ex. B, Tanner Depo., 64:7-9. Tanner was arrested and transported to the White County Law Enforcement Center, issued a court date, and his bond was set at $250.00. Ex. J.

B.   Tanner's Concealed Carry Handgun License.

On November 29, 2014, Tanner held a valid Arkansas CHCL. Ex. C. After the encounter between Ziegenhorn and Tanner on November 29th, the CHCL Division of ASP started the revocation process of Tanner's CHCL. *Id*. On December 10, 2014, ASP revoked Tanner's CHCL for openly carrying a weapon and failing to provide his identification to a law enforcement officer when requested. *Id*. On May 12, 2015, ASP held an administrative hearing concerning the revocation of Tanner's CHCL. ASP upheld the decision to revoke Tanner's CHCL. *Id*.

Pursuant to the Administrative Procedure Act, Tanner appealed ASP's determination to revoke his CHCL to the Pulaski County Circuit Court. *Id*. On May 26, 2016, the Pulaski County Circuit Court issued an order upholding ASP's determination to revoke Tanner's CHCL. *Id*. On appeal, Tanner argued that Ark. Code Ann. § 5-73-120 makes it lawful to openly carry a weapon so long as the person carrying the weapon does not intend to attempt to unlawfully employ the weapon against a person. *Id*. However, the Circuit Court stated "Tanner's interpretation of the statute is senseless" and "Tanner was not legally authorized to openly carry a firearm under any Arkansas or federal law." *Id*. at 6.

   C.   Relevant Criminal Proceedings.

       On June 16, 2015, the District Court of White County found Tanner guilty of the offense of obstructing governmental operations based on the encounter between Ziegenhorn and Tanner on November 29, 2014. Ex. K, p. 4. On November 17, 2015, the White County Circuit Court issued a judgment reversing the district court's decision to convict Tanner of obstructing governmental operations. Ex. L. The circuit court also ordered the clerk to refund Tanner's appeal bond in the amount of $250.00. Ex. M.

   D.   ASP's Facebook Page.

       Facebook is a social media platform owned and operated by Facebook, Inc. Ex. N. In 2015, ASP created a Facebook page. Ex. N. APS's Facebook page followers consist of a variety of Facebook users, including families and children. Ex. N, p. 3. The primary purpose of ASP's Facebook page is to utilize the social media platform to disseminate information to the public, not to open a public forum for discussion. Ex. N.

       In addition to the general terms and conditions established by Facebook, ASP created Terms and Conditions for its Facebook page. Ex. N, p. 1. ASP's Facebook page Terms and Conditions have been posted to the page from its inception. *Id*. As stated in the Terms and Conditions, the purpose of ASP's Facebook page "is to permit authorized employees of the Department to provide the public with information concerning the Arkansas State Police's mission, goals, programs, activities, events, news, stories, photographs, and videos and to disseminate other information and material intended to increase public awareness of and enhance respect for the Arkansas State Police and its members and employees. Please note that this is a purposefully controlled online site established for this limited purpose, NOT A PUBLIC FORUM." Ex. O.

A person designated as an administrator of ASP's Facebook page has the ability to: (1) post on ASP's Facebook page; (2) restrict Facebook users other than ASP from being able to post on the page; (3) hide or delete comments made by Facebook users; (4) report comments and Facebook users to Facebook; (5) block Facebook users from ASP's Facebook page; (6) automatically moderate the page through Facebook's settings where posts containing certain words are blocked; and (7) adjust an automatic profanity filter. Ex. N, pp. 2-3. ASP's Facebook page is set where ASP is the only user able to post on its page. Ex. N, p. 3. Facebook users other than ASP can only comment on existing ASP posts. *Id*. Facebook does not provide a Facebook page with the option to prohibit commenting completely. However, to be able to comment, Facebook users must like and/or follow ASP's Facebook page. *Id*. Once a user has liked and/or followed ASP's Facebook page, they may comment on an existing post by ASP but may not make an original post on ASP's Facebook page. *Id*. Comments made to an ASP post are displayed underneath the particular post on ASP's Facebook page. *Id*. In addition, Facebook users who have liked and/or followed ASP's Facebook page may send private messages that may be read and responded to by an administrator. *Id*.

ASP's Facebook page Terms and Conditions notify Facebook users that they must review and agree to the terms and conditions of Facebook and the Terms and Conditions established by ASP before submitting or posting a comment on its page. Ex. N, p. 2; Ex. O. The Terms and Conditions also notify Facebook users that ASP reserves the right to restrict, remove, or delete any comments that are contrary to and/or inconsistent with the purpose of ASP's Facebook page, are not topically related to particular postings authorized by ASP, or comments which otherwise violate the Terms and Conditions. *Id*.

The Terms and Conditions further notify Facebook users that ASP actively monitors and reviews comments submitted to ASP's Facebook page. Ex. N, p. 2; Ex. O. ASP attempts to review all comments on ASP's Facebook page for compliance with the Terms and Conditions. Ex. N, p. 2. If a comment does not comply with the Terms and Conditions, the comment can be hidden or deleted. An administrator can manually hide comments made by Facebook users to the ASP Facebook page. Ex. N, p. 3. If a comment is hidden, the original commenter can see their comment, the administrator can see the comment, the original commenter's friends can see the comment, but no one else can see the comment. *Id*. An administrator can also delete a comment. When a comment is deleted neither an administrator nor the commenter can see the comment deleted. *Id*.

In addition to the Terms and Conditions, ASP further attempts to control the content published to its Facebook page through functions available to it by Facebook. As mentioned above, ASP is the only Facebook user who can post content to its page. In addition, posts or comments containing certain designated words are automatically blocked. Ex. N, p. 4. Those words are: (1) jackass; (2) pig or pigs; (3) nigga or nigger; (4) ass; (5) copper; and (6) jerk. *Id*. An administrator can add or remove words from this list. *Id*. Facebook, further, allows Facebook page's to set a profanity filter. The profanity filter can be set to off, moderate, or strong. *Id*. ASP has set its Facebook page profanity filter to strong. *Id*.

At some point, Tanner followed ASP's Facebook page. Ex. N, p. 4. Tanner was blocked in September of 2016 from ASP's Facebook page after making comments on ASP's Facebook page and sending private messages to the page that were abusive and/or contained profanity in violation of ASP's Facebook page Terms and Conditions. Ex. N, p. 4. In the Complaint, Tanner claims ASP hid or deleted six comments he made to ASP's Facebook page. (DE 61, pp. 3-7). The six comments

Tanner made to ASP's Facebook page could have been removed for other violations of the Terms and Conditions. Ex. N, p. 4.

According to ASP's Facebook page Terms and Conditions, ASP reserves the right to remove any comments not topically related to the particular ASP post. Ex. N, p. 4. Most, if not all, of Tanner's comments could have been removed because they were not topically related to the particular ASP post to which he was commenting. *Id*. Also, according to the Terms and Conditions, ASP does not allow the posting of photographs, videos, audio recordings, or link to other pages or websites by anyone other than ASP. *Id*. ASP requests Facebook users to submit the content to ASP through a private message if they want to share it with ASP or believe ASP would like to share it on ASP's Facebook page. Ex. N, pp. 4-5. At least one of Tanner's comments, specifically his comment on February 18, 2016, could have been removed because it contained a link to another page or website and/or a photograph. *Id*.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate when the evidence viewed in the light most favorable to the nonmoving party presents no genuine issues of material fact and the moving party is entitled to summary judgment as a matter of law. *Hall v. Ramsey Cnty.*, 801 F.3d 912, 916 (8th Cir. 2015). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Gilkerson v. Nebraska Colocation Ctrs.*, LLC, 859 F.3d 1115, 1118 (8th Cir. 2017). A fact is material only when its resolution affects the outcome of the case. *TCF Nat'l Bank v. Market Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016); *Paine v. Jefferson Nat'l Life Ins. Co.*, 594 F.3d 989, 992 (8th Cir. 2010). A genuine issue of fact exists if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Paine*, 594 F.3d at 707; *Rakes v. Life Investors Ins. Co. of America*, 582 F.3d 886, 893 (8th Cir. 2009).

To defeat a motion for summary judgment, the nonmoving party has the burden "of presenting evidence sufficiently supporting [any] disputed material facts that a reasonable jury could return a verdict in [his] favor." *Gregory v. City of Rogers, Arkansas*, 974 F.2d 1006, 1010 (8th Cir. 1992) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). To meet this burden, the nonmoving party may not rest upon the mere allegations or denials in his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *TCF Nat'l Bank*, 812 F.3d at 707. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material facts and that the moving party is entitled to summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Best Buy Stores L.P., v. Benderson-Wainberg Assocs. L.P.*, 668 F.3d 1019, 1026 (8th Cir. 2012).

By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson*, 477 U.S. at 247. Factual disputes that are irrelevant or unnecessary will not be counted. *Id.* Broad and conclusory statements unsupported by facts are insufficient to support a 42 U.S.C. § 1983 cause of action. *Ellingburg v. King*, 490 F.2d 1270, 1271 (8th Cir. 1974).

When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated a clearly established right. *Manning v. Cotton*, 862 F.3d 663, 667 (8th Cir. 2017); *Mendoza v. U.S. Immigration & Customs Enforcement*, 849 F.3d 408, 416 (8th Cir. 2017). In doing so, the plaintiff may not rest upon the mere allegations or denials of his pleading, but must set forth

specific facts showing that there is some genuine issue for trial. *Anderson*, 477 U.S. at 248; *Manning*, 862 F.3d at 667; *Mendoza*, 849 F.3d at 416.

## IV.    ARGUMENT

A.    <u>Ziegenhorn did not violate Tanner's Fourth Amendment rights and therefore is entitled to qualified immunity</u>.

Ziegenhorn is entitled to qualified immunity because Tanner cannot establish that Ziegenhorn's conduct violated Plaintiff's Fourth Amendment rights. Tanner specifically alleges that Ziegenhorn's actions on December 3, 2014 and January 17, 2015 violated Tanner's Fourth Amendment rights under the Federal Civil Rights Act and the Arkansas Civil Rights Act.[1] Qualified immunity protects government officials performing discretionary actions from liability in a § 1983 action unless their conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Two questions guide the determination of whether a defendant is entitled to qualified immunity: (1) whether the plaintiff has shown the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct.[2]

---

[1] As pled in the Complaint, Tanner's claims under the Arkansas Civil Rights Act are brought through Article II Section 5 of the Arkansas Constitution. (DE 61 pp. 7-8, ¶¶ 36, 38). Article II Section 5 of the Arkansas Constitution states "[t]he citizens of this State shall have the right to keep and bear arms, for their common defense." Ark. Const. Art. II, § 5. This Court previously held that Tanner failed to state a Second Amendment claims under both federal and state law against Ziegenhorn. (DE 60, pp. 5, 9).

[2] *See Pearson v. Callahan*, 555 U.S. 223 (2009)(noting the two-step inquiry for resolving qualified immunity claims mandated by *Saucier v. Katz*, 533 U.S. 194 (2001), and holding that courts may exercise sound discretion in deciding which of the two prongs should be addressed first).

1. *Tanner cannot establish Ziegenhorn unreasonably seized or search Tanner in violation of Fourth Amendment rights.*

The Fourth Amendment provides protection for unreasonable search and seizures, and "its protections extend to brief investigatory stops of person or vehicles that fall short of a traditional arrest." *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)); *see also U.S. v. Tovar-Valdivia*, 193 F.3d 1025, 1028 (8th Cir. 1999). The Supreme Court has held that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S.Ct. 1536 (2001). "In the Fourth Amendment context, the Supreme Court has 'recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and [has] indicated that in such cases those officials…should not be held personally liable." *De La Rosa v. White*, 852 F.3d 740, 745 (8th Cir. 2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

"A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'" *Borgman v. Kedley*, 646 F.3d 518, 522-23 (8th Cir. 2011) (quoting *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317 (1983). "A law enforcement officer has probable cause 'when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *Gilmore v. City of Minneapolis*, 837 F.3d 827, 832 (8th Cir. 2016) (quoting *Borgman*, 646 F.3d at 523). "Whether probable cause exists depends upon the

reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S.Ct. 588 (2004). "If an office arrests a suspect under the mistaken belief that there is probable cause, arguable probable cause exists if the mistake is 'objectively reasonable.'" *Gilmore*, 837 F.3d at 832 (quoting *Borgman*, 646 F.3d at 523). A reasonable belief "means more than bare suspicion, but less than evidence which would justify condemnation or conviction." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010) (quoting *Brinegar v. U.S.*, 338 U.S. 160, 175, 69 S.Ct. 1302 (1949) (internal quotations omitted)).

"However, in order to effect a temporary investigative detention, officers need only reasonable suspicion based on the totality of the circumstances." *Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019). "While reasonable suspicion is a lower threshold than probable cause, it requires at least some minimal level of objective justification." *Id*. (citations and internal quotation marks omitted). "In determining whether an officer possessed reasonable suspicion to conduct a temporary investigative detention, or Terry stop, courts look only at the information the officer possessed at the time." *Id*. "When evaluating whether reasonable suspicion for a *Terry* stop exists, 'we view the [officer's] observations as a whole, rather than as discrete and disconnected occurrences.'" *U.S v. Hightower*, 716 F.3d 1117, 1121 (8th Cir. 2013) (quoting *U.S. v. Poitier*, 818 F.2d 679, 683 (8th Cir. 1987). "[E]ven if a court were to hold that the officer violated the Fourth Amendment by conducting a warrantless search, *Anderson* still operates to grant officers immunity for reasonable mistakes as to the legality of their actions." *Katz*, 533 U.S. at 206.

For the below reasons, Tanner cannot bear the ultimate burden of proof to establish Ziegenhorn violated his Fourth Amendment rights under the Federal Civil Rights Act or the Arkansas Civil Rights Act.

> i.   Tanner cannot establish that Ziegenhorn violated his Fourth Amendment rights on December 3, 2014.

Tanner cannot establish that Ziegenhorn violated his Fourth Amendment rights on December, 3, 2014, because Ziegenhorn had probable cause to conduct a reasonable seizure and search. On December 3, 2014, Ziegenhorn approached Tanner in the Searcy Wal-Mart to see if Tanner would voluntarily surrender his CHCL because the CHCL Division of ASP was in the revocation process due to the November 29, 2014, incident.

After approaching Tanner, Ziegenhorn asked Tanner if he was carrying a weapon. Tanner refused to answer his question multiple times and stated he did not have to answer any of Ziegenhorn's questions, but Tanner eventually stated that he was not carrying a weapon. Since Ziegenhorn's main purpose for approaching Tanner was to see if Tanner would voluntarily surrender his CHCL, Ziegenhorn asked Tanner if he could see his CHCL. However, at this point in the conversation, Ziegenhorn believed Tanner was starting to become disorderly in an area of Wal-Mart that contained a large number of people because Tanner raised his voice loud enough to attract the attention of customer's in that area of the store. Under Arkansas law, "[a] person commits the offense of disorderly conduct if, with the purpose to cause public inconvenience, annoyance, or alarm or recklessly creating a risk of public inconvenience, annoyance, or alarm, he or she: (1) Engages in fighting or in violent, threatening, or tumultuous behavior; (2) Makes unreasonable or excessive noise…(7) Creates a hazardous or physically offensive condition." Ark. Code Ann. § 5-71-207(a). Disorderly conduct is a class C misdemeanor. Ark. Code Ann. § 5-71-207(b).

Similar to their encounter five days prior, Tanner's demeanor had shifted from Ziegenhorn's perspective. "Arkansas police officers may consider a person's demeanor in deciding whether to arrest under the statute. *Graham v. Cawthorn*, 2013 Ark. 160, *8, 427 S.W.3d 34 (citing

*Watkins v. State*, 2010 Ark. App. 85, 2-6). In addition to raising his voice, it appeared Tanner stiffened and bowed up as if he was going to be confrontational. Ziegenhorn also thought it was possible that Tanner had someone else spectating within close proximity based on previous discussions with the Searcy Police Department. So, at this time, Ziegenhorn believed it was necessary to retrain Tanner for his and the public's safety and to move the situation outside before it escalated into something more.

While outside at Ziegenhorn's patrol car, Ziegenhorn went through the proper steps to identify Tanner. In the process of identifying Tanner, Ziegenhorn came across Tanner's CHCL in plain view. Because Ziegenhorn had probable cause to place Tanner in custody, the subsequent search of Tanner's person and confiscation of his CHCL also did not violate his Fourth Amendment rights. *See Gilmore*, 837 F.3d at 838; *see also Meehan v. Thompson*, 763 F.3d 936, 946 (8th Cir. 2014) ("[A] search incident to [an] arrest requires no additional justification." (second alteration in original) (quoting *U.S. v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467 (1973))).

For the above reasons, Ziegenhorn had probable cause to place Tanner in custody and confiscate his CHCL license.

      ii.    Tanner cannot establish that Ziegenhorn violated his Fourth Amendment rights on January 17, 2015.

Tanner cannot establish that Ziegenhorn violated his Fourth Amendment rights on January 17, 2015, when Tanner was arrested at his house by the Searcy Police Department. In his deposition, Tanner admitted that Ziegenhorn was not present during his arrest on January 17, 2015. Tanner was arrested because of the November 29, 2014, incident where he was openly carrying a weapon in the Searcy Wal-Mart; the arrest was not based on or related to the December 3, 2014, incident. This is clear because Ziegenhorn submitted the Affidavit to the Searcy District Court <u>prior</u> to the December 3, 2014, incident in the Searcy Wal-Mart. The Searcy District Court Judge

issued a warrant for arrest solely based on the facts included in Ziegenhorn's Affidavit. As discussed below, *supra* IV.A.2*,* the facts in the Affidavit are not in dispute between the parties. For these reasons, Tanner cannot establish that Ziegenhorn violated Tanner's Fourth Amendment rights when Tanner was arrested on January 17, 2015. This Court should therefore dismiss Tanner's federal and state-law claims related to January 17, 2015, against Ziegenhorn.

2. *Tanner cannot establish that Ziegenhorn violated his Fourth Amendment rights when Ziegenhorn applied for an arrest warrant.*

Tanner cannot establish that Ziegenhorn applied for an arrest warrant with allegedly misleading information about the November 29, 2014, incident. In the Complaint, Tanner does not specifically allege which information contained in the Affidavit was misleading. (DE 61, pp. 10-11, ¶¶ 54-55). Rather, Tanner takes issue with whether Ziegenhorn had good reason to believe that Tanner committed the offenses of obstruction of governmental operations and illegally carrying a weapon. *Id*.

"[I]t is clearly established that the Fourth Amendment requires a warrant application to contain a truthful factual showing of probable cause…" *Hunter v. Namanny*, 219 F.3d 825, 831 (8th Cir. 2000). "A warrant based upon an affidavit containing a deliberate falsehood or reckless disregard for the truth violates the Fourth Amendment." *Bagby v. Brondhaver*, 98 F.3d 1096, 1098 (8th Cir. 1996) (quotation omitted).

The facts contained in the Affidavit are not in dispute by the parties. The material facts in the Affidavit are: (1) Tanner was openly carrying a weapon inside the Wal-Mart in Searcy, Arkansas; (2) Ziegenhorn identified himself as Arkansas State Police; (3) Ziegenhorn asked Tanner to identify himself; and (4) Tanner refused to identify himself. Ex. F. Tanner was openly carrying a weapon in the Searcy Wal-Mart on November 29, 2014. Ziegenhorn identified himself

as being with ASP, asked Tanner to identify himself, and Tanner refused to identify himself to Ziegenhorn.

Furthermore, Ziegenhorn sought the approval of the local prosecutor before submitting the Affidavit to the White County District Court. On December 3, 2014, Ziegenhorn discussed the encounter between him and Tanner on November 29, 2014, and facts contained in the Affidavit with the local prosecutor. The local prosecutor subsequently approved the Affidavit. *Id*.; *See Partick v. Tyson Foods, Inc.*, 2016 Ark. App. 221, *14, 489 S.W.3d 683 (holding the law conclusively presumes the existence of probable cause when one fully and fairly discloses all the information he has to the prosecutor and follows the prosecuting attorney's advice).

For the above reasons, Tanner cannot establish Ziegenhorn violated his Fouth Amendment rights when he applied for an arrest warrant.

B.   ASP's Facebook Terms and Conditions do not violate Tanner's First Amendment rights.

1.   *ASP reasserts that its Facebook page should not be subject to the forum analysis but should rather be considered government speech based on the evidence now before this Court. ASP Defendant Bryant is therefore entitled to sovereign immunity.*

With the additional evidence submitted in support of ASP Defendants' motion for summary judgment, ASP respectfully requests this Court to reconsider whether the interactive space below an ASP post on its Facebook Page is subject to the forum doctrine. Based on the evidence now before this Court, it is clear ASP did not intentionally open a forum up for public discourse, but rather established an official Facebook page for a limited purpose—to disseminate information to the public.

"[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 803, 105 S.Ct. 3439 (1985) (quoting *U.S. Postal Serv. V. Council of Greenburgh*

*Civic Assns.*, 453 U.S. 114, 129, 101 S.Ct. 2676 (1981). "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Id.* at 802. The Supreme Court further stated that it "will not find that a public forum has been created in the face of clear evidence of a contrary intent…" *Id.* at 803. The governments "[i]ntent is not merely a matter of stated purpose…it must be inferred from a number of objective factors, including: the government's policy and past practice, as well as the nature of the property and its compatibility with expressive activity." *Bowman v. White*, 444 F.3d 967, 991 n.9 (8th Cir. 2006) (quoting *Paulsen v. County of Nassau*, 925 F.2d 65, 69 (2nd Cir. 1991).

Even though Facebook users who like or follow ASP's Facebook page can comment on a post by ASP on its Facebook page, it does not mean ASP intended to create a public forum. To the contrary, ASP expressly stated in its Facebook Terms and Conditions that it did not intend to create a public forum. Therefore, it would go against the intent of ASP to bifurcate the interactive space underneath an original post by ASP on its Facebook page by applying the forum doctrine.

ASP maintains that the government speech doctrine should apply to its Facebook page as a whole, including the interactive space. In assessing whether speech constitutes government speech as opposed to private speech, the Supreme Court has considered the following three factors: (1) whether government has long used the particular medium at issue to speak; (2) whether the medium is often closely identified in the public mind with the state; and (3) whether the state maintains direct control over the messages conveyed through the medium. *Gerlich v. Leath*, 861 F.3d 697, 708 (8th Cir. 2017) (citing *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 135 S.Ct. 2239, 2247-48 (2015). The government speech doctrine establishes that the government may advance its own speech without requiring viewpoint neutrality and is a category

of speech that falls outside the domain of the forum analysis. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467, 129 S.Ct. 1125 (2009).

First, ASP has used the Facebook page to convey and disseminate its mission, goals, programs, and other information to increase awareness to the public since the inception of ASP's Facebook page in 2015. As stated in ASP's Facebook Terms and Conditions, only authorized ASP employees can post to ASP's Facebook page. Ex. N. This has been the case since the Facebook page was created. *Id*. The purpose of ASP's Facebook page is to "provide the public with information concerning the [ASP's] mission, goals, programs activities, events, news, stories, photographs, and videos and to disseminate other information and material intended to increase public awareness of and enhance respect for [ASP] and its members and employees." Ex. O.

Secondly, ASP's Facebook page collectively is closely identified with ASP, not individual Facebook users that like and/or follow and comment on the page. Facebook users who have liked and/or followed the ASP Facebook page cannot post to the page. Ex. N. The Facebook users may, however, comment on a post made by ASP to its Facebook page. Ex. N. A post made by ASP and any comments below that post are contained on ASP's Facebook page and are, therefore, inherently associated with ASP's Facebook page, not the individual Facebook user who made the comment to an ASP post. In *Summum*, the United States Supreme Court stated "[p]ublic parks are often closely identified in the public mind with the government unit" and "commonly play an important role in defining the identity that [the government] projects to its own residents and to the outside world." 555 U.S. 460, 472, 129 S.Ct. 1125 (2009). The nature of the public parks in *Summum* is similar to ASP's Facebook page because, collectively, it is closely identified as ASP's Facebook page and it plays a role in defining the identity of ASP to its constituents.

Lastly, ASP's Facebook page is purposefully controlled and was established for a limited purpose—to disseminate information ASP demeaned appropriate to the public. Ex. O. ASP's attempt to retain final approval authority and editorial control over the content published to its Facebook page is evident through its Terms and Conditions and the functions utilized by ASP that are available to it through Facebook. From the inception of ASP's Facebook page, ASP created and published to its page Terms and Conditions to retain final authority and editorial control over the content published to its Facebook page. Ex. N; Ex. O. ASP's Facebook page Terms and Conditions specifically state "BEFORE SUBMITTING/POSTING A COMMENT ON THIS PAGE, YOU MUST REVIEW AND AGREE TO THE TERMS AND CONDITIONS OF FACEBOOK AND THE TERMS AND CONDITIONS ESTABLISHED BY THE ARKANSAS STATE POLICE." Ex. O. The Terms and Conditions further state that ASP reserves the right to "restrict, remove, or delete any posting/comment that is contrary to and/or inconsistent with the purpose of the page or in violation of the applicable terms and conditions." Ex. O.

Additionally, ASP utilizes the functions available to it by Facebook to further retain control over its Facebook page. Facebook allows page administrators to hide or delete comments and block individuals from a page. Ex. N. As the case here, an ASP employee hid or deleted multiple comments by Tanner and eventually blocked him from ASP's Facebook page because his comments were not consistent with the Terms and Conditions. Ex. N. Facebook also allows pages to automatically moderate posts/comments that contain certain words. Ex. N. To again retrain some form of final authority and editorial control of comments made by Facebook users, ASP has utilized this function to block comments containing the following words: (1) jackass; (2) pig or pigs; (3) nigga or nigger; (4) ass; (5) copper; and (6) jerk. Ex. N. ASP can add or remove words

from this list. Ex. N. Finally, Facebook allows page administrators to set a profanity filter. Ex. N. ASP has set the profanity filter to its Facebook page to strong. Ex. N.

For the above reasons, the government speech doctrine should apply to ASP's Facebook page as a whole. Because the forum analysis does not apply to government speech, ASP Defendant Bryant is therefore entitled to sovereign immunity and the claims against him should be dismissed. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65-66, 71 (1989) (Section 1983 claims against state actors in their official capacities are barred by the Eleventh Amendment).

    2.    ASP did not violate Tanner's First Amendment rights by removing his comments from ASP's Facebook Page.

As stated above, ASP maintains the government speech doctrine should apply even to the interactive space on its Facebook Page and that it did not violate Tanner's First Amendment rights by removing his comments from its Facebook Page. Nonetheless, if the forum doctrine applies to the interactive space of ASP's Facebook Page, this Court should find the interactive space to be a limited public forum. *See Davidson v. Plowman*, 247 F.Supp.3d 767 (E.D. Va. 2017), aff'd 715 Fed. Appx. 298 (4th Cir. 2018) (unpublished).

"The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948 (1983) (internal quotations omitted). To this end, the Supreme Court uses a forum analysis for evaluating restrictions of speech on government property. *Id.* at 45-46. The forum analysis initially requires a court to determine whether a property is a traditional public forum, a designated public forum, or a nonpublic forum. *Bowman*, 444 F.3d 967 (citing *Families Achieving Independence & Respect v. Neb. Dep't of Soc. Servs.*, 111 F.3d 1408, 1418 (8th Cir. 1997). The type of forum will

determines which standard of scrutiny is appropriate to decide whether a restriction on speech passes constitutional muster. *Bowman*, 444 F.3d at 974.

"Publicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will." *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702 (1983). To determine whether the space is a public forum, the court must "examine the traditional use of the property, the objective use and purposes of the space, and the government intent and policy with respect to the property, not merely its physical characteristics and location." *Bowman*, 444 F.3d at 978. "[T]he open nature of these spaces is merely a factor to consider in determining whether the government has opened its property." *Bowman*, 444 F.3d at 978 (citing *Grace*, 461 U.S. at 177). The court "must acknowledge the presence of any special characteristics regarding the environment in which those areas exist. *Bowman*, 444 F.3d at 978.

"A designated public forum is a nonpublic forum the government intentionally opens to expressive activity for a limited purpose such as use by certain groups or use for discussion of certain subjects." *Bowman*, 444 F.3d at 975 (citing *Perry Educ. Ass'n*, 460 U.S. at 46, 103 S.Ct. 948. "The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677-683, 118 S.Ct. 1633, (1998) (internal quotations omitted). The governments "[i]ntent is not merely a matter of stated purpose…it must be inferred from a number of objective factors, including: the government's policy and past practice, as well as the nature of the property and its compatibility with expressive activity." *Bowman*, 444 F.3d at 991 n.9 (quoting *Paulsen v. County of Nassau*, 925 F.2d 65, 69 (2nd Cir. 1991).

In the Eighth Circuit, "[a] designated public forum can be classified as either 'of a limited or unlimited character.'" *Bowman*, 444 F.3d at 976 (quoting *Van Bergen v. Minnesota*, 59 F.3d 1541, 1553 n. 8 (8th Cir. 1995)). The Eighth Circuit has adopted Second Circuit's view on designated public forums in that "a limited public forum is a subset of the designated public forum that arises where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Bowman*, 444 F.3d at 976 (quoting *Make the Road By Walking, Inc. v. Turner*, 378 F.3d 133, 143 (2nd Cir. 2004)) (internal quotations omitted). "An 'unlimited' designated public forum is a forum designated for expressive conduct by the government but not limited to a particular type of speech or speaker." *Id*.

"The distinction between a limited designated public forum and an unlimited designated public forum is significant because it controls the level of scrutiny given to restriction on speech." *Bowman*, 444 F.3d at 976. "In an unlimited designated public forum, the government may enforce a content-neutral time, place, and manner restriction only if the restriction is necessary to serve a significant government interest and is narrowly drawn to achieve that interest." *Id*. (citing *Perry Educ. Ass'n*, 460 U.S. at 46, 103 S.Ct. 948. "In contrast, in a limited designated public forum, '[r]estrictions on speech not within the type of expression allowed in a limited forum must only be reasonable and viewpoint neutral." *Bowman*, 444 F.3d at 976 (quoting *Turner*, 378 F.3d at 143).

Lastly, the government can most freely restrict speech in a nonpublic forum. "A nonpublic forum is government property which is not classified a traditional public forum or designated public forum." *Bowman*, 444 F.3d at 976 (citing *Warren v. Fairfax County*, 196 F.3d 186, 192 (4th Cir. 1999)). In this type of forum, the government can "'restrict speech as long as the restrictions are reasonable and are not an effort to suppress expression merely because the public officials

oppose a speaker's view.'" *Bowman*, 444 F.3d at 976 (quoting *American Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1098 (9th Cir. 2003)) (internal quotations omitted).

Here, even though the intent is not present, ASP at a maximum created a limited public forum if the forum doctrine applies to the interactive space on its Facebook page. As previously mentioned, APS's Facebook Page Terms and Conditions expressly state that it did not intend to create a public forum, but rather created its Facebook Page for a specific purpose—to disseminate information it demeaned appropriate to the public, specifically members of the public who have liked and/or followed its Facebook Page. Thus, ASP may restrict speech as long as the restrictions are reasonable and viewpoint neutral.

The law was not clearly established at the time ASP removed Tanner's six comments from its Facebook page. *See* DE 60. Albeit, Tanner's six comments were nonetheless in violation of ASP's Facebook page Terms and Conditions that were reasonable and viewpoint neutral. For example, according to ASP's Facebook page Terms and Conditions, ASP reserves the right to remove any comments not topically related to the particular ASP post. *See Plowman*, 247 F.Supp.3d at 777 ("a restriction limiting a forum to discussion of selected topics—a common restriction among limited public forums, *see Perry Educ. Ass'n*, 460 U.S. at 71 n.7, 103 S.Ct. 948—is self-evidently viewpoint neutral.").

Most, if not all, of Tanner's comments could have been removed because they were not topically related to the particular ASP post. Ex. N. For example, Tanner's labeled "Comment 2" in the Complaint was in response to an ASP post regarding a "little-known statute." DE 61, p. 6. As claimed, Comment 2 stated "[a]re you familiar with 5-54-122(c)(1)(b)? Because one of your troopers committed this crime, you know who it is." *Id*. Tanner claims Comment 2 was "a reference to Ziegenhorn's false statements against [Tanner] in various reports and testimony." *Id*.

By the very allegation in the Complaint, Comment 2 is not topically related to ASP's post, which is in violation of ASP's Facebook page Terms and Conditions.

Additionally, Tanner's comments identified as Comments 3 through 6 in the Complaint are clearly not topically related to ASP's post. Comments 3 through 6 were in response to an ASP post regarding "a new recruit class." DE 61, p. 6. The Comments state the following:

- Comment 3 – "Just don't be like that douche, Trooper Ziegenhorn." (DE 61, p. 6, ¶ 29).

- Comment 4 – "Just don't be like that fascist pig, Trooper Ziegenhorn." (DE 61, p. 6, ¶ 31).

- Comment 5 – "Just don't be like that fascist pig, Trooper Ziegenhorn." (DE 61, pp. 6-7, ¶ 32).

- Comment 6 – "So handcuffing someone and detaining them without any probable cause, stealing from them, then letting them go is taught in this class or is that something that DOUCHEBAG Ziegenhorn learned on his own?" (DE 61, p. 7, ¶ 32).

Additionally, according to ASP's Facebook page Terms and Conditions, ASP does not allow the posting of photographs, videos, audio recordings, or links to other pages or websites by anyone other than ASP. Ex. O. ASP requests Facebook users to submit any such content to ASP through a private message if they want to share it with ASP or believe ASP would like to share it on its Facebook page. *Id.* This restriction is both viewpoint neutral and reasonably related to the purpose of ASP's Facebook page.

Tanner's comment identified as Comment 1 was made in response to an ASP post that recognized an ASP employee. DE 61, p. 5. Comment 1 stated "I have this guy's autograph. He

supports crooked cops, so that makes him a crooked cop in my book. He needs to be held accountable as well if he is going to support the unlawful actions of his officers…[link to image of letter from Mike Foster] This guy sucks." DE 61, p. 4.

For the reasons above, ASP could have removed Tanner's six comments under reasonable and viewpoint neutral Terms and Conditions.

C.  <u>This Court should dismiss any state-law claims against ASP Defendants because Defendants are entitled to Statutory Immunity.</u>

The Arkansas General Assembly has determined that "[o]fficers and employees of the State of Arkansas are immune from liability and from suit…for damages for acts or omissions, other than malicious acts or omissions, occurring within the course and scope of their employment." Ark. Code Ann. § 19-10-305(a). The Arkansas Supreme Court has consistently held that "the immunity provided by section 19-10-305 is similar to that provided by the Supreme Court for federal civil-rights claims." *Simons v. Marshall*, 369 Ark. 447, 452-53 (2007); *see also Smith v. BRT*, 363 Ark. 126, 130-31 (2005); *Fegans v. Norris*, 351 Ark. 200 (2002). A state official has statutory immunity from state-law claims "if his actions did not violate clearly established principles of law for which a reasonable person would have knowledge." *Id*. at 452.

"More specifically, section 19-10-305(a) provides state employees with statutory immunity from civil liability for non-malicious acts occurring within the course of their employment." *Id*. For a Plaintiff to overcome an assertion of statutory immunity by a state employee, she must allege sufficient facts in her complaint to support a claim of malicious conduct. *E.g., Fuqua v. Flowers*, 341 Ark. 901, 905 (2000). The Arkansas Supreme Court has defined malice as "an intent and disposition to do a wrongful act greatly injurious to another[,]" and "the intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply an evil intent… A conscious violation of the law…which operates to the

prejudice of another person. A condition of the mind showing a heart…fatally bent on mischief."
*Id*. at 905-06 (citations and internal quotation marks omitted); *see also Simons*, 369 Ark. 447, 452-
53 (2007). "[A] bare allegation of willful and wanton conduct will not suffice to prove malice."
*Simons*, 369 Ark. at 453 (citation omitted).

In *Simons*, the plaintiff alleged that her rights were violated by an ASP trooper's use of
excessive force, excessive groping, and assault and battery. *Id*. In pleading facts to support her
claim, the plaintiff alleged that the defendant "grabbed and groped on" her breast and genitals in a
sexual manner and then said "Don't you know I'm a man with a gun" when she retaliated and
requested that he stop groping her. *Id*. at 454. The Supreme Court affirmed the dismissal of the
complaint because "the conclusory facts" set forth did not "demonstrate either malice or a
conscious violation of the law." *Id*. at 454.

This Court should follow *Simons* and dismiss any damages against ASP Defendants for
Tanner's state-law claims in the Complaint. First, Tanner cannot prove ASP violated clearly
established principles of law when ASP employees removed Tanner's comments from its
Facebook page and subsequently blocked him. *See* DE 60, p. 2. Secondly, Tanner cannot establish
that Ziegenhorn consciously violated the law or acted with malice towards him. Tanner's malicious
prosecution and perjury claims against ASP Defendant Ziegenhorn are discussed further below.

    1.   *Tanner cannot establish a malicious prosecution claim against Ziegenhorn*.

The Eighth Circuit "has uniformly held that malicious prosecution by itself is not
punishable under § 1983 because it does not allege a constitutional injury." *Kurtz v. City of
Shrewsbury*, 245 F.3d 753, 758 (8th Cir. 2001). "In order to establish a claim for malicious
prosecution, a plaintiff must prove the following five elements: (1) a proceeding instituted or
continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the

plaintiff; (3) absence of probable cause for the proceeding; (4) malice on the part of the defendant; and (5) damages." *McMullen v. McHughes Law Firm*, 2015 Ark. 15, 454 S.W.3d 200, 210 (citing *Sundeen v. Kroger*, 355 Ark. 138, 142, 133 S.W.3d 393, 395 (2003)).

The burden of proof rests with Tanner. For the reasons below, Tanner cannot meet the burden of proof for malicious prosecution.

      i.    Ziegenhorn had probable cause to believe Tanner violated the law on November 29, 2014.

First, Tanner cannot establish an absence of probable cause when Ziegenhorn submitted an affidavit of arrest with the White County District Court. In his Complaint, Tanner alleges that Ziegenhorn filed a misleading warrant for arrest against him that lacked probable cause. (DE 61, p. 11, ¶57). Tanner further states the warrant request omitted key facts of the November 29, 2014, interaction and misrepresented others. (DE 61, p. 12, ¶57). As previously discussed, *infra* IV.A.2, the overwhelming evidence says otherwise.

Probable cause for prosecution must be based upon the existence of facts or credible information that would induce the person of ordinary caution to believe the accused person to be guilty of the crime for which he is charged. *McMullen*, 2015 Ark. at 15-16. "Acting on the advice of counsel is a defense to a charge of malicious prosecution." *Patrick v. Tyson Foods, Inc.*, 2016 Ark. App. 221, *14, 489 S.W.3d 683 (citing *Family Dollar Trucking, Inc. v. Huff*, 2015 Ark. App. 574, 474 S.W.3d 100. "In order to avail oneself of this defense, one must have made a full, fair, and truthful disclosure of all the facts known to him and acted in good faith on counsel's advice." *Id*. The defense of acting on the advice of counsel applies in "greater force if the proceeding was instituted on the advice and approval of the state's prosecuting attorney." *Patrick*, 2016 Ark. App. at *14 (citation omitted). "If one in good faith fully and fairly discloses to an attorney or the prosecutor all the information he has and is advised that a crime was committed, then he has made

out a complete defense to an action for malicious prosecution." *Id*. Additionally, "[w]hen one makes such a disclosure to the prosecutor and follows the prosecuting attorney's advice, the law conclusively presumes the existence of probable cause, the lack of which is a necessary element in a suit for malicious prosecution." *Id*.

Furthermore, "Arkansas cases have consistently held that a judgment of conviction by a court of competent jurisdiction is conclusive evidence of the existence of probable cause, even though the judgment is later reversed." *Sundeen*, 355 Ark. at 143; *see Smith v. Anderson*, 259 Ark. 310, 532 S.W.2d 745 (1976); *see also Alexander v. Laman*, 225 Ark. 498, 283 S.W.2d 345 (1955). The plaintiff in *Alexander* was convicted "in municipal court, but upon appeal to circuit court, the charge was dismissed." *Sundeen*, 355 Ark. at 144 (citing *Alexander*, 225 Ark. at 499).

On December 3, 2014, Ziegenhorn submitted the Affidavit with the White County District Court. However, prior to submitting the Affidavit with the District Court, Ziegenhorn sought the local prosecutor's approval. The Affidavit was based solely on the November 29, 2014, incident where Tanner was wearing a tactical holster with a firearm strapped to his right thigh in an open carry position while inside the Searcy Wal-Mart at approximately 10:50 p.m. The facts the Affidavit relied on were that Tanner was wearing a tactical holster with a firearm strapped to his right thigh in an open carry position inside Searcy Wal-Mart and Tanner refused to identify himself when asked by Ziegenhorn. The Affidavit stated that Ziegenhorn believed Tanner committed the offense of Ark. Code Ann. §§ 5-73-120 (carrying a weapon) and 5-54-102 (obstructing governmental operations).

After submitting the Affidavit to the district court, Ziegenhorn was not involved in the process that ultimately led to Tanner's arrest on January 16, 2015. On January 16, 2015, the district court judge issued a warrant for Tanner's arrest based on the belief that Tanner had violated Ark.

Code Ann. § 5-54-102, obstructing governmental operations. Searcy Police Department subsequently executed that warrant.

The White County District Court found Tanner guilty of obstructing governmental operations. Tanner subsequently appealed that conviction to the White County Circuit Court, which reversed the district court's conviction. Similar to the plaintiff in *Alexander*, Tanner was convicted in the White County District Court of obstructing governmental operations, and that decision was later reversed by the White County Circuit Court. *See Alexander*, 225 Ark. at 499. Even though the circuit court later reversed the district court's decision, there is conclusive evidence of the existence of probable cause because the district court had competent jurisdiction and found Tanner guilty of obstructing governmental operations. *See Sundeen*, 355 Ark. at 147.

ii.   Tanner cannot establish Ziegenhorn acted out of malice.

Tanner cannot establish that Ziegenhorn brought charges against him out of malice. Malice has been defined as any improper or sinister motive for instituting the suit. *Hollingsworth v. First Nat'l Bank & Trust Co. of Rogers*, 311 Ark. 637, 640, 846 S.W.2d 17, 178-79 (1993) (citation omitted). Malice can be inferred from a lack of probable cause. *Sundeen*, 355 Ark. at 147. "However, when probable cause exists and there is no strong evidence of malice, a charge of malicious prosecution cannot succeed." *Id*. (citation omitted).

Since the White County District Court found Tanner guilty of obstructing governmental operations, there is conclusive evidence that probable cause existed for Ziegenhorn to submit the Affidavit. As evident by Tanner's appeal of the revocation of his CHCL, Tanner was required to provide identification to Ziegenhorn when he requested. Additionally, the guidance provided by ASP to Ziegenhorn at the time was that openly carrying a weapon was not legal under Ark. Code

Ann. § 5-73-120. It is therefore reasonable that Ziegenhorn believed Tanner had illegally carried a weapon on November 29, 2014.

Moreover, Tanner cannot establish Ziegenhorn acted out of malice towards Tanner when he submitted the Affidavit to the White County District Court. The Pulaski County Circuit Court found Tanner clearly violated CHCL regulations when he refused to identify himself to Ziegenhorn when requested to do so on November 29, 2014. Ex. C. The Circuit Court also stated Tanner's interpretation of Arkansas's statute regarding carrying a weapon was incorrect and Tanner was not legally authorized to openly carry a weapon. *Id.*

   2.   *Tanner cannot establish that Ziegenhorn committed perjury.*

In Plaintiff's Fifth Amended Complaint, Tanner claims Ziegenhorn "perjured himself on the stand during [Tanner's] state district court trial and in official reports regarding the incident, claiming that [Tanner] reached his hand down toward to his gun during their interaction." (DE 61, p. 13, ¶ 63). Tanner's claim has no merit and he cannot establish that Ziegenhorn committed perjury.

Pursuant to Ark. Code Ann. § 5-53-102, "[a] person commits perjury if in an official proceeding he or she knowingly: (1) Makes a false material statement under an oath or authorized by law…" A false material statement "means any false statement…which affects or could affect the course or outcome of an official proceeding or the action or decision of a public servant in the performance of any governmental function." Ark. Code Ann. § 5-53-101(1)(A).

Tanner cannot establish that Ziegenhorn knowingly made a false material statement that affected or could have affected the course or outcome of an official proceeding. First, Tanner simply cannot establish that Ziegenhorn knowingly made a false material statement. Ziegenhorn believed Tanner's right hand dropped down towards his weapon on the night of November 29,

2014, in the Searcy Wal-Mart. Tanner may claim that the security video footage from Wal-Mart on November 29, 2014, will prove Ziegenhorn made a false statement. However, Ziegenhorn had not watched the security video footage prior to testifying at Tanner's criminal case in the White County District Court or his CHCL revocation hearing. Ex. A, Ziegenhorn Depo., 92:11-12. Moreover, when Ziegenhorn watched the video at his deposition, he was unable to tell whether Tanner dropped his hands down from the angle of the footage. Ex. Ziegenhorn Depo., 95:17-19.

Additionally, the Affidavit submitted by Ziegenhorn that ultimately lead to Tanner's arrest on January 17, 2015, did not claim Tanner reached his hand down toward his weapon during their encounter on November 29, 2014. *See* Ex. F. Because it was not included in the Affidavit, the district court judge that issued the warrant for arrest for Tanner could not have relied on that statement.

Furthermore, the alleged false statement was not material to the issue before the White County District and Circuit Courts or the issue presented during the adjudication of Tanner's CHCL. Those issues revolved around whether Tanner was required to provide Ziegenhorn identification when requested to do so. *See* Ex. C, K.

For the reasons stated above, Tanner cannot establish Ziegenhorn committed perjury.

## V. CONCLUSION

For these reasons, ASP Defendants are entitled to summary judgment and the dismissal of the claims against them.

Respectfully submitted,

LESLIE RUTLEDGE,
Attorney General

By:    Reid P. Adkins
        Arkansas Bar # 2015216
        Assistant Attorney General

Attorney for ADC Defendant
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Telephone: (501) 682-1080
Fax: (501) 682-2591
reid.adkins@arkansasag.gov

William C. Bird III
Ark. Bar # 2005149
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Telephone: (501) 682-1317
Fax: (501) 682-2591
William.bird@arkansasag.gov

## **CERTIFICATE OF SERVICE**

I, Reid P. Adkins, hereby certify that on June 8, 2020, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which shall send notification of the filing

to any participants.

By:     Reid P. Adkins