IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**JAMES A. TANNER**                                                                              **PLAINTIFF**

**v.**                            **CASE NO. 4:17-CV-780-DPM**

**KURT ZIEGENHORN, ET AL.**                                             **DEFENDANTS**

<u>**STATEMEMT OF UNDISPUTED MATERIAL FACTS**</u>

1. Plaintiff James A. Tanner ("Tanner") filed his Fifth Amended Complaint on June 20, 2019. (DE 61).

2. Tanner specifically alleges that ASP Defendant Ziegenhorn violated Tanner's Fourth Amended rights under the Federal Civil Rights Act and Arkansas Civil Rights when: (1) on December 3, 2014, Ziegenhorn unlawfully searched and seized Tanner at the Wal-Mart in Searcy, Arkansas; (2) on January 17, 2015, Tanner was arrested by the Searcy Police Department on an affidavit of arrest Ziegenhorn submitted to the White County District Court arising from an encounter between Ziegenhorn and Tanner in the same Wal-Mart on November 29, 2014; and (3) Ziegenhorn allegedly applied for a warrant for arrest with misleading information. (DE 61)

3. Additionally, Tanner alleges ASP, through Colonel Bryant in his official capacity, violated his First Amendment rights under the Federal Civil Rights Act and the Arkansas Civil Rights Act. (DE 61).

4. Lastly, Tanner claims Ziegenhorn maliciously prosecuted him because of the incident occurring on November 29, 2014, and committed perjury when Ziegenhorn allegedly stretched the truth at a criminal hearing against Tanner in the White County District Court. (DE 61).

5. On November 29, 2014, Ziegenhorn was off duty shopping at the Searcy, Arkansas, Wal-Mart with his family at approximately 10:50 p.m. Ex. A, Ziegenhorn Depo., 13:18-14:4.

6. While shopping, Ziegenhorn noticed an individual walking around Wal-Mart openly carrying a pistol in a holster strapped to his right thigh. Ex. A, Ziegenhorn Depo., 14:4-8.

7. That individual was Tanner. Ex. A.

8. In an attempt to determine who the individual was, Ziegenhorn approached Tanner asking what law enforcement group he was with. Ex. A, 14:8-22; Ex. B, Tanner Depo., 21:4-14.

9. Tanner responded to the affect that he was not with any law enforcement group. Ex. A, Ziegenhorn Depo., 14:16-22.

10. At that time, Ziegenhorn identified himself as being with the Arkansas State Police. Ex. A, Ziegenhorn Depo., 14:24-15:1.

11. Ziegenhorn requested for Tanner to identify himself, but Tanner refused to do so. Ex C, p. 7; Ex. I, p. 2.

12. Tanner's demeanor changed, he grew defensive and agitated. Ex. C, p. 7.

13. As Ziegenhorn approached Tanner, it appeared to Ziegenhorn that Tanner's right arm began to fall in a downward motion towards his weapon. Ex. A, Ziegenhorn Depo., 15:1-3.

14. Based on his training Ziegenhorn believed it was necessary to gain control of the arm temporarily by grabbing ahold of Tanner's right arm and elbow so that Tanner would not have access to the weapon. Ex. A, Ziegenhorn Depo., 15:3-7.

15. While grasping Tanner's arm, Ziegenhorn again asked Tanner to identify himself. Ex. A, Ziegenhorn Depo, 15:9-12; Ex. B, Tanner Depo., 22:24-23:7.

16. Tanner again refused to identify himself to Ziegenhorn at this time. Ex. A, Ziegenhorn Depo., 15:9-12; Ex. B, Tanner Depo., 22:24-23:7.

17. After a brief moment, Ziegenhorn believed Tanner had calmed down, so he released his grip on Tanner's arm. Ex. A, Ziegenhorn Depo., 15:17-18:9.

18. Tanner told Ziegenhorn that he was going to call 911. Ex. A, Ziegenhorn Depo., 15:17-23. Ziegenhorn responded for him to do so. *Id*.

19. Ziegenhorn believed Tanner was not a threat at that time because it appeared Tanner had his cell phone in his right hand. Ex. A, Ziegenhorn Depo., 15:17-18:9. Tanner admits to having an object in his right hand. Ex. B, Tanner Depo., 24:20-25:7.

20. Ziegenhorn followed Tanner out of Wal-Mart where they were met by local Searcy Police Officers. Ex. A., Ziegenhorn Depo., 41:17-14. From that point forward, Ziegenhorn allowed the Searcy Police Department to take over the situation. Ex. A, Ziegenhorn Depo., 43:5-13.

21. On the night of November 29, 2014, Ziegenhorn did not see any identification from Tanner, including his concealed carry handgun license ("CHCL"). Ex. A, Ziegenhorn Depo., 23:7-16.

22. Ziegenhorn was not aware Tanner had a CHCL at the time of the encounter on November 29, 2014. Ex. A, Ziegenhorn Depo, 23:7-16.

23. At the time of the incident, the guidance provided by ASP to its officers was that open carry was not allowed even under the recent legislative Act 746. Ex. D, p. 10.

24. ASP's guidance included an opinion from the Arkansas Attorney General's Office that stated "Act 746 does not authorize 'open carry.'" Ex. E.

25. Based on the guidance provided by ASP, Ziegenhorn believed openly carrying a weapon was illegal. Ex. A, Ziegenhorn Depo., 49:17-50:13.

26. On December 3, 2014, Ziegenhorn was in Searcy, Arkansas, for the purpose of submitting an affidavit of arrest against Tanner (the "Affidavit") to the White County District Court. Ex. A, Ziegenhorn Depo., 58:2-19.

27. The Affidavit completed by Ziegenhorn was based on the incident on November 29, 2014, where Ziegenhorn confronted Tanner in the Searcy Wal-Mart because Tanner was wearing a tactical holster with a firearm strapped to his right thigh in an open carry manner and refused to identify himself. Ex. F. The Affidavit stated that Ziegenhorn believed Tanner committed the offenses of Ark. Code Ann. §§ 5-73-120 (obstruction of governmental operations) and 5-54-102 (carrying a prohibited weapon). Ex. F.

28. Prior to submitting the Affidavit to the district court, Ziegenhorn sought the approval of the local prosecutor. Ex. A, Ziegenhorn Depo., 58:2-19.

29. In route to the prosecutor's office, Ziegenhorn picked up a police report from the Searcy Police Department for the November 29, 2014, incident; Ziegenhorn also obtained a police report relating to Tanner walking down the street in Searcy with a firearm on October 8, 2014. Ex. A, Ziegenhorn Depo., 78:17-79:7.

30. At the prosecutor's office, Ziegenhorn and the prosecutor reviewed the Affidavit. Ex. A, Ziegenhorn Depo., 58:7-59:14.

31. Ziegenhorn's general practice is to seek the approval of an affidavit of arrest by the local prosecutor before submitting an affidavit of arrest to the court. Ex. A, Ziegenhorn Depo., 58:7-59:14.

32. After the local prosecutor approved the Affidavit, Ziegenhorn submitted the Affidavit to the White County District Court. Ex. A, Ziegenhorn Depo., 58:7-59:14. Ziegenhorn was not provided a definite timeframe of when the judge would review the Affidavit, but he was told the district court like to review affidavits of arrest and the court issues their own warrants of arrest. Ex. A, Ziegenhorn Depo., 62:4-8. So Ziegenhorn left the Affidavit with the court. *Id*.

33. From the district court's office, Ziegenhorn proceeded to the Wal-Mart in Searcy, Arkansas, to go to the vision care center. Ex. A, Ziegenhorn Depo., 62:11-16. After entering Wal-Mart, while on his way to the vision care center, Ziegenhorn noticed Tanner in the customer service area. Ex. A, Ziegenhorn Depo., 64:19-22. Ziegenhorn was not previously aware that Tanner was at the Searcy Wal-Mart. Ex. A. Ziegenhorn continued to the vision care center. Ex. A, Ziegenhorn Depo., 64:19-25.

34. When Ziegenhorn left the vision care center and was approaching the customer service area, Tanner was still standing there. Ex. A, Ziegenhorn Depo., 64:25-65:1.

35. Based on the November 29, 2014, incident, the CHCL Division of ASP had started the process to revoke Tanner's CHCL. Ex. A, Ziegenhorn Depo., 65:1-4. Ziegenhorn was aware of this and decided to approach Tanner to see if Tanner would voluntarily surrender his CHCL. Ex. A, Ziegenhorn Depo., 65:1-7.

36. Ziegenhorn approached Tanner and asked him how he was doing. Ex. I, p. 4. Ziegenhorn then asked Tanner if he was carrying a weapon. Ex. I, p. 4.

37. Tanner replied that he did not have to answer that question and that he does not have to answer any of Ziegenhorn's questions. Ex. B, Tanner Depo., 48:14-17.

38. Ziegenhorn asked Tanner several more times if he was carrying a weapon. Ex. B, Tanner Depo., 48:18-19.

39. Tanner eventually stated that he was not carrying a weapon. Ex. B, Tanner Depo., 48:19-20. Ziegenhorn then asked Tanner if he could see his identification. Ex. B, Tanner Depo., 48:20-22. Tanner strongly opposed showing Ziegenhorn his identification. Ex. G, p. 3.

40. Ziegenhorn then asks Tanner if he can see his CHCL. Ex A, Ziegenhorn Depo., 70:22-21:8.

41. At this point in the conversation, Ziegenhorn believed Tanner was becoming disorderly in an area of Wal-Mart that contained a large number of people. Ex. A, Ziegenhorn Depo., 65:18-21.

42. From Ziegenhorn's perspective, Tanner raised his voice to a level where he started attracting peoples' attention at the front of Wal-Mart. Ex. I, p. 7. Tanner stiffened and bowed up as if he was going to be confrontational. Ex. I, pp. 5-7.

43. Ziegenhorn could not see who was to his back and believed it was possible for Tanner to have someone within close proximity based on a previous conversation he had with a Searcy Police Officer. Ex. A, Ziegenhorn Depo., 65:11-15.

44. At this time, Ziegenhorn believed it was necessary to place Tanner in custody for his and the public's safety and to move the situation outside before it escalated. Ex. A, Ziegenhorn Depo., 65:16-24.

45. Ziegenhorn subsequently proceeded to escort Tanner outside the Wal-Mart to his patrol car and attempted to talk to Tanner in a calm manner. Ex. A, Ziegenhorn Depo., 66:6-9.

46. While at Ziegenhorn's patrol car, Ziegenhorn went through the proper steps to identify Tanner by viewing his driver's license, which was located in his wallet. Ex. A, Ziegenhorn Depo., 66:9-12. Tanner's CHCL was visible upon the initial opening of his wallet. Ex. A, Ziegenhorn Depo., 66:14-16.

47. Ziegenhorn confiscated Tanner's CHCL and informed Tanner that he was sending it to Little Rock because it was under review for revocation. Ex. A, Ziegenhorn Depo., 66:17-23.

48. Based on the encounter with Tanner five days prior, Ziegenhorn also wanted to make sure Tanner was not carrying a weapon. Ex. I, p. 5. Ziegenhorn patted Tanner down and determined he was not carrying a weapon at this time. Ex. I, p. 6.

49. Ziegenhorn decided to release Tanner without any charges on December 3, 2014, so Ziegenhorn returned Tanner's wallet and driver's license. Ex. I, p. 5. Ziegenhorn explained that he was not going to charge him now and informed him of the pending charges by the prosecutor. Ex. G, p. 3. After the December 3, 2014, encounter, Ziegenhorn sent a memorandum for each encounter and Tanner's CHCL to ASP. Ex. I, p. 5; Ex. G.

50. On January 15, 2015, the White County District Court issued an arrest warrant for obstructing governmental operations against Tanner based on the Affidavit submitted by Ziegenhorn. Ex. H.

51. The Searcy Police Department served the arrest warrant on Tanner at his place of residence on January 17, 2015. Ex. B, Tanner Depo., 63:5-64:3; Ex. J. Ziegenhorn was not

present at any point of the arrest on January 17, 2015. Ex. B, Tanner Depo., 64:7-9. Tanner was arrested and transported to the White County Law Enforcement Center, issued a court date, and bond set at $250.00. Ex. J.

52. On November 29, 2014, Tanner held a valid Arkansas CHCL. Ex. C.

53. After the encounter between Ziegenhorn and Tanner on November 29th, the CHCL Division of ASP started the revocation process of Tanner's CHCL. Ex. C. On December 10, 2014, ASP revoked Tanner's CHCL for openly carrying a weapon and failing to provide his identification to a law enforcement officer when requested. Ex. C.

54. On May 12, 2015, ASP held an administrative hearing concerning the revocation of Tanner's CHCL. Ex. C. ASP upheld the decision to revoke Tanner's CHCL. Ex. C.

55. Pursuant to the Arkansas Administrative Procedure Act, Tanner appealed ASP's determination to revoke his CHCL to the Pulaski County Circuit Court. Ex. C. On May 26, 2016, the Pulaski County Circuit Court issued an order upholding ASP's determination to revoke Tanner's CHCL. Ex. C.

56. On appeal, Tanner argued that Ark. Code Ann. § 5-73-120 makes it lawful to openly carry a weapon so long as the person carrying the weapon does not intend to attempt to unlawfully employ the weapon against a person. Ex. C. The Pulaski County Circuit Court stated "Tanner's interpretation of the statute is senseless" and "Tanner was not legally authorized to openly carry a firearm under any Arkansas or federal law. Ex. C., p. 6

57. On June 16, 2015, the District Court of White County found Tanner guilty of the offense of obstructing governmental operations based on the encounter between Ziegenhorn and Tanner on November 29, 2014. Ex. K, p. 4.

58. On November 17, 2015, the White County Circuit Court issued a judgment reversing the district court's decision to convict Tanner of obstructing governmental operations. Ex. L. The circuit court also ordered the clerk to refund Tanner's appeal bond in the amount of $250.00. Ex. M.

59. Facebook is a social media platform owned and operated by Facebook, Inc. Ex. N.

60. In 2015, ASP created a Facebook page. Ex. N.

61. ASP's Facebook page followers consist of a variety of Facebook users, including families and children. Ex. N, p. 3.

62. The primary purpose of ASP's Facebook page is to utilize the social media platform to disseminate information to the public, not to open a public forum for discussion. Ex. N.

63. In addition to the general terms and conditions established by Facebook, ASP created Terms and Conditions for its Facebook page. Ex. N, p. 1. ASP's Facebook page Terms and Conditions have been posted to the page from its inception. Ex. N, p. 1.

64. As stated in the Terms and Conditions, the purpose of ASP's Facebook page "is to permit authorized employees of the Department to provide the public with information concerning the Arkansas State Police's mission, goals, programs, activities, events, news, stories, photographs, and videos and to disseminate other information and material intended to increase public awareness of and enhance respect for the Arkansas State Police and its members and employees. Please note that this is a purposefully controlled online site established for this limited purpose, NOT A PUBLIC FORUM." Ex. N; Ex. O.

65. A person designated as an administrator of ASP's Facebook page has the ability to: (1) post on ASP's Facebook page; (2) restrict Facebook users other than ASP from being able to post on the page; (3) hide or delete comments made by Facebook users; (4) report comments and Facebook users to Facebook; (5) block Facebook users from ASP's Facebook page; (6) automatically moderate the page from Facebook's settings where posts containing certain words are blocked; and (7) adjust an automatic profanity filter. Ex. N, pp. 2-3.

66. ASP's Facebook page is set where ASP is the only user able to post on its page. Ex. N, p. 3.

67. Facebook users other than ASP can only comment on existing ASP posts. Ex. N, p. 3. Facebook does not provide a Facebook page with the option to prohibit commenting completely. *Id*. However, to be able to comment, Facebook users must like and/or follow ASP's Facebook page. *Id*. Once a user has liked and/or followed ASP's Facebook page, they may comment on an existing post by ASP but may not make an original post on ASP's Facebook page. *Id*. Comments made to an ASP post are displayed underneath the particular post on ASP's Facebook page. *Id*. In addition, Facebook users who have liked and/or followed ASP's Facebook page may send private messages that may be read and responded by an administrator. *Id*.

68. ASP's Facebook page Terms and Conditions notify Facebook users that they must review and agree to the terms and conditions of Facebook and the Terms and Conditions established by ASP before submitting or posting a comment on its page. Ex. N, p. 2; Ex. O. The Terms and Conditions also notify Facebook users that ASP reserves the right to restrict, remove, or delete any comments that are contrary to and/or inconsistent with the purpose of ASP's Facebook page, are not topically related to particular postings authorized by ASP, or comments which otherwise violate the Terms and Conditions. Ex. N, p. 2; Ex. O.

69. The Terms and Conditions further notify Facebook users that ASP actively monitors and reviews comments submitted to ASP's Facebook page. Ex. N, p. 2; Ex. O.

70. ASP attempts to review all comments on ASP's Facebook page for compliance with its Terms and Conditions. Ex. N, p. 2.

71. An administrator can manually hide comments made by Facebook users to the ASP Facebook page. If a comment is hidden, the original commenter can see their comment, the administrator can see the comment, the original commenter's friends can see the comment, but no one else on the page can see the comment. Ex. N, p. 3.

72. An administrator can also delete a comment. When a comment is deleted neither an administrator nor the commenter can see the comment deleted. Ex. N, p. 3.

73. Through Facebook's setting, posts or comments containing certain designated words are automatically blocked. Those words are: (1) jackass; (2) pig or pigs; (3) nigga or nigger; (4) ass; (5) copper; and (6) jerk. An administrator can add or remove words from this list. Ex. N, p. 4.

74. Through Facebook's setting, ASP's Facebook page profanity filter is set to "strong" for its Facebook page. This setting can be set to off, moderate, or strong. Ex. N, p. 4.

75. At some point, Tanner followed ASP's Facebook page. Tanner was blocked in September of 2016 from ASP's Facebook page after making comments on ASP's Facebook page and sending private messages to the page that were abusive and/or contained profanity in violation of ASP's Facebook page Terms and Conditions. Ex. N, p. 4.

76. The six comments Tanner made to ASP's Facebook page could have been removed for other violations of the Terms and Conditions. Ex. N, p. 4.

77. According to ASP's Facebook page Terms and Conditions, ASP reserves the right to remove any comments not topically related to the particular ASP post. Ex. N, p. 4.

78. Most, if not all, of Tanner's comments could have been removed because they were not topically related to the particular ASP post to which he was commenting. Ex. N, p. 4.

79. Also, according to the Terms and Conditions, ASP does not allow the posting of photographs, videos, audio recordings, or link to other pages or websites by anyone other than ASP. Ex. N, p. 4. ASP requests Facebook users to submit the content to ASP through a private message if they want to share it with ASP or believe ASP would like to share it on ASP's Facebook page. Ex. N, pp. 4-5.

80. At least one of Tanner's comments, specifically his comment on February 18, 2016, could have been removed because it contained a link to another page or website and/or a photograph. Ex. N, pp. 4-5.

WHEREFORE, ASP Defendants respectfully requests that their Motion for Summary Judgment be granted.

    Respectfully submitted,

    LESLIE RUTLEDGE,
    Attorney General

By:    Reid P. Adkins
    Arkansas Bar # 2015216
    Assistant Attorney General
    Attorney for ADC Defendants
    323 Center Street, Suite 200
    Little Rock, Arkansas 72201
    Telephone: (501) 682-1080
    Fax: (501) 682-2591
    reid.adkins@arkansasag.gov

> William C. Bird III (2005149)
> Assistant Attorney General
> 323 Center Street, Suite 200
> Little Rock, Arkansas 72201
> Tel: (501) 682-1317
> Fax: (501) 682-2591
> william.bird@arkansasag.gov
>
> *Attorneys for ASP Defendants*

## CERTIFICATE OF SERVICE

I, Reid P. Adkins, hereby certify that on June 8, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of the filing to any participants.

By:   Reid P. Adkins