IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**JAMES ANDREW TANNER**  **PLAINTIFF**

**V.**  **CASE NO. 4:17-CV-780-DPM**

**KURT ZIEGENHORN, ET AL.**  **DEFENDANTS**

**RESPONSE TO PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

### I. INTRODUCTION

On June 8, 2020, Plaintiff James Tanner ("Tanner") filed a motion for partial summary judgment against the Arkansas State Police Defendants Kurt Ziegenhorn, in his individual capacity, and Colonel Bill Bryant, in his official capacity. In the motion, Tanner claims ASP violated his First Amendment right when it deleted or hid his comments on ASP's Facebook page and blocked him from the page. Tanner seeks injunctive and declaratory relief against ASP. Additionally, Tanner claims ASP Defendant Ziegenhorn violated his Fourth Amendment rights on December 3, 2014, when Ziegenhorn allegedly unreasonably seized and searched him.

For the reasons stated below, Tanner's motion for partial summary judgment should be denied.

### II. FACTUAL BACKGROUND

Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, ASP Defendants adopt by reference, as if stated word for word herein, the Statement of Undisputed Material Facts (DE 81) and ASP Defendants' responses to Tanner's Statement of Material Facts filed contemporaneously with this response. Additionally, each reference to exhibits made herein will be to the exhibits

attached to ASP Defendants' motion for summary judgment (DE 79) and this response, unless otherwise indicated.

### III. STANDARD OF REVIEW

Summary judgment is appropriate when the evidence viewed in the light most favorable to the nonmoving party presents no genuine issues of material fact and the moving party is entitled to summary judgment as a matter of law. *Hall v. Ramsey Cnty.*, 801 F.3d 912, 916 (8th Cir. 2015). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Gilkerson v. Nebraska Colocation Ctrs.*, LLC, 859 F.3d 1115, 1118 (8th Cir. 2017). A fact is material only when its resolution affects the outcome of the case. *TCF Nat'l Bank v. Market Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016); *Paine v. Jefferson Nat'l Life Ins. Co.*, 594 F.3d 989, 992 (8th Cir. 2010). A genuine issue of fact exists if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Paine*, 594 F.3d at 707; *Rakes v. Life Investors Ins. Co. of America*, 582 F.3d 886, 893 (8th Cir. 2009).

To defeat a motion for summary judgment, the nonmoving party has the burden "of presenting evidence sufficiently supporting [any] disputed material facts that a reasonable jury could return a verdict in [his] favor." *Gregory v. City of Rogers, Arkansas*, 974 F.2d 1006, 1010 (8th Cir. 1992) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). To meet this burden, the nonmoving party may not rest upon the mere allegations or denials in his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *TCF Nat'l Bank*, 812 F.3d at 707. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material facts and that the moving party is entitled to summary judgment as a matter of law."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Best Buy Stores L.P., v. Benderson-Wainberg Assocs. L.P.*, 668 F.3d 1019, 1026 (8th Cir. 2012).

By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson*, 477 U.S. at 247. Factual disputes that are irrelevant or unnecessary will not be counted. *Id*. Broad and conclusory statements unsupported by facts are insufficient to support a 42 U.S.C. § 1983 cause of action. *Ellingburg v. King*, 490 F.2d 1270, 1271 (8th Cir. 1974).

### IV.  ARGUMENT

A.  <u>ASP's Facebook Terms and Conditions do not violate Tanner's First Amendment rights</u>.

1.  *ASP reasserts that its Facebook page should not be subject to the forum analysis but should rather be considered government speech based on the evidence now before this Court. ASP Defendant Bryant is therefore entitled to sovereign immunity.*

Based on the evidence now before this Court, it is clear ASP did not intentionally open a forum up for public discourse, but rather established an official Facebook page for a limited purpose—to disseminate information to the public. Therefore, with the additional evidence submitted in support of ASP Defendants' motion for summary judgment (DE 79), ASP respectfully requests this Court to reconsider whether the interactive space below an ASP post on its Facebook Page is subject to the forum doctrine.

"[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 803, 105 S.Ct. 3439 (1985) (quoting *U.S. Postal Serv. V. Council of Greenburgh Civic Assns.*, 453 U.S. 114, 129, 101 S.Ct. 2676 (1981). "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a

nontraditional forum for public discourse." *Id*. at 802. The Supreme Court further stated that it "will not find that a public forum has been created in the face of clear evidence of a contrary intent…" *Id.* at 803. The governments "[i]ntent is not merely a matter of stated purpose…it must be inferred from a number of objective factors, including: the government's policy and past practice, as well as the nature of the property and its compatibility with expressive activity." *Bowman v. White*, 444 F.3d 967, 991 n.9 (8th Cir. 2006) (quoting *Paulsen v. County of Nassau*, 925 F.2d 65, 69 (2nd Cir. 1991).

Even though Facebook users who like or follow ASP's Facebook page can comment on a post by ASP on its Facebook page, it does not mean ASP intended to create a public forum. To the contrary, ASP expressly stated in its Facebook Terms and Conditions that it did not intend to create a public forum. Therefore, it would go against the intent of ASP to bifurcate the interactive space underneath an original post by ASP on its Facebook page by applying the forum doctrine.

ASP maintains that the government speech doctrine should apply to its Facebook page as a whole, including the interactive space. In assessing whether speech constitutes government speech as opposed to private speech, the Supreme Court has considered the following three factors: (1) whether government has long used the particular medium at issue to speak; (2) whether the medium is often closely identified in the public mind with the state; and (3) whether the state maintains direct control over the messages conveyed through the medium. *Gerlich v. Leath*, 861 F.3d 697, 708 (8th Cir. 2017) (citing *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 135 S.Ct. 2239, 2247-48 (2015). The government speech doctrine establishes that the government may advance its own speech without requiring viewpoint neutrality and is a category of speech that falls outside the domain of the forum analysis. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467, 129 S.Ct. 1125 (2009).

First, ASP has used the Facebook page to convey and disseminate its mission, goals, programs, and other information to increase awareness to the public since the inception of ASP's Facebook page in 2015. As stated in ASP's Facebook Terms and Conditions, only authorized ASP employees can post to ASP's Facebook page. Ex. N. This has been the case since the Facebook page was created. *Id*. The primary purpose of ASP's Facebook page is to "provide the public with information concerning the [ASP's] mission, goals, programs activities, events, news, stories, photographs, and videos and to disseminate other information and material intended to increase public awareness of and enhance respect for [ASP] and its members and employees." Ex. N; Ex. O.

Secondly, ASP's Facebook page collectively is closely identified with ASP, not individual Facebook users that like and/or follow and comment on the page. Facebook users who have liked and/or followed the ASP Facebook page cannot post to the page. Ex. N. The Facebook users may, however, comment on a post made by ASP to its Facebook page. Ex. N. A post made by ASP and any comments below that post are contained on ASP's Facebook page and are, therefore, inherently associated with ASP's Facebook page, not the individual Facebook user who made the comment to an ASP post. In *Summum*, the United States Supreme Court stated "[p]ublic parks are often closely identified in the public mind with the government unit" and "commonly play an important role in defining the identity that [the government] projects to its own residents and to the outside world." 555 U.S. 460, 472, 129 S.Ct. 1125 (2009). The nature of the public parks in *Summum* is similar to ASP's Facebook page because, collectively, it is closely identified as ASP's Facebook page and it plays a role in defining the identity of ASP to its constituents.

Lastly, ASP's Facebook page is purposefully controlled and was established for a limited purpose—to disseminate information ASP demeaned appropriate to the public. Ex. O. ASP's

attempt to retain final approval authority and editorial control over the content published to its Facebook page is evident through its Terms and Conditions and the functions utilized by ASP that are available to it through Facebook. Tanner claims that ASP's Facebook page Terms and Conditions were not publicly available at the time of his comments. DE 77, p. 6. However, from the inception of ASP's Facebook page, ASP created and published to its page Terms and Conditions to retain final authority and editorial control over the content published to its Facebook page. Ex. N; Ex. O. ASP's Facebook page Terms and Conditions are not part of ASP's policy and procedure manual, but are rather published on ASP's Facebook page. Ex N, p. 1; DE 76-5, Plaintiff's Ex. 5, p. 2, Sadler Depo., 92:2-13.

ASP's Facebook page Terms and Conditions specifically state "BEFORE SUBMITTING/POSTING A COMMENT ON THIS PAGE, YOU MUST REVIEW AND AGREE TO THE TERMS AND CONDITIONS OF FACEBOOK AND THE TERMS AND CONDITIONS ESTABLISHED BY THE ARKANSAS STATE POLICE." Ex. O. The Terms and Conditions further state that ASP reserves the right to "restrict, remove, or delete any posting/comment that is contrary to and/or inconsistent with the purpose of the page or in violation of the applicable terms and conditions." Ex. O.

Additionally, ASP utilizes the functions available to it by Facebook to further retain control over its Facebook page. Facebook allows page administrators to hide or delete comments and block individuals from a page. Ex. N. As the case here, an ASP employee hid or deleted multiple comments by Tanner and eventually blocked him from ASP's Facebook page because his comments were not consistent with the Terms and Conditions. Ex. N. Facebook also allows pages to automatically moderate posts/comments that contain certain words. Ex. N. To again retrain some form of final authority and editorial control of comments made by Facebook users, ASP has

utilized this function to block comments containing the following words: (1) jackass; (2) pig or pigs; (3) nigga or nigger; (4) ass; (5) copper; and (6) jerk. Ex. N. ASP can add or remove words from this list. Ex. N. Finally, Facebook allows page administrators to set a profanity filter. Ex. N. ASP has set the profanity filter to its Facebook page to strong. Ex. N.

For the above reasons, the government speech doctrine should apply to ASP's Facebook page as a whole. Because the forum analysis does not apply to government speech, ASP Defendant Bryant is therefore entitled to sovereign immunity and the claims against him should be dismissed. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65-66, 71 (1989) (Section 1983 claims against state actors in their official capacities are barred by the Eleventh Amendment).

2. ASP did not violate Tanner's First Amendment rights by removing his comments from ASP's Facebook Page.

As stated above, ASP maintains the government speech doctrine should apply even to the interactive space on its Facebook Page and that it did not violate Tanner's First Amendment rights by removing his comments from its Facebook Page. Nonetheless, if the forum doctrine applies to the interactive space of ASP's Facebook Page, this Court should find the interactive space to be a limited public forum. *See Davidson v. Plowman*, 247 F.Supp.3d 767 (E.D. Va. 2017), aff'd 715 Fed. Appx. 298 (4th Cir. 2018) (unpublished).

"The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948 (1983) (internal quotations omitted). To this end, the Supreme Court uses a forum analysis for evaluating restrictions of speech on government property. *Id.* at 45-46. The forum analysis initially requires a court to determine whether a property is a traditional public forum, a designated public forum, or a nonpublic forum. *Bowman*, 444 F.3d 967 (citing *Families Achieving Independence & Respect*

*v. Neb. Dep't of Soc. Servs.*, 111 F.3d 1408, 1418 (8th Cir. 1997). The type of forum will determines which standard of scrutiny is appropriate to decide whether a restriction on speech passes constitutional muster. *Bowman*, 444 F.3d at 974.

"Publicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will." *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702 (1983). To determine whether the space is a public forum, the court must "examine the traditional use of the property, the objective use and purposes of the space, and the government intent and policy with respect to the property, not merely its physical characteristics and location." *Bowman*, 444 F.3d at 978. "[T]he open nature of these spaces is merely a factor to consider in determining whether the government has opened its property." *Bowman*, 444 F.3d at 978 (citing *Grace*, 461 U.S. at 177). The court "must acknowledge the presence of any special characteristics regarding the environment in which those areas exist. *Bowman*, 444 F.3d at 978.

"A designated public forum is a nonpublic forum the government intentionally opens to expressive activity for a limited purpose such as use by certain groups or use for discussion of certain subjects." *Bowman*, 444 F.3d at 975 (citing *Perry Educ. Ass'n*, 460 U.S. at 46, 103 S.Ct. 948. "The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677-683, 118 S.Ct. 1633, (1998) (internal quotations omitted). The governments "[i]ntent is not merely a matter of stated purpose…it must be inferred from a number of objective factors, including: the government's policy and past practice, as well as the nature of the property and its compatibility with expressive activity." *Bowman*, 444 F.3d at 991 n.9 (quoting *Paulsen v. County of Nassau*, 925 F.2d 65, 69 (2nd Cir. 1991).

In the Eighth Circuit, "[a] designated public forum can be classified as either 'of a limited or unlimited character.'" *Bowman*, 444 F.3d at 976 (quoting *Van Bergen v. Minnesota*, 59 F.3d 1541, 1553 n. 8 (8th Cir. 1995)). The Eighth Circuit has adopted Second Circuit's view on designated public forums in that "a limited public forum is a subset of the designated public forum that arises where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Bowman*, 444 F.3d at 976 (quoting *Make the Road By Walking, Inc. v. Turner*, 378 F.3d 133, 143 (2nd Cir. 2004)) (internal quotations omitted). "An 'unlimited' designated public forum is a forum designated for expressive conduct by the government but not limited to a particular type of speech or speaker." *Id*.

"The distinction between a limited designated public forum and an unlimited designated public forum is significant because it controls the level of scrutiny given to restriction on speech." *Bowman*, 444 F.3d at 976. "In an unlimited designated public forum, the government may enforce a content-neutral time, place, and manner restriction only if the restriction is necessary to serve a significant government interest and is narrowly drawn to achieve that interest." *Id*. (citing *Perry Educ. Ass'n*, 460 U.S. at 46, 103 S.Ct. 948. "In contrast, in a limited designated public forum, '[r]estrictions on speech not within the type of expression allowed in a limited forum must only be reasonable and viewpoint neutral." *Bowman*, 444 F.3d at 976 (quoting *Turner*, 378 F.3d at 143).

Lastly, the government can most freely restrict speech in a nonpublic forum. "A nonpublic forum is government property which is not classified a traditional public forum or designated public forum." *Bowman*, 444 F.3d at 976 (citing *Warren v. Fairfax County*, 196 F.3d 186, 192 (4th Cir. 1999)). In this type of forum, the government can "'restrict speech as long as the restrictions are reasonable and are not an effort to suppress expression merely because the public officials

oppose a speaker's view.'" *Bowman*, 444 F.3d at 976 (quoting *American Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1098 (9th Cir. 2003)) (internal quotations omitted).

Here, even though the intent is not present, ASP at a maximum created a limited public forum if the forum doctrine applies to the interactive space on its Facebook page. As previously mentioned, APS's Facebook Page Terms and Conditions expressly state that it did not intend to create a public forum, but rather created its Facebook Page for a specific purpose—to disseminate information it demeaned appropriate to the public, specifically members of the public who have liked and/or followed its Facebook Page. Thus, ASP may restrict speech as long as the restrictions are reasonable and viewpoint neutral.

The law was not clearly established at the time ASP removed Tanner's six comments from its Facebook page. *See* DE 60. Albeit, Tanner's six comments were nonetheless in violation of ASP's Facebook page Terms and Conditions that were reasonable and viewpoint neutral. For example, according to ASP's Facebook page Terms and Conditions, ASP reserves the right to remove any comments not topically related to the particular ASP post. *See Plowman*, 247 F.Supp.3d at 777 ("a restriction limiting a forum to discussion of selected topics—a common restriction among limited public forums, *see Perry Educ. Ass'n*, 460 U.S. at 71 n.7, 103 S.Ct. 948—is self-evidently viewpoint neutral.").

Most, if not all, of Tanner's comments could have been removed because they were not topically related to the particular ASP post. Ex. N. For example, Tanner's labeled "Comment 2" in the Complaint was in response to an ASP post regarding a "little-known statute." DE 61, p. 6. ASP's post was in regard to impeding traffic and the law that covers the issue, specifically Ark. Code Ann. § 27-51-301. Comment 2 stated "[a]re you familiar with 5-54-122(c)(1)(b)? Because one of your troopers committed this crime, you know who it is." Plaintiff's Ex. 1, p. 4. Tanner

claims Comment 2 was "a reference to Ziegenhorn's false statements against [Tanner] in various reports and testimony." DE 61, p. 6. Comment 2 is not topically related to ASP's post, which is in violation of ASP's Facebook page Terms and Conditions.

Additionally, Tanner's comments identified as Comments 3 through 6 in the Complaint are clearly not topically related to ASP's post. Comments 3 through 6 were in response to an ASP post regarding "a new recruit class." DE 61, p. 6. The Comments state the following:

- Comment 3 – "Just don't be like that douche, Trooper Ziegenhorn." (DE 61, p. 6, ¶ 29; Plaintiff's Ex. 1, p. 5).

- Comment 4 – "Just don't be like that fascist pig, Trooper Ziegenhorn." (DE 61, p. 6, ¶ 31; Plaintiff's Ex. 1, p. 6).

- Comment 5 – "Just don't be like that fascist pig, Trooper Ziegenhorn, aka douchebag." (DE 61, pp. 6-7, ¶ 32; Plaintiff's Ex. 1, p. 7).

- Comment 6 – "So handcuffing someone and detaining them without any probable cause, stealing from them, then letting them go is taught in this class or is that something that DOUCHEBAG Ziegenhorn learned on his own?" (DE 61, p. 7, ¶ 32; Plaintiff's Ex. 1, p. 8).

Additionally, according to ASP's Facebook page Terms and Conditions, ASP does not allow the posting of photographs, videos, audio recordings, or links to other pages or websites by anyone other than ASP. Ex. O. ASP requests Facebook users to submit any such content to ASP through a private message if they want to share it with ASP or believe ASP would like to share it on its Facebook page. *Id*. This restriction is both viewpoint neutral and reasonably related to the purpose of ASP's Facebook page.

Tanner's comment identified as Comment 1 was made in response to an ASP post that recognized an ASP employee. DE 61, p. 5; Plaintiff's Ex. 1, p. 43. Comment 1 stated "I have this guy's autograph. He supports crooked cops, so that makes him a crooked cop in my book. He needs to be held accountable as well if he is going to support the unlawful actions of his officers…[link to image of letter from Mike Foster] This guy sucks." DE 61, p. 4; Plaintiff's Ex. 1, p. 3.

For the reasons above, ASP could have removed Tanner's six comments under ASP's Facebook page Terms and Conditions that were reasonable and viewpoint neutral.

B. <u>Ziegenhorn did not violate Tanner's Fourth Amendment rights on December 3, 2014, and therefore is entitled to qualified immunity</u>.

Ziegenhorn is entitled to qualified immunity because Tanner cannot establish that Ziegenhorn's conduct violated Plaintiff's Fourth Amendment rights. Tanner claims Ziegenhorn's actions on December 3, 2014, violated his Fourth Amendment rights under the Federal Civil Rights Act and the Arkansas Civil Rights Act. However, qualified immunity protects government officials performing discretionary actions from liability in a § 1983 action unless their conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Two questions guide the determination of whether a defendant is entitled to qualified immunity: (1) whether the plaintiff has shown the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct.[1]

---

[1] *See Pearson v. Callahan*, 555 U.S. 223 (2009)(noting the two-step inquiry for resolving qualified immunity claims mandated by *Saucier v. Katz*, 533 U.S. 194 (2001), and holding that courts may exercise sound discretion in deciding which of the two prongs should be addressed first).

The Fourth Amendment provides protection for unreasonable search and seizures, and "its protections extend to brief investigatory stops of person or vehicles that fall short of a traditional arrest." *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)); *see also U.S. v. Tovar-Valdivia*, 193 F.3d 1025, 1028 (8th Cir. 1999). The Supreme Court has held that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S.Ct. 1536 (2001). "In the Fourth Amendment context, the Supreme Court has 'recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and [has] indicated that in such cases those officials…should not be held personally liable." *De La Rosa v. White*, 852 F.3d 740, 745 (8th Cir. 2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

"A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'" *Borgman v. Kedley*, 646 F.3d 518, 522-23 (8th Cir. 2011) (quoting *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317 (1983). "A law enforcement officer has probable cause 'when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *Gilmore v. City of Minneapolis*, 837 F.3d 827, 832 (8th Cir. 2016) (quoting *Borgman*, 646 F.3d at 523). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the

arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S.Ct. 588 (2004). "If an office arrests a suspect under the mistaken belief that there is probable cause, arguable probable cause exists if the mistake is 'objectively reasonable.'" *Gilmore*, 837 F.3d at 832 (quoting *Borgman*, 646 F.3d at 523). A reasonable belief "means more than bare suspicion, but less than evidence which would justify condemnation or conviction." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010) (quoting *Brinegar v. U.S.*, 338 U.S. 160, 175, 69 S.Ct. 1302 (1949) (internal quotations omitted)).

Tanner cannot establish that Ziegenhorn violated his Fourth Amendment rights on December, 3, 2014, because Ziegenhorn had probable cause to conduct a reasonable seizure and search. In the Complaint, Tanner alleges that on December 3, 2014, Ziegenhorn stalked him at the Searcy Wal-Mart when Ziegenhorn arrived at Wal-Mart moments after Tanner, approached him, and demanded whether Tanner was carrying a weapon. DE 61, p. 9, ¶¶ 49-50. However, Tanner's allegation rests purely on speculation. Ziegenhorn was at the Searcy Wal-Mart for one reason, to drop off his son's broken glasses so they could be repaired. DE 79-1, Ex. A, Ziegenhorn Depo., 114:24 – 115:6. Tanner claims that Wal-Mart's medical records "show Ziegenhorn actually arrived at the Wal-Mart Vision Center on December 6th, 2014 to turn in the glasses…"[2] DE 77, p. 19. This simply is not true. According to the manager of the Searcy Vision Center located in Wal-Mart, the medical records show that the order was placed on December 6, 2014, not that Ziegenhorn arrived at the Wal-Mart Vision Center on that day. Ex. P, Runsick Depo., 34:13 – 35:12.

---

[2] On p. 27 of DE 76-3, Plaintiff included as an exhibit a medical record which contains the unredacted name of the minor son of ASP Defendant Ziegenhorn. Defendants request the Court place this page under seal to protect the disclosure of such information.

After entering the Searcy Wal-Mart on December 3, 2014, Ziegenhorn noticed Tanner in the customer service area while on his way to the vision center. Ex. A, Ziegenhorn Depo., 64:19-22. After leaving the vision center, Ziegenhorn noticed Tanner was still in the customer service area. Ex. A, Ziegenhorn Depo., 64:25-65:1. Ziegenhorn approached Tanner in the Searcy Wal-Mart to see if Tanner would voluntarily surrender his CHCL because the CHCL Division of ASP was in the revocation process due to the November 29, 2014, incident. Ziegenhorn approached Tanner in the customer service area from the direction of the Vision Center. Ex. A, Ziegenhorn Depo., 65:1-7. After approaching Tanner, Ziegenhorn asked Tanner if he was carrying a weapon. Tanner refused to answer his question multiple times and stated he did not have to answer any of Ziegenhorn's questions, but Tanner eventually stated that he was not carrying a weapon. Ex. I, p. 4; Ex. B, Tanner Depo., 48:14-20. Ziegenhorn then asked Tanner if he could see his identification. Ex. B, Tanner Depo., 48:20-22. Tanner strongly opposed showing Ziegenhorn his identification. Ex. G, p. 3.

Since Ziegenhorn's main purpose for approaching Tanner was to see if Tanner would voluntarily surrender his CHCL, Ziegenhorn asked Tanner if he could see his CHCL. Ex. A, Ziegenhorn Depo., 70:22-71:8. Tanner claims he "stood there with his arms folded, and if the officer would have ended his questioning, Tanner would have likely stopped talking." (DE 77, p. 28). However, the video footage from the Searcy Wal-Mart customer service area shows Tanner and Ziegenhorn from the waist down. Plaintiff's Ex. 9, Clip 9. At this point in the conversation, Ziegenhorn believed Tanner was starting to become disorderly in an area of Wal-Mart that contained a large number of people because he believed Tanner raised his voice loud enough to attract the attention of customer's in that area of the store and his demeanor changed as if he was about to be confrontational. Ex. A, Ziegenhorn Depo., 65:18-21; Ex. I, p. 7. Under Arkansas law,

"[a] person commits the offense of disorderly conduct if, with the purpose to cause public inconvenience, annoyance, or alarm or recklessly creating a risk of public inconvenience, annoyance, or alarm, he or she: (1) Engages in fighting or in violent, threatening, or tumultuous behavior; (2) Makes unreasonable or excessive noise…(7) Creates a hazardous or physically offensive condition." Ark. Code Ann. § 5-71-207(a). Disorderly conduct is a class C misdemeanor. Ark. Code Ann. § 5-71-207(b).

On November 29, 2014, just five days prior, Ziegenhorn encountered Tanner for the first time where Tanner was openly carrying a weapon in Searcy Wal-Mart. Ex. A, Ziegnehorn Depo., 13:18-14:8. At the time, the guidance provided by ASP to its officers was that open carry was illegal. Ex. D, p. 10. During this encounter, Ziegenhorn experienced Tanner become defensive and agitated while carrying a weapon in Searcy Wal-Mart. Ex. A, Ziegenhorn Depo., 18:14-20:24; Ex. G, p. 1. Similarly, on December 3, 2014, Tanner's demeanor had shifted from Ziegenhorn's perspective. "Arkansas police officers may consider a person's demeanor in deciding whether to arrest under the disorderly statute. *Graham v. Cawthorn*, 2013 Ark. 160, \*8, 427 S.W.3d 34 (citing *Watkins v. State*, 2010 Ark. App. 85, 2-6). In addition to raising his voice, it appeared Tanner stiffened and bowed up as if he was going to be confrontational. Ex. I, pp. 5-7. Ziegenhorn also thought it was possible that Tanner had someone else spectating within close proximity based on previous discussions with the Searcy Police Department. Ex. A, Ziegenhorn Depo., 65:11-15. So, at this time, Ziegenhorn believed it was necessary to retrain Tanner for his and the public's safety and to move the situation outside before it escalated into something more. Ex. A, Ziegenhorn Depo., 65:16-24.

While outside at Ziegenhorn's patrol car, Ziegenhorn went through the proper steps to identify Tanner. Ex. A, Ziegenhorn Depo., 66:9-12. In the process of identifying Tanner,

Ziegenhorn came across Tanner's CHCL in plain view. Ex. A, Ziegenhorn Depo., 66:14-16. Because Ziegenhorn had probable cause to place Tanner in custody, the subsequent search of Tanner's person and confiscation of his CHCL also did not violate his Fourth Amendment rights. *See Gilmore*, 837 F.3d at 838; *see also Meehan v. Thompson*, 763 F.3d 936, 946 (8th Cir. 2014) ("[A] search incident to [an] arrest requires no additional justification." (second alteration in original) (quoting *U.S. v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467 (1973))).

For the above reasons, Ziegenhorn had probable cause to place Tanner in custody and confiscate his CHCL license. Thus, Ziegenhorn is entitled to qualified immunity and the claims against him should be dismissed.

C. This Court should dismiss any state-law claims against ASP Defendants because Defendants are entitled to Statutory Immunity.

The Arkansas General Assembly has determined that "[o]fficers and employees of the State of Arkansas are immune from liability and from suit…for damages for acts or omissions, other than malicious acts or omissions, occurring within the course and scope of their employment." Ark. Code Ann. § 19-10-305(a). The Arkansas Supreme Court has consistently held that "the immunity provided by section 19-10-305 is similar to that provided by the Supreme Court for federal civil-rights claims." *Simons v. Marshall*, 369 Ark. 447, 452-53 (2007); *see also Smith v. BRT*, 363 Ark. 126, 130-31 (2005); *Fegans v. Norris*, 351 Ark. 200 (2002). A state official has statutory immunity from state-law claims "if his actions did not violate clearly established principles of law for which a reasonable person would have knowledge." *Id*. at 452.

"More specifically, section 19-10-305(a) provides state employees with statutory immunity from civil liability for non-malicious acts occurring within the course of their employment." *Id*. For a Plaintiff to overcome an assertion of statutory immunity by a state employee, she must allege sufficient facts in her complaint to support a claim of malicious conduct. *E.g., Fuqua v. Flowers*,

341 Ark. 901, 905 (2000). The Arkansas Supreme Court has defined malice as "an intent and disposition to do a wrongful act greatly injurious to another[,]" and "the intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply an evil intent… A conscious violation of the law…which operates to the prejudice of another person. A condition of the mind showing a heart…fatally bent on mischief." *Id*. at 905-06 (citations and internal quotation marks omitted); *see also Simons*, 369 Ark. 447, 452-53 (2007). "[A] bare allegation of willful and wanton conduct will not suffice to prove malice." *Simons*, 369 Ark. at 453 (citation omitted).

In *Simons*, the plaintiff alleged that her rights were violated by an ASP trooper's use of excessive force, excessive groping, and assault and battery. *Id*. In pleading facts to support her claim, the plaintiff alleged that the defendant "grabbed and groped on" her breast and genitals in a sexual manner and then said "Don't you know I'm a man with a gun" when she retaliated and requested that he stop groping her. *Id*. at 454. The Supreme Court affirmed the dismissal of the complaint because "the conclusory facts" set forth did not "demonstrate either malice or a conscious violation of the law." *Id*. at 454.

This Court should follow *Simons* and dismiss any damages against ASP Defendants for Tanner's state-law claims in the Complaint. First, Tanner cannot prove ASP violated clearly established principles of law when ASP employees removed Tanner's comments from its Facebook page and subsequently blocked him. *See* DE 60, p. 2. Secondly, Tanner cannot establish that Ziegenhorn acted with malice towards him on December 3, 2014.

## V. CONCLUSION

For these reasons, Tanner's motion for partial summary judgment should be denied and ASP Defendants are entitled to summary judgment (DE 79).

       Respectfully submitted,

       LESLIE RUTLEDGE,
       Attorney General

By: <u>Reid P. Adkins</u>
   Arkansas Bar # 2015216
   Assistant Attorney General
   Attorney for ADC Defendant
   323 Center Street, Suite 200
   Little Rock, Arkansas 72201
   Telephone: (501) 682-1080
   Fax: (501) 682-2591
   reid.adkins@arkansasag.gov

   William C. Bird III
   Ark. Bar # 2005149
   323 Center Street, Suite 200
   Little Rock, Arkansas 72201
   Telephone: (501) 682-1317
   Fax: (501) 682-2591
   William.bird@arkansasag.gov

## **CERTIFICATE OF SERVICE**

  I, Reid P. Adkins, hereby certify that on July 3, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of the filing to any participants.

       By: <u>Reid P. Adkins</u>