# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# CENTRAL DIVISION

JAMES ANDREW TANNER
PLAINTIFF

v. 4:17-CV-780-DPM

KURT ZIEGENHORN, ET AL.                                          DEFENDANTS

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

1. In Defendants' SOF 10, Defendants stated: "At that time, Ziegenhorn identified himself as being with the Arkansas State Police. Ex. A, Ziegenhorn Depo., 14:24-15:1."

   **Response to Defendants' 10:** Tanner was approached by Ziegenhorn and had no idea who he was at the time. Doc. 79-2, pg. 21, lines 4-18. Ziegenhorn asked if Tanner was law enforcement, and when Tanner said no, Ziegenhorn grabbed Tanner by the arm and said state police, identify yourself. Id. Ziegenhorn was wearing a t-shirt and blue jeans. Id. After Tanner was grabbed Tanner asked Ziegenhorn to produce a badge, and he refused. Doc. 79-2, pg. 22, lines 2-8. This is not identifying yourself as "being with the Arkansas State Police."

2. In Defendants' SOF 11, Defendants stated: "Ziegenhorn requested for Tanner to identify himself, but Tanner refused to do so. Ex C, p. 7; Ex. I, p. 2."

   **Response to Defendants' 11:** Ziegenhorn grabbed Tanner by the arm and then Ziegenhorn said "State Police, Identify Yourself." Doc. 79-2, pg. 21, lines 4-18.

3. In Defendants' SOF 12, Defendants' stated: "Tanner's demeanor changed, he grew defensive and agitated. Ex. C, p. 7."
**Response to Defendants' 12:** False. Tanner remained "pretty calm throughout the whole ordeal." Document 79-2, pg. 31, lines 17-23. Tanner's demeanor was "confused" after being grabbed by Ziegenhorn. pg. 32 lines 1-17.

4. In Defendants' SOF 13, Defendants stated: "As Ziegenhorn approached Tanner, it appeared to Ziegenhorn that Tanner's right arm began to fall in a downward motion towards his weapon. Ex. A, Ziegenhorn Depo., 15:1-3.

   **Response to Defendants' 13:** False. The video does not show that Tanner's arm moves downward at all prior to being grabbed by Ziegenhorn. Doc. 76-9, Clip 1 at around 10:52:35.

5. In Defendants' SOF 15, Defendants' stated: "While grasping Tanner's arm, Ziegenhorn again asked Tanner to identify himself. Ex. A, Ziegenhorn Depo, 15:9-12; Ex. B, Tanner Depo., 22:24-23:7.
**Response to Defendants' 13:** Inaccurate. Ziegenhorn just yelled "IDENTIFY YOURSELF." Doc. 79-2 pg. 22 and 23, lines 25 through 3. This was not a question that was asked, this was an order. Ziegenhorn never asked or ordered Tanner to identify himself prior to grabbing onto Tanner. Doc. 79-2, Tanner Depo., pg. 21, lines 4-14. Therefore, Ziegenhorn could not have asked Tanner to identify himself "again" once Ziegenhorn grabbed onto Tanner. Id. After Ziegenhorn grabbed Tanner, Ziegenhorn then ordered Tanner to identify himself, to which Tanner asked to see a badge, which Ziegenhorn would not produce. Doc. 79-2, Tanner Depo. 22:24-23:7. It is at that point, Tanner refused to identify himself. Id.

6. In Defendants' SOF 19, Defendants' stated: "Ziegenhorn believed Tanner was not a threat at that time because it appeared Tanner had his cell phone in his right hand. Ex. A, Ziegenhorn Depo., 15:17-18:9. Tanner admits to having an object in his right hand. Ex. B, Tanner Depo., 24:20-25:7. "

I think it was in his left in the video.

7. In Defendants' SOF 20, Defendants stated: Ziegenhorn followed Tanner out of Wal-Mart where they were met by local Searcy Police Officers. Ex. A., Ziegenhorn Depo., 41:17-14. From that point forward, Ziegenhorn allowed the Searcy Police Department to take over the situation. Ex. A, Ziegenhorn Depo., 43:5-13.

    **Response to Defendants' 20:** While Tanner and Ziegenhorn waited for local police to arrive, Ziegenhorn cornered Tanner and yelled obscenities at him. Doc. 79-2, Tanner Depo., pg. 35-36, lines 23-25 and 1-6. Then, they walked over to the Searcy Police together. Id.

8. In Defendants' SOF 24, Defendants' stated: "ASP's guidance included an opinion from the Arkansas Attorney General's Office that stated "Act 746 does not authorize 'open carry.'" Ex. E."
    **Response to Defendants' 24:** The Attorney General avoided the question of whether the mens rea changes in Act 746 had legalized open carry and limited his response to only whether the changes in the "journey clause" authorized open carry. Id at pg. 1 and pg. 4 footnote 8. Legalization is different than authorization.
    The ASP's guidance also included an email Ziegenhorn read and received about the law change that stated ""The act also amends the mental state to require that a person have the purpose to attempt to unlawfully employ the weapon as a weapon against a person." Ziegenhorn Deposition, pg. 51, lines 17-25, and pg. 52, lines 23-25, and pg. 53 line 1. Ziegenhorn understood this to mean a change in the mental state requirement from before. Id, pg. 52, lines 23-25.pg. 52, lines 4-17. Ziegenhorn admitted the change in mental state was in the Attorney General's opinion. Id. pg. 57, lines 6-8.

9. In Defendants' SOF 33, Defendants stated: "From the district court's office, Ziegenhorn proceeded to the Wal-Mart in Searcy, Arkansas, to go to the vision care center. Ex. A, Ziegenhorn Depo., 62:11-16. After entering

Wal-Mart, while on his way to the vision care center, Ziegenhorn noticed Tanner in the customer service area. Ex. A, Ziegenhorn Depo., 64:19-22. Ziegenhorn was not previously aware that Tanner was at the Searcy Wal-Mart. Ex. A. Ziegenhorn continued to the vision care center. Ex. A, Ziegenhorn Depo., 64:19-25"

**Response to Defendants' 33:** Wal-Mart medical records show that Ziegenhorn arrived at the Wal-Mart Vision Center on December 6th, 2014 to turn in the glasses, and Ziegenhorn's wife arrived on December 9th, 2014, to pick up the new pair. Doc. 76, Exhibit 3, Ziegenhorn Medical Records, pg. 26 and 27.  Also, Ziegenhorn does not know if his version of the story is that he was there to pick up the glasses or drop them off. Exhibit 4, Ziegenhorn Deposition, pg. 76, lines 12-15. Ziegenhorn's OPS interview and memo about the incident state differing reasons. Based on the security footage, Ziegenhorn arrives at the exact Wal-Mart less than 10 seconds after Tanner, just mere hours after looking into a warrant for Tanner, out of the way from his job assignment and more than 30 miles from his home. Doc. 76, Exhibit 9, Video Clip 11, 13; Exhibit 4, Ziegenhorn Deposition, pg. 6. Exhibit 9, Video Clip 11, 13, Exhibit 4, Ziegenhorn Deposition pg. 6. Ziegenhorn has a history of stalking people that made complaints against him. Doc. 79-1, Ziegenhorn Depo., pages 3 and 4, 9:21-13:14. Ziegenhorn also cussed Tanner out the last time he saw him.  Ziegenhorn Depos, pg. 46, lines 5-12. Based on these irregularities, it is possible for a jury to infer that Ziegenhorn did in fact stalk Tanner to the Wal-Mart that day.

10. In Defendants' SOF 34, Defendants stated: "When Ziegenhorn left the vision care center and was approaching the customer service area, Tanner was still standing there. Ex. A, Ziegenhorn Depo., 64:25-65:1."
    **Response to Defendants' 34:** Plaintiff believes that the issues raised in response to Defendants' SOF 33 raise doubts as to whether or not this is truthful.

11. In Defendants' SOF 35, Defendants stated: "Based on the November 29, 2014, incident, the CHCL Division of ASP had started the process to revoke Tanner's CHCL. Ex. A, Ziegenhorn Depo., 65:1-4. Ziegenhorn was aware of this and decided to approach Tanner to see if Tanner would voluntarily surrender his CHCL. Ex. A, Ziegenhorn Depo., 65:1-7."

    **Response to Defendants' SOF 35:** Ziegenhorn never indicated in the deposition quotations provided by defendants that Ziegenhorn was going to see if Tanner would "voluntarily" surrender his CHCL.

12. In Defendants' SOF 40, Defendants' stated: "Ziegenhorn then asks Tanner if he can see his CHCL. Ex A, Ziegenhorn Depo., 70:22-21:8."

    **Response to Defendants' SOF 40:** False. Ziegenhorn did not ask Tanner if he could see his CHCL, except Ziegenhorn claims he asked after Tanner was in handcuffs. Doc. 79-2, Tanner Depo., pg. 48, lines 11-25, and pg. 49 line 1. Id at pg. 85, lines 9-14: "Did Ziegenhorn ever ask for your conceal 10 carry license before you were put in handcuffs? A. No."
    Ziegenhorn approached Tanner and asked Tanner for his ID and asked if Tanner was carrying a weapon. Exhibit 3, 2nd Ziegenhorn Memo, pg. 6 at lines 4-5, Exhibit 4 Ziegenhorn Deposition at 69, 70; PBSUMF ¶43. Tanner responded that he was not carrying a weapon at the time. Exhibit 4, at 69 and 70. Tanner also contended that he did not have to show Ziegenhorn his identification. Id at lines 5-6, PBSUMF ¶44.

13. In Defendants' SOF 41, Defendants stated: "At this point in the conversation, Ziegenhorn believed Tanner was becoming disorderly in an area of Wal-Mart that contained a large number of people. Ex. A, Ziegenhorn Depo., 65:18-21."
    **Response to Defendants' SOF 41:** Tanner had not yet become loud and obnoxious. Ziegenhorn stated "There is no doubt in my mine [sic] he _**would have**_ got loud, obnoxious, I mean, at some point there and that's when I took

immediate action, moved it outside, clear everybody else." Doc. 79-3, pg. 26, **_emphasis added._**

14. In Defendants SOF 42, Defendants stated: "From Ziegenhorn's perspective, Tanner raised his voice to a level where he started attracting peoples' attention at the front of Wal-Mart. Ex. I, p. 7. Tanner stiffened and bowed up as if he was going to be confrontational. Ex. I, pp. 5-7."
    **Response to Defendants' SOF 42:** That is what Ziegenhorn testified to, but that is not what happened. The video shows Tanner remained relatively still. See Doc. 76-9, Video Clip 9 from 1:42:00-1:42:40. A crowd did not gather and it does not appear that a single additional person came to the area. Id. It appears as though maybe one woman looked over to see the conversation between Tanner and Ziegenhorn. Id at 1:42:12. However the woman could also have been just speaking to the person she was in line with as she made similar head and body movements prior to the officer's arrival. Id at 1:41:50-1:42:00. Tanner testified his voice was normal and never elevated, and he did not stiffen or bow up. Doc. 79-2, Tanner Depo., pg. 85, lines 15-25 and pg. 86 1-2.

15. In Defendants' SOF 43, Defendants stated: "Ziegenhorn could not see who was to his back and believed it was possible for Tanner to have someone within close proximity based on a previous conversation he had with a Searcy Police Officer. Ex. A, Ziegenhorn Depo., 65:11-15.
    **Response to Defendants' SOF 43:** The video shows that Ziegenhorn's back was not to a single person. Exhibit 9, Video Clip 9, from 1:42:02-1:42:40; PBSUMF ¶52. By loud, Ziegenhorn meant that Tanner had become loud enough to attract the attention of those around them in the Wal-Mart, not that Tanner was yelling at Ziegenhorn. Exhibit 4, Ziegenhorn Deposition, pg. 75, lines 18-20. Ziegenhorn claims Tanner "stiffened up," and Tanner's tone of voice changed from "normal to a higher pitch." Exhibit 3, Ziegenhorn Memos and OPS Interview, pg. 25. When asked what exactly Ziegenhorn was worried about Tanner doing, Ziegenhorn stated he did not know. Exhibit 4, Ziegenhorn Deposition, pg. 111, lines 19-25. Even

according to Ziegenhorn, the most danger he was in was the danger of being filmed. Exhibit 4, Ziegenhorn Deposition, pg. 65, lines 11 to 15. Although there is no evidence that Tanner has ever had anyone film him whilst open carrying, except that one guy that Ziegenhorn claims said that, who Ziegenhorn cannot even remember his name. Id, at Page 67, lines 11 to 16. The Searcy Police Report which Ziegenhorn had read previous to this interaction only had Tanner listed as being alone and carrying a firearm. Exhibit 3, pg. 15.

16. In Defendants' SOF 44, Defendant stated: "At this time, Ziegenhorn believed it was necessary to place Tanner in custody for his and the public's safety and to move the situation outside before it escalated. Ex. A, Ziegenhorn Depo., 65:16-24."
**Response to Defendants' SOF 44:** If that was Ziegenhorn's belief, there was no basis for it based on Plaintiff's response to Defendants' SOF 43.

17. In Defendants' SOF 73, Defendant stated, "Through Facebook's setting, posts or comments containing certain designated words are automatically blocked. Those words are: (1) jackass; (2) pig or pigs; (3) nigga or nigger; (4) ass; (5) copper; and (6) jerk. An administrator can add or remove words from this list. Ex. N, p. 4."
**Response to Defendants' SOF 73:** There is nothing in the evidence that shows this filter was activated at the time of Tanner's comments. See Plaintiff's Exhibit 2 (Doc. 76-2) where someone comments "dumbass."

18. In Defendants' SOF 74, Defendant stated, "Through Facebook's setting, ASP's Facebook page profanity filter is set to "strong" for its Facebook page. This setting can be set to off, moderate, or strong. Ex. N, p. 4."
**Response to Defendants' SOF 74:** No indication this was the case at the time. See response in Number 18.

19. In Defendants' SOF 76, Defendant stated, "The six comments Tanner made to ASP's Facebook page could have been removed for other violations of the Terms and Conditions. Ex. N, p. 4."

**Response to Defendants' SOF 76:** False, the ASP said all of the reasons for the deleting of the comments were because they were abusive and/or contained profanity.  Plaintiff's Exhibit 6 (Doc. 76-6).

20. In Defendants' SOF 78, Defendants stated:  "Most, if not all, of Tanner's comments could have been removed because they were not topically related to the particular ASP post to which he was commenting. Ex. N, p. 4."
**Response to Defendats' SOF 78:**  False. Plaintiff's Exhibit 6 (Doc. 76-6).

21. In Defendants' SOF 79, Defendants stated:  "Also, according to the Terms and Conditions, ASP does not allow the posting of photographs, videos, audio recordings, or link to other pages or websites by anyone other than ASP. Ex. N, p. 4. ASP requests Facebook users to submit the content to ASP through a private message if they want to share it with ASP or believe ASP would like to share it on ASP's Facebook page. Ex. N, pp. 4-5."
**Response to Defendants' SOF 79:**  The ASP allows links to other sites all the time. Technically, Drew's link was to the same website, Facebook. It is clear they did not allow this comment because it did not enhance the respect of the ASP. Also, they allow pictures, gifs, etc.  Doc. 76-2.

                                              Respectfully Submitted,
By:    /s/ W. Whitfield Hyman
           W. WHITFIELD HYMAN
           ABA# 2013237
           Attorney for Plaintiff
           King Law Group, PLLC
           300 N. Sixth Street
           Fort Smith, AR 72901
           479-782-1125 Phone
           479-316-2252 Fax
           Hyman@ArkansasLawKing.com

**CERTIFICATE OF SERVICE**

I, W. Whitfield Hyman, hereby certify that a true and correct copy of the foregoing instrument was served upon counsel of record, specifically Reid Adkins and William Bird of the Arkansas Attorney General's Office ***via electronic filing*** (CM/ECF) on this 3rd day of July, 2020.