**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**

**CENTRAL DIVISION**

**JAMES ANDREW TANNER**                                    **PLAINTIFF**

v. 4:17-cv-780-DPM

**KURT ZIEGENHORN in his**                                    **DEFENDANTS**
**individual capacity; and BILL**
**BRYANT, Colonel, in his official**
**capacity as head of the Arkansas**
**State Police**

**PLAINTIFF'S BRIEF IN SUPPORT OF HIS RESPONSE**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

A.      Ziegenhorn's Encounters with Tanner

There are six different sources to pull from when determining the facts of Tanner's arrests, in

chronological order of creation date they are: 1) Ziegenhorn's probable cause affidavit, 2)

Ziegenhorn's memos, 3) Ziegenhorn's testimony during an OPS interview as a response to

Tanner's citizen complaints, 4) Tanner and Ziegenhorn's sworn testimony during Tanner's

Concealed Handgun License Revocation Hearing (CHLRH), 5) Ziegenhorn's and the State of

Arkansas' responses to Interrogatories, and 6) Ziegenhorn's testimony during his deposition

taken for this case. Ziegenhorn admitted that his earlier recollections are more accurate than his

recollection at the deposition. Exhibit 4, Ziegenhorn Deposition, pg. 13, lines 18-25 to pg. 14

line 1. At all times relevant to this lawsuit, Ziegenhorn's primary assignment was to conduct

patrol and law enforcement operations in Woodruff County as a part of the Arkansas State

Police's Highway Patrol Division. Exhibit 6, Defendant State of Arkansas' Interrogatory

Response No. 18, pg 21. Ziegenhorn was assigned to Troop D, which consists of the counties of

Cross, Crittenden, Lee, Monroe, Phillips, Prairie, St. Francis, and Woodruff. Exhibit 6,

Defendant State Police Interrogatory No. 17, pg 20.

## FIRST ARREST OF DREW TANNER

Ziegenhorn had taken his annual leave and was not working on November 29th, 2014.

Exhibit 3, pg. 1 and 3; PBSUMF ¶19. On November 29th, Kurt Ziegenhorn was in the Searcy,

White County, Arkansas Walmart with his family. Exhibit 4, Ziegenhorn Deposition, pg. page 14

lines 2-4; PBSUMF ¶20. While there, Ziegenhorn saw a man later identified as Tanner openly

carrying a firearm. Exhibit 4,  Ziegenhorn Deposition, Pg. 14, lines 5-8; PBSUMF ¶21. Mr.

Tanner walked toward a center area between two aisles while Ziegenhorn observed Tanner from

afar. Exhibit 9 Video Clip 1. Tanner then walked diagonally away from Ziegenhorn between the

main two aisles and then became stationary at a display. See Clip 1 of Video. While at the

display, Tanner picked up an item with his left hand and was quickly approached by Ziegenhorn.

See Clip 1 of Video. Ziegenhorn did not remember initially lifting his shirt so that his badge

would be more visible because he thought Tanner might be law enforcement. Exhibit 4,

Ziegenhorn Deposition pg. 104 line 25, pg. 105 lines 1-8.

Ziegenhorn's gun was not visible but Ziegenhorn claims his badge was visible and clipped to his

right pocket. Exhibit 3, Ziegenhorn OPS Interview, pg 23, last paragraph. Ziegenhorn's badge is

not visible in the video. See Exhibit 9, Clip 1 of video. However, Ziegenhorn believes the badge

is visible at 10:51:50 in Exhibit 9 Clip 1. Exhibit 4, Ziegenhorn Deposition, pg. 95, lines 23-25,

pg. 96, lines 1-10. Tanner claims that the badge was not visible when Tanner was approached.

See Doc. 61, pg. 8, Paragraph 42. "At that time, there was nothing on Ziegenhorn's person visually identifying Ziegenhorn as a Trooper." Tanner Affidavit.

Regardless of which of the following versions of the story the Court believes, it is irrefutable that the following took place in 4 to 6 seconds. Exhibit 4, Ziegenhorn Deposition, Pg. 94, lines 19-25 to Pg. 95, lines 1-12, and Exhibit 9, Video Clip 1 from 10: 52: 29 to 10: 52: 35.

Ziegenhorn then asked Tanner which law enforcement department Tanner was with, Tanner responded that he was with nobody. Exhibit 3, Ziegenhorn OPS Interview, Pg. 19-20, and Exhibit 4, Ziegenhorn Deposition, Pg. 14 lines 14-18; PBSUMF ¶22. Ziegenhorn then demanded Tanner identify himself and demanded to see Tanner's identification. Exhibit 3, Ziegenhorn OPS Interview, pg. 20-21, Exhibit 3, Probable Cause Affidavit pg 11, Ziegenhorn 1st Memo pg. 9; PBSUMF ¶23.

This is where Ziegenhorn's story fractures depending on which source document you use to determine what happened. PBSUMF ¶24.  In each of these versions, it is irrefutable that Tanner's left hand contains an item he just picked up from a display and Ziegenhorn grabs onto Tanner's arm. Exhibit 3, pp. 9, 19-20; Exhibit 9, Video Clip 1; PBSUMF ¶25.

**Ziegenhorn Version 1**

Ziegenhorn never mentions that Tanner ever moved his hand in the direction of his firearm. See Exhibit 3, Probable Cause Affidavit, pg. 11. "I asked the subject what law enforcement department he was with, and the subject stated that he was with no one. I identified myself as Trooper Ziegenhorn with the Arkansas State Police and Asked him for his name and

ID. He refused and said that he didn't have to." Id. Ziegenhorn followed Tanner to the front door of the Walmart where they would later meet with Searcy PD. Id.

### Ziegenhorn Version 2

After being ordered to produce identification, Tanner allegedly let his hand come down to his side a little bit in the area of his firearm. See Exhibit 3, Ziegenhorn Memo pg. 9 and OPS Interview, Pg. 19-20. When Tanner's hand moved, Ziegenhorn grabbed Tanner's wrist and elbow in order to prevent Tanner from possibly reaching for the firearm. Exhibit 3, 1st Ziegenhorn Memo, pg. 9. Although Ziegenhorn had just demanded that Tanner produce identification and Tanner's left hand was full, Ziegenhorn still thought it necessary to stop the only free hand that Tanner could use to produce identification.

### Ziegenhorn Version 3

After being ordered to produce identification, Tanner allegedly told Ziegenhorn that he did not have to produce identification or give his name. Exhibit 3, Ziegenhorn OPS Interview, pg. 19-20. Then Tanner let his right hand come "down to his side a little bit" causing Ziegenhorn to grab Tanner's right wrist and elbow. Exhibit 3, Ziegenhorn OPS Interview, Pg. 19-20.

### SECOND ARREST OF DREW TANNER

On December 3rd, 2014 Ziegenhorn was only scheduled to work from 3:00 pm to 7:00 pm, and 8:00 pm to midnight. Exhibit 3, Ziegenhorn's Timesheet, pg. 2; PBSUMF ¶27. On

December 3rd Ziegenhorn went to Searcy to file for an affidavit warrant against Tanner for the events of November 29th, 2014. Exhibit 4, Ziegenhorn Deposition, pg. 58, Lines 2 - 19.

At 12:11 p.m. on December 3rd Ziegenhorn sent an email with a memo about the November 29th, 2014 incident to Greg Downs and Cora Gentry. Exhibit 3, pp. 8-10 (email from Ziegenhorn to Downs with attachments); PBSUMF ¶28. That email stated that on November 29th, 2014 Searcy Police Department had performed an ID check and found that Tanner did not have any current warrants. Exhibit 3, pp. 9-10 (Ziegenhorn memo about 11/29/2014); PBSUMF ¶29. Those Searcy officers informed Ziegenhorn that this was not their first encounter with Tanner. Id., and PBSUMF ¶30.  The other encounter with Tanner had a one-line report which read: "ESCORTING SUBJECT BACK TO HIS HOME SO HE CAN PROPERLY SECURE THE WEAPON." Exhibit 3, Searcy Police Report, p. 16.

At 9:37 a.m. on December 3rd, 2014, Ziegenhorn checked in with dispatch that he was headed to the White County Prosecutor's Office. Exhibit 3, Exhibit 3, p. 18; PBSUMF ¶31. The next time Ziegenhorn would check in on the radio was at 3:36 p.m. to let dispatch know he was headed to the Brinkley Office. Exhibit 3, p. 17; PBSUMF ¶32.

At approximately 1:50 p.m. on December 3rd, 2014, while in the Searcy Walmart again, Ziegenhorn saw Drew Tanner for the second time. Exhibit 3, Dec. 3rd Ziegenhorn Memo, Pg. 6, lines 1-3; PBSUMF ¶33. Drew Tanner is seen exiting his vehicle at approximately 1:35:30pm in Clip 13, and walks toward the Wal-Mart.  He is seen wearing a red shirt and what appear to be khaki cargo pants.  Clip 13 at 1:35:41; PBSUMF ¶34.  Ziegenhorn's vehicle is seen driving in front of Wal-Mart at 1:35:57 and Ziegenhorn exits his vehicle at exactly 1:36:40. Exhibit 4,

Ziegenhorn Deposition, pg. 101, lines 7-15 and Exhibit 9, Video Clip 11; PBSUMF ¶35.

Ziegenhorn claims he had just parked in the fire-lane to either pick up or drop off a pair of

glasses. Exhibit 4, Ziegenhorn Deposition, pg. 76, lines 12-15; PBSUMF ¶36. However,

Wal-Mart medical records show that Ziegenhorn actually arrived at the Wal-Mart Vision Center

on December 6th, 2014 to turn in the glasses, and Ziegenhorn's wife arrived on December 9th,

2014 to pick up the new pair. Exhibit 3, Ziegenhorn Medical Records, pg. 26 and 27; PBSUMF

¶37. Based on the security footage, and not coincidentally, Ziegenhorn arrives at the exact

Wal-Mart less than 10 seconds after Tanner, just mere hours after looking into a warrant for

Tanner, out of the way from his job assignment and more than 30 miles from his home. Exhibit

9, Video Clip 11, 13; Exhibit 4, Ziegenhorn Deposition, pg. 6; PBSUMF ¶38. Ziegenhorn had

never heard of Tanner having to be arrested or becoming violent with police officers prior to

Ziegenhorn's interactions with Tanner. Exhibit 4, Ziegenhorn Deposition, pg. 107, lines 1-11;

PBSUMF ¶39.

Ziegenhorn approaches the Wal-Mart entrance at approximately 1:37:04pm.  Exhibit 9,

Clip 12; PBSUMF ¶40.  At approximately 1:41:41pm, Tanner is seen waiting by the customer

service area in Walmart.  Id. at Clip 9, PBSUMF ¶41.  At 1:41:57pm, Ziegenhorn is seen

entering the customer service area where Tanner is waiting, less than five minutes from when he

approached the Wal-Mart entrance.  Id. at Clip 9, PBSUMF ¶42.  Ziegenhorn then approached

Tanner and asked Tanner for his ID and asked if Tanner was carrying a weapon. Exhibit 3, 2nd

Ziegenhorn Memo, pg. 6 at lines 4-5, Exhibit 4 Ziegenhorn Deposition at 69, 70; PBSUMF ¶43.

Tanner responded that he was not carrying a weapon at the time. Exhibit 4, at 69 and 70. Tanner

also contended that he did not have to show Ziegenhorn his identification. Id at lines 5-6,

PBSUMF ¶44.  According to Ziegenhorn, Tanner appeared to be becoming disorderly and to keep from having any confrontation in front of a large group of people inside a business, Ziegenhorn stated he restrained Tanner for officer safety. Id at lines 6-8. Ziegenhorn again asked for Tanner's identification card while he was in handcuffs and Tanner again refused. Id at lines 9-10. How Tanner was going to comply with the request to produce his identification card while handcuffed is unknown. Ziegenhorn then searched Mr. Tanner for an ID, found a wallet, opened it up, and inside was Tanner's Driver's License and CHCL permit inside of Tanner's wallet. Id., PBSUMF ¶45. Ziegenhorn ended his report that "It appeared to me that Mr. Tanner shows cynicism towards law enforcement and authority. His refusal to comply, references to the constitution, invoking silence in conversation, and his attempts to quote law were repetitive." Id at Pg. 2, lines 1-3, PBSUMF ¶46.

Ziegenhorn admitted that when he approached Tanner, Ziegenhorn referred to Tanner by name. Exhibit 4, Ziegenhorn Deposition, Pg. 65, lines 5-7, PBSUMF ¶47. Ziegenhorn asked Tanner if Tanner was armed, Tanner said he was not. Exhibit 4, Ziegenhorn Deposition, pg. 65, line 25, and pg. 66 lines 1-4, PBSUMF ¶48. Ziegenhorn testified that he could not exactly remember Tanner's response, but that Tanner's voice became elevated. Exhibit 4, Ziegenhorn's Deposition, pg. 65, lines 8-11. Ziegenhorn claims that he read a report from the Searcy Police Department about how Tanner carries a weapon and has someone else film him. Exhibit 4, Ziegenhorn's deposition, pg. 65, 11-15, PBSUMF ¶49. There are Searcy Department police reports about Tanner openly carrying firearms, however none of the reports mention that Tanner has another person film him, none of the reports indicate that Tanner was breaking any laws or disrespectful to law enforcement, and none of the reports ever indicate that Tanner carries his

firearm concealed. Exhibit 3, Searcy Police Reports pages 12-16; PBSUMF ¶50. At that point,

Ziegenhorn claims that because Ziegenhorn felt Tanner was becoming disorderly and because

Ziegenhorn's back was to a large crowd, he felt it would be safer to continue the interaction with

Tanner in handcuffs. Exhibit 4, Ziegenhorn Deposition, pg. 65, lines 16-24; PBSUMF ¶51.

However, the video shows that Ziegenhorn's back was not to a single person. Exhibit 9, Video

Clip 9, from 1:42:02-1:42:40; PBSUMF ¶52. By loud, Ziegenhorn meant that Tanner had

become loud enough to attract the attention of those around them in the Wal-Mart, not that

Tanner was yelling at Ziegenhorn. Exhibit 4, Ziegenhorn Deposition, pg. 75, lines 18-20.

Ziegenhorn claims Tanner "stiffened up," and Tanner's tone of voice changed from "normal to a

higher pitch." Exhibit 3, Ziegenhorn Memos and OPS Interview, pg. 25. When asked what

exactly Ziegenhorn was worried about Tanner doing, Ziegenhorn stated he did not know. Exhibit

4, Ziegenhorn Deposition, pg. 111, lines 19-25. Ziegenhorn did not know if Tanner had another

person behind Ziegenhorn and Ziegenhorn did not know if Tanner would have become violent.

Id. Ziegenhorn placed Tanner in Handcuffs because Ziegenhorn wanted to make sure Tanner was

not carrying a weapon and Ziegenhorn had learned that Tanner had previously been

confrontational with the Searcy Police Department. Exhibit 3, pg. 23. Ziegenhorn wanted to

control the situation and move it outside. Exhibit 3, pg. 24. Tanner had not yet become loud and

obnoxious. "There is no doubt in my mine [sic] he ***would have got*** loud, obnoxious, I mean, at

some point there and that's when I took immediate action, moved it outside, clear everybody

else." Exhibit 3, pg. 26, emphasis added; PBSUMF ¶53. Ziegenhorn testified that he could not

recall how he asked Tanner if Tanner was armed and for Tanner's concealed handgun license.

Exhibit 4, Ziegenhorn Deposition, Pg. 74, lines 2-8. Ziegenhorn also testified that his earlier

recollections of the arrest of Tanner are more accurate than his recollections during the deposition. Exhibit 4, Ziegenhorn Deposition, pg. 89, lines 10-14 ("It's the same story. As it goes on, I get older and forget.")

There is a video of the entire December 3rd, 2014 interaction between Tanner and Ziegenhorn. Exhibit 9, Video Clip 9. Ziegenhorn approaches Tanner at 1:42:02 p.m. and places Tanner in handcuffs by 1:42:40. Id. In the video, Tanner remains relatively still the entire time. See Plaintiff's Exhibit Video Clip 9 from 1:42:00-1:42:40; PBSUMF ¶54.  A crowd did not gather and it does not appear that a single additional person came to the area. Id. It appears as though maybe one woman looked over to see the conversation between Tanner and Ziegenhorn. Id at 1:42:12. However the woman could also have been just speaking to the person she was in line with as she made similar head and body movements prior to the officer's arrival. Id at 1:41:50-1:42:00.

Ziegenhorn never demanded Tanner's Concealed Handgun License before Ziegenhorn arrested Tanner on December 3rd, 2014. Exhibit 3, pg. 6-7, and 24-25; Exhibit 8; PBSUMF ¶55. In Ziegenhorn's memorandum about the incident Ziegenhorn does not mention asking for Tanner's Concealed Handgun Carry License at all. Id at 6-7. In Ziegenhorn's OPS interview, it is unclear if Ziegenhorn told Tanner that "I'd like to see your concealed carry permit," or just thought it to himself. Exhibit 3, pg. 22. Ziegenhorn could not recall how he asked about Tanner's Concealed Carry License. Exhibit 4, Pg. 74, lines 5-8. "Q. Okay.  So I'm just worried about what exactly was said before you started to restrain him and put cuffs on him. A. I believe it was -- I asked him if he was carrying and he said, "No, I'm not." Exhibit 4, Ziegenhorn Deposition, pg.

74 line 25, and pg. 75, lines 1-4. Telling a person that you would "like" to see something is not an order for that item to be produced. Ziegenhorn never claims that he told Tanner to quiet down, or anything similar in any of his various versions of the incident.

## LEGAL ANALYSIS OF SECOND TANNER ARREST

1.   Ziegenhorn did not have the authority to demand Tanner produce identification and arrest him for a second time on December 3rd, 2014 because Ziegenhorn did not have reasonable suspicion to believe that Tanner had committed or was about to commit the crime of Disorderly Conduct, and Ziegenhorn already knew who Tanner was.

2.   Ziegenhorn did not have probable cause or even arguable probable cause to arrest Tanner for the crime of Disorderly Conduct.

3.   Ziegenhorn did not have reason to believe that placing Tanner under arrest was necessary for officer safety.

"A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.' " *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011) (quoting *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)). An officer possesses probable cause to effectuate a warrantless arrest "when the totality of the circumstances at the time of the arrest 'are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.' " Id. at 523 (quoting *Fisher v. Wal-Mart Stores, Inc. et al.*, 619 F.3d 811, 816 (8th Cir. 2010)). Arguable probable cause exists if Tanner's arrest "was based on an objectively reasonable—even if mistaken—belief that the arrest was based in probable cause.*" Ulrich v.

*Pope Cty.*, 715 F.3d 1054, 1059 (8th Cir. 2013). Arguable probable cause provides law enforcement officers in a qualified immunity analysis "an even wider berth for mistaken judgments" than the probable cause standard affords a reasonable person. Id. Analyzing whether arguable probable cause exists "necessarily includes consideration of probable cause." Id. In other words, Ziegenhorn is protected by qualified immunity if a reasonable officer in his shoes would have reasonably believed, even if mistaken, based on objective facts, that Tanner was violating the disorderly conduct statute's excessive noise prohibition by raising his voice when answering Ziegenhorn's questions. No crowd gathered as a result of the interactions between Ziegenhorn and Tanner, traffic was not affected, no complaints were lodged by anyone in the community, business was not interrupted, nor were an officer's orders disobeyed. *Thurairajah v. City of Ft. Smith, Arkansas*, 925 F.3d 979, 984 (8th Cir. 2019).

Ziegenhorn already knew Tanner's name and Tanner answered all Ziegenhorn's questions. However, Ziegenhorn still arrested Tanner because he claims Tanner was "about to" become disorderly. Arkansas law on when an officer may detain someone is clear:

"This court has stated that encounters with police may be separated into three categories: The first and least intrusive category is when an officer merely approaches an individual on a street and asks if he is willing to answer some questions. Because the encounter is in a public place and is consensual, it does not constitute a 'seizure' within the meaning of the fourth amendment. The second police encounter is when the officer may justifiably restrain an individual for a short period of time if they have an 'articulable suspicion' that the person has committed or is about to commit a crime. The initially consensual encounter is transformed into a seizure when,

considering all the circumstances, a reasonable person would believe that he is not free to leave. The final category is the full-scale arrest, which must be based on probable cause." *Fowler v. State*, 371 S.W.3d 677, 680–81 (Ark. 2010)

The "crime" Ziegenhorn claimed Tanner was allegedly about to commit was Disorderly Conduct. The statute reads, in relevant part:

(a) A person commits the offense of disorderly conduct if, with the purpose to cause public inconvenience, annoyance, or alarm or recklessly creating a risk of public inconvenience, annoyance, or alarm, he or she:

(2) Makes unreasonable or excessive noise;

Ark. Code Ann. § 5-71-207.

Out of all the separate violations included in the catch-all "Disorderly Conduct," the only one that would make sense would be "makes unreasonable or excessive noise." Ark. Code Ann. § 5-71-207(a)(2). Tanner had not made unreasonable noise up until that point. How Ziegenhorn could have concluded that Tanner somehow would have made the future unreasonable or excessive noise with the purpose to cause public inconvenience, annoyance, or alarm based on his previous knowledge of Tanner and this incident is clear: Ziegenhorn had no basis for that assumption.

Under the regulations promulgated by the Arkansas State Police for concealed handgun license holders at the time of the arrest in 2014, Rule 3.2 provided the following:

"(a) While in possession of a concealed handgun, the licensee shall present the original license for inspection, along with an official form of photo identification, upon request for identification by any law enforcement officer.

(b) In any official contact with law enforcement is in possession of a handgun, when the officer asks the licensee for identification (driver's license, or personal information, such as name and

date of birth), the licensee shall notify the officer that he or she holds a concealed handgun carry license and that he or she has a handgun in his or her possession."

That regulation has since been updated and presently reads:

"(a) While in possession of a handgun, if a licensee is asked for identification (driver's license or personal information, such as name and date of birth) by any law enforcement officer, the licensee shall present the original license, or an electronic copy in an acceptable electronic format, for inspection, along with an official form of photo identification. The licensee shall also notify the officer that he or she holds a concealed handgun carry license and that he or she has a handgun in his or her possession.

(b) If the licensee IS NOT in possession of a handgun, when a law enforcement officer asks the licensee for identification (driver's license or personal information, such as name and date of birth), the licensee is not required to present the concealed handgun carry license or notify the officer that he or she holds a concealed handgun carry license." Code Ark. R. 130.00.8-3.2

Arkansas precedent declining to uphold a disorderly conduct charge is also illustrative. In *M.J. v. State*, the Arkansas Court of Appeals held that 20 seconds of public shouting involving foul language did not establish disorderly conduct. 381 S.W.3d 880, 883–84 (Ark. Ct. App. 2011). The entire December interaction between Ziegenhorn and Tanner only lasted less than 38 seconds before Ziegenhorn placed Tanner in cuffs. Exhibit 9, Video Clip 9, 1:42:00 to 1:42:38. Arkansas courts have followed this trend, and criminalize speech only when the circumstances indicate the necessary mens rea exists and the speech has a likelihood of inciting immediate violence. See *Johnson v. State*, 37 S.W.3d at 194 (affirming disorderly conduct conviction of defendant with known previous charge of assaulting a police officer who used profane language against law enforcement officers while "alternating between states of calm and irrationality . . . flailing his arms about, cursing loudly, and eventually demonstrating a violent demeanor.");

*Bailey v. State*, 972 S.W.2d at 245 (affirming disorderly conduct conviction of defendant who used profanity and also stood and grabbed law enforcement officer by the arm).

No reasonable officer would believe under the circumstances in this case that Tanner was disorderly or was about to become disorderly. Tanner stood there with his arms folded, and if the officer would have ended his questioning, Tanner would have likely stopped talking. See *Buffkins v. City of Omaha, Douglas County*, Neb., 922 F.2d 465, 472 (8th Cir. 1990) ("In addition, Buffkins' use of the word 'asshole' could not reasonably have prompted a violent response from the arresting officers . . . because police officers are expected to exercise greater restraint in their response than the average citizen.").

Tanner's Fourth Amendment right to be free from unreasonable seizure was clearly established at the time of his arrest. See *Pearson*, 555 U.S. at 232, 129 S.Ct. 808. "It was clearly established in 2013 'that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment.' " *Hoyland v. McMenomy*, 869 F.3d 644, 652 (8th Cir. 2017) (citing *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010) (per curiam)). No contrary precedent was issued between 2013 and December 2014, when Ziegenhorn arrested Tanner.

## Officer Safety

Even if Ziegenhorn had reasonable suspicion to detain Tanner (which he did not), he did not have the authority to do more than pat-down for weapons, searching Tanner's wallet was illegal. See *Shay v. State*, 562 S.W.3d 832, 834 (Ark. 2018). Even a pat-down for weapons would have been illegal because Ziegenhorn had no indication that Tanner was armed and dangerous. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Tanner had always openly carried a

firearm in his previous interactions with the police, Tanner had told Ziegenhorn he was not armed, and Tanner had no history of dangerous behavior. Ziegenhorn cuffed Tanner, forced him outside, searched him for his wallet, got the wallet, and then searched inside of the wallet. Ziegenhorn's stated reason for doing this was "officer safety," but it is clear no reasonable officer could believe that. Even according to Ziegenhorn, the most danger he was in was the danger of being filmed. Exhibit 4, Ziegenhorn Deposition, pg. 65, lines 11 to 15. Although there is no evidence that Tanner has ever had anyone film him whilst open carrying, except that one guy that Ziegenhorn claims said that, who Ziegenhorn cannot even remember his name. Id, at Page 67, lines 11 to 16. The Searcy Police Report which Ziegenhorn had read previous to this interaction only had Tanner listed as being alone and carrying a firearm. Exhibit 3, pg. 15.

The real reason Ziegenhorn arrested Tanner appears to be perfectly summarized by Ziegenhorn himself: "It appeared to me that Mr. Tanner shows cynicism towards law enforcement and authority. His refusal to comply, references to the constitution [sic], invoking silence in conversation, and his attempts to quote the law were repetitive." Exhibit 3, pg. 7. What Ziegenhorn has inadvertently described, and subsequently punished, is an informed citizen invoking his rights.

D.     ASP's Facebook Page

Terms and conditions have been posted since it's inception. False. Tanner's comments could have been removed for other violations of the Terms and Conditions. Ex. N, p. 4. False, they responded to the ROG differently.

**Factual Background**

This motion partially centers around Mr. Tanner's many Facebook comments on the Arkansas State Police Facebook page in February and March of 2016. Doc. 61; PBSUMF; Exhibit 8.  Mr. Tanner only has a physical record of six such comments. Doc. 61 at 2.  To date, Arkansas State Employees have either deleted or hidden from view all of Mr. Tanner's comments on the ASP Facebook page. Exhibit 6, pg. 1 and Exhibit 8.  Ultimately, Mr. Tanner was blocked from any participation in the ASP Facebook page. Exhibit 8, PBSUMF ¶14. Mr. Tanner contacted the Arkansas State Police administrators and informed them of the illegality of their actions in real time. Exhibit 1, pg. 1; PBSUMF ¶17. Further, Arkansas State Police employee Elizabeth Chapman wrote a memo to her superiors about the unconstitutionality of deleting or hiding Drew's comments. Exhibit 6, pg. 16; PBSUMF ¶18. Also, the official website of the Arkansas State Police directs people to contact the ASP directly on Facebook. See (Screenshot of https://asp.arkansas.gov/ bottom right).

### 1.   The First Deleted Comment

In February, 2016, the Arkansas State Police decided to recognize the promotion of one of their officers in a post on the Arkansas State Police Facebook page. Doc 61 at 3, PBSUMF ¶1.  The post read, in relevant portion: "The State Police Commission also approved the recommendations for promotion of four other State Troopers. Lieutenant Mike Foster was promoted to the rank of captain. Kennedy, 42, of Benton, is a twenty-two year veteran of the department. Captain Kennedy has devoted the past nine years of his career assigned to the department's training section and as assistant commander of the Arkansas State Police Administrative Services Division where he will continue in that role." Exhibit 1, pg. 43. Drew, a

follower of the page, recognized the name "Mike Foster" as one of the men who had conducted the internal investigation in response to Drew's complaints. Exhibit 8. This individual had investigated Drew's complaints regarding Ziegenhorn's hostile, harassing, and stalking behavior and determined that Ziegenhorn had done nothing wrong. Exhibit 8.

Frustrated by the public accolades of what he considered to be an unethical officer, Drew decided to take to social media in order to inform the public of the corruption within the ASP. Exhibit 8. Drew commented, "I have this guy's autograph. He supports crooked cops, so that makes him a crooked cop in my book. He needs to be held accountable as well if he is going to support the unlawful actions of his officers...[link to picture of document from ASP]... This guy sucks." Exhibit 1, pg. 3; PBSUMF ¶2. Tanner attached a link to a picture of the notice from the ASP to the comment. Id.  This comment was deleted by employees of the Arkansas State Police, Elizabeth Chapman or Mike Kennedy. Exhibit 6, pg. 1 and Exhibit 5, pg. 1, lines 5-10; PBSUMF ¶3.

The Arkansas State Police claim that "All of the reasons why" Drew Tanner's Facebook comments were deleted were because they were "Abusive comments and/or profanity in violation of the Arkansas State Police Facebook Terms and Conditions." Exhibit 6, pg. 1, ROG. 9. When asked if the Arkansas State Police had ever used a post containing profanity, they responded that they never have. Exhibit 6, pg. 22, ROG 22. However, the Arkansas State Police have used the word "sucks" in this context in one of their posts. Exhibit 1, pg. 16, PBSUMF ¶4. It is therefore impossible that the ASP genuinely holds the expression, "sucks," to be profanity. It is also equally unlikely that this use of "profanity" is why Drew's comment was deleted the

next day. Exhibit 8. Although Mr. Tanner was informed by a page administrator that he may repost his comment, Mr. Tanner did so and yet his subsequent identical comment was still deleted. Exhibit 8 and  Exhibit 1, pg 1; PBSUMF ¶5.

### 2.   The Second Deleted Comment

Drew's next deleted comment was under the following post on the ASP page dated Tuesday, March 1, 2016, relevant portions included:

"#learnthelawtuesdays The Arkansas State Police wants YOU to know the laws!! Every week, we will post an Arkansas statute and answer a few of the common questions that we get concerning that specific law. If you have questions about a certain law, or would like to know more, please ask us and we might use it on our new #learnthelawtuesdays! Today we are covering "impeding traffic" and the law that covers this issue. The law states that you must drive on the right side of the roadway, aka. the right lane. Some common questions that we receive concerning this law are: ... Impeding traffic falls under Arkansas Law: 27-51-301. Vehicles to be driven on right side of roadway..." Exhibit 1, pg. 4; PBSUMF ¶ 6.

Under that post, Drew commented: "Are you familiar with 5-54-122? Specifically (c)(1) D and E? At least one of your troopers committed this crime. You know who it is." Exhibit 1, pg. 4. A.C.A. 5-54-122 is the "Filing False Report with Law Enforcement Agency" statute. Subsection (c)(1) lists different ways you can violate the statute for it to be a class D felony. In that list is (D) which describes a violation where the intent of the person filing the false report has to be an attempt by the filer to cover up their own crime, and (E) which describes a violation where the false report has to lead to the arrest of another person. This comment was in reference to

Ziegenhorn's largely fabricated report against Mr. Tanner, and another public jab at the ASP's corruption. Exhibit 3, pg. 6-9. This comment was deleted by employees of the Arkansas State Police, Elizabeth Chapman or Mike Kennedy the next day. Exhibit 8, Tanner Affidavit and Exhibit 6, pg. 1; PBSUMF ¶7, 8. As there is no vulgarity nor profanity in this comment, the ASP must have objected to its content, deeming it "abusive." Exhibit 6, pg. 1; PBSUMF¶9.

### 3.   The Third, Fourth, Fifth, and Sixth Deleted Comments

Under a September 14th, 2016 post by the Arkansas State Police showing a recent class of Arkansas State Troopers, Mr. Tanner made the following comment at 7:03 p.m.: "Just don't be like that douche, Trooper Ziegenhorn." Exhibit 1, pg. 5, PBSUMF ¶10. Mr. Tanner quickly realized it had been deleted, so he made another comment that used different terms at 7:27 pm: "Just don't be like that fascist pig, Trooper Ziegenhorn." Exhibit 1, pg. 6; PBSUMF ¶11.  Frustrated that these comments had been deleted, he changed them one last time at 7:29 p.m.: "Just don't be like that fascist pig, Trooper Ziegenhorn, aka douchebag." Exhibit 1, pg. 7, PBSUMF ¶12. At 8:01 p.m., Mr. Tanner sent a private message to an administrator of the Facebook page telling them "go fuck yourself you fascist pig." Exhibit 1, pg. 2; PBSUMF ¶13. Mr. Tanner commented at 9:50 p.m.: "So handcuffing someone and detaining them without any probable cause, stealing from them, then letting them go is taught in this class, or is that something that DOUCHEBAG Ziegenhorn learned on his own?" Exhibit 1, pg 8. Shortly after this comment, Mr. Tanner was banned from participation in the Arkansas State Police Facebook page. Exhibit 8, Tanner Affidavit; PBSUMF ¶14.

Mr. Tanner contends there were no policies and procedures or terms and conditions for using the Arkansas State Police Facebook Page publicly available, and that he did not break any known "rules." Exhibit 8, Tanner Affidavit. Although the Defendant contends there were publicly available terms and conditions for participation in their Facebook page in their interrogatory, a slew of evidence proves otherwise. Exhibit 1, pg. 10, Way Back Machine pg. 14-42, and Exhibit 5, pg. 2-3 Sadler no "policies and procedures" for ASP Facebook page; PBSUMF ¶15.

The "Way Back Machine" is operated by Archive.org, a neutral nonprofit website intended to document the history of many websites. The "Way Back Machine" is a product of Archive.org that "crawls" websites and captures how they existed on the date they were "crawled." Exhibit 1, pg. 14-42, www.Archive.org. The "Way Back Machine" shows no reference to terms and conditions on the ASP Facebook Page by the date of Mr. Tanner's last comments. Id at pg. 14, 22. Rather, the Way Back Machine shows that approximately one month after Mr. Tanner's last comment, a reference to those terms and conditions can be seen. Id at 31.

Further, in the Defendant's own responses to a Request for Production of Facebook records for all of the information stored by Facebook about the Arkansas State Police Facebook Page on the dates Mr. Tanner's comments showed that no indication that "terms and conditions" OR policies and procedures existed on the page during the relevant times. Exhibit 9, "General Information" and "About." When asked to produce the Facebook policies and procedures in a FOIA request, the Arkansas State Police Public Information Officer Bill Sadler stated there were no responsive records. Exhibit 5, pg 2-3. Finally, the only dated "Terms and Conditions" of the Arkansas State

Police are dated as being *after* Mr. Tanner's comments were made. Exhibit 1, ASP Facebook Terms and Conditions, pg. 10.

These current "terms and conditions" provided are unconstitutional on their face and as applied to Tanner. "The Arkansas State Police reserve the right to restrict, remove, and/or block any person, group, or entity submitting and/or repeatedly submitting comment(s)/posting(s) contrary or inconsistent with the purpose of this page, not topically related to particular postings authorized by the Department, and/or that are in violating of the applicable terms and conditions." See Exhibit 1, ASP Facebook Terms and Conditions, pg 10. The "purpose" of the Facebook page is to "permit authorized employees of the Department to provide the public with information concerning the Arkansas State Police's mission, goals, programs, activities, events, news, stories, photographs, and videos and to disseminate other information and material intended to increase public awareness of and enhance respect for the Arkansas State Police and its members and employees.  See Exhibit 1, ASP Facebook Terms and Conditions, pg 10.

The Arkansas State Police's posts generally elicit many comments from members of the community and the ASP. See Exhibit 9, Timeline of Posts; PBSUMF ¶16; Also the Arkansas State Police Facebook page generally: www.Facebook.com/ArStatePolice. The ASP could have deleted all comments from users after they were published, yet, they did not. Exhibit 7, pg. 23 the Facebook Help Center https://www.facebook.com/help/www/297845860255949?helpref=faq_content. The ASP could have developed a viewpoint-neutral commenting and posting policy, however they failed to do that as well. Exhibit 1, pg. 9-13, ASP Facebook Terms and Conditions.

Instead, the ASP had no policies at the time of James Andrew Tanner's comments; rather, the available evidence points to an instituted policy *after* the initial complaint. Exhibit 1, pg. 10. Indeed, even the ASP's "terms and conditions" as written acknowledges that people have been allowed and will continue to be allowed to make comments on the ASP's posts in a variety of ways: "ALL COMMENTS submitted/posted to this page are actively monitored and reviewed by the Arkansas State Police. The Arkansas State Police reserve the right to restrict, remove, or delete any posting/comment that is contrary to and/or inconsistent with the purpose of the page or in violation of the applicable terms and conditions." ASP Facebook Terms and Conditions. Exhibit 1, pg 11.

We do know that positive "off topic" comments were indeed allowed. Exhibit 1, pg. 8 (A Facebook commenter invited all troopers to a random event). Many police departments that maintain a Facebook page describe their pages as "limited public forums." This description seems to be pervasive throughout most department Facebook pages, a cursory search revealed the following police department Facebook pages (and many more) that declared themselves to be "limited public forums." Exhibit 10, pg. 1-4. Jackson, Missouri Police Department page: https://www.facebook.com/JacksonMissouriPD/posts/1632519430172204 . The Georgia Tech Police Department Facebook page: https://www.facebook.com/GaTechPD/app/208195102528120/?ref=page_internal .The Highland Village, Texas Police Department Facebook page: https://www.facebook.com/pg/HighlandVillagePolice/about/?ref=page_internal

On Facebook, when a person comments on a post their portrait and name appear beside their comment. Exhibit 1, pg. 3. The speech of the person who made the comment is entirely inside a box and any user of the platform would know this, and a person who is not a user of the platform would most likely not be viewing a Facebook page. The ASP has since implemented a disclaimer in their current "Terms and Conditions" that states that the comments on the posts are not necessarily those of the ASP. Exhibit 1, pg. 9-13 Arkansas State Police Facebook Page Terms and Conditions.

The Arkansas State Police Facebook page can not even control what color or style of font the commenters write their comments in. Exhibit 7, pg. 3.  When typing a comment on the Arkansas State Police Facebook page, a commenter may choose from what appears to be hundreds of thousands of gifs (moving pictures) and "stickers." Exhibit 7, pg. 4. A Facebook page may not prevent comments on its posts, it can only delete or hide the comments after they have been made. Exhibit 7, pg. 23.

https://www.facebook.com/help/www/248844142141117/?helpref=hc_fnav . "While you can't disable comments on your Page's posts, you can hide or delete individual comments." *Id*. Facebook is a publicly traded private company. See: https://www.nasdaq.com/symbol/fb

Additionally, the Arkansas State Police do not even have final say over what may or may not be posted in the comments section of their own page. The Arkansas State Police "Terms and Conditions" acknowledge this: "By using or accessing Facebook and this page, you are, in addition to accepting the terms and conditions for use established by Facebook and the Arkansas State Police, also accepting the practices described in the Facebook Data Use Policy. For more

information on Facebook's Data Use Policy, go to http://www.facebook.com/policy.php."
Exhibit 1, pg. 13. The ASP does not have final control over who may comment or even be a user.
Tou cannot use Facebook if: You are under 13 years old. You are a convicted sex offender. They
previously disabled your account for violations of their terms or policies. You are prohibited
from receiving our products, services, or software under applicable laws. Exhibit 7, pg. 5-14.
https://www.facebook.com/legal/terms/update. Some of the content prohibited by Facebook
includes content that is considered hate speech, violence and graphic content, adult nudity and
sexual activity, sexual solicitation, or cruel and insensitive. Exhibit 7, pg. 15.
https://www.facebook.com/communitystandards/objectionable_content Id. That includes content
that depicts real people and mocks their implied or actual serious physical injuries, disease, or
disability, non-consensual sexual touching, or premature death. Id.

"The purpose of the Arkansas State Police Facebook page is to permit authorized employees of
the Department to provide the public with information concerning the Arkansas State Police's
mission, goals, programs, activities, events, news, stories, photographs, and videos and to
disseminate other information and material intended to increase public awareness of and enhance
respect for the Arkansas State Police and its members and employees. Please note that this is a
purposefully controlled online site established for this limited purpose." Exhibit 1, pg. 10

        However, over the past few years the Arkansas State Police Facebook page has actively
solicited input from their users to create non-pre-approved content in the comments of the page
hundreds of times. Exhibit 9, All ASP Facebook Information, 2015-2018 Timelines, Index;
PBSUMF ¶16. Their own "terms and conditions" outline how they anticipate governing how

people respond in the comments. Exhibit 1, pg. 10-13. Finally, Facebook itself describes Pages as a way for entities to have a multi-faceted interaction with users, which is much more than merely "disseminating information." Exhibit 7, pg. 1 and 21.

https://www.facebook.com/notes/facebook/facebook-tips-whats-the-difference-between-a-facebook-page-and-group/324706977130/. In the "Help Section" of Facebook, the portion concerning Pages starts off with the first subheading as how to "Like and Interact With Pages." Exhibit 7, pg. 24. https://www.facebook.com/help/1771297453117418/?helpref=hc_fnav. Disseminating information is for static websites, which the ASP already has. See http://asp.arkansas.gov/.

## The ASP Created a Forum

If the speech at issue is not "government speech" and the speech is in a space controlled by the government, the speech is occurring in one of four types of forums created by the government: traditional public forums, designated public forums, limited public forums, and nonpublic forums. See Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 484, 129 S. Ct. 1125, 1127, 1140, (2009). Once it has opened a limited forum the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not "reasonable in light of the purpose served by the forum… nor may it discriminate against speech on the basis of its viewpoint." Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 829, 115 S. Ct. 2510, 2517, 132 L. Ed. 2d 700 (1995). The type of forum created by the ASP is not important here, because the Plaintiffs have sufficiently plead viewpoint discrimination, which is impermissible in any of the forums created by a government entity. *Id*.

The Fourth Circuit has suggested that the government "of course" would open a forum for speech by creating a website that includes a " 'chat room' or 'bulletin board' in which private viewers could express opinions or post information," or that otherwise "invite[s] or allow[s] private persons to publish information or their positions." *Page v. Lexington Cnty. Sch. Dist. One,* 531 F.3d 275, 284 (4th Cir. 2008). Government Facebook pages are such websites. See: *Davison v. Loudoun Cnty. Bd. of Supervisors*, 267 F. Supp. 3d 702, 716 (E.D. Va. 2017).

## CONSTITUTIONALITY OF ASP FACEBOOK TERMS AND CONDITIONS

The "terms and conditions" fall short of the "viewpoint neutral" stance required by the Constitution. "As a general matter, the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Brown v. Entm't Merchs. Ass'n, 564 U.S. 786, 791 (2011) (citing Ashcroft v. Am. Civil Liberties Union, 535 U.S. 564, 573 (2002)). Certain narrow legal categories of speech, such as obscenity, defamation, fraud, incitement, and speech integral to criminal conduct, are not protected under the First Amendment. R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 383 (1992). Tanner's comments do not fall under any of those categories. "[S]peech on matters of public concern fall within the core of First Amendment protection." Knight First Amendment Inst. at Columbia Univ. v. Trump, 302 F. Supp. 3d 541, 565 (S.D.N.Y. 2018) ("Knight I") (citing Engquist v. Ore. Dep't of Agric., 553 U.S. 591, 600 (2008)). Additionally, as a general premise, "social media is entitled to the same First Amendment protections as other forms of media." Knight First Amendment Inst. at Columbia Univ. v. Trump, 928 F.3d 226, 237 (2d Cir. 2019) ("Knight II") (citing Packingham v. North Carolina, 137 S. Ct. 1730 (2017)).

Tanner's comments were deleted, and then Tanner was subsequently blocked from interacting in the ASP Facebook Page. There is nothing in the record to suggest that Tanner's comments belong to any of the categories not protected by the First Amendment.  As such, this Court must conclude that Tanner's comments and interaction with the ASP Facebook Page is protected speech.

As mentioned above, the type of forum at issue determines the applicable standards for when a government restriction amounts to a First Amendment violation. Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 800 (1985). Because this Court deems the interactive spaces of Facebook's comments section to be a public forum (Doc. 60), the following limits on constitutional government regulation of speech apply: "[t]he government may enforce a content-neutral time, place, and manner restriction only if the restriction is necessary to serve a significant government interest and is narrowly drawn to achieve that interest." Bowman v. White, 444 F.3d 967, 976 (8th Cir. 2006) (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983)).

Defendant Bryant's department blocking Tanner from participating in the ASP Facebook Page was neither content-neutral, necessary to serve a significant interest, nor narrowly drawn to achieve that interest.  Tanner was blocked after several comments criticizing ASP for corruption, undoubtedly a subject of public concern.  Based on the record in this case and undisputed material facts, the Court must conclude that Defendant Bryant and his employees blocked Tanner based on his expressive activity in critique of the ASP. Defendants' action in blocking Tanner is not content-neutral. Davison v. Randall, 912 F.3d 666, 687 (4th Cir. 2019) ("Viewpoint

discrimination is apparent, for example, if a government official's decision to take a challenged action was impermissibly motivated by a desire to suppress a particular point of view."); Cornelius. 474 U.S. at 812-13. Plaintiff's continued exclusion from the interactive space of Defendants' Facebook based on viewpoint is inconsistent with the First Amendment. The Court therefore must conclude that Tanner has established the deprivation of a constitutional right for purposes of his § 1983 claim.

"[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." Roe v. Humke, 128 F.3d 1213, 1215 (8th Cir. 1997). The "color of law" "inquiry is necessarily fact intensive," and requires the Court to find the existence of "a sufficient nexus exists between the official's public position and the official's harmful conduct." Ramirez–Peyro v. Holder, 574 F.3d 893, 900-01 (8th Cir. 2009). "The [color of law] element is satisfied if the defendant acts or purports to act in the performance of official duties, even if he oversteps his authority and misuses power." Johnson v. Phillips, 664 F.3d 232, 240 (8th Cir. 2011). With particular reference to issues arising under the First Amendment, "a challenged action by a governmental official is fairly attributable to the state when the sole intention of the official in taking the action was to suppress speech critical of his conduct of official duties or fitness for public office." Davison, 912 F.3d at 680 (citing Rossignol v. Voorhaar, 316 F.3d 516, 524 (4th Cir. 2003), cert. denied, 540 U.S. 822 (2003).

In this case, Defendants blocked Tanner after he posted comments criticizing ASP corruption. The Court has already determined the ASP Facebook Page is a public forum. Doc.

60. In the absence of evidence suggesting Defendants blocked Tanner for any reason other than to exclude comments critical of Defendants' role within/as a government agency, the Court must find that Defendants' actions were under color of state law. As such, Tanner has proven that Defendant violated his freedom of speech, and Plaintiff is entitled to summary judgment on these grounds.

## **Perjury**

Tanner's hands were stationary and did not move before Ziegenhorn grabbed Tanner's arm. Doc. 20-1, pg. 7-8, Notarized and Sworn Complaint signed by Tanner. Additionally, Mr. Ziegenhorn testified his badge was visible during this time and before the interaction, clipped just below his firearm. Id. However the badge was not visible until Mr. Ziegenhorn pulled it out after Drew backed away from Ziegenhorn. Id. Ziegenhorn also testified that when he identified himself as Kurt Ziegenhorn with the Arkansas State Police and asked Tanner for his ID that Mr. Tanner responded a "condescending sense" copping an attitude and saying, "I don't have to show you nothing," and at that point Drew dropped his right hand down and that Drew had his pistol on his right side. Id. Ziegenhorn testified that is what caused him to grab Tanner. Id. However, Ziegenhorn immediately grabbed Tanner after Tanner stated that he was not with any law enforcement agency, before stating that his name was Kurt Ziegenhorn, before stating "state police identify yourself," and before Tanner refused to identify himself. Id. In Doc. 51-5, Concealed Handgun Record page 8, Ziegenhorn says he saw Tanner's hand drop down.

Ziegenhorn testified again in his deposition that Tanner's hand began to drop down from his chest to his waist where the weapon was.  Ziegenhorn Deposition, Doc. 79-1, pg 5-6. Again in Ziegenhorn's Deposition, Doc. 79-1, pg 22-23, he says that after reviewing the Conceal

Handgun Testimony, he stands by what he has now testified to twice. He was given the opportunity to review his previous testimony for accuracy and still doubled down that that is what happened, However, in the video, the interaction is clear:  Tanner's arm does not move and Tanner does not even have time to react before Ziegenhorn grabs him.  Doc. 76-9, Clip 1 at around 10:52:35. Ziegenhorn testified that his Concealed Handgun License Revocation Hearing testimony, OPS Interview, and Memo would have been generally the same testimony he gave in District Court. Doc. 79-1, Ziegenhorn Deposition, pg. 87, lines 11-25.

Arkansas Code Annotated 5-53-101 defines a "False material statement" as "any false statement, regardless of its admissibility under the rules of evidence, which affects or could affect the course or outcome of an official proceeding or the action or decision of a public servant in the performance of any governmental function." Whether or not Tanner reached for his gun, or whether or not Tanner refused to identify himself prior to Ziegenhorn grabbing Tanner, or whether or not Ziegenhorn fully identified himself with a visible badge/full name, would all go to reasonable suspicion to detain someone and demand their identification under the Obstructing Governmental Operations statute. "[A]n officer may not arrest a suspect for failure to identify himself if the request for identification is not reasonably related to the circumstances justifying the stop." Stufflebeam v. Harris, 521 F.3d 884, 888 (8th Cir. 2008).

Respectfully Submitted,
W. WHITFIELD HYMAN                                King Law Group, PLLC
ATTORNEY FOR PLAINTIFF                            300 N. Sixth Street
By: /s/ W. Whitfield Hyman                        Fort Smith, AR 72901
W. Whitfield Hyman ABA# 2013-237                  479-782-1125 Phone
Attorney for James Andrew Tanner                  479-316-2252 Fax

Hyman@ArkansasLawKing.com

**<u>CERTIFICATE OF SERVICE</u>**

I, W. Whitfield Hyman, hereby certify that a true and correct copy of the foregoing instrument was served upon counsel of record, specifically Reid Adkins and William Bird of the Arkansas Attorney General's Office ***<u>via electronic filing</u>*** (CM/ECF) and the video on this 8th day of June 2020.