# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS

# CENTRAL DIVISION

| | | |
|---|---|---|
| **JAMES ANDREW TANNER** | | **PLAINTIFF** |
| v. 4:17-cv-780-DPM | | |
| **KURT ZIEGENHORN in his individual capacity and BILL BRYANT, Colonel, in his official capacity as head of the Arkansas State Police** | | **DEFENDANTS** |

## PLAINTIFF'S AMENDED AND SUBSTITUTED TRIAL BRIEF FOR JUDGMENT ON FREE SPEECH COUNTS

Plaintiff (hereinafter "Drew" or "Mr. Tanner") brought this action against Defendants in part when Arkansas State Police employees violated his federal and state free speech rights by hiding or deleting comments he made on the government-run and owned "Arkansas State Police" Facebook page, then going so far as to block him from participation on the page. For relief, Mr. Tanner seeks declaratory judgment that the policies and customs of the Arkansas State Police be declared unconstitutional both in form and in practice; injunctive relief to restore his comments and to unblock him from interacting with the website; and, for his attorney's fees and costs. A jury heard the matter from July 5th to 8th of 2021. Mr. Tanner now respectfully submits this brief advising the Court that Mr. Tanner must prevail in all fourteen (14) of his free speech counts against separate Defendant

Arkansas State Police (Hereinafter, "ASP" or "State Police" or the "State" or otherwise, "Fascist Pigs").

## Factual Background

In February, March, and September of 2016, Mr. Tanner's made many Facebook comments on the Arkansas State Police Facebook page. See Plaintiff's Trial Exhibits 2, 3, and 4. Those comments were hidden, blocked from view, or otherwise deleted by ~~Fascist Pigs~~ the ASP.

The first was a comment Drew made about Mike Foster. See Plaintiff's Trial Exhibit 2. For nine excruciating hours, Mr. Tanner awaited a decision when the ASP finally and benevolently dictated that they would allow him to repost his comment. See Plaintiff's Trial Exhibit 8, Conversation With ASP Facebook Administrator. However, no less than *four* (4) of Mr. Tanner's other comments appear to have been automatically blocked by what can be described as a "profanity filter" offered by Facebook and put in place by ASP Facebook Page Admin Corporal Chapman-Head.

This "profanity filter" has three possible settings: "weak," a middle strength setting, and "strong." At trial, Corporal Chapman-Head testified she had made the decision to turn on the profanity filter after attending a seminar. Corporal Chapman-Head, faced with three different possible outcomes, let her academy

training kick in and selected the most severe and attractive of the possible settings: "Strong." To further protect our children and the public safety, Corporal Chapman-Head added a few more words to the filter, including but not limited to: jackass, pig, pigs, copper, ass, and jerk. See Plaintiff's Trial Exhibit regarding page Settings, potentially Plaintiff's 18. While these words have multiple legitimate meanings and connotations outside of police fragility, their addition to this filter is a demonstration of just that.

Four of Mr. Tanner's comments contained the following words that were blocked by the profanity filter, those comments chronologically are:

1. Comment three contained the words "fascist pig." See Plaintiff's Trial Exhibit 4.
2. Comment four contained the word "douche." Id.
3. Comment five contained the words "fascist pig" and "douchebag." Id.
4. Comment six contained the word douchebag. Id.

The remaining comment, comment two, appears to have been deleted or hidden automatically when Mr. Tanner was blocked by the ~~Fascist Pig~~ASP Facebook page, as it did not contain profanity and Corporal Chapman-Head testified that she only affirmatively deleted comment one. See Plaintiff's Trial Exhibit 3.

Ultimately, Mr. Tanner was left to essentially pack up his laptop and go home. Much to his impotent scorn, Mr. Tanner was blocked from his constitutional right to troll government fascists on the ASP Facebook page. The jury found the impetus of The Blocking was when Mr. Tanner cursed at ASP Facebook Page Admin Mike Kennedy in a private message, something Mr. Tanner contends is not only his hobby but his right.

1. The First Deleted Comment

In February, 2016, the Arkansas State Police decided to recognize one of their own by publicizing his promotion in a post on the ASP Facebook page. The post read, in relevant portion: "The State Police Commission also approved the recommendations for promotion of four other State Troopers. Lieutenant Mike Foster was promoted to the rank of Captain. Foster, 42, of Benton, is a twenty-two year veteran of the department. Captain Foster has devoted the past nine years of his career assigned to the department's training section and as assistant commander of the Arkansas State Police Administrative Services Division where he will continue in that role." Plaintiff's Trial Exhibit 2.

Drew, an avid follower of the page and general hater of police corruption, recognized the name "Mike Foster" as one of the officers who had conducted an

internal investigation into Drew's complaints. Foster had determined that Ziegenhorn had done nothing wrong, much to Drew's chagrin.

Frustrated by the public accolades of what he considered to be an unethical officer, and fueled by Mountain Dew and The Truth, Drew decided to take to social media in order to inform the public of the corruption within the ASP. <u>See Plaintiff's Trial Exhibit 2</u>.  Like a warrior, his keyboard was his weapon.  Drew commented, "I have this guy's autograph. He supports crooked cops, so that makes him a crooked cop in my book. He needs to be held accountable as well if he is going to support the unlawful actions of his officers...[link to picture of document from ASP]... This guy sucks." <u>Plaintiff's Trial Exhibit 2.</u> Tanner attached a link to a picture of the notice from the ASP to the comment. <u>Id</u>**.**  According to Corporal Chapman-Head's testimony, the comment was deleted because the comment was "disrespectful."

### 2. <u>Third, Fourth, Fifth, and Sixth Deleted Comments</u>

Under a September 14th, 2016, post by the ASP showing a recent class of Arkansas State Troopers, Mr. Tanner made the following comment at 7:03 p.m.: "Just don't be like that douche, Trooper Ziegenhorn." <u>See Plaintiff's Trial Exhibit 4</u>. Mr. Tanner, no doubt repeatedly hitting the refresh button to see how many 'Likes' his sick burn had garnered, quickly realized it had been hidden from view.

Not to be outsmarted by stupid A.I., Drew made another sick burn with different terms at 7:27 pm: "Just don't be like that fascist pig, Trooper Ziegenhorn." Id. Mr. Tanner added one more comment, underscoring his poetic points about Ziegenhorn: "Just don't be like that fascist pig, Trooper Ziegenhorn, aka douchebag." Id.

Still agitated over half an hour later, at 8:01 p.m., Mr. Tanner sent a private message to an administrator of the Facebook page telling them "go fuck yourself you fascist pig." Plaintiff's Trial Exhibit 8. Frustrated that these sick burns had been removed, he added one more at 9:50 p.m., his wit exhausted and giving his last his all: "So handcuffing someone and detaining them without any probable cause, stealing from them, then letting them go is taught in this class, or is that something that DOUCHEBAG Ziegenhorn learned on his own?" Plaintiff's Trial Exhibit 4.  Though undoubtedly satisfied with himself, Mr. Tanner shortly discovered the sharp and instantaneous strike of the ASP Ban Hammer, as he was banned from future participation in the Arkansas State Police Facebook page.

### 3.   ASP Facebook Page's Terms and Conditions

"The Arkansas State Police reserve the right to restrict, remove, and/or block any person, group, or entity submitting and/or repeatedly submitting comment(s)/posting(s) contrary or inconsistent with the purpose of this page, not

topically related to particular postings authorized by the Department, and/or that are in violating of the applicable terms and conditions." See Plaintiff's Trial Exhibit 16. The "purpose" of the Facebook page is to "permit authorized employees of the Department to provide the public with information concerning the Arkansas State Police's mission, goals, programs, activities, events, news, stories, photographs, and videos and to disseminate other information and material intended to increase public awareness of and enhance respect for the Arkansas State Police and its members and employees." Id.  Mr. Tanner rests on his arguments made in Plaintiff's Motion for Summary Judgment previously filed with the Court.

## THE LAW REGARDING PRIOR PREVIOUS RESTRAINT

In Kunz v. New York, New York City adopted an ordinance that made it unlawful to hold public worship or meetings on the streets without first obtaining a permit from the city. Kunz v. People of State of New York, 340 U.S. 290, 71 S. Ct. 312, 95 L. Ed. 280 (1951). This permit system was an illegal prior restraint because it was content based. Id. The statute would have been lawful as long as the restrictions removed much of the discretion from administrative officials and the restrictions were not content based or discriminatory in who could use the space: "Although this Court has recognized that a statute may be enacted which prevents serious interference with normal usage of streets and parks...we have consistently

condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places." Kunz v. People of State of New York, 340 U.S. 290, 293–94, 71 S. Ct. 312, 315, 95 L. Ed. 280 (1951) (internal citations omitted).

In Southeastern Promotions, Ltd. v. Conrad, Chattanooga, Tennessee denied a musical troupe the use of a government facility from showing the controversial rock musical "Hair." Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 558–59, 95 S. Ct. 1239, 1246, 43 L. Ed. 2d 448 (1975). The directors of the facility denied the application because "Hair" involves nudity and obscenity on stage. Id.

Any system of prior restraint "comes to this Court bearing a heavy presumption against its constitutional validity." See Id and Bantam Books, Inc. v. Sullivan, 372 U.S., at 70, 83 S.Ct., at 639; New York Times Co. v. United States, 403 U.S., at 714, 91 S.Ct. 713; Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971); Carroll v. Princess Anne, 393 U.S. 175, 181, 89 S.Ct. 347, 351, 21 L.Ed.2d 325 (1968); Near v. Minnesota ex rel. Olson, 283 U.S., at 716, 51 S.Ct., at 631. The presumption against prior restraints is heavier and the degree of protection broader than even that against limits on expression imposed by criminal penalties. Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 558–59, 95 S. Ct. 1239, 1246, 43 L. Ed. 2d 448 (1975).

The rules regarding prior restraint apply to film, the postal service, live theater, and any public forum, including the ASP Facebook page:

"Although most of our cases have pertained to motion picture licensing or censorship, this Court has applied Freedman to the system by which federal customs agents seize imported materials...and to that by which postal officials restrict use of the mails... In Blount we held unconstitutional provisions of the postal laws designed to control use of the mails for commerce in obscene materials. The provisions enabled the Postmaster General to halt delivery of mail to an individual and prevent payment of money orders to him. The administrative order became effective without judicial approval, and the burden of obtaining judicial review was placed upon the user. If a scheme that restricts access to the mails must furnish the procedural safeguards set forth in Freedman, no less must be expected of a system that regulates use of a public forum." Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 560, 95 S. Ct. 1239, 1247, 43 L. Ed. 2d 448 (1975)

In Freedman v. Maryland, the Supreme Court held that the procedural scheme of the Maryland motion picture censorship statute failed to provide adequate safeguards against undue inhibition of protected expression since (1) if censor disapproved film, exhibitor was required to assume burden of instituting judicial proceedings and persuading court that film was protected expression, (2) once board had acted against film, exhibition thereof was prohibited pending

judicial review, however protracted, and (3) statute provided no assurance of prompt judicial determination. Freedman v. State of Md., 380 U.S. 51, 85 S. Ct. 734, 13 L. Ed. 2d 649 (1965).

In Se. Promotions, Ltd v. Conrad, the Court did not even evaluate whether or not the musical "Hair" was obscene, even though it had nudity and simulated sex acts performed on stage; the Court found a free speech violation in the procedures of the censorship alone, and narrowly tailored their decision to just that:

"The procedural shortcomings that form the basis for our decision are unrelated to the standard that the board applied. Whatever the reasons may have been for the board's exclusion of the musical, it could not escape the obligation to afford appropriate procedural safeguards. We need not decide whether the standard of obscenity applied by respondents or the courts below was sufficiently precise or substantively correct, or whether the production is in fact obscene...The standard, whatever it may be, must be implemented under a system that assures prompt judicial review with a minimal restriction of First Amendment rights necessary under the circumstances." Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 562, 95 S. Ct. 1239, 1248, 43 L. Ed. 2d 448 (1975).

In short, in order to have prior restraint there are steps you have to follow from Freedman v. Maryland:

1. The burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor or regulator.

2. Any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo.

3. A prompt final judicial determination must be assured.

## FIRST COMMENT LEGAL ANALYSIS

Mr. Tanner's comment was deleted for at least nine hours before he was informed that he could repost the comment. Compare Plaintiff's Trial Exhibit 2 to the timestamp on the conversation in Plaintiff's Trial Exhibit 8. The State may not exclude speech where its distinction is not "reasonable in light of the purpose served by the forum… nor may it discriminate against speech on the basis of its viewpoint." Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 829, 115 S. Ct. 2510, 2517, 132 L. Ed. 2d 700 (1995). Viewpoint discrimination is impermissible in any of the forums created by a government entity, and separate from the reasonableness standard. *Id.*

At least 9 hours of a comment being deleted is not a "de minimis" injury. If Mr. Tanner was detained for 9 hours, that would not be de minimis. If a newspaper was precluded from delivering it's newspapers for 9 hours, that would not be de minimis. If Mr. Tanner were told he could not say a specific phrase for 9 hours,

this would not be de minimis. Drew was basically blocked from contacting the police in his State on one of the largest most prevalent communication platforms in the world. If this action is allowed to stand without a declaratory judgment finding illegality, every government agent could lawfully delete every Facebook comment and merely change their mind only after being confronted about the deletion. This Court is incredibly lucky that Mr. Tanner was actually paying attention to whether or not his comment was deleted, otherwise this case would have slipped through the cracks.

### **THIRD COMMENT LEGAL ANALYSIS**

The word "pig" is automatically blocked by the ASP Facebook page profanity filter and was specifically added as a blocked word by Corporal Chapman-Head. See Plaintiff's Trial Exhibit about the ASP Facebook Page Settings (Trial Exhibit 18?) and Corporal Chapman-Head's testimony. The word "pig" is not only another name for a swine or hog, but also disparaging slang for a "police officer." See "pig" Merriam-Webster.com. Merriam-Webster, 2021. Web. 1 August 2021. The University of Arkansas mascot is a razorback boar, and the chant "Woo Pig Sooie!" is used at sporting events.

Automatically and indefinitely blocking comments with certain words in them violates the Freedman test. Freedman v. State of Md., 380 U.S. 51, 85 S. Ct.

734, 13 L. Ed. 2d 649 (1965). The burden of instituting judicial proceedings has been illegally placed on Mr. Tanner, as he filed this lawsuit several years ago. Proving that the material is unprotected under free speech illegally fell on Mr. Tanner at trial, but the Court must now shift that burden to the Defendant. The prior restraint was indefinite as these comments have been hidden for over five years. The final judicial determination was not prompt, as this case was filed in 2017.

It is clear from Cpl. Chapman-Head's testimony that the automatic blocking of words like "pig," "jerk," or "copper" is not "reasonable in light of the purpose served by the forum." <u>Rosenberger v. Rector & Visitors of Univ. of Virginia</u>, 515 U.S. 819, 829, 115 S. Ct. 2510, 2517, 132 L. Ed. 2d 700 (1995). Even though the terms and conditions and Cpl. Chapman-Head's testimony is that the "purpose" of the ASP Facebook page is to enhance the respect for the Arkansas State Police, that is not the purpose of the comments section underneath the posts. (The purpose of the Facebook Page is to "permit authorized employees of the Department to provide the public with information concerning the Arkansas State Police's mission, goals, programs, activities, events, news, stories, photographs, and videos and to disseminate other information and material intended to increase public awareness of and enhance respect for the Arkansas State Police and its members and employees." See Plaintiff's Trial Exhibit 16.) People are commenting to

communicate ideas with each other and the Arkansas State Police. Facebook requires that the user be 13 years old in order to create a Facebook account. See Plaintiff's Trial Exhibit 10. Most thirteen year old children are old enough to know the words Mr. Tanner used in his comments and come across far worse on the internet.

It is clear that the words "pig" and "copper" were banned because of their slang connotation to be anti-police. The Arkansas State Police placed a prior restraint on speech in a public forum that was viewpoint based, and viewpoint discrimination is never allowed. Davison v. Randall, 912 F.3d 666, 687 (4th Cir. 2019) ("Viewpoint discrimination is apparent, for example, if a government official's decision to take a challenged action was impermissibly motivated by a desire to suppress a particular point of view.")

## **FOURTH, FIFTH, AND SIXTH COMMENT LEGAL ANALYSIS**

Mr. Tanner's other comments that were automatically hidden contained the words "douche" and "douchebag" in addition to "pig." See Plaintiff's Trial Exhibit 4. The same prior restraint analysis applies to these comments as to the comment containing the word "pig." However, "douche" and "douchebag" were not blocked because of a word specifically added by an employee of the Arkansas State Police. "Douche" and "douchebag" appear to have

been blocked by the automatic profanity filter. For the interest of brevity, Plaintiff reasserts the same legal arguments here as were made regarding prior restraint about comment three. Corporal Chapman-Head testified that she did not know which specific words were in the filters. This itself is legally troublesome due to it's overbreadth.

The Court said that the Internet more closely resembles books and newspapers than TV or radio, and is therefore deserving of the utmost freedom from content regulation.  Reno v. Am. C.L. Union, 521 U.S. 844, 117 S. Ct. 2329, 138 L. Ed. 2d 874. The Court did so in finding the Communications Decency Act to be a violation of the First Amendment. Id.  The CDA had a provision that made it a crime to use any interactive computer service to display in a manner available to a person under 18 any communication that uses patently offensive language. The Court held that although there is a compelling interest to protect children, that does not justify an unnecessarily broad suppression of speech addressed to adults:

"It is true that we have repeatedly recognized the governmental interest in protecting children from harmful materials...But that interest does not justify an unnecessarily broad suppression of speech addressed to adults. As we have explained, the Government may not "reduc[e] the adult population ... to ... only what is fit for children."..."[R]egardless of the strength of the government's interest" in protecting children, "**[t]he level of discourse reaching a mailbox**

**simply cannot be limited to that which would be suitable for a sandbox**." … Reno v. Am. C.L. Union, 521 U.S. 844, 875, 117 S. Ct. 2329, 2346, 138 L. Ed. 2d 874 (1997) (**emphasis added**).

Since this is a content based restriction, the government could not rely on the time, place and manner arguments, because the Internet "unlike radio, receives full First Amendment protection; and cannot be properly analyzed as a form of time, place, and manner regulation because it is a content-based blanket restriction on speech" Reno v. Am. C.L. Union, 521 U.S. 844, 845, 117 S. Ct. 2329, 2332, 138 L. Ed. 2d 874 (1997). The Court found that the statute was unconstitutionally vague and overbroad. Id.

The Supreme Court developed a test in Ward v. Rock Against Racism for time, place, and manner restrictions on speech in government created public forums. Ward v. Rock Against Racism, 491 U.S. 781, 800, 109 S. Ct. 2746, 2758, 105 L. Ed. 2d 661 (1989). A portion of that test is that if there is a content based restriction, it has to be the least restrictive possible restriction and any state action based on content must be evaluated under strict scrutiny. ("such content-based restrictions on political speech "must be subjected to the most exacting scrutiny.) Ward v. Rock Against Racism, 491 U.S. 781, 800, 109 S. Ct. 2746, 2758, 105 L. Ed. 2d 661 (1989). (Ultimately, the Court held in Ward that volume restraints were

not a content based restriction, although Plaintiff's Counsel contends that volume is essential to rock & roll, contrary to the Supreme Court's assertions otherwise).

The testimony in this case was that there were three possible profanity filters: strong, medium, and weak. The Arkansas State Police chose the most restrictive filter, and by default, that is not the least restrictive. Corporal Chapman-Head testified that she does not have the time to read the hundreds of comments under the ASP Facebook posts. However, in order to have the least restrictive content based regulations, the ASP should have evaluated each comment individually to make the decision as to whether or not they could lawfully hide or delete the comment.

A comment containing a swear word is going to be inherently negative, and the comments under the posts by the Arkansas State Police are expected to be about the Arkansas State Police, therefore these restrictions are a de facto restriction on viewpoint. Even if this ban is considered a content based restriction as opposed to viewpoint, the court must evaluate the ban under strict scrutiny and the actions of the State must be the least restrictive possible. The actions taken here were not the least restrictive possible and were wholly unnecessary in light of the forum.

## SECOND COMMENT AND BLOCKING TANNER LEGAL ANALYSIS

Tanner's second comment did not contain profanity and was not automatically hidden, however it was inadvertently hidden or deleted when Mr. Tanner was banned from participation in the Facebook page. See Testimony of Corporal Chapman-Head. The jury found that Mr. Tanner was blocked from participation in the Facebook page because of his conversation with Mike Kennedy, and not because of the reason the Arkansas State Police provided in their response to interrogatories.

The conversation included the following relevant exchange found in Plaintiff's Trial Exhibit 8:

Mike Kennedy - "You are welcome to post any opinion you want. If you use profanity again I will ban you. There [sic] lots of families and children that follow our site. You may no [sic] care about them, we do."

Drew Tanner - "Go Fuck Yourself. Fascist Pig."

Drew Tanner - "My post now says "douchebag" you lawless jackasses."

The resulting ban was illegal. Police officers are held to a higher standard and cannot take adverse action against people for merely telling a police officer to go eff himself. See Houston v. Hill, 482 U.S. 451, 462, 107 S.Ct. 2502, 2510, 96

L.Ed.2d 398 (1986), Buffkins v. City of Omaha, Douglas Cty., Neb., 922 F.2d 465, 472 (8th Cir. 1990).

Mr. Tanner would not have his phone number legally blocked from calling a police station if this conversation had been over the phone. Mr. Tanner would not be arrested at the park for using this language during a protest against the police. Mr. Tanner could have been lawfully ignored, he had a right to petition his government through the communication system that the government had in place, and Mr. Tanner was illegally blocked from doing so, and subsequently had his comments removed and his participation in a different forum (the Facebook page) banned.

## CONCLUSION

Counsel will concede that this is not the most sophisticated case with the most sophisticated of facts.  But, it is important.  While at first glance we have a keyboard warrior trolling state employees on Facebook, it is more important than that.  These pages are controlled by police who disseminate information to the public on a platform where citizens expect to be able communicate, criticize, and praise freely.  The issue is not that the State picked the strongest of three filters, although that is also illegal, the issue is that the state instituted a language "profanity filter" at all.  The same people entrusted to carry out laws and perform

in the interest of public safety; the same people entrusted with tasers and guns and militarized weaponry simply cannot knee-jerk react by taking away rights when citizens hurt their feelings.  When police face no accountability, and feel entitled to take away rights when they are as easy as clicking a button, it is no wonder why Ziegenhorn was found to have committed no wrongdoing after the State Police investigated Drew's complaints, even though the civil rights violations were open and obvious.

W. WHITFIELD HYMAN
ATTORNEY FOR PLAINTIFF

By: ~~/s/ W. Whitfield Hyman~~
W. Whitfield Hyman
Attorney for James Andrew Tanner
King Law Group, PLLC
300 N. Sixth Street
Fort Smith, AR 72901
479-782-1125
479-316-2252 Fax
ABA# 2013-237
hyman@arkansaslawking.com

## CERTIFICATE OF SERVICE

I, W. Whitfield Hyman, hereby certify that a true and correct copy of the foregoing instrument was served upon counsel of record, specifically Reid Adkins and William Bird of the Arkansas Attorney General's Office ***via electronic filing*** (CM/ECF) on this 9th~~2nd~~ day of August 2021.