IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

JAMES ANDREW TANNER                                              PLAINTIFF

V.                          CASE NO. 4:17-CV-780-DPM

KURT ZIEGENHORN, ET AL.                                          DEFENDANTS

**DEFENDANTS' RESPONSE TO PLAINTIFF'S
POST-TRIAL MOTION FOR JUDGMENT AS MATTER OF LAW**

### I.   INTRODUCTION

On June 20, 2019, James A. Tanner ("Tanner") filed an Amended Complaint alleging the Arkansas State Police ("ASP"), through Colonel Bryant in his official-capacity, violated his First Amendment rights. (DE 61). A jury trial was held the week of July 6, 2021 and concluded on July 8, 2021. (DE 127,128, 129). After deliberations, the jury returned special verdicts. (DE 135). Importantly, the jury made fact findings concluding that ASP did not delete any of Tanner's Facebook comments because of the views he expressed. *Id.* Further, the jury concluded that ASP blocked Tanner from its Facebook page, not because of view he expressed in public comments, but because of what he said in private messages to page administrators. *Id*. Based on these findings, the Court requested post-trial briefing on certain First Amendment issues. (DE 136).

For the reasons stated below, Tanner's post-trial motion for judgment as a matter of law on his First Amendment claims should be denied, and this Court should dismiss ASP from this matter.

## II.    RELEVANT FACTUAL BACKGROUND

Tanner claims ASP violated his First Amendment rights when ASP allegedly hid or deleted several comments Tanner made on ASP's Facebook page and blocked him after an exchange through the private messaging feature of Facebook. (DE 61). Tanner further alleges ASP's use of certain Facebook filtering options constitutes a prior restraint on his rights under the First Amendment.

In November of 2015, ASP Corporal Elizabeth Head ("Head") created ASP's official Facebook page. Head and Captain Mike Kennedy ("Kennedy") were the only administrators of the ASP Facebook page during the relevant timeframe of Tanner's interaction with its page. It is undisputed that Facebook is a social medial platform owned and operated by Facebook, Inc. and that ASP does not own or control any actions taken by Facebook. In addition, ASP's Facebook page was subject to Facebook's terms of service.

At trial, Head testified that the primary purpose of ASP's Facebook page is to utilize the social media platform to disseminate information to the public. Additionally, at the time ASP's Facebook page was created, ASP created Terms and Conditions for its Facebook page, which have been posted to the page from its inception. *See* DE 135, p. 1. As provided in ASP's Terms and Conditions, the purpose of ASP's Facebook page "is to permit authorized employees of the Department to provide the public with information concerning the Arkansas State Police's mission, goals, programs, activities, events, news, stories, photographs, and videos and to disseminate other information and material intended to increase public awareness of and enhance respect for the Arkansas State

Police and its members and employees." *See* Plaintiff's Trial Exhibit No. 16. The Terms and Conditions further state that the Facebook page is for a limited purpose and is not a public forum. *Id.*

ASP's Facebook page is set where ASP is the only user able to post on its page. Facebook users other than ASP can only comment on existing ASP posts. However, to interact with ASP's Facebook page, an individual must first become a Facebook user. According to Facebook, not everyone can become a Facebook user. For example, individuals under the age of thirteen cannot create a Facebook account. *See* Plaintiff's Trial Exhibit 10. In addition, to be able to comment, a Facebook user must like and/or follow ASP's Facebook page. Facebook does not provide a Facebook page, including ASP's Facebook page, a feature to turn commenting off.

ASP utilized certain filtering features made available to it by Facebook. These features included an automatic profanity filter and a custom profanity filter. The Facebook automatic profanity filter has the following options: (1) off, (2) moderate, and (3) strong. ASP set this profanity filter feature to "strong." It is undisputed that a Facebook page administrator does not control which words are contained in the profanity filter feature. Head testified she has no idea what words are included in Facebook's automatic filter. ASP also added specific words to the Facebook custom profanity filter. It is undisputed that Facebook, not the page administrator, removes comments when the custom filter is utilized. In addition, based on Head's testimony at trial, Facebook does not provide a page administrator the ability to review comments before comments are blocked by the filter.

Tanner made six comments on the ASP Facebook page. (DE 137, pp. 2-4). The jury concluded that ASP did not delete any of these comments based upon the views expressed. The jury further concluded that Tanner was not blocked from ASP's Facebook page because of the content of these comments. Rather, the jury concluded ASP blocked Tanner because of a series of private messages Tanner sent to ASP page administrators. (DE 135, p. 1, ¶4). At trial, Kennedy testified that because of the profane and abusive private messages received from Tanner, he essentially "hung-up the phone" on him. The private message thread between Tanner and ASP that led ASP to block Tanner is as follows:

| | |
|---|---|
| **Tanner:** | Stop being fascist authoritarians. I don't care if you like what I say or not, I have the right to say it. |
| **ASP:** | You are welcome to post any opinion you want. If you use profanity again I will ban you. There lots of families and children that follow our site. You may no [sic] care about them, we do. |
| **Tanner:** | Go Fuck Yourself. Fascist Pig. |
| **Tanner:** | My post now says "douchebag" you lawless jackasses. |

After deliberating, the jury returned the following special verdicts relating to ASP's Facebook page and Tanner's interaction with it: (1) ASP's Terms and Conditions were adopted before Tanner's first comment; (2) ASP's Terms and Conditions were publicly available when Tanner posted his comments; (3) ASP did not delete any of Tanner's comments because of the views expressed in the comments; and (4) ASP blocked

Tanner from its Facebook page because of what Tanner said in the private messages. (DE 135, p. 1).

### III. ARGUMENT

A. <u>Tanner cannot establish that ASP engaged in viewpoint discrimination in violation of his First Amendment rights by deleting or filtering comments</u>.

Despite the jury's clear findings, Tanner continues to advance a viewpoint discrimination claim, alleging that the comments he made on ASP's Facebook page in 2016 were "hidden, blocked from view, or otherwise deleted by [ASP]." (DE 137, p. 2). Specifically, Tanner claims ASP: (1) subjected him to more than a de minis injury because of the amount of time between his first comment being deleted and the time he was informed he could repost the comment (DE 137, pp. 11-12); and (2) placed a prior restraint on his speech for comments three (3) through six (6) based on viewpoint discrimination (DE 137, pp. 14, 17). For comments three through six, Tanner claims ASP's use of the profanity filter and filtering of specific words via the custom filter should be considered a prior restraint on his speech and, therefore, violative of his First Amendment rights. (DE 137). However, based on the Special Verdict No. 1 (the "Verdict") issued by the jury on July 8, 2021, Tanner cannot establish ASP violated his First Amendment rights based on viewpoint discrimination.

*Comment No. 1*

First, Tanner asks this Court to issue a declaratory judgment finding that ASP violated his First Amendment rights based on viewpoint discrimination when it deleted his first comment but allowed him to repost it. (DE 137). Tanner claims ASP violated his

First Amendment rights based on viewpoint discrimination when he was forced to wait "nine excruciating hours" before he was informed that he could repost his first comment. (DE 137, p. 2). First, there is no evidence in the trial record that Tanner waited "nine excruciating hours" prior to reposting his comment. Tanner did not offer any such testimony at trial. Neither did any other witness or exhibit establish—or even suggest—that Tanner "waited nine excruciating hours" before being able to repost his comment. More importantly, the declaratory judgment sought by Tanner as to the first comment would directly contradict the clear finding of the jury that ASP did not delete any of Tanner's comments based on his views. (DE 135, p. 1, ¶3). For this reason, Tanner cannot establish ASP violated his First Amendment rights based on viewpoint discrimination for comment one.

*Comment Nos. 3 - 6*

Next, Tanner claims ASP violated his First Amendment rights with regard to comments three through six because of ASP's utilization of Facebook's provided filtering features. (DE 137, pp. 12-17). Tanner specifically claims comments three through six were blocked by the filters utilized by ASP because the comments contained the following words: (1) comment three – "fascist pig;" (2) comment four – "douche;" (3) comment five – "fascist pig" and "douchebag;" (4) comment six – "douchebag." (DE 137, p. 3).[1] Tanner

---

[1] ASP asserts that the jury did not make any specific findings as to whether a filter deleted all, or any, of comments three through six. The testimony and evidence at trial suggested two possibilities: 1) the comments were caught by a filter, or 2) the comments later disappeared when Tanner was blocked from ASP's Facebook page. To the extent Plaintiff asserts the evidence at trial established that a filter deleted any particular comment, the jury made no such finding.

claims that ASP's utilization of those features should be considered a prior restraint of protected speech based on viewpoint discrimination.

With regard to the automatic profanity filter, it is undisputed that ASP does not control which words fall within each category (i.e., moderate and strong); rather, Facebook establishes which words fall within the levels of the profanity filter. Additionally, based on the evidence presented at trial, Facebook, not ASP, automatically filters comments that contain words for the level set. Head further testified that she was unable to review comments filtered by Facebook's profanity filter. In his post-trial brief, Tanner claims comments four through six were "blocked by the automatic profanity filter." (DE 137, pp. 14-15). Tanner claims the use of the profanity filter by ASP constitutes viewpoint discrimination when the filter blocked comments four through six because they contained the words "douche" and "douchebag." *Id*. at 17.

The second feature provided by Facebook that ASP utilized was filtering of comments that contained specific words. Tanner claims ASP's utilization of this feature also violated his First Amendment rights because comment three, and potentially comment five, were automatically blocked when the comment(s) contained the word "pig." (DE 137, pp. 3, 12-14). Tanner argues ASP placed a prior restraint on his speech in a public forum that was based on viewpoint because of the filtering of comments that contained specific words. *Id*.

However, such determination would again be contradictory to the Verdict because such a finding would, in essence, conclude that ASP deleted those comments—via the Facebook filters—based on the views expressed in them. Such a finding is precluded by

the jury's responses in Special Verdict No. 1. During trial, the parties presented extensive evidence regarding ASP's utilization of the two filtering features provided to page administrators by Facebook. Even with that evidence, the jury found that ASP did not delete any of Tanner's comments based on the views expressed in them. In post-trial comments, the Court stated that it would construe Tanner's Complaint broadly enough to encompass the First Amendment issues presented by ASP's use of filtering. As stated, evidence concerning filtering was presented to the jury at trial. Consequently, the Court likewise should construe Special Verdict No. 1, Question Nos. 3 and 4, broadly enough to encompass the question of whether ASP's use of filtering constituted deleting/blocking based upon viewpoint discrimination. The jury's findings clearly indicate it does not. Consequently, ASP's use of the profanity filter and specific words it requested Facebook to filter out cannot constitute a violation of Tanner's First Amendment rights based on viewpoint discrimination.

Lastly, Tanner requests this Court to require ASP to adhere to the procedural safeguards for prior restraint of protected speech set out in *Freedman v. State of Md.*, 380 U.S. 51, 85 S.Ct. 734 (1965). The procedural safeguards in *Freedman* are as follows: (1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 227, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (citing *Freedman*, 380 U.S. at 58-60). However, those procedural safeguards have historically been applied to statutes or

ordinances that establish a scheme conditioning expression on a licensing body's prior approval of content. *See Freedman*, 380 U.S. 51; *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (Plaintiff challenged ordinance granting mayor authority to grant or deny applications for annual permits to place news racks on public property); *FW/PBS, Inc. v. City of Dalls*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (Plaintiff challenged zoning and licensing ordinance on First Amendment prior restraint grounds).

Here, Tanner has not challenged a statute or ordinance that could provide the procedural safeguards set forth in *Freedman*. Tanner has challenged ASP's utilization of features provided by Facebook. There are no facts present before this Court showing ASP would have the authority to establish a procedure requiring expeditious judicial review of a page administrator's decision to utilize a feature made available to it by the private company that owns and operates the social media platform. In *Packingham v. North Carolina*, the United States Supreme Court stated that it "must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks…" 137 S.Ct. 1730, 1736, 198 L.Ed.2d 273 (2017). In a concurring opinion, Justice Alito stated "[t]he Court is correct that we should be cautious in apply our free speech precedents to the internet…Cyberspace is different from the physical world…we should proceed circumspectly, taking one step at a time." *Id*. at 1744.

B. <u>Blocking Tanner from ASP's Facebook page did not violate his First Amendment rights.</u>

On September 22, 2020, this Court issued an Order stating "[t]he interactive section of [ASP's] Facebook page isn't government speech but is instead a designated public forum." (DE 97). In so holding, the Court cited to *Knight First Amendment Institute at Columbia University v. Trump*, 302 F.Supp.3d 541, 574 (S.D.N.Y. 2018), *aff'd*, 928 F.3d 226 (2d Cir. 2019). Since this Court's Order, the Supreme Court vacated the United States Court of Appeals for the Second Circuit's judgment in *Knight*, 928 F.3d 226, and remanded the case with instructions to dismiss the case as moot to the extent the Second Circuit held that President Donald Trump's, then President of the United States, social media platform was a public forum. *See Biden v. Knight First Amendment Institute at Columbia University*, 141 S.Ct. 1220, 209 L.Ed.2d 519 (2021).

In *Biden*, Justice Thomas issued a concurring opinion questioning the applicability of the First Amendment to privately-owned social media platforms. *Id*. at 1221-27. Justice Thomas stated that "the Second Circuit's conclusion that Mr. Trump's Twitter account was a public forum is in tension with, among, other things, our frequent description of public forums as 'government-controlled spaces.'" *Id*. at 1222 (citations omitted). Justice Thomas further stated that the First Amendment may not have applied to Trump's Twitter account because "unbridled control of the account resided in the hands of the private party" and "[w]hether governmental use of private space implicates the First Amendment often depends on the government's control over that space." *Id*. at 1222.

> For example, a government agency that leases a conference room in a hotel to hold a public hearing about a proposed regulation cannot kick

> participants out of the hotel simply because they express concerns about the new regulation. See *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 547, 555, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). But government officials who informally gather with constituents in a hotel bar can ask the hotel to remove a pesky patron who elbows into the gathering to loudly voice his views. The difference is that the government controls the space in the first scenario, the hotel, in the latter.

*Id*. at 1222.

Similar to Trump's Twitter account, unbridled control of ASP's Facebook page resides in the hands of a private party, Facebook. It is undisputed that Facebook is owned and operated by a private entity, and not by ASP. Tanner cannot dispute that Facebook users, including ASP, are subject to terms and conditions of Facebook. Tanner also cannot dispute that Facebook could remove ASP's Facebook page or his account at any given time. Additionally, at trial, Head testified that Facebook consistently changes the social media platform and that she has no control over the changes made by Facebook. Because such unbridled control rests with Facebook, holding ASP's Facebook page as a public forum runs contrary to the United States Supreme Court's frequent description of public forums as government-controlled spaces. *See Biden*, 141 S.Ct. at 1222. Here, the Court should follow the rationale set forth in Justice Thomas's concurrence and find ASP's Facebook page to be government speech.

Furthermore, this Court has not held that the First Amendment applies to the private messaging section of ASP's Facebook page. According to the Verdict, ASP did not block Tanner because of the views he expressed in his comments, but rather blocked him because of what he said in the private messages to ASP. (DE 135, p. 1, ¶4). Tanner attempts to argue that blocking him based on the private messages violated his First

Amendment rights because police officers would not have probable cause to arrest him "at the park for using this language during a protest against the police." (DE 137, p. 19). The case before this Court is not an instance where a police officer arrested an individual because of what that person said to the officer. At trial, Kennedy testified that he essentially hung the phone up on Tanner because of the private messages sent to ASP. *Smith v. Ark. State Highway Emp., Local 1315*, 441 U.S. 463, 465, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979) (holding, in part, "the First Amendment does not impose any affirmative obligation on the government to listen..."). The facts before this Court are akin to those of the conference room example used by Justice Thomas in *Biden*. Here, ASP essentially asked Facebook to block Tanner from its Facebook page because of what Tanner said in private messages. Facebook did so.

## V. CONCLUSION

For the above reasons, ASP respectfully requests this Court to dismiss Tanner's First Amendment claims against it.

                                                Respectfully submitted,

                                                LESLIE RUTLEDGE,
                                                Attorney General

By:     <u>Reid P. Adkins</u>
           Arkansas Bar # 2015216
           Assistant Attorney General
           Attorney for ADC Defendant
           323 Center Street, Suite 200
           Little Rock, Arkansas 72201
           Telephone: (501) 682-1080
           Fax: (501) 682-2591
           reid.adkins@arkansasag.gov

## CERTIFICATE OF SERVICE

I, Reid P. Adkins, hereby certify that on August 16, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of the filing to any participants.

By: <u>Reid P. Adkins</u>